UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>Abdiaziz Shafii Farah *et al.*,<br><br>　　　　　Defendants. | Court File No. 22-cr-124 (NEB/TNL)<br><br>**MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR CHANGE OF VENUE** |

Defendants Abdiaziz Shafii Farah, Mohamed Jama Ismail, Mahad Ibrahim, Said Shafii Farah, Abdiwahab Maalim Aftin, and Mukhtar Mohamed Shariff ("Defendants") individually and for the benefit of all Defendants, submit this memorandum in support of their Motion for Change of Venue. Due to the Government's actions, including holding multiple press conferences, the media attention in this case has been expansive and inflammatory. In particular, the Government's September 20, 2022 press conference—which included displaying what may be grand jury material to the public in violation of Federal Rule of Evidence 6(e)—was essentially a closing argument that primed the public to presume the Defendants guilty. The hundreds of media articles that followed have been just as or more inflammatory, concluding that the Defendants are guilty and stating allegations as fact, even though discovery in this case has demonstrated that many of the Government's statements are inaccurate. Public comments to these articles, many of which are alarmingly racist, demonstrate the degree to which the jury pool has been tainted.

The inflammatory media coverage, which was precipitated by the Government's statements, has primed the jury pool to find the Defendants guilty such that they will be unable to receive a fair trial in this District. Accordingly, Defendants respectfully request the Court transfer venue for the trial to the Northern District of Illinois.

## BACKGROUND

On January 11, 2022, the Government obtained search warrants for its investigation into allegations of federal child nutrition program fraud. *See* Declaration of Steven L. Schleicher in Support of Motion for Change of Venue ("Schleicher Decl."), Ex. A. On January 20, 2022 the Government filed a motion to unseal those search warrants, which was granted the same day. *See Id.*, Exs. B-C. On February 1, 2022, the order was amended to unseal the warrants, applications, and affidavits as well. *Id*. Ex. D. This spurred an initial flurry of media attention, including articles such as the creatively titled "Crook Bastard Nonprofits Took Pandemic Money, Put Fraud on Minnesota Food Programs, Allegedly." *Id*., Ex. E. Other inflammatory and prejudicial articles included one titled "'Outrageous' $197 million fraud scheme bought houses, cars and luxury goods instead of food for starving children." *Id*. Ex. F. Articles routinely report allegations as fact, claiming that the Government has "discovered a 'massive fraud scheme'" and routinely repeating the Government's statements that "[a]lmost none of this money was used to feed children." *Id*. Ex. G.

Then, on September 20, 2022, the Department of Justice issued a press release proclaiming that the Defendants had

> exploited a program designed to provide nutritious food to needy children during the COVID-19 pandemic. Instead, they prioritized their own greed, stealing more than a quarter of a billion dollars in federal funds to purchase luxury cars, houses, jewelry, and coastal resort property abroad.

*See* Schleicher Decl., Ex. H. That same day, the United States Attorney's office held an extensive press conference, the video of which remains available and accessible on The Justice Department's YouTube Page. *See* The Justice Department, *USAO-MN Announces Charges Against 47 Defendants in $250 Million Feeding Our Future Fraud Scheme*, YOUTUBE (Sept. 20, 2022), https://www.youtube.com/watch?v=lXBVWVnXJrg. In that press conference, the Government made sweeping claims about all of the defendants charged—many of which were simply not accurate with respect to these Defendants. *See, e.g.*, *Id*. at 7:00-7:14 ("[T]he defendants primarily pocketed the money for themselves. Spending little on food, staff, and logistics."). This press conference ignited a new flurry of media attention, including coverage of the public inflammatory comments by the Minnesota Governor suggesting that the judge in the Feeding our Future civil case should be investigated. Schleicher Decl., Ex. I. In a gubernatorial debate, the Governor, referring to the Defendants, said that he "doesn't want to 'jeopardize any opportunity to put these people in prison' while the federal investigation is ongoing." *Id*., Ex. J. Even the Minnesota Attorney General's office weighed in, releasing an extensive press release claiming that without the Attorney General's office "there would likely have been no federal investigation or indictments." *Id*. Ex. K.

