UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-124(2) (NEB/DTS)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) **GOVERNMENT'S RESPONSE TO** ) **DEFENDANT'S POSITION** ) **REGARDING SENTENCING** |
| MOHAMED JAMA ISMAIL, | ) ) |
| Defendant. | ) |

The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Joseph H. Thompson, Harry M. Jacobs, Matthew S. Ebert, and Daniel W. Bobier, Assistant United States Attorneys, submits the following response to defendant Mohamed Ismail's sentencing memorandum.

**I.   BACKGROUND**

During the Covid-19 pandemic, while most Americans were coming together to ensure the health and safety of their communities, defendant Mohamed Ismail and his co-conspirators enriched themselves by carrying out a fraudulent scheme to obtain nearly $50 million in federal child nutrition program funds. To this day, Ismail has not expressed any remorse for his crime. Indeed, in his sentencing memo, he downplays the significance of his crime and attempts to portray himself as an immigrant entrepreneur who overcame adversity to achieve success in the United States and as someone who has had a positive impact on his community. In reality, Ismail has done untold damage to the state of Minnesota. His actions have called into

question the ability of the state to continue its tradition of providing a generous social safety net to those in need. Through his scheme, Ismail enriched himself and his co-conspirators. He stole money from taxpayers—money intended to feed children. He sent hundreds of dollars of fraud proceeds abroad, beyond the reach of American law enforcement. That money still awaits him upon his release. In short, this is an outrageous crime deserving of a significant sentence.

## II.     THE PSR CORRECTLY FOUND THAT THE LOSS WAS MORE THAN $25 MILLION

Guidelines section 2B1.1 provides that the loss amount is "the greater of the actual loss or intended loss." Guidelines § 2B1.1(b)(1), app. Note. 3. The government must prove the intended loss by a preponderance of the evidence. *United States v. Holthaus*, 486 F.3d 451, 454 (8th Cir. 2007). "The district court's method for calculating the amount of loss must be reasonable, but the loss need not be determined with precision." *United States v. Hodge*, 588 F.3d 970, 973 (8th Cir. 2009) (quoting *United States v. McIntosh*, 492 F.3d 956, 960–61 (8th Cir.2007)). "Because the damage wrought by fraud is sometimes difficult to calculate, a district court is charged only with reasonably estimating the loss using a preponderance of evidence standard." *United States v. Alexander*, 679 F.3d 721, 731 (8th Cir. 2012) (quoting *United States v. McKanry*, 628 F.3d 1010, 1019 (8th Cir. 2010)). Appellate courts "accord particular deference to the loss determination because of the district court's unique ability to assess the evidence and estimate the loss." *United States v. Scott*, 448 F.3d 1040, 1044 (8th Cir. 2006) (internal citations omitted).

## A. The defendants obtained more than $40 million in federal child nutrition program funds

The PSR correctly found that the base offense level is increased 22 levels pursuant to Guidelines § 2B1.1(1)(L) because the loss was more than $25 million but less than $65 million. PSR ¶103. This loss figure is based on the evidence introduced at trial showing that Ismail and his co-defendants fraudulently obtained more than $40 million in federal child nutrition program funds. *See, e.g.*, Gov't Ex. M-1, N-3.

As shown and presented at trial in Government Exhibits N-3 and N-5, the defendants submitted to MDE reimbursement claims for more than $49 million in federal child nutrition program funds. Of this, MDE paid out approximately $47,920,514 to the entities that sponsored the defendants' participation in the program, Partners in Nutrition and Feeding Our Future.[1] Those sponsors, in turn, retained approximately $5.6 million in adminstrative fees. The sponsors then paid over approximately $42,407,515 to Empire Cuisine & Market, ThinkTechAct, and other entities owned or controlled by the defendants, including more than $21 million to ThinkTechAct and more than $12 million to Empire Cuisine & Market.

---

[1] Pursuant to Guidelines § 5E1.1, Ismail and his co-defendants owe restitution for the full amount of the victim's loss. Accordingly, the Court should order Ismail to pay $47,920,514 in restitution.