Significant media attention has continued since then; a google news search for articles after the date of the January 11, 2022 search warrant reveals nearly a thousand

results for "Feeding our Future" with over a hundred results in the last month alone. Schleicher Decl. ¶ 13. Not only have articles remained inflammatory, reporting as fact the explosive and inaccurate allegations pulled from the Government's extensive press conference, but many public comments to those articles contain shocking and racist comments directed at the Defendants. For example, in response to an article published on March 13, 2022, commenters posted over a hundred racist comments, including that "the element of grifting [is] a virtue in Somali culture," "black lies matter" and "[c]an I hear a call for a stoning followed by a garroting?" *Id*., Ex. L. Comments on an Alpha News Article released the day of the Government's first press-conference likewise were filled with statements such as "[d]eport the Somalis . . . American jails are too good for these criminals!" and "[t]hese scammers are born with the ability to cheat, lie & steal! No rules when the victim is an Infidel! . . . Each should be tried, convicted, sentenced to long prison sentences (preferably Guantanamo) deported back to their shit holes on release, NEVER to live again in America!" *Id*. Ex. M. Sadly, these comments are not isolated and can be found on many, if not most, of the articles about this investigation which continue to be published to this day.

Meanwhile, the Government continues to hold press conferences, which lead to additional media coverage. *See, e.g.*, Fox 9 Minneapolis-St. Paul, LIVE: U.S. Attorney announcing more charges in Feeding Our Future fraud scheme, YOUTUBE (Mar. 13, 2023), https://www.youtube.com/watch?v=3YoTexedQr8. And the presence of the September 20, 2022 press conference on the Justice Department's YouTube Page constitutes on-demand republication of the statements made and documents displayed every single day.

# ARGUMENT

**I.      STANDARD**

The Defendants are entitled to a "fair[] [trial] in a public tribunal free of prejudice, passion, excitement, and tyrannical power." *Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966). That entitlement is precisely why the Federal Rules of Criminal Procedure provide that

> the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

Fed. R. Crim. P. 21(a). Rule 21 is discretionary, and as such this Court has broad discretion to determine whether Defendants have demonstrated sufficient prejudice to warrant transfer of venue.

Appellate courts have held transfer is <u>mandatory</u> where "pretrial publicity was so extensive and corrupting that a reviewing court is required to 'presume unfairness of constitutional magnitude.'" *United States v. Blom*, 242 F.3d 799, 803 (8th Cir. 2001) (quoting *Pruett v. Norris*, 153 F.3d 579. 585 (8th Cir. 1998)). Even if that standard is not satisfied, transfer may still be mandatory where "the voir dire testimony of those who became trial jurors demonstrated such actual prejudice that it was an abuse of discretion to deny a timely change-of-venue motion." *Id*. (reviewing for abuse of discretion). Here, pretrial publicity has been so extensive and corrupting that this Court can presume unfairness of constitutional magnitude. However, regardless of whether transfer is mandatory, it is within this Court's discretion to, and the Court should, order transfer under

5

Rule 21 because pretrial publicity has created so great a prejudice that that Defendants cannot obtain a fair and impartial trial in this District.

## II. TRANSFER OF VENUE IS REQUIRED DUE TO SIGNIFICANT GOVERNMENT-GENERATED UNFAIRLY PREJUDICIAL PRETRIAL PUBLICITY.

District Courts have wide discretion in determining whether change of venue based upon pretrial publicity is warranted, and consider factors including (1) the Government's culpability in generating pretrial publicity, (2) the extent of the media coverage and whether it is ongoing; (3) the objectivity of the media coverage; and (4) public opinion data. *See, e.g.*, *United States v. Rodriguez*, 581 F.3d 775, 785–86 (8th Cir. 2009) (discussing public opinion data); *United States v. Nelson*, 347 F.3d 701, 709 (8th Cir. 2003) (looking at time elapsed between crime and trial); *United States v. Allee*, 299 F.3d 996, 1000 (8th Cir. 2002) (considering the objectivity of news reports); *United States v. Blom*, 242 F.3d 799, 804 (8th Cir. 2001) (looking at extent, timing, and objectivity of reports); *United States v. Maldonado-Rivera*, 922 F.2d 934, 967 (2d Cir. 1990) ("In assessing the motion, the district court may take into account, inter alia, the extent to which the Government is responsible for generating the publicity."). The balance of these factors, and especially the Government's culpability in generating inaccurate and inflammatory publicity in violation of the federal rules of criminal procedure, warrants transfer of venue in this matter.