As depicted in Government Exhibit N-3, in addition to the more than $36 million received by the entities owned by the defendants themselves, more than $6 million in federal child nutrition program funds were sent by Partners in Nutrition and Feeding Our Future to other non-profit entities used as part of the scheme, including Somali Community Resettlement Services, The Free Minded Institute, and St. Cloud Somali Athletic Club. The government introduced bank records and summary charts showing the flow of funds into and out of these entities at trial.[2]

---

[2] *See, e.g.*, Gov't Ex. M-28, O-144, and O-145 (Somali Community Resettlement Services); M-29 and O-141 (The Free Minded Institute); M-27 and O-152 (St. Cloud Somali Athletic Club); M-14 (Madina Grocery Inc.); and M-24, O-136, and O-137 (New Prospect Learning Inc.).



As shown at trial, after receiving the federal child nutrition program funds, the defendants transferred the funds to and through a variety of entities to launder the funds. For example, ThinkTechAct—the non-profit company under which most of the sites were opened—received more than $21 million in federal child nutrition program funds in 2021.[3] Gov't Ex. M-30. More than $12 million of these funds were sent from ThinkTechAct to Ismail and Abdiaziz Farah's company, Empire Cuisine & Market, and another $3 million were sent to a related entity created by Abdiaziz Farah, Empire Enterprises.[4] This was in addition to the more than $12 million in federal child nutrition program funds that Empire Cuisine & Market received directly from Partners in Nurition and Feeding Our Future. M-13a.

---

[3]    In addition to the summary chart, the government introduced at trial records of ThinkTechAct Foundation's bank account. Gov't Ex. O-17.

[4]    At trial, the government introduced records of the various bank accounts opened in the name of Empire Cuisine & Market (Gov't Ex. O-7, O-8, O-9) as well as a chart summarizing all the funds that flowed into, and out of, the account. Gov't Ex. M-13a. Financial records related to Empire Enterprise's bank accounts were introduced at trial as Government Exhibits M-13z, O-11 and O-12.

| SOURCES OF FUNDS | Total Deposits |
|---|---|
| Partners in Nutrition | $ 18,006,479.56 |
| Feeding Our Future | $ 3,758,133.59 |
| Misc. Other Income | $ 100,041.98 |
| Related Parties - Success Academy | $ 55,000.00 |
| Rent Expense (Returned) | $ 2,880.00 |
| **Grand Total*** | **$ 21,922,535.13** |

**ThinkTechAct Foundation**
US Bank, Checking Account #104785323379
Period of Review: 9/24/2018 (Open) - 1/31/2022 (Closed)

| USES OF FUNDS | Total Withdrawals |
|---|---|
| Empire Cuisine and Market LLC / Empire Enterprises LLC | $ (15,431,972.54) |
| Legal Order - Bank Account Seizures | $ (1,842,797.55) |
| Afrique Hospitality Group LLC | $ (1,783,583.90) |
| Bushra Wholesalers LLC | $ (1,392,323.78) |
| Related Parties | $ (692,367.58) |
|    New Prospect Learning Inc. | (652,367.58) |
|    Anza International LLC | (20,000.00) |
|    Aflah Inc. | (20,000.00) |
| Payments to Other Individuals | $ (208,727.92) |
| Defendants' Other Entities | $ (177,390.00) |
| Mind Foundry Learning Inc. | $ (117,131.85) |
| Transportation and Logistics Companies | $ (115,042.02) |
|    Minnehaha Transportation | (115,042.02) |
| Misc. Other Expenses | $ (73,009.81) |
| Food Expense | $ (66,500.00) |
| Rent Expense | $ (19,886.00) |
| Cash Out | $ (2,000.00) |
| **Grand Total*** | **$ (21,922,732.95)** |

GOVERNMENT EXHIBIT
M-30
22-cr-124 (NEB/TNL)

Almost all of the federal child nutrition program funds were transferred into four companies set up and used by the conspirators as part of the scheme, including ThinkTechAct Foundation (Mahad Ibrahim and Abdiaziz Farah), Empire Cuisine & Market (Abdiaziz Farah and Mohamed Ismail), Empire Enterprises (Abdiaziz Farah and Abdimajid Nur), Afrique Hospitality Group (Mukhtar Shariff and Mahad Ibrahim), and Bushra Wholesalers (Said Farah and Abdiwahab Aftin).[5] For example, more than $25 million in federal child nutrition program funds were sent to Ismail's company, Empire Cuisine & Market. Gov't Ex. M-13a.