A. **The Government's Press Conference Violated Federal Regulations, May have Violated Federal Rule of Criminal Procedure 6(e) and Improperly Generated Significant Inflammatory Publicity.**

One of the major factors courts consider for transfer of venue related to publicity is "the extent to which the Government is responsible for generating the publicity." *See Maldonado-Riviera*, 922 F.2d at 967; *see also Sheppard v. Maxwell*, 384 U.S. 333, 361 (1966) ("The fact that many of the prejudicial news items can be traced to the prosecution, as well as the defense, aggravates the judge's failure to take any action."); *United States v. Burge*, No. 08 CR 846, 2009 WL 2386147, at *5 (N.D. Ill. July 29, 2009) (considering "whether the Government was responsible for the publication of the objectionable material"); *United States v. Jamieson*, 264 F. Supp. 2d 603, 605 (N.D. Ohio 2003) (explaining that the "source of the publicity" can be considered in the court's decision to grant or deny a rule 21(a) motion).

On September 20, 2022, the United States Attorney's office issued a press release and held a press conference to announce charges in its Feeding our Future investigation. *See* The Justice Department, USAO-MN Announces Charges Against 47 Defendants in $250 Million Feeding Our Future Fraud Scheme, YOUTUBE (Sept. 20, 2022), https://www.youtube.com/watch?v=lXBVWVnXJrg. There are specific guidelines for the release of information by DOJ personnel related to criminal proceedings. These rules were formulated because the availability information to the news media has become a "subject of concern in the administration of justice." 28 C.F.R. 50.2(a)(1). Accordingly, DOJ employees shall not "furnish any statement or information for the purpose of influencing the outcome of a defendant's trial… [or] furnish any statement or information, which could

7

reasonably be expected to be disseminated by means of public communication, if such a statement or information may reasonably be expected to influence the outcome of a pending or future trial." 28 C.F.R. 50.2(b)(2). The information that is authorized for disclosure is generally factual and non-inflammatory, including the defendant's name, age, residence, employment, marital status, and similar background information; the substance or text of the charge, such as a complaint, indictment, or information; the identity of the investigating and/or arresting agency and the length or scope of an investigation; the circumstances immediately surrounding an arrest, including the time and place of arrest, resistance, pursuit, possession and use of weapons, and a description of physical items seized at the time of arrest. *See* 28 C.F.R. 50.2(b)(3). "Disclosures should include only incontrovertible, factual matters, and should not include subjective observations. In addition, where background information or information relating to the circumstances of an arrest or investigation would be highly prejudicial or where the release thereof would serve no law enforcement function, such information should not be made public." *Id*. The September 20, 2022 press conference went well beyond these rules. The Government made arguments, statements of opinion, provided inaccurate information and improperly displayed documents.

For example, the Government's press conference featured a slideshow, during which on two separate occasions, the Government displayed "Summer Meal Counts" forms, and discussed the contents of those forms in detail:

8



*Id*. at 13:36.



*Id*. at 22:53. The Government subsequently produced those two forms in discovery. Upon review, it appears that those two forms are grand jury materials obtained pursuant to grand jury subpoenas and BATES labeled GJM-0000748 (signifying "Grand Jury Material") and

9

GJS-00382317 (signifying "Grand Jury Subpoena").[1] *See* Schleicher Decl. ¶ 16. If true, this disclosure violated not only the Department of Justice's own guidelines for the dissemination of information, *see* 28 C.F.R. 50.2(b)(2), but directly violated the Federal Rule of Criminal Procedure 6(e) prohibition on dissemination of grand jury materials to the public. Fed. R. Crim. P. 6(e)(2)(B) provides that an attorney for the Government must not disclose a matter occurring before the grand jury. Records, orders, and subpoenas relating to grand-jury proceedings must be kept under seal to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury. Fed. R. Crim. P. 6(e)(6).

Rule 6(e) "establishes a 'general rule of confidentiality for all matters occurring before the grand jury.'" *United States v. McDougal*, 559 F.3d 837, 840 (8th Cir. 2009) (noting the rule applies to all sealed grand jury materials). Rule 6(e) protects the integrity and legitimacy of the both the grand jury and subsequent criminal proceedings by preventing disclosure of secret materials to the public that could improperly taint the investigation and, ultimately, the jury pool.