At trial, the government introduced a chart summarizing all funds that flowed into, and out of, the various bank accounts opened in the name of these entities. Gov't Ex. M-1. This chart showed not only the more than $42 million in federal child

---

[5] At trial, the government introduced records of the bank accounts opened on behalf of Afrique Hospitality Group and Bushra Wholesalers along with charts summarizing all funds flowing into and out of those accounts. *See* Gov't Ex. M-6, M-6b, O-20, O-21, and O-22 (Afrique Hospitality Group) and Gov't Ex. M-10, M-10d, O-24, O-25, and O-26 (Bushra Wholesalers).

nutrition program funds deposited into the accounts (outlined in blue), but also accounted for all food purchases by the defendants and their entities (outlined in red).

| SOURCES OF FUNDS | Total Deposits | USES OF FUNDS | Total Withdrawals |
|---|---:|---|---:|
| Partners in Nutrition | $ 29,831,430.64 | Legal Order - Bank Account Seizures | $ (7,632,616.23) |
| Feeding Our Future | $ 6,085,264.78 | Related Parties | $ (6,959,229.57) |
| Related Parties | $ 4,955,949.77 | Defendants' Personal Accounts | $ (5,325,678.91) |
| Other Food Program Income | $ 1,786,985.67 | Food Expense | $ (5,094,088.82) |
| Credit Card Income | $ 1,062,943.76 | Assets - Real Estate Purchases and Construction | $ (4,805,311.00) |
| Investment Income | $ 886,000.00 | Defendants' Other Entities | $ (4,172,909.88) |
| Defendants' Personal Accounts | $ 456,302.24 | Foreign Transfers | $ (3,185,563.20) |
| Misc. Other Income | $ 244,192.14 | Payments to Other Individuals | $ (2,815,602.08) |
| Defendants' Other Entities | $ 199,985.00 | Misc. Other Expenses | $ (1,201,263.74) |
| Transportation and Logistics Companies | $ 179,464.01 | Transportation and Logistics Companies | $ (1,080,258.73) |
| Mizal Consulting LLC / Hadith Ahmed | $ 139,000.00 | Assets - Vehicle Expenses and Purchases | $ (733,759.33) |
| Assets - Real Estate Purchases and Construction | $ 122,648.74 | Cash Out | $ (522,302.33) |
| Afro Produce LLC | $ 71,359.37 | Rent Expense | $ (517,932.97) |
| Math Tech Tutoring LLC | $ 55,325.00 | Commercial Equipment and Supplies | $ (506,667.86) |
| Payments from Other Individuals | $ 47,000.00 | Personal Non-Food Expense | $ (273,000.00) |
| Truck Rental | $ 23,285.19 | Ikram Y. Mohamed | $ (250,000.00) |
| Mind Foundry Learning Inc. | $ 21,353.41 | Investment Income | $ (210,000.00) |
| Cash In | $ 11,530.00 | Undetermined Category | $ (176,000.00) |
| Restaurant Supplies / Equipment | $ 4,531.13 | Travel Expenses | $ (160,662.26) |
| Rent Expense | $ 2,880.00 | Mizal Consulting LLC / Hadith Ahmed | $ (140,250.00) |
| Misc. Other Expenses | $ 1,117.50 | Restaurant Supplies / Equipment | $ (132,057.00) |
| Food Expense | $ 1,014.82 | Mind Foundry Learning Inc. | $ (117,131.85) |
| Grand Total* | $ 46,189,563.17 | Truck Rental | $ (89,203.52) |
| | | Star Distribution LLC | $ (51,300.00) |
| | | Xogmaal Production | $ (12,500.00) |
| | | Domino's | $ (12,331.30) |
| | | Entertainment | $ (12,014.34) |
| | | Grand Total* | $ (46,189,634.92) |

"THE BIG FOUR" - Empire, ThinkTechAct, Bushra, Afrique
Period of Review: 5/12/2020 to 6/14/2022

*Excludes intercompany transfers and returned items due to insufficient funds.