Displaying <u>any</u> document or potential exhibit to the general public is problematic. "The possible exposure of jurors to such information that is not admitted could lead to grounds for reversal" in future possible appeals. *United States v. McNally*, 485 F.2d 398, 404 (8th Cir. 1973) (condemning a district attorney's release of medical information before

---

[1] During a meet and confer on May 3, 2023, undersigned counsel requested the Government disclose whether the two referenced documents were obtained outside of the grand jury process prior to September 20, 2022. The Government has not yet responded.

it was admitted into evidence at trial). Improperly publishing these documents to the public during a press conference served no purpose other than to taint the jury pool, requiring transfer in addition to other possible remedies deemed appropriate by the Court to prevent jurors from impermissibly using inadmissible evidence in their determination at the upcoming trial.

Compounding the prejudice, and using potential 6(e) material as a visual aid, the Government essentially delivered its closing argument and rebuttal, arguing: that "[n]o one participating in this . . . program legitimately would ever imagine that they could hire staff, purchase food, store food, handle the logistics involved in this process, make meals, serve them to children, and still make millions of dollars. It's not possible." *Id.* at 6:17-6:40. Defendants maintain their presumption of innocence and it is the Government's burden to *prove* knowing participation in a fraudulent scheme. The Government's blanket statement, however, serves to prime the jury pool for a "willful blindness" argument as a substitute for the lack of direct evidence connecting Defendants to a knowing participation in the alleged fraud. These statements, and indeed the entirety of the press conference, violated the Department of Justice's own regulations that prohibit making statements "concerning evidence or argument in the case" as well as statements as to "[a]ny opinion as to the accused's guilt . . . ." 28 C.F.R. 50.2(b)(6)(v-vi). This public closing argument provided the basis for the hundreds of news stories that would follow, and guaranteed that any prospective jurors in this district will repeatedly hear the Government's arguments before they ever enter the courtroom. At the very least, the Government should be precluded from making a willful blindness argument or obtaining a willful blindness instruction at trial.

In the live press conference, the Government also argued that "[h]ere, the defendants primarily pocketed the money for themselves. Spending little on food, staff, and logistics." *Id*. at 7:00-7:14. This statement is not accurate as to the Defendants herein, who in fact spend significant sums of money on food, staff, and logistics. The claim that they spent the vast majority of Government funds on luxury goods is unsupported. Nonetheless, the Government's public statements, both in the press conferences and unsealed warrant documents, spawned volumes of news articles reaching the same, consistent conclusion: that Defendants are guilty, and that they served little or no food. *See, e.g.*, *Id*. Exs. E-K. By placing these statements in the public domain, the Government spread a false narrative that has now primed the public to presume the Defendants' guilt.

**B.     The Media Coverage in this Case is Extensive and Ongoing.**

There may be a "presumption of inherent prejudice" when media coverage is so extensive, "inflammatory or accusatory as to presumptively create 'a trial atmosphere that had been utterly corrupted by press coverage.'" *Blom*, 242 F.3d at 804. Courts consider whether there has been a "substantial delay between the criminal act and the trial" when determining whether a "presumption of inherent unfairness" exists requiring transfer. *United States v. Nelson*, 347 F.3d 701, 709 (8th Cir. 2003) (finding that "media coverage decreased significantly to the point of vanishing" between the time of the crime and the time of trial). Here, a google news search for articles published after the date of the January 11, 2022 search warrant reveals nearly a thousand results for "Feeding our Future" with over a hundred results in the last month alone. Schleicher Decl. ¶ 13. The Government has held multiple press conferences, one recently, and stated that there are more to come. *See*

12

The Justice Department, USAO-MN Announces Charges Against 47 Defendants in $250 Million Feeding Our Future Fraud Scheme, YOUTUBE (Sept. 20, 2022), https://www.youtube.com/watch?v=lXBVWVnXJrg; Fox 9 Minneapolis-St. Paul, LIVE: U.S. Attorney announcing more charges in Feeding Our Future fraud scheme, YOUTUBE (Mar. 13, 2023), https://www.youtube.com/watch?v=3YoTexedQr8. It is clear from the thousands of articles, repeated press conferences, and hundreds of recent articles that media coverage of this case will not die down, and is likely to expand once trial approaches.