GOVERNMENT EXHIBIT M-1
22-cr-124 (NEB/TNL)

These food purchases—which totalled approximately $5,106,102—included all food purchases by the entities, including a significant amount of money spent on "food" that had nothing to do with the federal child nutrition program. For example, Empire Cuisine & Market operated a small halal deli and market located in a strip mall in Shakopee, Minnesota. As depicted in Government Exhibit M-1, the market had more than $1 million in credit card receipts during the time of the fraud scheme. In other words, regular customers spent more than $1 million buying food at Empire Cuisine & Market. As FBI Forensic Accountant Pauline Roase testified at trial, the funds credited to "food" on Government Exhibit M-1 and other summary charts

7

introduced at trial included money spent to puchase food and other items (such as halal meat and baby formula) for sale at the market. And as the Court saw, many of the defendants' food invoices were for the purchase of these types of items unrelated to the food program. *See, e.g.*, Gov't Ex. D-72 at 62-63, 82 (Lincoln Trading International invoices for the purchase of goat meat, lamb kidney, and other halal meats to sell at Empire Cuisine & Market), D-73 (Gold Star Distribution invoices for the purchase of non-food items to be sold at Empire Cuisine & Market), and Q-46 (Capital Imports invoices showing purchase of food unrelated to the federal child nutrition program). Nevertheless, FBI Forensic Accountant Pauline Roase testified that she credited money paid to these companies as food expense even though much of the money was spent on items unrelated to the food program in order to be conservative in her calculations.

### B. The loss amount far exceeded $25 million even if the Court credits all money spent on food, even the money spent on food unrelated to the federal child nutrition program

Ismail makes two arguments with respect to the loss amount. First, he argues that the loss amount is overstated and should be reduced based on the food purchased, and meals provided, by the defendants. Second, he argues that he should only be responsible for the money he personally pocketed from the scheme, and not the total amount of loss he and his co-conspirators caused. Both arguments fail.

The Sentencing Guidelines allow for credits against loss in certain situations. The Guidelines provide that the loss shall be reduced by the "fair market value . . . of services rendered by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." Guidelines § 2B1.1, app. Note 3(E)(i).

The advisory notes further provide that in cases involving government benefits, such as grants, loans, or entitlement program payments, the loss "shall be considered to be not less than the value of the benefit . . . diverted to uninteded uses." Guidelines § 2B1.1, app. note 3(F)(ii).

Here, the government disagrees that the loss figure should be reduced based on the value of the food actually provided by the defendants. As the Court heard at trial, the defendants served some food, but mainly as window dressing for their fraud scheme. And when they did so, they did not do so in a manner consistent with the rules of the federal child nutrition program. Even with the Covid waivers, the federal child nutrition program had rules about what qualified as a reimbursable meal. As MDE employee Emily Honer testified, even with the waivers, the program generally did not allow for the service of bulk groceries, such as onions, potatoes, and uncooked rice. In those circumstances where it did, the program required the food to be served or delivered with instructions and appropriate measurements so that a child could prepare a meal from the food provided. That did not happen here. Instead, much of the food was simply bulk groceries, such as onions, potatoes, and rice—not meals suitable and intended for children. As Emily Honer testified, MDE would not have approved defendants' claims and paid out federal child nutrition program reimbursement funds had they been aware of how defendants were operating. In other words, while the defendants may have served some food, they did not do so in a manner that benefited MDE or the federal child nutrition program. Accordingly,

9

the government does not believe they should receive credit for the food they purchased or distributed, in essence, to make it look good.

In deciding whether a defendant receives credit against loss, courts look to a defendant's subjective intent. That is, courts look to whether the items provided were provided in good faith, rather than to further the fraud scheme by, for example, lulling a victim into a false sense of complacency. *See, e.g.*, *United States v. Hartstein*, 500 F.3d 790, 797-98 (8th Cir. 2007); *United States v. Hatchett*, 622 F.3d 984, 987-88 (8th Cir. 2010) (same). Here, as the Court heard at trial, the defendants did not enroll in the federal child nutrition program to feed children. They did so to get rich. Indeed, the Court saw how members of the conspiracy describe the food program as a "golden ticket." Gov't Ex. H-54a at 4.



The Court also saw conspirators talking about using federal child nutrition program funds to build a for-profit community center and co-working space (Gov't Ex. 110 at 9) and purchase real estate and construct condo buildings in Kenya. There was little or no discussion of children.

Because the food defendants served was little more than window dressing, the Court should not credit defedants for any food they provided.

That being said, even if the Court credits defendants for all money spent on food, the loss amount far surpasses the $25 million benchmark that triggers the 22-level enhancement under Guidelines § 2B1.1(b)(1)(L). This is true even if the Court credits funds used to purchase food to sell at their halal market and deli, which had nothing to do with the federal child nutrition program.