Although some time has passed since the execution of the Government's search warrants, and more will likely pass before trial, it is clear that the Government's repeated public statements are working, and media coverage of this investigation will only intensify before trial. Just as coverage explodes every time the government holds a press conference, media coverage will continue and expand the closer this case moves to trial. The extensive and ongoing nature of media coverage in this case creates a presumption of inherent prejudice based upon the pervasiveness of inflammatory and accusatory public statements by the Government and media coverage that follows. This warrants transfer of venue outside of Minnesota, where the public is not so saturated with news articles and statements from federal and elected state officials unequivocally claiming Defendants' guilt.

### C. Media Coverage has Not Been Objective and has Presumed Defendants Guilty.

"[I]nflammatory publicity" can create an environment where "jurors cannot help but feel the pressures of knowing that friends and neighbors have their eyes upon them" resulting in inherent prejudice to a defendant. *See Estes v. Tex.*, 381 U.S. 532, 545 (1965);

13

*Maxwell*, 384 U.S. at 363 (reversing based upon "inherently prejudicial publicity which saturated the community"). This is especially true when media coverage is not "largely factual in nature." *Murphy v. Florida*, 421 U.S. 794, 802 (1975). Here, the Government generated massive coverage, which continues as the Government holds additional press conferences, generating media coverage that conclusively presumes Defendants guilty and reiterates the factually inaccurate statements made during the Government's first press conference.

Far from reporting pure facts and allegations, many of the hundreds of articles published every month heavily reference the Government's statement that "[a]lmost none of that money was used to feed children." Schleicher Decl. Exs. E-G. The Government's press release stated these allegations as if they were fact, quoting the United States Attorney as saying that "[t]hese defendants exploited a program designed to provide nutritious food to needy children during the COVID-19 pandemic." *Id*., Ex. H. Defendants obviously contests these claims, which are mere allegations and, Defendants contend, not representative of the evidence which will be presented at trial. Media coverage has, however, been as one-sided as the Government's press releases because the media has only been exposed to the Government's one-sided opinions. Unlike the Government, Defendants have not held press conferences or released documents to the media. Nor do they plan to do so—the discovery documents were provided pursuant to the Court's protective order.

As was identified in *Estes*, these false, inflammatory statements have inherently prejudiced defendants, requiring transfer to a venue where these statements have not been

14

so pervasive a part of the news cycle such that jurors will not "feel the pressures of knowing that friends and neighbors have their eyes upon them."

### D. Public Comments On News Stories Have Been Inflammatory, Demonstrating the Need for Transfer.

Courts look to public opinion data, including public comments, when assessing whether public opinion is unfairly prejudiced towards guilt. *See, e.g.*, *United States v. Petters*, No. 08-cr-364 (RHK/AJB), 2009 WL 3430133, at *2 (D. Minn. Oct. 16, 2009) (finding in that case that "[a] few derogatory comments" were not enough to indicate substantial prejudice). Although Defendants have not yet undertaken the significant effort and expense of public opinion polling, the public commentary sufficiently demonstrates that the potential jury pool in the District has been inflamed and the Defendants would be unable to receive a fair trial. This goes far beyond the "few derogatory comments" in *Petters*, and constitutes hundreds of inflammatory comments on individual articles. Many commenters focus primarily on the Somali heritage of the Defendants, making racist claims that "the element of grifting [is] a virtue in Somali culture," and that the Defendants are "scammers" who were "born with the ability to cheat, lie & steal!" *See* Schleicher Decl. Exs. K, L. They also focus on extreme punishments for the Defendants, including "stoning followed by a garroting," deportation "back to their shit holes," and "sentenc[ing] to long prison sentences (preferably Guantanamo) . . . ." *Id*. Exs. L, M.

These comments sections provide just two examples of public comments on the more than one thousand articles that discuss the Feeding our Future investigation. Many articles contain similar commentary, demonstrating the extent to which the extensive

15

coverage based upon the Government's accusatory public statements has poisoned public sentiment against the Defendants. Whereas in *Petters* the Government publicly stated that his victims were only his investors, here multiple federal and elected state officials have repeatedly told Minnesotans, and indeed all Americans, that they as taxpayers are victims of Defendants' alleged wrongdoing, as well as, of course "needy children." *Id*. Ex. H. This has deeply prejudiced the jury pool against Defendants, presumptively warranting transfer.