### C. The Court should not adopt a lesser loss figure based on Ismail's personal gain

Despite the fact that he and his co-conspirators obtained well more than $40 million in federal child nutrition program funds, Ismail argues that his loss figure under the Guidelines should be limited to the $2 million in fraud proceeds he deposited into his own personal bank account. In effect, he is asking the Court to ignore the fact that he participated in a massive conspiracy and fraudulent scheme through which he has his co-conspirators took home more than $40 million in fraud proceeds. This the Court should not do. It is black letter law that defendants are responsible for the reasonably foreseeable actions of their co-conspirators. Here, Ismail joined and participated in a massive fraud scheme through which he and his co-conspirators made tens of millions of dollars over a brief 18-month period. The idea that he should not be responsible for the full scope of that fraud scheme is absurd.

Finally, Ismail argues that the Sentencing Guidelines put too much emphasis on the amount of the loss caused by the fraud scheme. The government disagrees. Setting aside his general criticism of the Sentencing Guidelines, this case is hardly

11

one where the loss amount overstates the severity of the crime. Ismail participated in one of the most despicable and notorious fraud schemes in recent memory. He and his co-conspirators took advantage of a once-in-a-century global pandemic to steal money intended to be used to feed disadvantaged children. That Ismail does not recognize the immorality of his crime is reason enough to impose a significant sentence.

### III. THE PSR CORRECTLY FOUND THAT ISMAIL WAS AN AVERAGE PARTICIPANT IN THE SCHEME AND IS NOT ENTITLED TO A ROLE REDUCTION

The PSR correctly found that Ismail was an average participant in the fraud scheme and that he was not entitled to a role reduction under Guidelines § 3B1.2.

Guidelines section 3B1.2 provides that defendants who played a minor or mininal role in the offense may receive an offense level reduction. The application notes explain that the reduction is for "a defendant who plays a part in committing the offense that makes him substantially less culpable than the average pareticipant in the criminal activity." Guidelines § 3B1.2, application note 3. In the fraud context, the application notes provide an example of "a defendant in a health care fraud scheme, whose participation in the scheme was limited to serving as a nominee owner and who received little personal gain relative to the amount." *Id*.

That is a far cry from the facts of this case. Ismail co-owned the main entity involved in carrying out this massive fraud scheme and personally received more than $2 million in fraud proceeds deposited into his personal bank account, much of which

he sent abroad.[6] Ismail was involved in the scheme at the beginning. He signed and submitted fraudulent meal counts. And he received and laundered fraud proceeds. Therefore, he is not entitled to a minor role reduction even if he was less involved in the fraud than some of his co-defendants. *United States v. Ponce*, 311 F.3d 911, 913 (8th Cir. 2002) ("The mere fact that a defendant is less culpable than his co-defendants does not entitle defendant to 'minor participant' status.").

## IV. THE PSR CORRECTLY APPLIED AN OBSTRUCTION-OF-JUSTICE ENHANCEMENT

Ismail objects to the PSR's assessment of a 2-level enhancement for obstruction of justice based on his passport fraud and attempted flight from the United States. He argues that "there is simply no evidence that [he] was trying to flee the country to obstruct the investigation." Dkt. #672 at 5.

The government disagrees. As explained in its sentencing memorandum, the FBI seized passports belonging to both Ismail and his co-defendant and partner Abdiaziz Farah on January 20, 2022. Two months later, Ismail and Farah both submitted fraudulent passport applications on the same day, March 22, 2022, at the same place (the Minneapolis Passport Office). They both lied on their passport applications in the same way, each claiming he had "lost" his passport, despite knowing it had been seized by FBI agents.

---

[6]    Ismail notes that he was not a signatory on the Empire Cuisine & Market bank accounts. While this is true, that was because his bank accounts were being garnished due to an outstanding tax issue. Despite this tax issue, Ismail remained a full partner with Abdiaziz Farah and continued to own 50 percent of the company. Gov't Ex. O-71 at 19 ($1,699.10 garnished from Ismail's personal checking account on June 4, 2020); O-73 at 18 ($7,523.47 garnished from Ismail's personal checking account on June 4, 2020); O-15 at 164 ($2,173.74 garnished from Empire Gas & Grocery LLC account on June 4, 2020).

Both Ismail and Farah then booked flights out of the country. Ismail booked a flight to Nairobi, Kenya, where his wife and children lived and where he owned hundreds of thousands of dollars in real estate.