### III.     THE NORTHERN DISTRICT OF ILLINOIS IS AN APPROPRIATE VENUE FOR TRANSFER.

This Court has broad discretion to determine which "less prejudicial district" is appropriate for transfer of venue. *See United States v. Angiulo*, 497 F.2d 440, 441 (1st Cir. 1974). When assessing where to transfer, courts generally consider locations that are outside the zone of the case's negative media coverage, in a larger city, with convenient flights and lodging options, and the capacity to take on additional cases. *See United States v. Moody*, 762 F. Supp. 1485, 1490 (N.D. Ga. 1991) (citing *United States v. Dioguardi*, 428 F.2d 1033, 1039 (2d Cir. 1970). Here, there has been national media coverage of this case but state and local media outlets outside of Minnesota have far less extensively reported on this story. Looking at places with larger populations, outside of Minnesota, with convenient flights and capacity, Defendants recommend that the Court transfer this case to the Northern District of Illinois which would satisfy those appropriate considerations. *See, e.g.*, United States Courts, Federal Judiciary Caseload Statistics, Comparison of Districts (March 31, 2022), https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distcomparison0331.2022.pdf. Transfer to the

Northern District of Illinois would be convenient for all parties, while mitigating some of the significant prejudice caused by the Government's press conferences and disclosures, and the significant inflammatory prejudicial news coverage that followed. Although news articles on the case are available nation-wide, there is no question that articles have been most widely released and consumed in Minnesota, and elected officials of other states have not publicly commented on this investigation in the same way that those in Minnesota have. Therefore, due to its convenience and amenability to transfer, the Northern District of Illinois would be an appropriate venue for transfer.

## CONCLUSION

For all of these reasons, Defendants respectfully requests the Court order that venue be transferred to the Northern District of Illinois for trial.

Respectfully submitted,

Dated: May 4, 2023                                    **MASLON LLP**

By: */s/ Steven L. Schleicher*
    Steven L. Schleicher (#0260587)
    Clayton J. Carlson (#0401182)
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-4140
(612) 672-8200
Email:   steve.schleicher@maslon.com
             clayton.carlson@maslon.com

**ATTORNEYS FOR DEFENDANT SAID SHAFII FARAH**

17

Dated: May 4, 2023                     **BIRRELL LAW FIRM PLLC**


By: */s/ Ian S. Birrell*
    Andrew S. Birrell (#133760)
    Ian S. Birrell (#0396379)
333 South 7th Street, Suite 3020
Minneapolis, MN 55402
(612) 238-1939
Email:  andy@birrell.law
         ian@birrell.law

**ATTORNEYS FOR DEFENDANT ABDIAZIZ SHAFII FARAH**

Dated: May 4, 2023                     **SIEBEN & COTTER PLLC**


By: */s/ Patrick Cotter*
    Patrick Cotter (#0319120)
105 Hardman Ct., #110
South St. Paul, MN 55075
(651) 455-1555
Email:  patrick@siebencotterlaw.com

**ATTORNEYS FOR DEFENDANT MOHAMED JAMA ISMAIL**

Dated: May 4, 2023                     **MAUZY LAW FIRM**


By: */s/ William Dooling*
    William J. Mauzy (#68974)
    William R. Dooling (#0402244)
650 Third Avenue South, Suite 260
Minneapolis, MN 55402
(612) 504-5533
Email:  wmauzy@mauzylawfirm.com
         wdooling@mauzylawfirm.com

**ATTORNEYS FOR DEFENDANT MAHAD IBRAHIM**

Dated: May 4, 2023                    **KOCH & GARVIS, LLC**


By: */s/ Andrew S. Garvis*
    Andrew S. Garvis (#257989)
3109 Hennepin Avenue South
Minneapolis, MN 55408
(612) 827-8101
Email:   andrew@uptownlawyer.com

**ATTORNEYS FOR DEFENDANT**
**ABDIWAHAB MAALIM AFTIN**

Dated: May 4, 2023                    **GOETZ & ECKLAND P.A.**


By: */s/ Frederick J. Goetz*
   */s/ Andrew H. Mohring*
    Frederick J. Goetz (#185425)
    Andrew H. Mohring (#190731)
Banks Building
615 1st Avenue NE, Suite 425
Minneapolis, MN 55413
(612) 874-1552
 Email:   FGoetz@goetzeckland.com
        amohring@goetzeckland.com

**ATTORNEYS FOR DEFENDANT MUKHTAR**
**MOHAMED SHARIFF**