In the face of this evidence, Ismail's claim that his passport fraud and resulting flight from prosecution had nothing to do with his knowledge of his status as a target of an FBI investigation into a massive fraud scheme falls flat. So, too, does his claim that such behavior does not constitute obstruction of justice. While the application notes to Guidelines § 3C1.1 state that "avoiding or fleeing from arrest" ordinarily does not trigger an obstruction enhancement, courts have recognized that flight, coupled with other obstructive conduct, may justify the § 3C1.1 enhancement. The Eighth Circuit has held that the obstruction enhancement may apply where a defendant flees not in an "instinctive flight" to evade arrest, but to as part of a premidatated plan to obstruct an investigation of which the defendant is aware. *See, e.g.*, *United States v. Billingsley*, 160 F.3d 502, 507 (8th Cir. 1998); *United States v. Har*e, 49 F.3d 447, 453 (8th Cir. 1995) (upholding application of obstruction enhancement to defendant who agreed to cooperate in an investigation and then fled to Canada).

Here, Ismail's conduct went far beyond running from the police when they attempted to arrest him. He and Farah hatched and carried out a plan to obtain new U.S. passports by submitting fraudulent passport applications in which they lied and claimed their passports had been lost, when in reality they had been seized as part of a fraud investigation of which both Ismail and Farah knew they were targets. Ismail then attempted to use his fraudulently obtained passport to leave the country in

14

which he was being investigated and flee to the country in which he and his co-conspirators stashed much of their fraud proceeds. It is an understatement to say that had he successfully fled the country it would have obstructed his prosecution. Indeed, it likely would have prevented it altogether.

In any event, as the PSR pointed out, Ismail's sentencing guidelines actually increase without the obstruction enhancement. If, as Ismail suggests, his passport fraud was unrelated to his fraud conviction, then he receives 2 criminal history points for his passport fraud conviction (for which he was sentenced to 7 months in prison). PSR at ¶122, A.4. This would put him in criminal history category II. PSR at A.4.

In addition, with the addition of those criminal history points, Ismail would no longer qualifies for a 2-level reduction for having zero criminal history points under Guidelines § 4C1.1. PSR at A.4.

Accordingly, if Ismail does not receive an obstruction enhancement for the passport fraud conviction, his offense level remains 32 and he will fall into criminal history category II. This increases his Guidelines range from 121 to 151 months in prison to 135 to 168 months in prison due to the higher criminal history category. PSR at A.4. If Ismail persists in his objection, the government is fine proceeding in this manner.

V.  **ISMAIL IS FULLY DESERVING OF A SIGNIFICANT SENTENCE**

Ismail's argument that he should receive a sentence far below the advisory Guidelines range simply fails. He was involved in one of the most notorious fraud schemes in Minnesota history. He and his co-conspirators took advantage of a once-in-a-century global pandemic to enrich themselves by stealing nearly $50 million

intended to be used to feed disadvantaged children. His crime has called into question the way government operates in the state of Minnesota, and the sustainability of the state's generous social safety net.

That Ismail came to the United States as a refugee is a significant aggravating factor here. Rather than be grateful for the country that welcomed him when his own country did not, Ismail chose to steal from it. For Ismail, the American dream wasn't enough. He wanted to get rich quick, and he was willing to lie, cheat, and steal to accomplish his goal.

Sadly, Ismail sent much of his ill-gotten gains abroad to Kenya, where his family resided, and where they are beyond the reach of American law enforcement. Unlike many defendants who pled guilty, accepted responsibility for their crimes, and agreed to forfeit and turn over assets located abroad, Ismail has done no such thing. He has never expressed any responsibility or expressed any remorse for his actions. When he learned of the investigation, he committed passport fraud and attempted to flee the country. He continues to complain about not being able to travel to Kenya *after he was arrested and charged with passport fraud.* Dkt. #672 at 18. And he has never agreed to return the federal child nutrition program funds he sent abroad back to the United States. Because of his crime, he will leave prison a wealthy man—a fact that the court must consider in imposing a sentence. The Court must send the message that to both defendant Ismail and others that it is not worth it.

## VI. CONCLUSION

For the reasons stated above, the government respectfully requests that the Court impose a sentence of 151 months in prison.

Respectfully Submitted,

Dated: October 13, 2024

ANDREW M. LUGER
United States Attorney

BY: /s/ *Joseph H. Thompson*
JOSEPH H. THOMPSON
HARRY M. JACOBS
MATTHEW S. EBERT
DANIEL W. BOBIER
Assistant U.S. Attorneys