1              UNITED STATES DISTRICT COURT
                   DISTRICT of MINNESOTA
2

3    ------------------------------------------------------------
                                  )
4    United States of America,    ) File No. 22-cr-124
                                  )          (NEB/DTS)
5            Plaintiff,           )
                                  )
6    v.                           )
                                  )
     Abdiaziz Shafii Farah(1),    ) Courtroom 13W
7    Mohamed Jama Ismail(2),      ) Minneapolis, Minnesota
     Abdimajid Mohamed Nur(4),    ) Monday, May 6, 2024
8    Said Shafii Farah(5),        ) 9:00 a.m.
     Abdiwahab Maalim Aftin(6),   )
9    Mukhtar Mohamed Shariff(7),  )
     Hayat Mohamed Nur(8),        )
10                                )
             Defendants.          )
11                                )
     ------------------------------------------------------------
12
               BEFORE THE HONORABLE NANCY E. BRASEL
13         UNITED STATES DISTRICT COURT DISTRICT JUDGE

14         **JURY TRIAL PROCEEDINGS - VOLUME X of XXX**

15

16

17

18

19

20   Court Reporter:        LORI A. SIMPSON, RMR-CRR
                            United States Courthouse
21                          300 South Fourth Street, Box 1005
                            Minneapolis, Minnesota 55415
22
                               *   *   *
23

24       Proceedings recorded by mechanical stenography;
     Transcript produced by computer.

25                             *   *   *

2274

```
1      APPEARANCES:

2      For Plaintiff:              UNITED STATES ATTORNEY'S OFFICE
                                   BY:  JOSEPH H. THOMPSON
3                                       HARRY JACOBS
                                        MATTHEW S. EBERT
4                                       CHELSEA A. WALCKER
                                        DANIEL W. BOBIER
5                                  600 United States Courthouse
                                   300 South Fourth Street
6                                  Minneapolis, Minnesota 55415

7      For Defendant               BIRRELL LAW FIRM PLLC
       Abdiaziz Shafii             BY:  ANDREW S. BIRRELL
8      Farah(1):                        IAN S. BIRRELL
                                   333 South Seventh Street, #3020
9                                  Minneapolis, Minnesota 55402

10     For Defendant               SIEBEN & COTTER PLLC
       Mohamed Jama               BY:  PATRICK L. COTTER
11     Ismail(2):                  105 Hardman Court, #110
                                   South St. Paul, Minnesota 55075
12
       For Defendant               SAPONE & PETRILLO LLP
13     Abdimajid Mohamed           BY:  EDWARD V. SAPONE
       Nur(4):                     40 Fulton Street, 17th Floor
14                                 New York, New York 10038

15     For Defendant Said          MASLON LLP
       Shafii Farah(5):            BY:  STEVEN L. SCHLEICHER
16                                      CLAYTON CARLSON
                                   225 South Sixth Street, #2900
17                                 Minneapolis, Minnesota 55402

18     For Defendant               KOCH & GARVIS
       Abdiwahab Maalim            BY:  ANDREW S. GARVIS
19     Aftin(6):                   3109 Hennepin Avenue South
                                   Minneapolis, Minnesota 55408
20
       For Defendant Mukhtar       GOETZ AND ECKLAND P.A.
21     Mohamed Shariff (7):        BY:  FREDERICK J. GOETZ
                                        ANDREW H. MOHRING
22                                      KAITLYN C. FALK
                                   615 First Avenue NE, #425
23                                 Minneapolis, Minnesota 55413

24

25
```

1    APPEARANCES (Continued):

2     For Defendant Hayat        BRANDT KETTWICK DEFENSE PLLC
      Mohamed Nur(8):            BY:  MICHAEL J. BRANDT
3                                     NICOLE A. KETTWICK
                                 2150 Third Avenue, #210
4                                Anoka, Minnesota 55303

5

6                                     *    *    *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

                                                          PAGE
2

3    **BILL MENOZZI**
         Direct Examination (Cont.) By Mr. Ebert      2289
         Cross-Examination By Mr. Goetz               2323
4        Cross-Examination By Mr. Ian Birrell         2346
         Cross-Examination By Mr. Cotter              2361
5        Cross-Examination By Mr. Sapone              2365
         Redirect Examination By Mr. Ebert            2367
6        Recross-Examination By Mr. Goetz             2369

7    **WILLIAM WALKER**
         Direct Examination By Ms. Walcker            2371
8        Cross-Examination By Mr. Ian Birrell         2421
         Cross-Examination By Mr. Sapone              2423
9

10   **JOHN RUHLAND**
         Direct Examination By Ms. Walcker            2425
10       Cross-Examination By Mr. Cotter              2448
11       Cross-Examination By Mr. Sapone              2449

12   **DAMARIS GRAFFUNDER**
         Direct Examination By Ms. Walcker            2450
13       Cross-Examination By Mr. Cotter              2484
         Cross-Examination By Mr. Sapone              2498
14       Cross-Examination By Mr. Ian Birrell         2499

15   **OLDEMAR LOPEZ**
         Direct Examination By Mr. Jacobs             2501
16       Cross-Examination By Mr. Cotter              2510
         Cross-Examination By Mr. Carlson             2511
17       Cross-Examination By Mr. Ian Birrell         2517

18

19   GOVERNMENT EXHIBITS                              REC'D
             B-1                                      2285
20           B-2                                      2285
             B-3                                      2285
21           B-4                                      2285
             B-5                                      2285
22           B-6                                      2285
             B-7                                      2285
23           B-8                                      2285
             B-9                                      2285
24           B-10                                     2285
             B-11                                     2285
25           B-12                                     2285

# I N D E X  (Cont.)

|  |  | REC'D |
|---|---|---|
| B-13 | | 2285 |
| B-14 | | 2285 |
| B-15 | | 2285 |
| B-16 | | 2285 |
| B-17 | | 2285 |
| B-18 | | 2285 |
| B-19 | | 2285 |
| B-20 | | 2285 |
| B-21 | | 2285 |
| B-22 | | 2285 |
| B-23 | | 2285 |
| B-24 | | 2285 |
| B-25 | | 2285 |
| B-26 | | 2285 |
| B-27 | | 2285 |
| B-28 | | 2285 |
| B-29 | | 2285 |
| B-30 | | 2285 |
| B-31 | | 2285 |
| B-32 | | 2285 |
| B-33 | | 2285 |
| B-34 | | 2285 |
| B-35 | | 2285 |
| B-36 | | 2285 |
| C-59 | | 2319 |
| C-92 | | 2384 |
| C-120 | | 2309 |
| C-197 | | 2317 |
| C-205 | | 2504 |
| C-247 | | 2458 |
| O-1 | | 2285 |
| O-2 | | 2285 |
| O-3 | | 2285 |
| O-4 | | 2285 |
| O-5 | | 2285 |
| O-7 | | 2285 |
| O-8 | | 2285 |
| O-9 | | 2285 |
| O-11 | | 2285 |
| O-12 | | 2285 |
| O-14 | | 2285 |
| O-15 | | 2285 |
| O-17 | | 2285 |
| O-18 | | 2285 |
| O-20 | | 2285 |
| O-21 | | 2285 |

<pre>
 1                    I N D E X   (Cont.)

 2                                                   REC'D
           O-22                                      2285
 3         O-24                                      2285
           O-25                                      2285
 4         O-26                                      2285
           O-27                                      2285
 5         O-29                                      2285
           O-30                                      2285
 6         O-31                                      2285
           O-33                                      2285
 7         O-35                                      2285
           O-36                                      2285
 8         O-38                                      2285
           O-39                                      2285
 9         O-40                                      2285
           O-42                                      2285
10         O-43                                      2285
           O-44                                      2285
11         O-45                                      2285
           O-46                                      2285
12         O-47                                      2285
           O-48                                      2285
13         O-49                                      2285
           O-50                                      2285
14         O-51                                      2285
           O-52                                      2285
15         O-53                                      2285
           O-55                                      2285
16         O-56                                      2285
           O-56a                                     2285
17         O-57                                      2285
           O-58                                      2285
18         O-59                                      2285
           O-60                                      2285
19         O-61                                      2285
           O-62                                      2285
20         O-64                                      2285
           O-65                                      2285
21         O-66                                      2285
           O-67                                      2285
22         O-68                                      2285
           O-69                                      2285
23         O-70                                      2285
           O-71                                      2285
24         O-72                                      2285
           O-73                                      2285
25         O-74                                      2285
</pre>

**I N D E X**  (Cont.)

|  | REC'D |
|---|---|
| O-75 | 2285 |
| O-76 | 2285 |
| O-77 | 2285 |
| O-79 | 2285 |
| O-80 | 2285 |
| O-81 | 2285 |
| O-82 | 2285 |
| O-83 | 2285 |
| O-84 | 2285 |
| O-85 | 2285 |
| O-86 | 2285 |
| O-87 | 2285 |
| O-88 | 2285 |
| O-89 | 2285 |
| O-90 | 2285 |
| O-91 | 2285 |
| O-92 | 2285 |
| O-93 | 2285 |
| O-94 | 2285 |
| O-95 | 2285 |
| O-95a | 2285 |
| O-95b | 2285 |
| O-96 | 2285 |
| O-97 | 2285 |
| O-98 | 2285 |
| O-99 | 2285 |
| O-100 | 2285 |
| O-101 | 2285 |
| O-102 | 2285 |
| O-103 | 2285 |
| O-104 | 2285 |
| O-106 | 2285 |
| O-107 | 2285 |
| O-108 | 2285 |
| O-109 | 2285 |
| O-110 | 2285 |
| O-111 | 2285 |
| O-113 | 2285 |
| O-114 | 2285 |
| O-115 | 2285 |
| O-117 | 2285 |
| O-118 | 2285 |
| O-119 | 2285 |
| O-120 | 2285 |
| O-121 | 2285 |
| O-122 | 2285 |

1              **I N D E X**  (Cont.)

2                                                    REC'D
        O-123                                        2285
3       O-124                                        2285
        O-125                                        2285
4       O-126                                        2285
        O-127                                        2285
5       O-129                                        2285
        O-130                                        2285
6       O-131                                        2285
        O-136                                        2285
7       O-137                                        2285
        O-138                                        2285
8       O-139                                        2285
        O-141                                        2285
9       O-142                                        2285
        O-144                                        2285
10      O-145                                        2285
        O-146                                        2285
11      O-147                                        2285
        O-148                                        2285
12      O-149                                        2285
        O-150                                        2285
13      O-152                                        2285
        O-153                                        2285
14      O-154                                        2285
        O-155                                        2285
15      O-156                                        2285
        O-157                                        2285
16      O-158                                        2285
        O-159                                        2285
17      O-160                                        2285
        O-161                                        2285
18      O-162                                        2285
        O-163                                        2285
19      O-164                                        2285
        O-165                                        2285
20      O-166                                        2285
        O-167                                        2285
21      O-168                                        2285
        O-170                                        2285
22      O-171                                        2285
        O-172                                        2285
23      O-173                                        2285
        O-174                                        2285
24      O-175                                        2285
        O-176                                        2285
25      O-177                                        2285

1                              **I N D E X**  (Cont.)

2                                                                    REC'D
            O-178                                                    2285
3           O-179                                                    2285
            O-180                                                    2285
4           O-181                                                    2285
            O-182                                                    2285
5           O-183                                                    2285
            O-184                                                    2285
6           O-185                                                    2285
            O-185a                                                   2285
7           O-186                                                    2285
            O-188                                                    2285
8           O-189                                                    2285
            O-190                                                    2285
9           O-191                                                    2285
            O-192                                                    2285
10          O-193                                                    2285
            O-194                                                    2285
11          O-195                                                    2285
            O-196                                                    2285
12          O-197                                                    2285
            O-198                                                    2285
13          O-199                                                    2285
            O-200                                                    2285
14          O-201                                                    2285
            O-203                                                    2285
15          O-204                                                    2285
            O-205                                                    2285
16          O-207                                                    2285
            O-208                                                    2285
17          O-210                                                    2285
            O-211                                                    2285
18          O-212                                                    2285
            O-213                                                    2285
19          O-215                                                    2285
            O-216                                                    2285
20          O-217                                                    2285
            O-219                                                    2285
21          O-221                                                    2285
            O-222                                                    2285
22          O-223                                                    2285
            O-224                                                    2285
23          O-225                                                    2285
            O-226                                                    2285
24          O-227                                                    2285
            O-228                                                    2285
25          O-229                                                    2285

2282

1                    **I N D E X**   (Cont.)

2                                                              REC'D
         O-231                                                 2285
3        O-232                                                 2285
         O-233                                                 2285
4        O-234                                                 2285
         O-235                                                 2285
5        O-236                                                 2285
         O-237                                                 2285
6        O-238                                                 2285
         O-239                                                 2285
7        O-240                                                 2285
         O-241                                                 2285
8        O-243                                                 2285
         O-244                                                 2285
9        O-245                                                 2285
         O-246                                                 2285
10       O-247                                                 2285

11   DEFENSE EXHIBITS                                          REC'D
         D-11                                                  2285
12       D-12                                                  2285
         D-13                                                  2285
13       D-14                                                  2285
         D-15                                                  2285
14       D-16                                                  2285
         D-156                                                 2285
15       D-157                                                 2285
         D-158                                                 2285
16       D-159                                                 2285
         D-160                                                 2285
17       D-161                                                 2285
         D-162                                                 2285
18       D-163                                                 2285
         D-164                                                 2285
19       D-165                                                 2285
         D-166                                                 2285
20       D-719                                                 2285
         D-720                                                 2285
21       D-721                                                 2285
         D-768                                                 2285
22       D-769                                                 2285
         D-770                                                 2285
23       D-771                                                 2285
         D-772                                                 2285

24

25                          *   *   *

1           **P R O C E E D I N G S**

2              **IN OPEN COURT**

3           **(JURY NOT PRESENT)**

4       (Defendants present)

5

6           THE COURT:  All right.  Good morning.  We are on

7    the record out of the presence of the jury, and I am looking

8    to the parties to see if we have any agreement as to batch

9    exhibits to be admitted.

10          MR. ANDREW BIRRELL:  Good morning, Your Honor.  I

11   can tell you what I have.

12          THE COURT:  Excellent.

13          MR. ANDREW BIRRELL:  I have conferred with

14   Mr. Thompson and he requests a stipulation on his Series B

15   Secretary of State's records, which is B-1 through -- let me

16   see here -- through B-36.  We're willing to stipulate.

17          The government requests a stipulation on their

18   O series, which are bank records, and we will stipulate with

19   the exception that 133, 134 and 135 we won't stipulate.  We

20   contend instead they're 404(b), 403, 401 and 402

21   inadmissible.

22          THE COURT:  Okay.  So that is O-1 through O- --

23          MR. ANDREW BIRRELL:  Well, there's no 132.  So I

24   guess it's O-1 through O-131 and then --

25          THE COURT:  I have through O-247 for the O series.

```
1            MR. THOMPSON:  That's right, Your Honor.  There's

2    a few numbers that are skipped in there in addition to the

3    three that we are not stipping to.

4            THE COURT:  Okay.  So we are going to say O-1

5    through O-247 except numbers skipped on the exhibit list and

6    132 -- what were they?

7            MR. ANDREW BIRRELL:  133.

8            THE COURT:  '34, '35?

9            MR. ANDREW BIRRELL:  Yeah.  And 132 is blank.

10           THE COURT:  Okay.  133, 134 and 135 will not be

11   admitted.

12           All right.  And then others, Mr. Birrell, for you?

13           MR. ANDREW BIRRELL:  So coming my way, D1-1

14   through D1-6 they're going to stipulate to.

15           THE COURT:  D-1 through D1-6 or --

16           MR. ANDREW BIRRELL:  Yes.

17           THE COURT:  -- D-1 through D1-16?

18           MR. ANDREW BIRRELL:  6.  Let me start over.  D1-1,

19   D1-2, D1-3, D1-4, D1-5 and then D1-6.

20           THE COURT:  I got it.

21           MR. ANDREW BIRRELL:  And then the others are D1-56

22   through D1-66.

23           THE COURT:  All right.  And that's all you've got?

24           MR. ANDREW BIRRELL:  That's what I have.

25           THE COURT:  And any objection to any of those from
```

1    any of the other attorneys?

2              Okay.  So B-1 through B-36 are admitted.  O-1

3    through O-247 are admitted except the numbers that are blank

4    and 133, 134, 135, which are reserved due to objection.  And

5    then D1-1 through D1-6 are admitted.  D1-56 through D1-66

6    are admitted.

7              All right.  Any other agreements as to exhibits?

8    Mr. Mohring.

9              MR. MOHRING:  Thank you, Your Honor.

10             So I join in everything that was just said,

11   including the objection to Government 133 through 135 for

12   the reasons already stated.

13             In terms of agreed admission, D7 -- these are all

14   D7 exhibits.  D7-20 and 21 are agreed/stipulated admitted.

15   And then Defense -- D7 exhibits that are already in and

16   therefore there's no objection to are D7-19, D7-21 and D7-68

17   through 72 already in as government exhibits, but now in as

18   D7 exhibits as well.

19             THE COURT:  Okay.  Any other objection to those --

20   any other defendants have an objection to those?

21             All right.  So D7 through -- D7-20, D7-21, D7-19,

22   21, 68 through 72 are all admitted.

23             MR. MOHRING:  Yes.  Thank you.

24             THE COURT:  Okay.  Thanks.

25             MR. THOMPSON:  And we're in talks with some of the

1    other defense counsel, Your Honor, just so you know, about

2    stips that I don't think are relevant to today's witnesses.

3              THE COURT:  Okay.

4              MR. THOMPSON:  We've just got to work through

5    them.  Some of them are kind of mish-mashy exhibits with

6    multiple things.  We just want to take a closer look.

7              THE COURT:  Okay.  That's fine.  When you have

8    them, I will take them.

9              Anyone else want to be heard as to exhibits?  No.

10   Okay.  Let's go off the record.

11                   (Discussion off the record)

12              (Recess taken from 9:07-9:25 a.m.)

13                   *    *    *    *    *

14                   **IN OPEN COURT**

15                   **(JURY NOT PRESENT)**

16              THE COURT:  We are back on the record out of the

17   presence of the jury.

18              My understanding is there was something to be

19   placed on the record.  Mr. Goetz, is that you?

20              MR. GOETZ:  Yes, Your Honor, with a request from

21   the court as well.  We have a witness here, Mursal Doon.  He

22   is here in response to a subpoena.  He is represented by an

23   attorney, Douglas Nepp.  Mr. Nepp, I guess, fell out of the

24   loop of communication.

25              But we would ask the court, since we're not going

1    to get to his testimony today, that since he's here, the

2    court order that he come back at a later time as needed; and

3    we'll be in touch with Mr. Doon and his lawyer to arrange

4    that.

5              THE COURT:  All right.  Any objection from --

6    where's the attorney?  Any objection from the witness or

7    lawyer?

8              MR. GOETZ:  No.  The witness is here.  Mr. Doon?

9              THE COURT:  Hi.  All right.  So I am going to

10    order you to come back under that subpoena at a time when

11    your attorney tells you that we're ready for you.  Okay,

12    sir?

13              MR. DOON:  Thank you.

14              THE COURT:  All right.  Thank you very much for

15    being here.

16              MR. GOETZ:  That's it.  Thank you, Your Honor.

17              THE COURT:  Okay.  Thank you.  It looks like we're

18    almost ready, so I'll just stay out here.

19              MR. COTTER:  Your Honor, may I put one more thing

20    on the [inaudible]?

21              THE COURT:  I didn't hear that, but I'm sure

22    that -- go ahead.

23              MR. COTTER:  May I put one more thing on the

24    record quickly?

25              THE COURT:  Yes.

1           MR. COTTER:  Thank you.  This is Patrick Cotter.

2           And this is more of a peremptory thing.  In

3    reviewing Mr. Menozzi's 302, and I don't expect that there

4    would be this testimony, but there's some discussion about

5    what other public school staff saw or heard regarding

6    certain locations, as well as potentially relationships with

7    other property managers and what they might have heard or

8    saw.  I just want to flag that, that there would be a

9    hearsay objection in advance.  There's a couple paragraphs

10   or at least a full paragraph in the 302 on that.  So instead

11   of doing it while we have the jury in here, I wanted to put

12   it on the record, in advance.

13          THE COURT:  Mr. Ebert, do you anticipate such

14   testimony that would elicit a hearsay objection?

15          MR. EBERT:  I do not, Your Honor.  And, of course,

16   the 302s are not meant to be a verbatim indicator of what

17   anyone would testify to in court, but to the extent that

18   there are issues that involve what other people said or what

19   other people knew, those are properly reflected in the 302.

20   I don't intend to elicit them in testimony.

21          THE COURT:  All right.  Great.  Thank you.

22          MR. COTTER:  Thank you.

23                        **IN OPEN COURT**

24                       **(JURY PRESENT)**

25          THE COURT:  Good morning, everyone.  You may be

1    seated.  We are on the record in the presence of the jury.

2              Mr. Menozzi, you are still under oath; and

3    Mr. Ebert, you may inquire.

4              MR. EBERT:  Thank you, Your Honor.

5                        **(Bill Menozzi)**

6                  **DIRECT EXAMINATION (CONT.)**

7    BY MR. EBERT:

8    Q.  Good morning, Mr. Menozzi.

9    A.  Good morning.

10   Q.  When we last left on the end of the day on Friday, we

11   were discussing Shakopee School District's initial reaction

12   to the pandemic.  Do you recall that?

13   A.  Yes, I do.

14   Q.  And can you remind the jury what types of things the

15   district did when the pandemic hit in 2020.

16   A.  Yeah.  When the pandemic started in 2020, specifically

17   March of 2020, school district leaders got together and had

18   a conversation about how we were going to continue both our

19   learning environment for our students and how we were going

20   to continue meal service for our students, both breakfast

21   and lunch.  That included transportation of those meals, how

22   we were going to utilize our staff to best serve the needs

23   of our kids for however long the pandemic was going to last.

24   Q.  And, Mr. Menozzi, you testified about different ways

25   that the district began providing food in March of 2020.  Do

1    I have that right?

2    A.  Yes, that's correct.

3    Q.  A component of that, did it involve food being handed

4    out at a school?

5    A.  Yes, correct.

6    Q.  And can you remind the jury, which school was that?

7    A.  That was at Shakopee High School, which is one of our

8    ten school sites and our largest site.  Shakopee High School

9    was the meal pickup site.

10   Q.  And how often did the school put food out for pickup at

11   the high school?

12   A.  At the high school it was every day of the week, so

13   Monday through Friday, at the start of the pandemic.  Pickup

14   was every day of the week.

15   Q.  And can you provide a sense of generally how many people

16   would come each day, starting in March 2020, to the high

17   school.

18   A.  To the high school for meal pickup, it was between 11:00

19   and 1:00 during the day; and we generally had in the

20   neighborhood of between three and five hundred family -- or

21   three and five hundred students pick up meals every day at

22   the high school.  That was by far our largest site.  Between

23   three and six hundred at the start of the pandemic.

24   Q.  And generally were the numbers the same every day?

25   A.  They were not.

1    Q.  Can you explain?

2    A.  Yes, I can.  The numbers varied based on a number of

3    factors.

4              Weather was a big one.  If we had a day that was

5    pouring down rain, the participation would go down.  If we

6    had a day that was bright and sunny and a beautiful spring

7    day, the participation would generally go up.

8              Even more than that, the day of the week seemed to

9    be a variable.  Fridays were big days.  We did not provide

10   meal service on Saturday and Sunday, and so Friday --

11   generally we came to know that Friday was going to be a

12   rather large day in terms of the meal pickup.

13   Q.  Which school food location typically saw the largest

14   number of people come?

15   A.  I'm sorry.  Can you repeat the question?

16   Q.  Which location for the Shakopee School District was your

17   largest one?

18   A.  Shakopee High School is our largest site.

19   Q.  Now I want to talk about some of these other locations

20   you told the jury about at the end of the day on Friday.

21              Can you remind us, how many other sites did the

22   school district set up beginning in March of 2020?

23   A.  Yes.  So in addition to the meal pickup at the high

24   school, we also identified that there was a need that would

25   not be met just with the meal pickup and so we identified

BILL MENOZZI - DIRECT (EBERT)

1    ten sites, primarily based on low-income sites, in our

2    school district that we were going to participate in meal

3    delivery.

4    Q.  And what types of sites were those?

5    A.  Generally our low-income sites, so things like mobile

6    home parks, low-income townhomes, apartment complexes,

7    things of that nature.

8    Q.  How did the school go about interacting with those sites

9    in order to distribute?

10   A.  Yeah.  So the school district, whether it was our

11   superintendent, assistant superintendent, other directors,

12   would attempt to make contact with the mobile home parks,

13   townhomes, apartment complexes.  Sometimes we were able to

14   reach people by phone; other times not.

15          And in the case where -- in either case, when we

16   did the meal drop-off, the drop-off at various sites, we

17   would attempt to make contact with the apartment or mobile

18   home managers at each site and communicate the reason why we

19   were doing what we were doing.

20   Q.  The food that was delivered to the ten sites, where was

21   that food assembled?

22   A.  So we had three primary prep kitchens.  The high school

23   was the prep kitchen obviously for the meal pickup at the

24   high school.  Answering your question on the meal delivery,

25   we had two prep kitchens.  One was at Jackson Elementary

BILL MENOZZI - DIRECT (EBERT)

1    School, which is one of our five elementary schools; and

2    then West Middle School, which is one of our two middle

3    schools.  So the prep kitchens were at Jackson and West.

4    Q.  And the type of vehicle that delivered it to these ten

5    sites was what?

6    A.  School -- buses, school buses.  Smaller buses, not the

7    big 77-passenger buses, but we utilized smaller school buses

8    to deliver the meals.

9    Q.  What measures, if any, did Shakopee schools take to try

10   to keep food refrigerated or cooled that was being

11   delivered?

12   A.  We recognized that things changed as a result of the

13   pandemic in terms of what we could offer and then how we

14   needed to offer it, and so we would include coolers

15   oftentimes on the buses in order to keep things like milk

16   and other things that needed to be refrigerated.

17           And then when we were preparing meals in the prep

18   kitchens, all of the prep kitchens have full refrigerators,

19   freezers, walk-in coolers.  And so we would keep the food

20   cool and then be expedient in terms of how we would deliver

21   those meals in order to make sure that we were delivering

22   food that was prepared to eat.

23   Q.  Approximately how many people were involved in the

24   assembly at the high school?

25   A.  We had a head cook at the high school and then a number

BILL MENOZZI - DIRECT (EBERT)

1    of other sort of line workers to prepare the meals.  I don't

2    have the exact number, but it would be in the three to six

3    range at the high school to prepare those meals, food

4    service workers only.

5    Q.  And then approximately how many people were involved at

6    the other two schools for the assembly to the ten sites?

7    A.  So at each of those schools we again had a head cook,

8    who was sort of managing the process and helping with the

9    preparation, and then probably one or two less.  So if there

10   were three to six at the high school, probably three to four

11   or five at the other two prep kitchens.  A little bit

12   smaller, but not significantly smaller.

13   Q.  A moment ago you mentioned that there was a standard

14   pickup time at the high school?

15   A.  Yes.

16   Q.  Similarly, was there a set time for the delivery routes

17   to the ten sites?

18   A.  Yes.  We delivered in the morning.  It varied a little

19   bit, but I would say in the neighborhood of between 10:00

20   and 12:30, that time.  It could be 10:30, depending on the

21   day and how the meal prep came about, but it was generally

22   in that late morning to early afternoon.

23   Q.  Now, for what you're describing, was there an initial

24   plan for how long these measures were going to last when you

25   began them in March 2020?

BILL MENOZZI - DIRECT (EBERT)

1    A.  I remember the conversations.  We were going to provide

2    the need as long as the need was there.  Obviously, we

3    didn't know how long the pandemic was going to last, if we

4    were going to return to a normal learning environment, say,

5    in May or early June, at the end of the school year.  So we

6    were prepared to deliver meals and have meal pickup for as

7    long as the pandemic was going to last.

8    Q.  With respect to the ten sites, ultimately how long did

9    the school continue to do the bus routes to the ten sites?

10    A.  We did the bus routes to the ten sites for the remainder

11    of the school year, so March of 2020 through early June,

12    sort of that second week in June; and then we actually

13    continued on for the rest of the summer of 2020, so for

14    June, July and August of 2020.

15    Q.  And then same question with respect to the high school

16    pickup.  How long did that last?

17    A.  For the same time frame.  The rest of the school year,

18    so March through June of 2020, and then June, July and

19    August.  So the meal delivery to the ten sites and the meal

20    pickup at the high school mirrored each other.

21    Q.  On Friday I asked you some questions about the ways in

22    which the school district communicates to the members of the

23    district.  Do you recall that?

24    A.  Yes, I do.

25    Q.  And can you remind the jury of some of the languages

1    that are communicated out to the district from the school

2    itself.

3    A.  Our school district communicates out in English, Spanish

4    and Somali.  Those are our three languages that we

5    communicate out.

6         And then for any students that their language of

7    origin is outside of those three languages, we have a

8    software system that we can utilize to communicate with

9    students and families in their preferred language.

10        And then as I mentioned on Friday, we also have

11   the cultural liaisons for our Russian students, our

12   Vietnamese students in addition to the three that I

13   mentioned earlier.

14   Q.  With respect to the high school pickup, did the district

15   communicate that out to the population in these same

16   languages?

17   A.  Yes, we did.  And we utilized a number of different

18   communication vehicles.  We would -- we have a school

19   district website where we put important updates related to

20   weather or, in this case, meal distributions.  We'd put that

21   on there.  Also our social media channels, and then just

22   information that was sent home with our students as well.

23   Q.  And then with respect to the ten delivery sites, did the

24   district also utilize these same methods of communication?

25   A.  The same methods of communication.  Oftentimes or almost

1    entirely when we would send information regarding meal

2    pickup at the high school, in the same message we would also

3    send information regarding the meal delivery.  Those were --

4    again, mirrored each other in terms of our communication in

5    those three languages.

6    Q.  Did you participate in some of the deliveries?

7    A.  Yes.  As many people -- I recall in the spring of 2020

8    it was sort of an all hands on deck, and that was the case

9    for school district employees as well.

10         So I had the opportunity and was honored to

11   participate in the meal delivery to all ten sites.  I got a

12   chance to ride the buses, prepare the meals, hand out the

13   meals to all ten sites; and I also participated in the meal

14   handout at the high school as well.

15   Q.  Now, you testified a few moments ago about the numbers

16   that you would generally see at the high school pickup; is

17   that right?

18   A.  That's correct.

19   Q.  Can you describe for the jury the types of numbers that

20   you and the district observed at these ten sites.

21   A.  Generally speaking, we were between 30 and 60 meals per

22   day per site; and I am talking specifically, to answer your

23   question, about March of 2020 through the summer of 2020.

24   Generally between 30 and 60 meals.  It would vary, again,

25   based on weather, day of the week.

1          It would vary a little bit by site, but not

2    significantly.  In other words, there would not be a site

3    that would have 300 meals that we would deliver and then

4    another site where we would have four.  They would vary a

5    little bit, but not significantly.

6    Q.  So now I want to direct your attention to a little bit

7    later in time.  The fall of 2020, can you explain to the

8    jury what school looked like for the Shakopee District

9    starting in the fall of 2020.

10   A.  I remember a lot of unknown related to the COVID-19

11   pandemic, a lot of unknown related to learning environment

12   for our kids, a lot of unknown related to the meal program,

13   and just a lot of unknowns related to where we were going

14   with regard to the pandemic.

15          Again, much like our focus in March through the

16   summer, our focus was to make sure we were getting food in

17   the hands of kids.  And so to start the 2020-2021 school

18   year, so about September -- or not about.  In September of

19   2020 we started the school year in what's known as a hybrid

20   learning environment.

21          So our learning environments we loosely define in

22   terms of three different areas.  There is in-person

23   learning, which is all students all five days of the week in

24   person; distance learning, which would have been the spring

25   of 2020 where all students are learning from home because of

BILL MENOZZI - DIRECT (EBERT)

1    the COVID-19 pandemic; or the hybrid form, which in our case

2    was the start of the 2020-21 school year, where we split

3    students into an A and a B schedule to achieve what became a

4    very common term, "social distancing," where we could only

5    have so many students on buses, so many students in

6    classrooms.

7         And so we divided students into an A and a B

8    schedule where we had roughly half of the students in Day A,

9    which would be a Monday, and the other half of the students

10   would be in Day B, which would be a Tuesday.

11   Q.  And, Mr. Menozzi, can you remind the jury, approximately

12   how many students were enrolled in the district around the

13   time frame that you're testifying about now?

14   A.  Kindergarten through twelfth grade, so those 13 grades,

15   just shy of 8,000 students, in the neighborhood of 7,800

16   students.

17   Q.  And approximately how many of those roughly 8,000

18   students participated in this hybrid A/B model that you're

19   describing?

20   A.  The vast majority of our students.  We did have -- some

21   students would be the exception, a very few that continued

22   with the distance learning, but the vast majority of our

23   7,800 students from kindergarten through twelfth grade

24   participated in the A/B hybrid learning formula.

25   Q.  With respect to the vast majority that did the A/B, what

BILL MENOZZI - DIRECT (EBERT)

1   did food look like for them coming from the school district

2   starting in the fall of 2020?

3   A.  On the days that our students were in school, in-person

4   learning, they received their breakfast and lunch at school.

5   And so we were able to provide breakfast and lunch, not in a

6   normal manner, but we were able to provide that with our

7   kitchens in school.

8   Q.  What do you mean, "not in a normal manner"?

9   A.  We still needed to achieve social distancing, right?

10  And so we would spread out the cafeteria tables.  We would

11  limit the number of students at each table.  We were able to

12  provide meals, but we just had to spread students out.

13          So I guess when I am talking about not in a normal

14  manner, I am talking about achieving social distancing.  So

15  it didn't look the same as it did pre-pandemic with regard

16  to all students sitting together in a cafeteria.

17  Q.  I'm sorry.  So you mentioned that they received it on

18  which days?

19  A.  When students were in session, they received their

20  breakfast and lunch at school that day.  And then at the end

21  of that day -- so if I'm an A block student and it's a

22  Monday, it's an in-person day for me, I would receive my

23  breakfast and lunch for that day, for that Monday, while I'm

24  there.  Then at the end of the day, at the end of the school

25  day, because tomorrow is a B day, I'm going to be distance

BILL MENOZZI - DIRECT (EBERT)

1    learning that day, we gave students an opportunity at the
2    end of the day to take home a breakfast and a lunch for the
3    next day just to make sure they had food available, whether
4    in-person or at home, for all five days.
5    Q.  And did students avail themselves of the take-home
6    breakfast and lunch for the following day?
7    A.  Yes, they did.  It was a little bit of a learning
8    environment in terms of students trying to understand, okay,
9    I'm going to be home tomorrow, what does that look like for
10   meals, and working with our teachers and our school
11   administrators to communicate that message, but students did
12   take advantage of the meal at the end of the day.
13   Q.  You testified on Friday about the types of foods that
14   the district would make available to the population.  Do you
15   remember that?
16   A.  Yes, I do.
17   Q.  And did that include providing a menu that was sensitive
18   to potential allergies?
19   A.  Yes.
20   Q.  As well as to particular, you know, dietary
21   restrictions, depending upon the population of your
22   students?
23   A.  Yes, that's correct as well.
24   Q.  Did those types of factors, were they reflected in what
25   the school was serving in the fall of 2020?

1    A.  Yes, we continued with that.  An example, allergy

2    restrictions, things like lactose, milk, some butter in some

3    cases for peanut allergies, making sure that we had a turkey

4    and a ham option for sandwiches, things of that nature,

5    making sure that we adhered to the dietary and allergy

6    restrictions that we know to be true for our students.

7    Q.  Now, you mentioned some students opted to stay at home

8    starting in the fall of 2020; is that right?

9    A.  That's correct.

10   Q.  What, if anything, did the district do to provide food

11   to those students?

12   A.  Yes.  So we had some students, some -- a percentage of

13   the population, a small percentage of the population that

14   opted to stay home.  I remember conversations with families

15   that they may have somebody at home that is

16   immunocompromised or has -- just can't be exposed, and so

17   those students stayed home.  We did provide an opportunity

18   for meal delivery for those students.

19          So there was a Google form that went out and

20   families were able to fill out that form.  So even if those

21   students were not at their school for the hybrid learning

22   environment, if they were home 100 percent of the time, they

23   still had access to meals via delivery from the school by

24   filling out a form.

25   Q.  Did the same methods of communicating to the population

BILL MENOZZI - DIRECT (EBERT)

1    apply with respect to the stay-at-home students in the fall

2    of 2020?

3    A.  Yes.  Those three different languages, English, Spanish

4    and Somali.

5    Q.  Approximately when did the fall semester that began in

6    September 2020, approximately when did it end?

7    A.  This is -- I'm not as familiar with semesters.  Based on

8    my job in finance and operations, I'm more familiar with

9    fiscal years.  So I guess I'm not sure in terms of semester.

10            MR. GOETZ:  Objection.  602, Your Honor, at this

11    point, foundation.

12            THE COURT:  Overruled.  You may answer.

13            THE WITNESS:  I'm not as familiar with semesters.

14    So I know that we continued in this A/B hybrid learning

15    format from approximately the -- not approximately, but from

16    the start of the school year through the beginning part of

17    November; and I remember that because that's during the fall

18    of 2020 when COVID really spiked again.

19    BY MR. EBERT:

20    Q.  So then what happened when it spiked again?

21    A.  Sure.  We got together again as an administrative team

22    and talked about what we were going to do, and I remember --

23    I remember the date.  November 17th of 2020 we moved all of

24    our students again -- and this was a very, very tough

25    decision as a school district -- we moved all of our

BILL MENOZZI - DIRECT (EBERT)

1   students from that A/B hybrid form back to distance learning

2   because of the COVID spike.

3            We did that from November of 2020 until after

4   winter break, so approximately that early January time

5   frame.  So November 17th through early January, I think

6   January 4th, we moved all students back to distance

7   learning.

8   Q.  And so from November 2020 until, you said, January 2021?

9   A.  That's correct.

10  Q.  Was the school providing food to the students during

11  that time period?

12  A.  We did.  This would be the only time where the meal

13  pickup and meal delivery did not mirror each other.  So

14  during November 17th to early January we provided meal

15  pickup at the high school just like we always did before,

16  not always -- like we did before in March to August of 2020.

17  So we provided meal pickup opportunities at the high school

18  during that time, November 17th through January 4th.  We

19  just were not able to provide meal delivery.  So we provided

20  meal pickup at the high school during that time.

21  Q.  And did families avail themselves of that pickup

22  location?

23  A.  Yes, they did.

24  Q.  Can you explain.

25  A.  Families would come through the drive-thru line.  We

1    had, just from a logistics standpoint -- our Shakopee High

2    School is a large high school.  Door number 20 is the door

3    on the north side of the high school in normal times where

4    the bus lineup occurs, and so we would have a big sign

5    outside and families would pull through that area and we

6    would bring meals out for the students for pickup during

7    that time.  So families were able to come and pick up those

8    meals and took advantage of that.

9    Q.  And then can you explain what happened with respect to

10   the school year after students returned in January 2021.

11   A.  Yes.  So we were excited to welcome our students back in

12   early January 2021 and to a hybrid learning environment

13   again.  We are sort of in this pattern where we started the

14   school year 2020-2021 in a hybrid form, we go to distance

15   learning and then we go back to hybrid, which I remember at

16   that point really felt like a step in the right direction.

17   For our students, for our faculty and for our

18   administrators, we were excited about that chance to return

19   in January.

20   Q.  And for how long did the school maintain the hybrid

21   model when you resumed in January 2021?

22   A.  Yeah, we were in hybrid learning again from January

23   until early April, and so really those winter months,

24   January, February, March.  Our normal spring break in

25   Shakopee School District is sort of that last week of March,

1    first week of April time frame.

2              And so after spring break and really throughout

3    March, we were seeing those COVID cases going the right

4    direction.  And so after spring break in 2021, finally, in

5    April we were able to return for the first time since March

6    of 2020 to a normal learning environment, in April of 2021.

7    Q.  And prior to spring break in March of 2021, were

8    students receiving -- did students have the option to

9    receive two meals when it was their A or B day to be on

10   campus?

11   A.  Yes.  So the form of the meal -- serving the meals when

12   students were in session and the form of the meals during

13   their hybrid day was the same January through spring break

14   as it was to start the year; they received a meal in session

15   and then at the end of the day they had an option to take a

16   meal for the next day.

17   Q.  And during the time frame you're testifying about right

18   now, did the same measures apply with respect to students

19   doing distance learning at home?

20   A.  Yes.

21   Q.  Now I want to direct your attention to the summer of

22   2021.  Did the district provide food options to the student

23   population then?

24   A.  Yes, we did.

25   Q.  Can you explain that to the jury, please.

1    A.  It was similar to the summer of 2020 but a little bit

2    different in terms of this was our second summer,

3    unfortunately, providing -- I say "unfortunately" because of

4    the continuation of COVID during the summer of 2021 --

5    providing meals to students.

6             So we provided the same meal pickup at the high

7    school and the same meal delivery to those identified sites

8    within our Shakopee school community, and we did that for

9    the time period June 15th of 2021 through September 2nd of

10   2021.  So from June 15 to September 2nd, meal pickup at the

11   high school, meal delivery at those ten sites is what we

12   provided.

13   Q.  And communications about these options, were those put

14   out there to the public?

15   A.  Yes.  Communications were the same in the three

16   languages, on the website, social media, sending information

17   home with families.

18             I do remember the end of the school year 2021 --

19   so May and June of 2021 obviously different than May and

20   June of 2020 because we were entirely in distance learning

21   during that time, May and June of 2020.

22             2021 students were in session and so we had an

23   opportunity to work with our students, work with our

24   families to communicate the upcoming opportunities for meal

25   pickup at the high school and meal delivery.  We were just

BILL MENOZZI - DIRECT (EBERT)

1    able to get the information out to our students at the end

2    of the year.

3    Q.  Now I want to direct your attention to the fall of 2021.

4    Can you explain to the jury what school looked like for

5    Shakopee starting in that semester.

6    A.  So the fall of 2021 was our return to a normal learning

7    environment, "normal learning environment" meaning all

8    students in person all five days, all students having the

9    opportunity for breakfast and lunch in school every day.

10   Just a great time for our school community in terms of a

11   return to a normal learning environment to start the school

12   year.

13   Q.  Mr. Menozzi, I want to show you an exhibit that's been

14   marked but not yet admitted, and you should see this in a

15   moment up on your screen.  This has been marked as

16   Exhibit C-120.  Do you see that on your screen?

17   A.  Yes, I do.

18   Q.  And do you recognize it?

19   A.  Yes, I recognize Clifton Townhomes, yes.

20   Q.  And is it a photograph of Clifton Townhomes?

21   A.  Yes, it is.

22   Q.  And how do you recognize it?

23   A.  Clifton Townhomes was one of our ten delivery sites for

24   the entirety of the pandemic.  So when I am talking about

25   the entirety, I am talking March 2020 through September 2nd

1    of 2021 that was one of our ten delivery sites.

2    Q.  Is it a true and accurate depiction of it?

3    A.  Yes, it is.

4           MR. EBERT:  At this time the government offers

5    Exhibit C-120.

6           MR. GOETZ:  No objection, Your Honor.

7           THE COURT:  C-120 is admitted.

8    BY MR. EBERT:

9    Q.  Okay.  Now that the jury has a chance to see this, can

10   you explain what we're looking at here with this photo of

11   Clifton Townhomes.

12   A.  So the photo is of the entrance to Clifton Townhomes.

13   And what you see, obviously, are some garages straight

14   ahead.  On the right side of the photo would be the office

15   area, and then there are a handful of low-income townhome

16   housing units within the area.  And then sort of what you

17   see is the main parking, the main parking area of Clifton

18   Townhomes.

19   Q.  And where would the bus typically pull up?

20   A.  As I mentioned, I had the opportunity to visit Clifton

21   Townhomes.  Our bus would pull up in the driveway that you

22   see and then would park by the office building on the right

23   and that's where we would park, and the students would come

24   and gather their meals at that office building.

25   Q.  And did the district keep track of the number of meals

1    it was handing out on a given day at a given location?

2    A.  Yes, we did.

3    Q.  And generally speaking -- and are you familiar with

4    those numbers?

5    A.  Yes, I am.

6    Q.  Generally speaking, approximately how many would you

7    observe seeing at Clifton Townhomes?

8              MR. GOETZ:  Objection, Your Honor.  Foundation.

9    May I inquire?

10             THE COURT:  Foundation as to time, is that what

11   you are concerned about?

12             MR. GOETZ:  As to numbers and time and personal

13   observations.

14             THE COURT:  Can you lay more foundation?

15   BY MR. EBERT:

16   Q.  Starting off in the early months of the pandemic, March,

17   April, May, 2020, at that time did you participate in

18   delivery at Clifton Townhomes?

19   A.  Yes, I did.

20   Q.  Based on your observations, generally is there a range

21   of how many you would see?

22             MR. GOETZ:  Same objection, Your Honor.

23             THE COURT:  Overruled.  You may answer.

24             THE WITNESS:  In the mid 20s would be an average

25   day.  Sometimes as high as 40 meals, sometimes as low as the

1    low teens, as I mentioned, with those same variables.  But

2    25 meals would be -- for Clifton Townhomes per day would be

3    an average.

4    BY MR. EBERT:

5    Q.  At any point in 2020 or 2021 did the school district

6    serve hundreds of meals servings at Clifton Townhomes per

7    day?

8    A.  No, not one time.

9    Q.  Are you aware of any organization other than the school

10   district in 2020 or 2021 that was distributing food at

11   Clifton Townhomes?

12   A.  No, I'm not.

13   Q.  Did you ever observe any other organization in 2020 or

14   '21 delivering food at Clifton Townhomes?

15   A.  No, I did not.

16   Q.  I'm showing you what is in evidence as Exhibit N-28.

17   Can you see that on the screen?

18   A.  Yes, I can.

19   Q.  I'm going to enlarge a part of it so we can see.

20           This summary of meal claims at issue in this case,

21   do you see first October 2020?

22   A.  Yes, I do.

23   Q.  Can you remind the jury, what was happening with the

24   school district in October of 2020?

25   A.  We were in a hybrid learning environment, that A/B

1    environment, in October of 2020, so where kids would receive

2    their meal, breakfast and lunch, when it was their day to be

3    on-site at their school and then at the end of the day they

4    would receive their meal -- an option to receive their meal

5    for the next day when they were remote.

6    Q.  And then at the bottom of this claims data, do you see

7    where it says average daily attendance for October, November

8    and December of 2020?

9    A.  Yes, I do.

10   Q.  And what numbers do you see?

11   A.  October 2020, average daily attendance of 406; November

12   2020, average daily attendance of 449; December 2020,

13   average daily attendance of 450.

14   Q.  How do those numbers compare to what the school district

15   served at this location?

16   A.  Significantly more.

17   Q.  Even close?

18   A.  Not close.

19           MR. GOETZ:  Objection.  Argumentative, Your Honor.

20           THE COURT:  Overruled.  You may answer.

21           THE WITNESS:  Not close.  As I mentioned, during

22   the summer --

23           MR. GOETZ:  Objection.  Nonresponsive at this

24   point, Your Honor.

25           THE COURT:  Sustained.  Will you ask another

1     question?

2              MR. EBERT:  Your Honor, could I just clarify what

3     the answer was to the previous question --

4              THE COURT:  You may.

5              MR. EBERT:  -- before the most recent objection?

6              THE COURT:  You may.

7     BY MR. EBERT:

8     Q.  Did you answer that these numbers were not even close;

9     is that right?

10    A.  The numbers shown here under the row of average daily

11    attendance for October, November, December of 2020 were not

12    close to the meal delivery counts that we had during the

13    pandemic.

14    Q.  All right.  Now I've enlarged a bigger area of this

15    chart.  Are you able to see that on the screen, sir?

16    A.  Yes, I am.

17    Q.  Directing your attention to January through May 2021,

18    can you remind the jury what school looked like for Shakopee

19    students during that time frame.

20    A.  Yes.  January, February and March we were in the hybrid

21    learning environment, the A/B schedule; and then starting in

22    April, early April, post spring break through the end of the

23    school year and early June, we were back to a normal

24    learning environment.

25    Q.  Was there ever a point in time where the school district

BILL MENOZZI - DIRECT (EBERT)

1    delivered 80,600 servings of food to Clifton Townhomes in a

2    month?

3    A.  No, we never delivered that quantity of food.

4    Q.  What about March of 2021, was there ever a point where

5    the Shakopee District delivered 93,000 servings of food to

6    Clifton Townhomes?

7    A.  No.  No again.  And I don't believe that would be

8    possible.

9    Q.  Why not?

10            MR. COTTER:  Objection.  Nonresponsive,

11   Your Honor.

12            THE COURT:  Overruled.  It will stand.

13   BY MR. EBERT:

14   Q.  And why not?

15   A.  Logistical challenges of getting that quantity of food

16   to that small of a location.

17            Clifton Townhomes is in a rather densely populated

18   residential area in Shakopee.  As I mentioned, our ten

19   sites -- it is near Pearson Early Learning Center, just to

20   the north of Pearson Early Learning Center or a residential

21   area.

22            The parking area is rather small, room for in the

23   neighborhood of 50 to 70 vehicles in total.  And I remember

24   we had conversations with our transportation provider --

25            MR. IAN BIRRELL:  Objection, Your Honor.  Hearsay.

```
 1              THE COURT:  Sustained.  You can re-ask a question.
 2              MR. EBERT:  Yes, Your Honor.
 3    BY MR. EBERT:
 4    Q.  Directing your attention back to these months in 2021,
 5    do you see at the very bottom where it's indicating an
 6    average daily attendance under the CACFP program?
 7    A.  Yes, I do.
 8    Q.  It indicates 850 up to 1,000 daily attendance by April
 9    and May 2021.  Do you see that?
10    A.  I see 1,000 average daily attendance March, April and
11    May of 2021.
12    Q.  Are those numbers close to what the district delivered
13    to this site?
14    A.  No.  Those numbers are significantly higher than what we
15    delivered to the site.
16    Q.  Now I want to focus on the summer of 2021.  Was the
17    school delivering to this site in the summer of 2021?
18    A.  To Clifton Townhomes?
19    Q.  Yes.  Was it?
20    A.  Yes, we were.
21    Q.  In a portion of June 2021 and a portion of -- strike
22    that.
23              In June of 2021, did the district have an average
24    daily attendance of 1,000 food servings in the month of June
25    2021?
```

1   A.  No.  Significantly less than 1,000 servings in June of
2   2021.
3   Q.  Do you know what the school was serving at this site in
4   the summer of 2021?
5   A.  Yes, I do.  We were serving meals generally in the mid
6   teens to low 20s per site per day.
7   Q.  And then to end the year 2021, by October, November,
8   December 2021, what was the status of Shakopee students?
9   A.  Shakopee students were back in session full-time to
10  start -- for the entirety of the 2021-22 school year.  So
11  starting on September -- after Labor Day, September of 2021,
12  through the entirety of the 2021-22 school year we were in
13  session full-time.
14  Q.  Next I want to show you another item that is not yet in
15  evidence.  It's been marked as C-197.  Do you recognize
16  that?
17  A.  Yes, I do.
18  Q.  And what do you recognize it to be?
19  A.  That is Sarazin Flats.  It's an apartment complex in
20  Shakopee.
21  Q.  Is it a true and accurate depiction of that location?
22  A.  Yes, it is.
23          MR. EBERT:  At this time the government offers
24  Exhibit C-197, Your Honor.
25          MR. IAN BIRRELL:  No objection.

BILL MENOZZI - DIRECT (EBERT)

```
 1              THE COURT:  C-197 is admitted.
 2   BY MR. EBERT:
 3   Q.  Now that the jury has a chance to look at it, can you
 4   explain what we see on the screen, sir.
 5   A.  Sarazin Flats is an apartment complex in Shakopee just
 6   to the south of Highway 169, which is sort of the main
 7   highway that goes through Shakopee.  It's visible from
 8   Highway 169 adjacent to Target and it was an area in our
 9   school district.  It was one of the ten sites where we
10   delivered meals throughout the pandemic.
11   Q.  And can you describe, looking here at the first page of
12   this exhibit, C-197, where food was handed out by the school
13   district.
14   A.  Yes.  Sarazin is a -- the entrance is sort of a
15   cul-de-sac in between Target and the apartment complex.
16   When we delivered meals -- and as I mentioned before, this
17   was one of the sites that I had an opportunity to visit --
18   we would pull into the turnaround area with the small buses,
19   and then students would come and gather their meals from
20   that collection area in the parking lot of Sarazin.
21   Q.  And focusing in on the months within 2020 of March to
22   the end of the summer of 2020, typically how many meals were
23   handed out on a given day at this location by the school?
24   A.  Again, in the mid 20s.  You know, mid 20s would be an
25   average per day.  Some days higher, 35 to 40.  Some days in
```

BILL MENOZZI - DIRECT (EBERT)

```
1   the low teens.  But, again, mid 20s would be an average
2   number per day.
3   Q.  Are you aware of any other organization in 2020 or 2021
4   that delivered food to children here, besides the school
5   district?
6   A.  No, I'm not.
7   Q.  I'm showing you what is in evidence as Exhibit N-46.  Do
8   you see that?
9   A.  Yes, I do.
10  Q.  And with respect to the month of March 2021, students
11  were doing the hybrid model at that point in time; is that
12  correct?
13  A.  That is correct.
14  Q.  Do you see here under this claims data there is an
15  indicated average daily attendance of 502?  Do you see that?
16  A.  I do.
17  Q.  And how does that measure against what the school
18  district did when it served meals at this location?
19  A.  Again, significantly more.  As I mentioned, we were in
20  sort of the mid 20s.  Never higher than 40 or 50 per day.
21  Q.  Next I'm going to show you an exhibit that is not in
22  evidence but is marked as Exhibit C-59.  Do you recognize
23  that?
24  A.  Yes, I do.
25  Q.  And what is it?
```

1    A.  That is Bonnevista Terrace.  It's a mobile home park in

2    Shakopee.

3    Q.  A location that you are familiar with?

4    A.  It is.  Bonnevista is right across the street, Old Brick

5    Yard Road, from the school district office, which, as I

6    mentioned on Friday, we have ten school district locations

7    and then a school district office.  Bonnevista is right

8    across the street from our district office.  It's a site

9    that I see every day when I go to work.

10    Q.  Is this a true and accurate depiction of that location?

11    A.  Yes, it is.

12        MR. EBERT:  At this time, Your Honor, the

13    government offers Exhibit C-59.

14        MR. IAN BIRRELL:  Without objection.

15        THE COURT:  C-59 is admitted.

16    BY MR. EBERT:

17    Q.  Okay.  Now that the jury is able to see this, can you

18    explain what we are looking at on the screen.

19    A.  Yes, I can.  So this is the main entrance to Bonnevista

20    mobile home park.  You see the main drive in there.  You

21    have the option to either drive straight ahead and enter the

22    mobile home park residential area or you can veer off to the

23    left and there's a gravel parking lot for parking as well.

24    Q.  Okay.  And you said that this is across the street from

25    a certain location.  Did I get that right?

1    A.  That's correct.  It is across the street from the school

2    district central office.  And I should clarify, where the

3    school district central office -- the superintendent,

4    assistant superintendent, and all of the directors and their

5    staff are housed at the school district central office.

6    Q.  And where do you work?

7    A.  I work there at the school district central office.

8    Q.  And what type of facility is Bonnevista Terrace?

9    A.  It is a mobile home park.

10   Q.  And do you have a sense of approximately how many

11   enrolled Shakopee students lived there in 2020-2021?

12   A.  The sense that I would have on that would be based on

13   participation in the meal delivery program.

14   Q.  And what did you observe on that front when you were

15   there?

16   A.  Slightly more than the previous two that we talked

17   about.

18           So this has a little bit larger footprint, meaning

19   a little bit larger in terms of acreage where the mobile

20   home park is, rather than the townhome and the apartment

21   that we looked at previously.

22           On average, we delivered approximately 40 meals at

23   Bonnevista.  And so in terms of the number of students that

24   reside there, I assume it to be slightly more than 40 based

25   on participation.

BILL MENOZZI - DIRECT (EBERT)

1    Q.  Are you aware of any other organization that distributed

2    food to children at Bonnevista Terrace in 2020?

3    A.  No, I'm not.

4    Q.  What about throughout 2021?

5    A.  No again.

6    Q.  Did you ever observe food being distributed other than

7    the Shakopee School District at this location in 2020?

8    A.  No.  And this one -- as I mentioned, I see it every day.

9    I drive by it every day, most days several times per day.

10   And so during that time, I never saw anybody else delivering

11   food there.

12   Q.  Is that also true for 2021?

13   A.  That is.

14   Q.  I'm showing you what's in evidence as Exhibit N-18.  Do

15   you see that?

16   A.  Yes, I do.

17   Q.  And do you see where it indicates meals claimed for the

18   month of December 2021?

19   A.  Yes, I do.

20   Q.  Average daily attendance of 222?

21   A.  Yes, I see that.

22   Q.  Is this anything you ever observed?

23   A.  No, not close to anything I would have observed.

24   Q.  What do you mean, "not close"?

25   A.  Our meal delivery was significantly less.  As I

1    mentioned, on average about 40 per day at Bonnevista.  So

2    that's what I mean by "significantly less."

3    Q.  And in December 2021, what did life look like for

4    Shakopee students at that point?

5    A.  So December 2021 is within the 2021-22 school year and

6    so that was a return to a normal learning environment.  We

7    did have a very brief pandemic adjustment from November 22nd

8    to 26th over Thanksgiving break, but we're looking at

9    December here, which would have been after that.  Our

10   students would have been in person full-time in the month of

11   December 2021.

12   Q.  Jumping back to the beginning of the pandemic, in the

13   spring of 2020 was there ever a time where at the high

14   school pickup the school ran out of food?

15   A.  No.  The need at the high school, meaning the number of

16   students, was always fulfilled by the food available,

17   always.

18   Q.  In the spring of 2020, was there ever a time where on

19   the ten-site delivery the district ran out of food?

20   A.  Never.  We always had sufficient quantity to meet the

21   need.

22   Q.  In the summer of 2020, did the district ever run out of

23   food at the sites or at the high school pickup?

24   A.  No.

25   Q.  In the fall of 2020 under the hybrid system, did the

1    district ever run out of food to offer to students while

2    they were in school?

3    A.  No.  We never ran out of food for both hybrid students

4    that were in person that day, breakfast and lunch in school,

5    and we never ran out of food for students taking meals home

6    at the end of the day for their hybrid day the next day.

7    Q.  Did the school ever run out of food for folks doing

8    distance learning in 2020 and 2021?

9    A.  No.

10   Q.  At any point in 2021, any of the four seasons of that

11   year, did the Shakopee School District not have enough food

12   to give to the students?

13   A.  No.  The need was always met.

14              MR. EBERT:  Thank you, Your Honor.  I have no

15   further questions.

16              THE COURT:  Thank you, Counsel.

17              Cross-examination, Mr. Goetz.

18              MR. GOETZ:  Thank you, Your Honor.  I will need

19   just a minute, please, Your Honor.

20              THE COURT:  Yes.

21                   (Pause in proceedings)

22                   **CROSS-EXAMINATION**

23   BY MR. GOETZ:

24   Q.  Okay.  Good morning, sir.

25   A.  Good morning.

1    Q.  Is your last name pronounced mah-noz-ee?  Did I

2    pronounce that --

3    A.  That's correct, mah-noz-ee is the correct pronunciation.

4    Q.  Well, my name is Frederick Goetz.  I represent Mukhtar

5    Shariff.

6              We've never met before, have we?

7    A.  No, we have not.

8    Q.  You have met the folks on this side of the courtroom

9    (indicating), the government prosecution team, correct?

10   A.  That's correct.

11   Q.  A couple times, right?

12   A.  That's correct.

13   Q.  And you had the pleasure of going to the U.S. Attorney's

14   Office down on the sixth floor and go to a big meeting room

15   there?

16   A.  It was not a big meeting room, but correct.

17   Q.  Must have been cozy, then, because you had a lot of

18   folks there, right?  You had about five prosecutors and at

19   least four agents.  Do you remember that?

20   A.  I don't recall the number, but I do recall meeting.

21   Q.  A lot of folks, fair to say, right?

22   A.  I wouldn't call it a lot of folks.  In the room there

23   was less than ten.

24   Q.  Okay.  You have never met with anybody on this side of

25   the courtroom (indicating), to your knowledge; is that

1   right?

2   A.  That's correct.

3   Q.  Okay.  So first, Mr. Menozzi, I just want to get an idea

4   of the, if you will, org chart for the Shakopee Public

5   Schools.  Is that all right?

6   A.  Yes.

7   Q.  So you are the director of finance and operations; is

8   that right?

9   A.  That's correct.

10  Q.  Your direct report is to the superintendent; is that

11  correct?

12  A.  Correct.

13  Q.  And his name is?

14  A.  His name is Dr. Mike Redmond.

15  Q.  And did you and he work together at the Mahtomedi School

16  District?

17  A.  We did not.  We both worked there, but at separate

18  times.

19  Q.  I see.  I see.

20          So he's your -- you directly report to him.  Who

21  directly reports to you in the area of food service?

22  A.  Deb Ross is our food service manager.

23  Q.  Deb Ross-Coen, food and nutrition services manager; is

24  that right?

25  A.  That's correct.

BILL MENOZZI - CROSS (GOETZ)

```
 1    Q.  Okay.  And so in terms of establishing the menus,
 2    packaging the food, doing all of that organization, is that
 3    Ms. Ross-Coen's area?
 4    A.  Packaging the food would not be Ms. Ross-Coen's area.
 5    That would be our head cooks at each of the buildings.  Our
 6    food service manager, Ms. Ross-Coen, plays an integral role
 7    in setting the menus and making sure that all of the menus
 8    are reimbursable meals, meaning they have those
 9    qualifications.
10    Q.  Okay.  And I'm glad you mentioned that phrase,
11    "reimbursable meals."  Are you familiar with that phrase
12    being associated with the U.S. Department of Agriculture?
13    A.  Yes, I am.
14    Q.  And the Minnesota Department of Education?
15    A.  That's correct.
16    Q.  I'll come back to that.  But since we're talking about
17    the food program, forgive me, but I am going to drag you
18    into acronym land for a little bit.  Okay?  We're going to
19    go through some acronyms.
20          We talked about the USDA, U.S. Department of
21    Agriculture.  Are you familiar with the SNP?
22    A.  Yes.
23    Q.  That's the School Nutrition Program; is that right?
24    A.  That's correct.
25    Q.  Now, over the course of your testimony today and on
```

BILL MENOZZI - CROSS (GOETZ)

```
1    Friday, have you been telling us about your involvement --
2    when I say "you," you and the Shakopee Public Schools --
3    giving food to children under the School Nutrition Program?
4    A.  Yes.
5    Q.  Okay.  There's another program called the Child and
6    Adult Care Food Program.  Is the Shakopee Public Schools
7    involved in distributing food to children under that
8    program?
9    A.  I do not know that information.
10   Q.  Okay.  There's another program, SPB.  Are you familiar
11   with that acronym?
12   A.  There are a number of acronyms in food service in the
13   state of Minnesota.  I'm not familiar with all of them.
14   That's one I'm not familiar with.
15   Q.  Well, forgive me, but this case is about child food
16   programs and I need to kind of find out how much you know
17   about those.  All right?  If you don't know, that's fine.
18   We just want to clarify that.
19           So the SPB, you don't know what that acronym is?
20   A.  No.
21   Q.  School Breakfast Program, you're not familiar with that?
22   A.  I'm familiar with the program.  The acronym eluded me.
23   Q.  Got it.
24           NSLP, are you familiar with that acronym?
25   A.  National School Lunch Program?
```

BILL MENUZZI - CROSS (GOETZ)

```
 1    Q.  Got it.
 2            AFSS, are you familiar with that program?  And I
 3    will tell you After School Snack Program.  Sounds like you
 4    didn't know that one; is that fair?
 5    A.  Again, the acronym eluded me.
 6    Q.  Okay.  MKMP, are you familiar with that program,
 7    Minnesota Kindergarten Milk Program?
 8    A.  I knew it had to do with milk.
 9    Q.  All right.  Because -- all right.
10            SMP, are you familiar with that program?
11    A.  School Nutrition Program?
12    Q.  I'm sorry.  I didn't pronounce it.  SMP?
13    A.  School Milk Program.
14    Q.  Got it.
15            So those last series of acronyms that I've given
16    you, SPB, NSLP, AFSS, MKMP, SMP, those all fall under the
17    School Nutrition Program; is that your understanding?
18    A.  That's my understanding.
19    Q.  Okay.  Now, there's another program.  You said you
20    weren't familiar with the CACFP, the Child and Adult Care
21    Food Program.  Are you familiar with the Summer Food Service
22    Program?
23    A.  Yes, I am.
24    Q.  Okay.  And were the meals in the summer, that you've
25    been telling us about, that Shakopee Public Schools
```

BILL MENOZZI - CROSS (GOETZ)

1    distributed summer of 2020, summer of 2021 under that

2    program, that SFSP program?

3    A.  I know that before COVID and after COVID, the Summer

4    Nutrition Program is a program for extended school year,

5    summer school.  I am not familiar with the meals that were

6    claimed during COVID, if they fell under the School

7    Nutrition Program or the Seamless Summer Option.

8    Q.  So everything that you've been telling us about in the

9    last day -- two days, you don't know if it all falls under

10   this SMP bucket or if any of it falls under the SFSP bucket;

11   is that fair?

12   A.  My role is the director of finance and operations.  Our

13   manager of nutrition programs, food service, that's really

14   her umbrella.  She has that information.  And based on her

15   history and achievement in the district, I have every reason

16   to believe that her knowledge is appropriate for that.

17   Q.  Okay.  Respectfully, I'm going to ask that question

18   again because I don't think you answered it.

19        My question was:  Everything you've been telling

20   us about in terms of the food distribution in the summer at

21   the Shakopee Public Schools, you don't know if it falls

22   under the SNP, the School Nutrition Program, or the Summer

23   Food Service program, you yourself don't know; is that

24   right?

25   A.  That would be information that our food service manager

1    would have.

2    Q.  So let's dial back a bit and talk about the Shakopee

3    School District.

4              As I understand it from Friday, you told us that

5    that school district has 7,800 students, approximately; is

6    that right?

7    A.  Approximately, in grades kindergarten through twelfth

8    grade.

9    Q.  And was that consistent for 2020 and 2021,

10    approximately?

11    A.  For fiscal year 2020 and fiscal year 2021?

12    Q.  And perhaps I should say in school years.  So, say, for

13    the 2019-2020 school year and the 2020-2021 school year and

14    then the 2021-2022 school years, was it on average about

15    7,800 students?

16    A.  Yes.  We are in a period -- that's why I hesitated a

17    little bit.  We are in a period of slightly declining

18    enrollment as a district and so our enrollment has gone down

19    slightly overall.  It would not be significant to this

20    conversation, the decrease in our enrollment.

21    Q.  Okay.  So for purposes of our conversation, we can use

22    that 7,800 number as the approximate number of students in

23    your school district?

24    A.  Correct.

25    Q.  All right.  And as I recall your testimony from Friday,

1    you indicated that of that 7,800 student population, on a

2    typical day about 1,500 eat a meal, breakfast, lunch or

3    both; is that right?

4    A.   More specifically, the 1,500 number that I gave on

5    Friday was at our Shakopee High School.  So we have 7,800

6    students district-wide spread over our ten school buildings.

7    One of our buildings, Shakopee High School, serves

8    approximately 1,500 meals per day --

9    Q.   Okay.

10   A.   -- but in total we serve more than that.

11   Q.   Okay.  Thank you for that clarification.

12            Can you give me that total, then, how many meals,

13   breakfast, lunch -- how many students typically will get a

14   meal a day in the Shakopee public school system from your

15   schools?

16   A.   Can I ask you a clarifying question?

17   Q.   Sure.

18   A.   Before COVID?  After COVID?  During a normal learning

19   environment, is that what you are asking?

20   Q.   Right.

21   A.   In the neighborhood of 5,000 meals per day.

22   Q.   Okay.  So then there's approximately 2,000 -- and for

23   clarification, if I can ask you a -- do you mean 5,000 meals

24   or 5,000 students?  Because you offer two meals a day,

25   right?

1    A.  5,000 students would participate in our meal program on

2    average per day.

3    Q.  Okay.  So if you have 5,000 participating on average per

4    day, that could be 10,000 meals per day that Shakopee Public

5    Schools would be distributing, right?

6    A.  It would be unlikely that all 5,000 meals -- or students

7    would participate in both breakfast and lunch.  So 10,000

8    would be very unlikely because it would be unlikely both --

9    students would participate in both.

10   Q.  Okay.  So what would be a more likely number on a

11   pre-COVID average day?

12   A.  I don't have the participation numbers and breakout for

13   breakfast and lunch, so I am going to stick with the 5,000

14   because that's the number that I'm familiar with based on my

15   role in the organization.

16   Q.  Okay.  All right.  And the meals that you provide are

17   breakfast and lunch, correct?

18   A.  That's correct.

19   Q.  You don't provide after-school snacks, correct?

20   A.  No.

21   Q.  You don't provide a meal called supper; is that right?

22   A.  No.

23   Q.  Now, during the pandemic we heard that the numbers of

24   meals provided, it seems like they decreased, is that right,

25   provided by the Shakopee Public School District?

BILL MENOZZI - CROSS (GOETZ)

1    A.  I'm sorry.  Can you ask that question again?

2    Q.  Sure.  You told us -- we were talking about pre-pandemic

3    you said typically 5,000 kids in your school district got a

4    meal from the Shakopee Public Schools each day.  When the

5    pandemic happened, I understood that those numbers of kids

6    getting meals decreased, you had less kids getting food from

7    Shakopee Public Schools.  Is that accurate?

8    A.  That's correct.  Not all students that traditionally

9    participated in the meal program during an in-person

10   learning environment participated in meal pickup or

11   delivery.

12   Q.  So as I understood your testimony -- and please correct

13   me if I'm wrong -- on a daily basis pandemic -- and we are

14   just talking about when the pandemic started.  So in the

15   spring of 2020 you had 300 to 600 kids from the high school

16   who would participate every day, is that right, pick up a

17   meal?

18   A.  Yes.

19   Q.  All right.  And you had the distribution sites.  There

20   were ten of them.  Between 30 to 60 meals at each site per

21   day; is that right?

22   A.  For the time frame March of 2020 through the end of the

23   school year, so second week of June, that would be an

24   average number, yes.

25   Q.  Okay.  So if we add, then, those numbers together,

BILL MENOZZI - CROSS (GOETZ)

```
 1    thinking of that 5,000 pre-pandemic, early phase of the
 2    pandemic, it would have been between 600 and 1,200 meals
 3    that Shakopee Public Schools was distributing, correct?
 4    A.  Can you give me your calculations, how you arrived at
 5    that number?
 6    Q.  Sure.  And you're the finance guy.  Please correct me if
 7    my numbers are wrong.
 8            But you've got 300 to 600 meals at the high school
 9    every day, right?
10    A.  That's correct.
11    Q.  You have ten sites distributing either 30 to 60 meals at
12    each site, right?
13    A.  Correct.
14    Q.  That's 300 to 600, correct?
15    A.  Yep.
16    Q.  So you take 300 plus 300 equals 600 on the low end.  Are
17    you with me?
18    A.  I'm with you.
19    Q.  And 600 plus 600, 1,200 on the high end.  Are you with
20    me on that?
21    A.  Yes.
22    Q.  Okay.  So then first phase of the pandemic, Shakopee
23    Public Schools were distributing between 600 and 1,200
24    breakfasts and lunches per day, right?
25    A.  Yes.
```

1   Q.  Okay.  The kids who previously got food at the high

2   school and the other schools, the difference being between

3   about 30 -- I guess 4,400 and 3,800, you'd agree they still

4   have to eat, right?

5   A.  All people have to eat, yes.

6   Q.  They would have to get food from somewhere, correct?

7   A.  Correct.

8   Q.  Now, the participation rates that we just went through,

9   it seemed to me -- and correct me if I'm wrong, but as I

10  understood your questioning from Mr. Ebert, that the number

11  of students picking up meals during the pandemic was highest

12  at the early phase of the pandemic, the spring 2020 time

13  period.  Is that right or did I have that wrong?

14  A.  The first phase of the pandemic was our highest

15  utilization.

16  Q.  Okay.  And then from the summer of 2020, did your

17  utilization rates decrease in that summer?

18  A.  I wouldn't say decrease.  They varied, again, based on

19  those factors that I talked about earlier, weather, day of

20  the week, time of -- the summer.

21  Q.  Okay.  So if we had between 600 and 1,200 participation

22  rate in the spring, what was the participation rate for all

23  your schools, then, in the summer of 2020?

24  A.  I don't know that I have an exact number.  It would be

25  on average a little bit less than the first phase of the

 1    pandemic, but not materially different than the first phase
 2    of the pandemic.
 3    Q.  So for purposes of our broad general discussion, can we
 4    still use that 600 to 1,200 number for that summer of 2020?
 5    A.  I think that would be an appropriate number, yeah.
 6    Q.  And -- so then we still have between 4,400 and 3,800
 7    students who previously got food in the public schools who
 8    had to get their meals from somewhere else, correct?
 9    A.  Yes.  And many of our families in both the first phase
10    of the pandemic and throughout the pandemic, many of our
11    students made the decision to just eat at home, eat their
12    food at home.
13    Q.  And you obviously don't have personal knowledge of, you
14    know, the families and the children who did not get food
15    from the Shakopee School District, where they get their food
16    from.  Correct, you don't have personal knowledge of that?
17    A.  No, we would not have that information.
18    Q.  And within the School District of Shakopee, would you
19    agree there are students who don't attend the Shakopee
20    Public Schools?
21    A.  Yes.  We have students that are homeschooled.  We have a
22    nonpublic school.  Shakopee Area Catholic School is in our
23    school district boundary.  We have charter schools.  All of
24    those students were eligible to participate in the pickup
25    program, that is to say, a Shakopee Area Catholic School

1    student, a homeschool student, a charter school student,

2    they were all -- any school-age child was eligible to

3    participate in the program.

4    Q.  Okay.  But whether they did or not, you don't know,

5    correct?

6    A.  We know if they participated in the program.  We don't

7    know where they received their food if they did not

8    participate in the program.

9    Q.  All right.  Now I want to talk about the food that you

10   did distribute.  We talked about the meals, just the

11   breakfast and the lunch.

12             Did you put two meals in a bag, then, and give it

13   to the kids; or how were those meals distributed when you,

14   you know, gave away food at the high school and went to the

15   ten sites?

16   A.  We would prepare the food for delivery in those two

17   kitchens, Jackson and West, and then we would prepare the

18   food for pickup at the high school.

19             To answer your question directly, we would put

20   lunch in one paper bag, we would put breakfast in another

21   paper bag; and we would make sure those two bags are

22   together, either with a staple or some other adjoining

23   material.

24             And then we would take the lunches from the food

25   prep kitchens, put them in milk crates or other cardboard

1    boxes and then load those onto the buses, usually using the
2    back of the bus door that swings open.
3              And then we would load the buses up and then
4    deliver the food to those ten sites, utilizing our
5    paraprofessionals, which I spoke about on Friday, our
6    teacher assistants and utilizing, obviously, our bus drivers
7    and our transportation company.
8    Q.  So when the students, then, would come to pick up a bag,
9    they would get one bag with two bags -- two bags within a
10   bag, so two meals in a bag that they would then take with
11   them?
12   A.  They would get a breakfast and a lunch, correct.
13   Q.  You were not distributing seven days' worth of meals
14   bundled together in one bag, correct, that's not how you did
15   it for the Shakopee Public Schools?
16   A.  Now, we need to be more specific in terms of the time of
17   the pandemic.  So at the high school, for example, in the
18   summer of 2021 we did meal pickup at the high school on
19   Tuesdays whereby students would receive five breakfasts and
20   lunches on Tuesday for Monday through Friday.  Never did we
21   give students seven meals for Saturday and Sunday during
22   that meal pickup on Tuesday.
23   Q.  Okay.  And let me step back -- and I appreciate your
24   answer, but just step back for clarification.
25              In your bags you never included four meals for a

1    day, correct?  In other words, you didn't have breakfast,

2    lunch, snack, supper in one bag, you didn't do it that way,

3    correct?

4    A.  That's correct.

5    Q.  And you had for -- using the example you just gave when

6    you gave five days' worth of meals to kids, if we looked in

7    the bag, would we see, like, five bags of breakfasts and

8    five bags of lunches within the bigger bag?

9    A.  No.  And I want to make sure I'm answering your

10   question.  So for the five days, they would receive five

11   bags with breakfast and then five different bags with

12   lunch --

13   Q.  Okay.

14   A.  -- a week's worth of food, and I am talking specifically

15   for the meal pickup at the high school.

16   Q.  Okay.

17   A.  The meal delivery we delivered on Tuesdays and

18   Thursdays, but I'm not sure that's specifically what you are

19   asking about.

20   Q.  No, but I appreciate the answer.

21       And then so the way you did not do it is to give

22   the people who came to get the food sort of one bag that

23   might have mixed ingredients in there?  You talked about

24   reimbursable meals.  You know, you have to have your fruit,

25   you have to have your vegetables, you have to have your

BILL MENOZZI - CROSS (GOETZ)

1    protein, you have to have your grains and then you have to

2    have your milk, your dairy, right?

3    A.  Correct.

4    Q.  So you don't -- for your program, you did not do it that

5    people would pick up a bag of food with all those items

6    together in one bag?

7    A.  No.  Our meals that we prepared for our students were

8    ready-made sandwiches, fruit cups, milk, a grain,

9    ready-made, ready to eat.

10   Q.  And did you provide -- when we talked about the

11   distribution at the high school and at the ten sites, was

12   this food provided directly to children?

13   A.  The -- so we receive our guidance from the USDA, and

14   that guidance I remember changed in April of 2021.

15         So it's a yes with -- so from March of 2020

16   through meals delivered -- and it wouldn't be applicable in

17   our case -- April of 2021, we gave meals to kids, school-age

18   kids.  Again, whether they were Shakopee public school

19   students, homeschooled, charter school, private school or a

20   school-aged kid that was from a surrounding community, we

21   gave the meals to the students.

22         The guidance changed from the USDA in April of

23   2021 allowing us to give meals to parents or guardians.

24   That would be the rare exception, that we would give meals

25   to parents or guardians.

```
 1              For example, when we would deliver the meals,

 2    oftentime mom or dad or guardian would come up to the bus

 3    and they would point at one, two, three kids that were kind

 4    of hanging out the front door and say, Hey, I would like

 5    three meals for my three kids, that we could see, at the

 6    home.  We would make eye contact with the kids and give the

 7    meals to mom or dad or guardian.

 8    Q.  Okay.  So I appreciate you telling us how your -- the

 9    program you participated in worked.

10              So we've had testimony from other witnesses that

11    there were, what are called, parent pickup waivers in place

12    as early as March of 2020 or April 2020.  But that's not the

13    way it was for your program, the one that you operated

14    under.  That parent pickup waiver did not kick in until

15    April of 2021, that was your understanding?

16    A.  We -- I remember the guidance from the USDA in April of

17    2021 allowing for that flexibility.

18    Q.  Okay.  And let's talk about -- directly about the

19    guidance.  Did you receive -- when I say "you," Shakopee

20    Public Schools, to the extent that you have knowledge of it.

21    Do you receive guidance directly from the USDA as to how to

22    operate your participation in the food program?

23    A.  Our school district receives that guidance in an e-mail

24    form from the USDA.  Again, our manager of nutrition

25    programs, Deb Ross-Coen, receives those e-mails.
```

1    Q.  So there's direct communication from the USDA to your

2    food service manager about what they need to do to operate

3    under the food service programs, correct?

4    A.  Guidance from the USDA, waivers that may be applicable,

5    and question-and-answer during COVID was a common

6    distribution e-mail from the USDA.

7    Q.  Okay.  And we can agree just on a very high level that

8    navigating education in general, the teaching, the

9    instruction, the distribution of food, that was challenging

10   during the COVID years.  Would you agree with that?

11   A.  I would agree that there were complexities related to

12   COVID.  However, when it came to feeding kids, that was

13   never a complex thing for Shakopee schools.

14            We always made the decision that we were going to

15   get food in the hands of our kids.  We were going to

16   continue to submit for reimbursement after delivering those

17   meals and trust the process.

18            So the process was complex related to COVID,

19   distance learning, hybrid learning, in-person learning,

20   social distancing, but the principle of getting food to kids

21   was never complicated in our school district.

22   Q.  So in your food program that you operated under, you

23   didn't find it to be complex.  That's good.

24            Were you aware that there were 113 waivers issued

25   by the USDA concerning other -- some other food programs?

1    A.  I would not be aware of the number of waivers.

2    Q.  Okay.  So the waivers that you received instruction on,

3    from your recollection, didn't seem to be too difficult to

4    understand and to comply with; is that accurate?

5    A.  Again, I think that absent guidance that was very

6    specific to our situation, we fell upon the practice of

7    getting food in the hands of kids and then submitting for

8    reimbursement, which would be our previous practice.

9    Q.  Okay.  But you did have that guidance directly from the

10   USDA to your food services manager, correct?

11   A.  Yes.  We received an e-mail form, guidance from the

12   USDA.

13   Q.  Throughout the pandemic?

14   A.  I don't know about throughout the duration of the

15   pandemic because I've only seen -- our practice is our

16   nutrition services manager will forward me guidance as it's

17   applicable to my situation and my role in the district, and

18   then we will meet on it as needed.

19   Q.  Okay.

20   A.  As an example, Q&A that are more recurring practice-type

21   things, I typically would not meet with her on something

22   like that, but something regarding a process change, for

23   example, increased flexibility to allow parents to pick up

24   meals, that would be something we would meet about in terms

25   of a change in practice.

BILL MENOZZI - CROSS (GOETZ)

1    Q.  Okay.  And I appreciate that clarification, you weren't

2    always brought in on these, but I think the point I want to

3    make sure I understand that was there is that there was a

4    direct line of communication between the USDA and your food

5    service manager throughout the pandemic?

6    A.  Our food service manager was able to receive guidance

7    from a number of sources, the USDA being one of them.  Other

8    sources would be the Department of Education, the food

9    service manager state group that she is a member of,

10   guidance from a number of organizations and colleagues in

11   the industry.

12   Q.  So -- and this is just the last area that I'll clarify.

13   So your food service manager had direct guidance from USDA

14   and the MDE, Minnesota Department of Education, correct?

15   A.  Yes.

16   Q.  And you also mentioned that organization.  That's the

17   Minnesota School Nutrition Association; is that right?

18   A.  That sounds correct, yeah.  Again, down the acronym

19   road, but that sounds correct.

20   Q.  So if there are any questions about the rules, the

21   waivers, what they needed to do to comply with the food

22   program requirements during the pandemic, fair to say your

23   food service manager had multiple sources that were

24   providing information and multiple sources she could go to?

25   A.  Sources of information.

1          And then it's important to note that school

2     districts are highly regulated.  Our fiscal year runs from

3     July to June.  Each year we're subject to an annual

4     financial audit for not only our financial results, but also

5     our internal controls.

6          So we receive the guidance, we put the guidance

7     into practice, and then at the end of each year that

8     practice is heavily regulated in terms of an annual audit

9     for both our results in making sure that our results are

10    appropriate, but also our internal controls, meaning how

11    we're evaluating the guidance and putting that into

12    practice, that's evaluated on an annual basis by an external

13    financial auditor as well.

14          THE COURT:  Mr. Goetz, when you're ready, we need

15    to take a break.

16          MR. GOETZ:  All the questions I have.  Thank you.

17          THE COURT:  All right.  Thank you.  We will come

18    back at 11:10, so 11:10.  All rise, please.

19          (Recess taken from 10:52-11:12 a.m.)

20                    *    *    *    *    *

21                    **IN OPEN COURT**

22                    **(JURY PRESENT)**

23          THE COURT:  Mr. Birrell.

24          MR. IAN BIRRELL:  Thank you, Your Honor.

25

                          **CROSS-EXAMINATION**

1

2    BY MR. IAN BIRRELL:

3    Q.  Good morning, Mr. Menozzi.

4    A.  Good morning.

5    Q.  My name is Ian Birrell, and I represent Abdiaziz Farah.

6    And we've never met before, right?

7    A.  That's correct.

8    Q.  And you said you did meet with the prosecution team

9    before to talk about the case a little bit, right?

10   A.  Yes, I met with the prosecution team.

11   Q.  Do you know when you first talked to them, about what

12   time or what date?

13   A.  I don't have the exact date.  A month or slightly more

14   ago would be reasonable.

15   Q.  So maybe early April or so.  Does that sound about

16   right?

17   A.  That would be reasonable.

18   Q.  And I think you testified earlier that when you were

19   working in this food program in 2020-2021, you were worried

20   about feeding people, not worried as much about these

21   regulations; is that fair?

22   A.  When our school district leadership team got together at

23   the start of the pandemic, there was a number of unknowns.

24   One thing that we made sure of is that we continued to teach

25   kids, what a school district does, teaching and learning;

BILL MENOZZI - CROSS (IAN BIRRELL)

1     and we continued to provide the basic needs for our kids

2     that were provided pre-pandemic, one of those being food

3     service.

4     Q.  Right.  That was something that was important to you,

5     right?

6     A.  It was important to our school district, yes.

7     Q.  And you personally?

8     A.  And to me personally, very much so.

9     Q.  And you're here to testify about your personal

10    experiences and observations; is that fair?

11    A.  Yes.

12    Q.  And you can't testify to things that you don't know

13    about, right?

14    A.  That's correct.

15    Q.  And as sort of a preliminary matter, you know in this

16    case there were meals billed for and claimed, right?

17    A.  Meals billed for by the school district and claimed?

18    Q.  Billed for and claimed by the defendants, right?

19    A.  Correct, yes.

20    Q.  And we saw some of those documents, right?

21    A.  That's correct.

22    Q.  But there's a lot you don't know about what happened in

23    this case, right?  You don't know the menus that were

24    provided by the defendants, right?

25    A.  No, I do not know that.

BILL MENOZZI - CROSS (IAN BIRREEL)

```
1    Q.  You don't know the type of food that they provided,
2    right?
3    A.  Correct, I would not have that information.
4    Q.  You wouldn't have information on where they purchased
5    ingredients, right?
6    A.  Correct.
7    Q.  Or know the quantity of ingredients they purchased?
8    A.  No.  I'm here specifically to talk about what we did as
9    a school district.
10   Q.  Right.  And you don't know -- you talked about your
11   experiences with ensuring that food was refrigerated and
12   cooled, right?
13   A.  Yes.
14   Q.  You don't know if they had some process for how food
15   would be refrigerated and cooled, or if they didn't, right?
16   A.  I would not have that information.
17   Q.  There were a few questions on if food was served to
18   parents or kids directly, and you testified that you and
19   Shakopee provided food to kids directly, right?
20   A.  For a portion of the pandemic until the USDA relaxed the
21   guidance?
22   Q.  Right.
23   A.  That's correct.
24   Q.  And you don't know if they followed those same practices
25   or handled things in some other way, right?
```

BILL MENOZZI - CROSS (IAN BIRRELL)

1    A.  Again, I know the process of the school district.

2    Q.  Right.  So I think -- I know your answer to this, but

3    you don't know how they billed, correct?

4    A.  I know the billing process, submitting meal counts

5    through what's known as the CliCS program, another acronym.

6    I know that is our process.  I know that's generally the

7    acceptable process to submit for meal reimbursement in the

8    state of Minnesota.  But to answer your question directly, I

9    know that's our process.  I don't know other processes.

10   Q.  And you don't know how many meals they handed out

11   ultimately?

12   A.  No, I don't have the entirety of that information other

13   than what I saw on the screen.

14   Q.  Right.

15        Okay.  We talked a little bit about -- well, just

16   now talking about CliCS a little bit.  Are you the person

17   submitting these bills through CliCS or is that someone else

18   in your team?

19   A.  That is somebody else on my team.  So in our org chart,

20   as I mentioned previously, we have our superintendent,

21   assistant superintendent, director level positions; and then

22   underneath my -- on my team would be our nutrition services

23   team, specifically our food service manager and then the

24   clerical employee.  Those two employees in conjunction

25   submit for reimbursement through the CliCS program.

BILL MENOZZI - CROSS (IAN BIRRELL)

1    Q.  How about creating financial documents, responding to

2    audits and managing internal controls, are those part of

3    your job?  Is that fair?

4    A.  Yes, for both the general fund, which is by far and away

5    the largest fund of the school district -- that's the

6    day-to-day operations of teachers and staff -- and also the

7    food service fund, which is more applicable to your

8    question, we prepare financial statements and work in

9    conjunction with our external audit to prepare those

10   documents.

11   Q.  And when you create those documents, you rely on the

12   numbers and work and analysis of other people on your team;

13   is that fair?

14   A.  Yes, very much so.

15   Q.  So to put a point on it, you don't personally observe

16   meals being handed out, observe the money that's coming in;

17   somebody else on your team does that and creates the reports

18   and brings them to you and then you do what you need to do

19   with them?

20   A.  Much like in any organization, I do spot-checks, right?

21   So that would be true pre-pandemic, post-pandemic and also

22   during the pandemic.

23        I had the opportunity to get out into our school

24   buildings, all ten of them, and view everything from how we

25   are doing breakfast and lunch, meaning serving -- how we are

BILL MENOZZI - CROSS (IAN BIRRELL)

1    handling kids as they come through the line, to the product
2    that we're putting out there.

3         I do spot-checks on our reimbursement processes
4    through CliCS.  I did that via meal delivery during the ten
5    sites and meal pickup.  But in terms of the day-to-day
6    submission through CliCS, that would be a member of my team.
7    Q.  So someone else would validate the meal counts, someone
8    else would submit it to CliCS and you would see the end
9    result; is that fair?
10   A.  That would be true for my position not only in Shakopee,
11   but that would be the normal practice for all public schools
12   in Minnesota, to have something -- some practice like that.
13   Q.  And your role is primarily in finance; is that fair?
14   A.  No, I would not say -- my role is different every day.
15   Finance and operations.

16        Finance sort of speaks for itself.  We're talking
17   about the annual budget, annual audit, tax levy, operating
18   levy, planning sort of the forward-facing financial part of
19   a school district.

20        And then the other part of my job, equally as
21   important, is the operations side.  So as I mentioned on
22   Friday, that would encompass all of our buildings, our
23   custodial team, so we have a head of buildings and grounds,
24   so he is on my team, as are all of our custodial staff; our
25   nutrition services team, the 58 employees that I mentioned

BILL MENOZZI - CROSS (IAN BIRRELL)

1    on Friday that work under our food service team; and then

2    also school district transportation.  That would really be

3    the operations side of my job.

4         So to answer your question directly, I think they

5    are fairly equal and seasonal, depending on the time of the

6    year.

7    Q.  So finance and operations, including, but not limited

8    to, the food and nutrition services part of the Shakopee

9    public school system, fair?

10   A.  Yes, that's part of the operations part of my job.

11   Q.  Okay.  And as part of either the finance or operation

12   side or both, you have to know how much the schools are

13   spending to create meals, right?

14   A.  I have an approximate figure based off of our financial

15   results of how much we're spending on labor costs for our

16   food services team; how much we're spending on food costs;

17   things like equipment, ovens, refrigeration for our

18   kitchens.  The food service fund, that four and a half

19   million that I talked about in that fund on Friday, I have a

20   general idea of how that money is spent.

21   Q.  And that's important for you to have that understanding

22   because you have budgets you have to work within, right?

23   A.  Correct.  I do work with our food service manager,

24   Ms. Ross-Coen, to create those budgets for those different

25   areas.

1    Q.  And generally speaking, different food ingredients and

2    different food products cost different amounts to create,

3    right?

4    A.  Generally speaking, yes.  I think that that's a question

5    that would be more applicable for our nutrition services

6    manager.  I know that on a personal experience going to the

7    grocery store, right?  I understand those things cost -- you

8    know, different products cost different.

9           What I can tell you related to that is we do have

10   a primary food vendor.  Upper Lakes Food is our primary food

11   vendor.  We also have a primary milk vendor, which is Kemps.

12   We also have a primary bread vendor, which is Pan-O-Gold.

13          And our process for that is we solicit open bids

14   for those products and they will submit the most common

15   items for our school district.  So I know the prices for

16   those during that open bid process.

17   Q.  And so at Shakopee High School, for example, there are a

18   variety of different foods that are served, right?

19   A.  Correct.

20   Q.  So I think there are pizzas that are served hot to

21   students, right?

22   A.  Yes.

23   Q.  Paninis, right?

24   A.  Yes.  Yes, we have a main serving line.  We also have

25   some à la carte type options.  So there are a number of

1    offerings for our kids.

2    Q.  There's a fresh salad line too; is that -- that's one of

3    them?

4    A.  That's correct.

5    Q.  Okay.  And maybe you don't know this, but do you know if

6    some of those meals cost more to provide to a student than

7    other of those meals?  So does it cost a different amount to

8    provide a salad versus a pizza?

9    A.  Yeah, the ingredients factor into the overall cost.  So

10   depending on the meal that we're providing, the costs can

11   vary throughout the school year depending on the meal that

12   we provide.

13            I look at things in terms of on average for this

14   period of time this is how much we're spending on food

15   costs, which would include things like salad, pizza,

16   paninis, other à la carte items.

17   Q.  So do you know during the COVID times, then, when you

18   were handing out the sandwiches to students at Shakopee High

19   School, say, that those amount -- did those sandwiches cost

20   the same to make as the hot meals that are provided, say,

21   today?

22   A.  There was a savings in terms of food costs during the

23   pandemic.  I think the savings was primarily because of what

24   we were able to provide in a meal pickup and meal delivery.

25   I touched on that earlier.  Providing things that were

1    efficient and things that were ready-made to eat for the

2    kids, the options may not have been as extensive or were not

3    as extensive as pre-pandemic.  So if there were any savings,

4    that was because of what we were able to offer given the

5    remote environment of how we delivered meals to our

6    students.

7    Q.  So is it fair to say that your focus wasn't on being

8    dollar efficient, it was making sure that good food was

9    getting to where it needed to go; is that fair?

10   A.  Very much so.

11   Q.  And kind of the last subject here, I want to -- I was a

12   little bit unclear about some of these numbers of kids and

13   numbers of meals, so I just wanted to make sure I understood

14   that.

15        I think you said there were about 7,800 kids,

16   roughly speaking, enrolled at the Shakopee School District

17   during this time period, right?

18   A.  In total, yes, kindergarten through twelfth grade.

19   Q.  And there are some kids in the area -- well, who live in

20   the area but who do not go to the Shakopee School District,

21   right, and you talked about some of those?

22   A.  That would be the case for most public school districts,

23   right?  There are charter schools.  Some students are

24   homeschooled.  We have Shakopee Area Catholic School, a

25   nonpublic school.

1          So, yes, there are students that live within our

2     school district boundary that elect other options for their

3     education and there are students that live outside of our

4     school district boundary that open enroll into Shakopee

5     schools.

6          Minnesota has an open enrollment where a Shakopee

7     student can enroll in another district, but another district

8     [sic] in another school district can enroll in Shakopee.

9     There's open movement throughout.

10    Q.  So fair to say you don't know the exact number of kids

11    who live in the area, even though you know pretty much the

12    exact number of kids or roughly the number of kids who go to

13    the Shakopee School District; is that fair?

14    A.  I have generally a pretty good idea of our number of

15    students -- school-aged students that are resident students.

16    So the State of Minnesota keeps that information.

17         The two counts are both resident students, that is

18    to say, all school district aged students that live within

19    the Shakopee School District area; and then there's what's

20    known as the adjusted count, that is to say, the actual

21    number of students that attend Shakopee School District.

22         So our adjusted count is obviously the majority of

23    resident students but also students that open enroll from

24    outside of Shakopee into the school district.

25    Q.  So is the adjusted count that 7,800?

BILL MENOZZI - CROSS (IAN BIRRELL)

1    A.  The adjusted count is 7,800, that is to say, the number

2    of school district students that attend Shakopee schools.

3    The resident count is slightly larger, just shy of 9,000,

4    8,700 or 8,800 students.  So that kind of tells you what --

5    the open enrollment out versus in, the net of that.

6    Q.  And the homeschooled students and things like that, is

7    that included in that resident student count?

8    A.  The State of Minnesota does not track open -- or, excuse

9    me, homeschool enrollment.  By "State of Minnesota," the

10   State Department of Education does not track homeschool or

11   private school enrollment.  So I do not have that

12   information other than our Shakopee Area Catholic School is

13   Grade K through 8.

14          And generally speaking when I'm talking my school

15   district enrollment budgeting, every year I budget for

16   approximately 60 students from Grade 8 to Grade 9.  So

17   60 students from Shakopee Area Catholic School in Grade 8

18   that will attend Shakopee High School in Grade 9, I make

19   sure to budget for those students.

20   Q.  Okay.  So it sounds like you had numbers for some of

21   these categories but not others.  So you don't know the

22   number of homeschooled students, the number of charter

23   school students outside of that Shakopee Catholic School; is

24   that true?  So you don't -- that's maybe not a clear

25   question.

1          Let me just ask you:  Do you know the number of

2     school-aged kids who live in Shakopee?

3     A.  We have a pretty good idea.  We have -- so let me back

4     up and say --

5     Q.  What's that number, first?

6     A.  Yep.  As I mentioned, our resident count is just shy of

7     9,000, 8,700, 8,800.  The State of Minnesota does not keep

8     counts for nonpublics, and I know there's 90 to 100 students

9     per grade at Shakopee Area Catholic School and then a

10    smaller count of homeschooled students.

11          And I would be remiss if I didn't say that we work

12    pretty closely with the City of Shakopee and also Scott

13    County on birth rates, and we track enrollment carefully in

14    terms of birth rates and enrollment projecting.  School

15    district budgeting in the state of Minnesota is heavily

16    dependent on enrollment.

17    Q.  I am kind of getting lost here.

18    A.  Okay.

19    Q.  Do you have an understanding, a good estimate of the

20    number of school-aged students who live in Shakopee?

21    A.  Yes.

22    Q.  What's your estimate to that?

23    A.  Nonresident count is 8,700.

24    Q.  Okay.  And --

25    A.  Excuse me.  Our resident count -- now I'm getting

BILL MENOZZI - CROSS (IAN BIRRELL)

1    lost -- is 8,700.

2    Q.  And about 5,000 kids get one or more meals at the

3    Shakopee school system, about; is that fair?  Is that what

4    the 5,000 was, kids who are eating one or more meals in the

5    Shakopee public school system?

6    A.  Yeah, pre-pandemic in-person learning, on average we are

7    feeding approximately 5,000 students per day, Grades K

8    through 12, throughout all of our ten buildings.

9    Q.  And some of those students get breakfast, some get

10   lunch, and some get breakfast and lunch, right?

11   A.  There's a higher participation in lunch than breakfast,

12   but your comment is correct, some get breakfast, some get

13   lunch, some get both, some get neither.

14   Q.  Okay.  So for those -- well, for those 9,000 or so kids

15   who live in the area, presumably most of them are eating

16   three meals a day and a snack or multiple snacks, possibly;

17   is that fair to say?

18   A.  Judging by the kids that I know, that's definitely fair

19   to say.

20   Q.  You would hope that's the case at least?

21   A.  Yeah.

22   Q.  And you know that the USDA anticipates that that's the

23   case, right?

24   A.  I would assume so.  I don't know that.

25   Q.  Okay.  So breakfast, lunch, supper, and snack, that's

1   four.  9,000 times four is about 36,000, right?

2   A.  9,000 times four is 36,000.

3   Q.  So amongst those 9,000 resident school-aged kids who

4   live in Shakopee, the expectation is that they would eat

5   around 36,000 meals a day -- or 36,000 meals plus one snack

6   a day; is that fair?

7   A.  I know that our school district provides breakfast and

8   lunch, right?  And I know that --

9   Q.  Okay.

10  A.  So I don't -- I see where you are going.  I know what

11  the school district does, and I know that our practice is to

12  provide breakfast and lunch.

13  Q.  Okay.  So you don't know where they are getting these

14  other meals, generally, right?

15  A.  I don't have information on where kids are eating when

16  they are not at the school.

17  Q.  But if they are eating suppers and snacks, they are

18  getting it from somewhere that's not the school because the

19  school doesn't provide them, right?

20  A.  We provide breakfast and lunch.

21  Q.  Okay.  Thank you, Mr. Menozzi.

22          MR. IAN BIRRELL:  I have nothing further,

23  Your Honor.

24          THE COURT:  Mr. Cotter.

25          MR. COTTER:  Thank you.

1                    **CROSS-EXAMINATION**

2    BY MR. COTTER:

3    Q.  Good morning.

4    A.  Good morning.

5    Q.  I am going to make this real quick.

6         Because I have a three-year-old, all these numbers

7    didn't include the kids that from the time they're able to

8    eat solid foods until they're in school, those numbers are

9    not included, correct?

10   A.  We include numbers for our students that attend school,

11   so --

12   Q.  So the answer is "correct," right?

13   A.  That's correct.

14   Q.  All right.  I'm just asking you to answer the questions.

15        So we don't know how many of those other children

16   that are not in school that are in Shakopee during 2020 and

17   2021, you're not -- you don't have the specific number,

18   personal knowledge of it, do you?

19   A.  We work with the city and the county to look at census

20   data, so we would have an idea of that number.

21   Q.  I'm asking you right here.  Sitting here right now, do

22   you have the number of children between the age of zero and

23   five in 2020 and 2021?

24   A.  I don't have that number in front of me.

25   Q.  All right.  Thank you.

BILL MENUZZI - CROSS (COTTER)

1          But, of course, they would need to eat too, right?

2    A.  All people need to eat, yes.

3    Q.  All right.  Thank you.

4          And as it pertains to just the demographics, I

5    just want to -- did I understand correctly that over

6    50 percent of the student population in the Shakopee School

7    District is minority?

8    A.  51 percent.

9    Q.  And there's a significant enough Somali population, that

10   it's one of the three languages that are used for

11   communications; is that correct?

12   A.  Correct.

13   Q.  Do you have an idea of the exact percentage of that

14   9,000 students that identify as Somali?

15   A.  Our cultural liaison would have that.  I do not.

16   Q.  You don't know, but it's a substantial number; is that

17   correct?

18   A.  It's significant enough that, as you said, it's one of

19   the three languages that we send out our communications.

20   Q.  And it's been growing, fair?

21   A.  Yes.

22   Q.  All right.  And as it pertains to -- and this is just if

23   you know the answer to this.  Do you know, do you have any

24   knowledge that those Somali students actually go to Islamic

25   school when they go to the mosque?

BILL MENOZZI - CROSS (COTTER)

```
 1    A.  I would not have that information, no.

 2    Q.  Fair enough.  I was just curious if you knew that.

 3              As to a couple of the observations you made, at

 4    Clifton Townhomes -- you said you went out on the buses a

 5    few times yourself when you hand-delivered the unitized

 6    breakfast and lunch to the kids there; is that correct?

 7    A.  Many times, yes.

 8    Q.  Did you go every single day?

 9    A.  Not every day.  No, that wouldn't be a good use of my

10    time and my role.

11    Q.  Right.  And so you did some spot-checks, like you talked

12    about, correct, where you got to participate?

13    A.  Yes, correct.

14    Q.  You didn't go on the weekend, did you?

15    A.  No.  No, we did not deliver food via the ten sites and

16    the pickup that I mentioned on Saturday and Sunday.

17    Q.  Right.  And obviously you don't know exactly what was

18    going on at those locations at all times, do you?

19    A.  Personally, but I have no --

20    Q.  I am asking you personally.

21    A.  Personally, no, but my team --

22    Q.  That was your answer.  Personally was the question.

23    Were you personally knowledgeable of it?

24              MR. EBERT:  I am going to object.  Could we have

25    the witness be able to at least answer the question before
```

```
 1    he is interrupted?
 2              THE COURT:  Can you rephrase the question?  Then
 3    he can answer.
 4              MR. COTTER:  Sure.  I'll just withdraw it.
 5    BY MR. COTTER:
 6    Q.  Mr. Menozzi, as it pertains to -- just give me one
 7    second.  I'm almost done.
 8                        (Pause in proceedings)
 9    BY MR. COTTER:
10    Q.  I think you already testified to this, but you didn't
11    really have any personal knowledge or understanding of the
12    Child and Adult Food Care Program, correct, that wasn't
13    within your realm?
14    A.  Our nutrition services manager has that information.
15    Q.  And you also didn't have personal knowledge about
16    certain waivers that applied to that program, correct?
17    A.  Our nutrition services manager would have that
18    information.
19    Q.  And you wouldn't know if there might have been children
20    coming from other school districts or other locations to be
21    fed outside of school because it's not something that was
22    within your knowledge, correct?
23    A.  When kids came to the line, we -- if they were
24    school-age, we gave them a meal.  We did not want to prevent
25    any barriers for kids receiving a meal.  So if they were
```

1    school-age, we handed them a meal.

2    Q.  Got it.  So it didn't matter necessarily that they were

3    from the Shakopee School District; if they showed up and

4    they wanted a meal, you gave it to them?

5    A.  Yeah, whether they were our school district student, a

6    nonpublic student or a student from a surrounding school

7    district.  And the same would also be said if a Shakopee

8    student was in, let's say, Prior Lake and went to their

9    school food distribution, they would get a meal there as

10   well.

11   Q.  Because the goal during the pandemic was to get kids

12   fed, right?

13   A.  That's correct.

14              MR. COTTER:  No further questions.  Thank you.

15              THE COURT:  Thank you, Counsel.

16              Mr. Sapone.

17              MR. SAPONE:  Thank you, Your Honor.

18                         **CROSS-EXAMINATION**

19   BY MR. SAPONE:

20   Q.  Good morning, sir.  How are you?

21   A.  Good morning.  I'm good.

22   Q.  My name is Ed Sapone.  I represent Abdimajid Nur.  We've

23   never spoken, yes?

24   A.  We have never spoken.

25   Q.  Sir, you talked about the ten sites at which food was

1    delivered.  Do you recall?

2    A.  Yes, I do.

3    Q.  And I think you said that the times were generally from

4    11:00 a.m. to 1:00 or 2:00 p.m.?

5    A.  During the March of 2020 through August of 2020 time

6    frame, that's correct.

7    Q.  And during that time frame, you yourself went on some of

8    those trips to hand out food, yes?

9    A.  Yes.

10   Q.  You don't know whether students picked up meals

11   somewhere else before 11:00 on those days, right?

12   A.  No, but I have significant reason to believe that if we

13   were handing out meals and a student had already received a

14   meal, that we would at least at some point during that time

15   frame have heard that information; and we never did.

16   Q.  But the answer is you don't know, right?

17   A.  I was never told that information.

18   Q.  And they didn't have to sign something that said they

19   didn't, right?

20   A.  No, we did not require students to sign something saying

21   they received a meal.

22   Q.  You don't know whether parents, on behalf of students,

23   picked up meals from somewhere else before 11:00 a.m.,

24   right?

25   A.  No, I do not know that, but, again, I think that if

BILL MENOZZI - REDIRECT (EBERT)

1    meals had been picked up or delivered, we would have heard

2    that information at some point during the pandemic.

3    Q.  As you sit here now, you don't know it, right?

4    A.  We don't know it.

5    Q.  And the same is true about after 1:00 or 2:00 p.m., you

6    don't know whether students went to another place and picked

7    up meals, right?

8    A.  That's correct.

9    Q.  You don't know whether parents, on behalf of students,

10   did that, right?

11   A.  Correct.

12           MR. SAPONE:  Nothing further.

13           THE COURT:  Thank you, Mr. Sapone.

14           Mr. Ebert.

15                    **REDIRECT EXAMINATION**

16   BY MR. EBERT:

17   Q.  Just a few questions, Mr. Menozzi.

18           You were asked on cross-examination about what you

19   observed when food was distributed by the school.  Do you

20   recall that?

21   A.  Yes.

22   Q.  So your testimony, is it correct, is based upon your own

23   observations?

24   A.  That's correct.

25   Q.  Did the school district also maintain tallies of meals

1    that were served out at the sites?

2    A.  Yes.  That's how we submitted for reimbursement.

3    Q.  And are you generally aware of that information as well?

4    A.  Yes, I am.

5    Q.  Is your testimony also based on that data?

6    A.  Yes, it is.

7    Q.  You were asked on cross-examination a series of

8    questions, and you talked about vendors that the school

9    uses.  Do you recall that?

10   A.  Yes, I do.  The three main vendors, yes.

11   Q.  You had a milk vendor?

12   A.  Kemps.

13   Q.  And what were the other ones?

14   A.  Our milk vendor was Kemps.  Our food vendor is Upper

15   Lakes, or also known as a prime vendor, prime food vendor.

16   It was Upper Lakes Foods.  And then our bread vendor was

17   Pan-O-Gold.

18   Q.  And just so we are understanding correctly, the school

19   district paid money to those vendors?

20   A.  That's correct.

21   Q.  At any point during the pandemic did those vendors

22   provide money to you personally?

23          MR. IAN BIRRELL:  Objection.  Beyond the scope.

24          THE COURT:  Overruled.

25          THE WITNESS:  No, never.  Not only would that be a

BILL MENOZZI - RECROSS (GOETZ)

```
1    fireable offense --
2              MR. IAN BIRRELL:  Objection.  Nonresponsive.
3              THE COURT:  Overruled.  You may answer.
4              THE WITNESS:  Not only would that be a fireable
5    offense, that would be illegal for public schools in the
6    state of Minnesota to receive money from any vendor.
7    There's a $5 gift law.  Anything above $5 would be illegal.
8    I would lose my job.  That would be illegal for me to do, to
9    receive any type of money from a vendor of any sort.
10             MR. EBERT:  I have no further questions,
11   Your Honor.
12             MR. GOETZ:  Just one --
13             THE COURT:  Mr. Goetz.
14             MR. GOETZ:  -- quick question.
15                        RECROSS-EXAMINATION
16   BY MR. GOETZ:
17   Q.  Mr. Menozzi, you were just asked about tallies, meal
18   tallies.  Was that just the number of meals served?  Is that
19   how you took your tallies?
20   A.  So our process during the pandemic, knowing that a lot
21   of this was mobile -- right? -- we're delivering meals,
22   we're having people pick up meals, was to keep record on
23   each of the buses and then have that go up to our central
24   food service office and then submitted that way.  And so
25   that was our process during the pandemic.
```

1    Q.  And was that record just of the number of meals served?

2    A.  Yes.  We submitted for the number of meals served, not

3    the number of meals prepared.  It would have been the number

4    of meals served.

5    Q.  And so you didn't submit the names of the children who

6    received the meals, just the number of meals that you were

7    actually serving on a given day; is that right?

8    A.  That's correct.  Again, we didn't want to provide a

9    barrier for any of our students to receive a meal;

10   therefore, if it was a school-aged student that wanted a

11   meal, we gave that student a meal.  We did not make them

12   write their name down or check anything off.  That would

13   have been a normal practice for all school districts --

14   public school districts in the state of Minnesota.

15   Q.  Thank you, sir.

16            MR. GOETZ:  No more questions.

17            THE COURT:  Nothing?

18            MR. EBERT:  Nothing further, Your Honor.

19            THE COURT:  All right.  Thank you.  You may step

20   down, sir.

21            THE WITNESS:  Thank you.

22            THE COURT:  The government may call its next

23   witness.

24            MS. WALCKER:  Your Honor, the government calls

25   Bill Walker.

WILLIAM WALKER - DIRECT (WALCKER)

```
1              THE COURT:  Good morning, sir.  You are going to
2    come around the tables and up to the witness stand, and I
3    will have you remain standing to take the oath.
4              THE WITNESS:  All right.
5                        (Witness sworn)
6              THE COURT:  Thank you.  You may have a seat,
7    please, and that microphone moves as you need it to.
8              Could you please state and spell both your first
9    and last name for the record.
10             THE WITNESS:  Yes.  William Walker, W-i-l-l-i-a-m,
11   W-a-l-k-e-r.
12             THE COURT:  Ms. Walcker.
13             MS. WALCKER:  Thank you, Your Honor.
14                      (William Walker)
15                    DIRECT EXAMINATION
16   BY MS. WALCKER:
17   Q.  Good morning, Mr. Walker.
18   A.  Good morning.
19   Q.  Mr. Walker, why don't you start by telling us where you
20   live.
21   A.  Sure.  So I live in Eden Prairie currently, with my wife
22   and daughter.
23   Q.  How old is your daughter?
24   A.  Twelve.
25   Q.  Briefly, what's your educational background?
```

WILLIAM WALKER - DIRECT (WALCKER)

1   A.  Sure.  Educational background?  I have a bachelor's in
2   history and a master's in education.
3   Q.  Where did you get your undergrad degree from?
4   A.  Sure.  Undergraduate, Gordon College in Massachusetts.
5   My master's degree is from the University of Minnesota here
6   in the Twin Cities.
7   Q.  Do you work, Mr. Walker?
8   A.  I do, full-time.  I work for a consulting firm now, the
9   106 Group.  We're local in St. Paul.
10  Q.  What do you do with the 106 Group?
11  A.  Cultural resource management.  I write proposals.  I
12  work on cases.  So continuing a lot of the work I used to do
13  when I worked for the government.  So we -- historic sites,
14  archeological sites, things like that.  So we provide
15  consulting for places like MnDOT, the National Park Service,
16  government agencies in general, private companies, so --
17  Q.  I think one of those acronyms you said was MnDOT.  Can
18  you --
19  A.  Yeah.  Minnesota --
20  Q.  -- explain that for the jury.
21  A.  -- Department of Transportation.
22  Q.  Are those local focused?
23  A.  Yeah.  So MnDOT wants to build a highway.  The law
24  states they have to be mindful of impacts that a highway
25  being built is going to have on historic sites,

1    archaeological sites, neighborhoods, things like that.  So

2    we -- I work for a consultant and our job is to figure that

3    information out, what impact will a job have on historic

4    sites, archeological sites, things like that.

5    Q.  How long have you worked for the 106 Group?

6    A.  Not quite a year.  Actually, no, now it has been just a

7    year.  I started in May of 2023.

8    Q.  It's hard to believe we are in May.

9    A.  I know.

10   Q.  Where did you work before the 106 Group?

11   A.  Yeah.  So before that I was cultural resources manager

12   for Three Rivers Park District.  So we're a local park

13   agency that serves mostly the Minneapolis western

14   metropolitan area.  We're the only special park district in

15   Minnesota.

16   Q.  I want to circle back on a couple of things, but you

17   mentioned there at the end "only special park district in

18   Minnesota"?

19   A.  Yeah.  So think big, large natural parks, things like

20   that, that's primarily -- so Three Rivers kind of fills the

21   gap between state parks and local city or county parks.

22   Q.  How long did you work for the Three Rivers Park

23   District?

24   A.  For just about 15 years.

25   Q.  Do you recall approximately when you started and when

1    you ended working for the Three Rivers Park District?

2    A.  Yes.  So I started in June 2009 and then would have

3    ended at the very end of April 2023.

4    Q.  That's when you joined the 106 Group?

5    A.  Yeah, with a couple days off in between.

6    Q.  Good.

7            How many parks are in the Three Rivers Park

8    District?

9    A.  It's about 20, somewhere in the neighborhood of 20

10   parks.  27,000 acres.  We're one of the bigger public land

11   agencies in the Twin Cities.

12   Q.  Are you familiar with a park called The Landing?

13   A.  I am indeed.

14   Q.  Is that one of those 20 or so parks in the Three Rivers

15   Park District?

16   A.  It is.  Technically, it's a special recreation feature,

17   that's our classification under Met Council, but it's, yes,

18   one of the 20 parks.

19   Q.  You mentioned the Met Council.  What is the Met Council?

20   A.  So Met Council is -- that's a harder question to answer

21   than you might think.  Met Council is the agency that

22   manages everything from city buses to they have a hand in

23   local parks throughout the Twin Cities metro.

24           So Three Rivers, Ramsey County Parks Department,

25   Dakota County Parks Department, all the larger park systems

WILLIAM WALKER - DIRECT (WALCKER)

1    in the metro make up these special parks that Met Council

2    has a hand in operating or has a hand in funding.

3    Q.  Where was your office when you worked at the Three

4    Rivers Park District?

5    A.  Two different places.  So when I first started in 2009,

6    my office was at the park district headquarters in Plymouth.

7    In about 2015 or somewhere thereabout my office moved down

8    to The Landing because my job had changed somewhat, and so

9    my office from 2015 to 2023 was at The Landing in Shakopee.

10   Q.  How did your job change in that time frame?

11   A.  So when I first got hired for Three Rivers, my job was

12   to -- I was the person in charge of all things related to

13   history.

14           So, again, if you want to build a trail, if you

15   want to build a parking lot, because that's public land,

16   state law and, depending on where your money is coming from,

17   federal law requires that you consider the impact of that

18   construction on historic sites.

19           So originally my job was just focused on the

20   regulatory work, so making sure we were compliant with all

21   of the laws, we were doing archeology in advance of

22   construction, things like that.

23           By 2015 my duties were expanded and so I took over

24   all of our public programming related to history as well,

25   and so that's when my job moved to The Landing because

WILLIAM WALKER - DIRECT (WALCKER)

1    The Landing was one of the more prominent historical

2    features of the Three Rivers system.

3    Q.  I want to talk about that now, but just to confirm, so

4    from around 2015 through 2023, were you officed at

5    The Landing park?

6    A.  I was.

7    Q.  So let's talk about The Landing now.  For jurors who

8    have never visited The Landing, can you describe The Landing

9    for us.

10   A.  Yes.  So, first, it used to be called Historic Murphy's

11   Landing.  If you are of a certain age, there's a good

12   chance -- and you lived in the Twin Cities metro -- there's

13   a good chance you went there as a kid.  It was a pretty

14   standard field trip place.

15        The Landing as an entity is a park that started

16   out actually as a private museum, and it's a collection of

17   old buildings that have been gathered from throughout the

18   lower Minnesota River Valley.  So think colonial

19   Williamsburg, Old Sturbridge Village in Massachusetts.  It's

20   Minnesota's version of that or that's -- it was built in the

21   '70s to be Minnesota's version of that.

22        So it's a very long kind of linear park.  The

23   whole idea was it was built on a timeline.  So you would buy

24   your ticket and you would sort of walk through Minnesota

25   history from one end of the park to the other by looking at

1    these old buildings that have been moved to the site.

2    Q.  So there's an educational component to that specific

3    park, right?

4    A.  Yes.

5    Q.  Okay.  Where is The Landing located within the Three

6    Rivers Park District?

7    A.  So it's on the Minnesota River.  So it's on the south

8    bank of the Minnesota River and Shakopee, just across the

9    river from Eden Prairie.  And it's on the eastern edge of

10   the city of Shakopee.  So if you're driving on 101, you will

11   go right past it right before you get downtown in Shakopee.

12   Q.  About how far is The Landing from downtown Minneapolis,

13   where we are seated today?

14   A.  I'll give you the Minnesota answer.  I don't know miles,

15   but it's about 20 minutes, 25 minutes, depending on the

16   traffic.

17   Q.  Mr. Walker, I'm going to show you what's been admitted

18   as Government Exhibit N-117.

19   A.  Mm-hmm.

20   Q.  Do you recognize this?

21   A.  I do.

22   Q.  Are you familiar with this area?

23   A.  Very familiar, yep.

24   Q.  Can you explain what we're seeing here.

25   A.  This is an aerial image of the city of Shakopee with --

1    you can see The Landing is highlighted on the east side.

2    That large road at the top is Highway 101.  It's also -- on

3    here I guess it's also Alternate 169.  And then the grid

4    that you see right on the river, that's the city of

5    Shakopee.  So that's the downtown grid of Shakopee and

6    that's The Landing.

7    Q.  I'm going to zoom in here.

8         So you mentioned the Minnesota River is on one

9    side?

10   A.  Yep.

11   Q.  Is that what we are seeing here above the red dot?

12   A.  Yep.

13   Q.  And then you mentioned the highway is the other border

14   to The Landing?

15   A.  Mm-hmm.

16   Q.  And you said it's sort of on the edge of Shakopee; is

17   that correct?

18   A.  That is correct.

19   Q.  It says here, "Shakopee Historic," it's cut off here,

20   but can you tell the jurors a little bit about the area

21   surrounding The Landing.

22   A.  Yes.  So the part that's cut off, it's the Shakopee

23   Historic District.  If you want to geek out on history, it's

24   a section that's on the National Register.

25         The park itself, again, it's linear.  So it's a

1    very long, very skinny park.  It's not quite a mile from one

2    parking lot to the other.

3           And the road that -- you can see there's a tan

4    line that's just above the highway.  So that's the main

5    trail that passes through the park.  So, again, when it was

6    built in the late '60s, early '70s, that's the main trail

7    and you would walk along that.  And the first building that

8    you come to is an 1840s fur post.  Then there's a 1857 farm

9    and then there's an 1880s farm and then an 1889 village.

10   And that's the -- kind of the length of the park.

11   Q.  I'm going to show you another close-up map of

12   The Landing here that includes some of the places you were

13   just describing for us.

14          Turning to page 3 of Government Exhibit N-117, do

15   you recognize this, Mr. Walker?

16   A.  I do.

17   Q.  Did you help create this map?

18   A.  I did.

19   Q.  Can you walk us through what we're seeing here.  Let's

20   start -- you mentioned sort of a linear setup.  Let's start

21   on the left side of the park, and I am going to zoom in here

22   on the left side of the park.  What are we seeing here,

23   Mr. Walker?

24   A.  Yep.  So this is the west side of the park.  The main

25   park entrance is on the west side.  So at the bottom corner

1    you're seeing the main parking area.

2         Immediately to the west, where it says, "Memorial

3    Park," that's actually -- that's a city park that is next to

4    The Landing.  So the property line is right where the color

5    changes.  Three Rivers owns everything to the east.  The

6    City of Shakopee owns the park land to the west.

7    Q.  Okay.  And it looks like here there's -- next to the

8    park entrance there's sort of a cream-colored area with a

9    "P" on it.  Is that the west side entrance you mentioned?

10   A.  Yep.  So that's the -- the west side is the main

11   entrance to the park.  It is signed as such off of

12   Highway 101.

13        And then the parking area is that tan area.  It's

14   a large gravel parking lot, just sort of open parking, on

15   the west side of the park.

16        And then the visitor entrance.  This sort of

17   brownish/russet color, that's the trail that you would walk

18   along into the entrance of the park.

19        And the buildings that you see there are the --

20   most of them are historic buildings that have been brought

21   in from other areas to recreate this 1889 village.

22   Q.  So here (indicating) is where the public would enter the

23   park, this is the public entrance?

24   A.  Yes, that's correct.

25   Q.  And do you see next to the parking lot we were just

1    talking about, it looks like there's sort of a picnic table
2    sign/symbol here.  Do you see that?
3    A.  I do.
4    Q.  Can you tell us, what is that?
5    A.  So that's our picnic shelter or picnic pavilion.  It's a
6    rentable facility in the park.  So it's a large -- it's
7    open-sided, so there's no walls.  It's just a big roof with
8    a concrete floor underneath.  And that's -- it's a large
9    rental area.  So if you want to have a big picnic, if you
10   were a big school group, if you want to rent it for a
11   wedding, that's our rentable space at the park.
12   Q.  And moving along, you mentioned some of the historic
13   aspects of the farm, for example, here (indicating).  Can
14   you walk us through this section of the park.
15   A.  Sure.  So, again, this was designed to be a historical
16   timeline as you walk through the park.  So you enter in a
17   1889 village and then you kind of progressively walk
18   backward in time.
19        So an 1889 farm.  There's a barn and a farmhouse
20   and a couple of other outbuildings.  We actually have
21   animals in that field, which is why there's the cow icon.
22        So there's -- the next one along is the 1857 farm.
23   The idea is you are supposed to see the difference between
24   1889 farm people producing wheat to making bread at
25   Minneapolis.  And that's how Minneapolis becomes the mill

1    city, right?  Like we're the bread -- the milling capital of

2    the world for a time.  That's different from a 1857 farm.

3    People are subsisting.  So it's log buildings.  It's a small

4    footprint.  They are not producing market crops.  They're

5    producing food to eat.

6              And then the final building is the 1845 fur post.

7    So it would -- again, it's a fur trader building.  It

8    actually came from just a mile away in Shakopee.  It used to

9    be Oliver Faribault's house.

10   Q.  You seem to know a lot about history, Mr. Walker.

11   A.  That's what they pay me for.

12   Q.  Let's turn to the last section of the park on this map

13   here.  It looks like after the fur trading post, there is

14   another entrance here with the staff operations office on

15   the map.  Do you see that?

16   A.  I do.

17   Q.  Did you have an office in the staff operations office

18   when you worked at The Landing?

19   A.  I did.

20   Q.  And is that staff building accessible to only staff via

21   that entrance?

22   A.  Yes.

23   Q.  Is that where the park staff would park, right here

24   (indicating) in this tan-colored area?

25   A.  Yes.  The big lot there is for staff parking.  It's also

WILLIAM WALKER - DIRECT (WALCKER)

1    an overflow lot if we had a large event.  There are times

2    when we would use that parking area.

3              My office was in the building with the X on the

4    roof.  The other building that's kind of off to the

5    right-hand side, it's a big Quonset hut.  It's where we

6    store a lot of our machinery, maintenance equipment,

7    Bobcats, things like that.

8    Q.  All right.  Now let's look at a couple of photos of

9    The Landing itself.  I'm going to show you what's been

10   identified as Government Exhibit C-92.  Do you recognize

11   this, Mr. Walker?

12   A.  I do.  So this is our large gravel parking lot, and

13   you're standing about where -- if you remember on that map,

14   the road kind of comes in and turns.  So you'd be standing,

15   you know, just off the treeline there, so just as you've

16   entered into the lot off of Highway 101.

17   Q.  Before we walk -- we are going to walk through these in

18   a minute, but do you recognize the images here in Government

19   Exhibit C-92?

20   A.  I do.

21   Q.  All right.  And are these fair and accurate depictions

22   of The Landing?

23   A.  They are.

24   Q.  Is this what The Landing would have looked like in 2020?

25   A.  Yes, with a few minor exceptions.

1    Q.  And what are those?

2    A.  There were two buildings that actually -- you can see

3    there's a car in the image there.  There used to be two

4    buildings that were placed -- so the reason The Landing

5    became a park is because it couldn't fund itself as a

6    private museum, and over the years they brought a lot of

7    buildings to the park that never actually ended up on the

8    foundations they were supposed to.  So there were two

9    buildings right about where that car is that have since been

10   moved beyond the gate.

11         Then you can see there's three boulders there.  So

12   I believe until later in 2020, until the fall of 2020, there

13   was a wooden fence where those boulders are.

14         So, again, two buildings that have since been

15   moved inside the park and then a fence that was removed.

16   Other than that, it hasn't changed.  Those are the only

17   exceptions.

18         MS. WALCKER:  Your Honor, I would offer Government

19   Exhibit C-92.

20         MR. IAN BIRRELL:  No objection.

21         THE COURT:  C-92 is admitted and now may be

22   published.

23         MS. WALCKER:  Thank you, Your Honor.

24   BY MS. WALCKER:

25   Q.  Mr. Walker, now that the jury can see along with us

1    here, do you recognize this first picture here?

2    A.  I do.

3    Q.  And can you describe for the jury what we're seeing in

4    this first photograph.

5    A.  Again, this is -- you are looking eastward into the

6    large gravel parking lot, which is the main visitor parking

7    lot for the park.  So you would have just entered in from

8    Highway 101, and so you enter and then you would turn right

9    and this is what you would see.  So you can park anywhere

10   inside that large gravel area, and then the visitor entrance

11   is straight ahead just beyond where those boulders are.

12   Q.  And I think you referenced earlier there was a pavilion

13   or picnic area.  Is this (indicating) that area that we saw

14   earlier on the other map?

15   A.  It is, yes.

16   Q.  Okay.  Let's turn to the next page here.  What are we

17   seeing here on page 2 of Government Exhibit C-92?

18   A.  So this is a close-up of that -- of the entrance into

19   that pavilion.  It's separately signed.  It's called the

20   Rivers Bend Picnic Shelter.  I think that's its name.

21          The gate is a locked gate.  When we rent this out

22   for weddings or things like that, you would get the

23   combination to the lock.  And the reason the gate is there

24   is people can still walk through it, but we only want the

25   gate open if -- you know, again, a lot of wedding rentals.

WILLIAM WALKER - DIRECT (WALCKER)

```
1   They will bring the catering truck, they will back it up to
2   the pavilion.  And the idea is you get the lock combination
3   so you can get as close to the building as you can to unload
4   anything that you might need when you have rented the
5   pavilion.
6   Q.  And that's off the public entrance here, the public
7   parking lot?
8   A.  This is off the public entrance, yes, but this is signed
9   as the Rivers Bend Picnic Shelter or Pavilion or something
10  like that.  So this isn't the way that everyone would funnel
11  into the park.  You would actually enter the park on the
12  other side of the parking lot.
13  Q.  Okay.  Let's turn to the next page here.  What are we
14  seeing here on page 3 of Government Exhibit 92?
15  A.  So this is standing right in the entrance to that picnic
16  shelter.  You can see it's -- there are no -- it's an
17  open-sided facility.  There are canvas walls that can come
18  down in stormy weather, but otherwise it's just a concrete
19  slab with a roof.
20          And then the sign in the front is -- indicates if
21  the space has been reserved.  So if you've booked -- so you
22  can only use the facility if you've rented it through the
23  park district.  And if it's rented, then this sign is posted
24  up that shows that it's reserved.
25  Q.  So it's some information on how to -- if you wanted to
```

1    reserve this pavilion, it's got a phone number, a website;

2    is that right?

3    A.   Yep, that's correct.  So the main -- that 6700 number is

4    the park district's main number.  The 7881 actually gets you

5    to the main office where my -- the on-site office in

6    Shakopee, where my office was.

7    Q.   Is there a process if you wanted to use something like

8    this at the park?

9    A.   There is.  So you can reserve the shelter online.  You

10   can reserve it by calling either of those two numbers.  And

11   it has to be reserved in advance.

12   Q.   It looks like, and you can see it better on the previous

13   photo, but there's no tables or chairs in the pavilion?

14   A.   No.  It's a large open space.  We do have tables and

15   chairs that are provided as part of a rental.  They are

16   foldable white plastic tables and chairs you buy at Costco.

17   And just to -- if you were standing here looking at the

18   pavilion, just to your left there's a little building where

19   all that stuff lives.  But those tables and chairs are only

20   out if the facility has been rented.

21   Q.   Okay.  And what are we seeing here on the right side of

22   the photo here, zooming in on --

23   A.   There's a couple of barbecue grills that are part of the

24   rental.  The building just beyond the retaining wall is the

25   old Bloomington Ferry Church.  And then the purple building

1    with the blue shutters is one of the -- I think that's the

2    newest of the buildings that have moved in.  It's an

3    1890s -- it's called the Tabaka House, actually.  But it's

4    an 1890 -- it's a Victorian house.

5    Q.  And then it looks like there's some water here in the

6    distance.  Is this the Minnesota River we saw on the map

7    earlier?

8    A.  Yep.  So this is the Minnesota River.  The river makes a

9    big swoop through the park.  You can kind of see that on the

10   map.  So this is the beginning of that big swoop.

11            And then the stone wall there is actually an

12   overlook wall that was built during the Depression.  It was

13   by the Youth Workers Camp.  It was, you know, one of

14   Roosevelt's government soup -- alphabet soup programs.  But

15   there used to be a Youth Workers Camp here and they built

16   that overlook wall.  So that was the feature that actually

17   got them -- got people interested in building the park there

18   in the '60s and '70s.

19   Q.  All right.  Let's look at a couple more photos here.

20   Turning to the next page, what are we seeing in this photo

21   on page 4?

22   A.  So this is the sign and entrance to the staff entrance

23   side of the park, so the eastern end of the park.  The white

24   barn is our staff offices.  So my office was in that white

25   barn.

```
 1              The gates that you see there are closed to
 2    generally keep the public out of that side of the park.
 3    Occasionally during weekdays the right side arm would be
 4    open to allow our staff in and out of -- access in and out
 5    of the park.
 6    Q.  It looks like there's a sign there that says, "Visitor
 7    Parking" with an arrow to the left.
 8    A.  Yes.
 9    Q.  Do you see that?
10              Is that directing to the west side of the park,
11    the public entrance we just looked at?
12    A.  It is.  Actually, if you squint, you can kind of see
13    there's language there at the bottom underneath the arrow.
14    Q.  Okay.  I think we've got a close-up on the next image
15    here.
16    A.  It says, "Use West Entrance."
17    Q.  Okay.  Here we go.
18    A.  There you go.
19    Q.  Is that what you were referring to here, "Use West
20    Entrance"?
21    A.  Yes.
22    Q.  Okay.  So if folks were to come to this entrance, they
23    would see this sign.  They would be directed to go to the
24    public entrance on the west side of the park?
25    A.  That's correct.
```

WILLIAM WALKER - DIRECT (WALCKER)

1    Q.  The sign "Authorized Vehicles Only," do you know what

2    that's referring to?

3    A.  Yes.  So, again, it's signed as the staff entrance.

4    This isn't supposed to be a public entrance.  The gates do

5    get locked at 5:00.  So we really try to discourage people

6    from accidentally parking in here because their car will get

7    locked in at 5:00.  So "Authorized Vehicles" is to keep you

8    out.

9    Q.  So you've got the two signs and the gate to tell people

10   the public entrance is on the other side of the park?

11   A.  Yes.

12   Q.  All right.  Well, now that we have a better picture of

13   The Landing and the map, the layout, I want to talk about

14   your work at The Landing.

15        So what was your position when you worked at

16   The Landing from 2015 through 2023?

17   A.  Yeah.  So my -- again, 2015, somewhere thereabout, my

18   duties had changed.  So in addition to the regulatory work,

19   I was also responsible for all of our public interpretation.

20        So interpretation, if you're not in the business,

21   is think of the Park Rangers that tell stories.  That's our

22   job.  So when I talk about interpretive staff, that's what I

23   mean.  It's the people that work for the park district that

24   tell stories, the ones dressed like Laura Ingalls telling

25   you about the old houses.

```
 1              So anyway, from 2015 onward my duties were not
 2    just the regulatory, but also to oversee all of our
 3    interpretive programming, including all of the programming
 4    at The Landing.  So a big part of my job was physically
 5    being there and supervising the staff of interpreters who
 6    actually produced the guided tours, the summer camps, the
 7    school programs, all of those things.
 8    Q.  Those were all programs that you managed as part of your
 9    responsibilities?
10    A.  Yes, and I had a staff of people that I supervised.  So,
11    yeah, that was my work.
12    Q.  How many folks did you supervise at The Landing?
13    A.  I think it was seven total.  So one administrative
14    person, so one person who was our front desk attendant, who
15    took reservations, who took phone calls, who booked school
16    groups, all of that stuff; and then six interpretive staff,
17    two of whom were full-time and then everybody else was sort
18    of a smattering of different allotments of part-time work.
19    Q.  Okay.  What was your work schedule when you were at
20    The Landing?
21    A.  Monday through Friday, usually 8:30 to 5:30 or somewhere
22    thereabout.
23    Q.  So were you at The Landing most days of the week, Monday
24    through Friday?
25    A.  Yes, and occasional weekends.  If we had a big event, I
```

1    was usually there.  So yeah.

2    Q.  And as part of your day-to-day activities, would you go

3    throughout the park, throughout The Landing?

4    A.  I would.  So in particular, in the mornings usually I

5    was the second or third person at the park.  Our maintenance

6    staff started earlier.  And so the gate was usually open by

7    the time I got there, and I would -- before I parked and

8    went into my office, I would usually take a drive through

9    the park, just the -- we are the definition of an attractive

10   nuisance.

11          So this time of year in particular, there was

12   almost always some vandalism or something that had gone on.

13   And so I had just gotten into the habit of driving through

14   the park in the mornings, looking for broken windows,

15   looking for kicked-open doors, anything out of the ordinary.

16   It just was part of the morning routine.

17   Q.  As part of your role, was it important for you to know

18   what was going on at The Landing on any given day?

19   A.  Yes.

20   Q.  So you mentioned that you would also supervise a team of

21   different folks at The Landing.  How many employees are at

22   The Landing on any given day?  Can you describe that for the

23   jurors.

24   A.  Yes.  So it really depends.  Again, I'd say I had seven

25   staff that were regular, so one administrative assistant,

WILLIAM WALKER - DIRECT (WALCKER)

1   six interpreters, so people with history degrees that tell

2   stories.

3           And then in addition to that, depending on the

4   year and depending on the time of year, we might have a

5   seasonal staff of interpreters, so an additional, you know,

6   seven to sometimes as many as ten people who would work, you

7   know, different days, summer programs, things like that,

8   generally in the summer.

9           And then we had a maintenance staff.  So our park

10  is -- our park maintenance wasn't just responsible for, you

11  know, general maintenance, cleaning up, making sure that --

12  not just at The Landing, but also for Hyland Park as well,

13  which is across the river in Bloomington.

14          So on any given day there could be anywhere from

15  two to three to twenty staff in the park at The Landing.

16  Q.  Is there always some Landing staff on-site at

17  The Landing?

18  A.  Generally speaking during broad business hours.  So from

19  6:00 a.m. to, say, 5:30, 6:00 p.m. there's generally

20  somebody in the park.

21  Q.  And as part of your role as a manager, would you talk

22  with other park employees throughout the day --

23  A.  Yes.

24  Q.  -- about what was going on at the park?

25  A.  Yeah.  So especially during 2020 -- right? -- so

1    everybody's operations were slightly different during the

2    pandemic -- our buildings were not open.

3              So my staff -- one of the things I would assign

4    them to is -- we'd call it roving.  You would just be a

5    person in a park district uniform or in historical period

6    clothing walking around talking to visitors who, you know,

7    just happened to be using the park.

8              Like lots of other parks throughout the country,

9    there were more people in the park during 2020 than there

10   might have been, you know, before that, just because people

11   were trying to get outside and trying to do something that

12   was other than being at home on the computer.

13   Q.  So let's talk about before 2020.  Can you give us a

14   sense of the number of daily visitors at The Landing.

15   A.  Yeah.  So The Landing, as you might suspect, if you're

16   not a history buff, is not one of our highest visited parks

17   in Three Rivers, right?  Three Rivers is known for big

18   natural parks where people go birding and hiking and

19   snowshoeing and skiing and all those kinds of things.  So

20   The Landing's visitation is lower than most other parks.

21             You know, on a good day I would see 20, 25, maybe,

22   people before COVID.  Then during COVID we'd see more than

23   that, because there were more people walking and hiking and

24   riding their bikes.  But we are still a very -- we're not

25   talking hundreds.  We are talking under a hundred people a

1    day and usually quite a bit less than that.

2    Q.  And were there certain times -- well, let me ask you

3    this.  What were the hours of The Landing?

4    A.  Yeah.  So technically the park hours are 5:00 a.m. to

5    10:00 p.m., which is the same as every other Three Rivers

6    park.  Functionally, they were generally 9:00 a.m. to

7    5:00 p.m.  When COVID wasn't happening and the buildings

8    were open, that's when you could take a tour, that's when

9    you could participate in a program, that's when the school

10   groups came.  But technically you can be there until

11   10:00 p.m.

12   Q.  Were there certain times of day that were busier than

13   others?

14   A.  Generally the mornings.  Mornings were busiest with dog

15   walkers and hikers and that kind of thing.  Midday was

16   generally busy with specific programs.  So summer camps

17   during the summer.  School groups during the spring and

18   fall.  So, again, fluctuating as the calendar progressed.

19   Q.  As part of your responsibilities, would you and the

20   folks that you supervised track the number of visitors at

21   The Landing?

22   A.  Yes.

23   Q.  Why would you do that?

24   A.  So I mentioned Met Council earlier.  Three Rivers gets

25   most of its funding through property taxes, but it gets a

1    sliver of funding through Met Council and that money is

2    connected to visitation, right?  You want to make sure that

3    you are giving money to parks that people are using.

4          And so part of everybody's job at Three Rivers,

5    but specifically the site supervisor -- so I am the site

6    supervisor for The Landing; there's another site supervisor

7    for Hyland Park in Bloomington -- part of our job is to

8    generally track visitation, so having at least a rough idea

9    of how many people are using the park every day.

10          And we want those numbers to be high if you're in

11   my position because you know that those numbers show that

12   people like the parks, they're using them, right?  I am

13   working for the park system.  I want to know that people are

14   using the parks, and I want to know that we can show as good

15   of number as possible to warrant whatever funding we might

16   be getting from Met Council.

17   Q.  You mentioned earlier some of the programs or events

18   that would be held at The Landing.  Do you remember that?

19   A.  Mm-hmm.

20   Q.  Can you tell us a little bit about some of those events

21   that were larger events at The Landing.

22   A.  Yes.  So we're talking not just within COVID, right?  We

23   are talking in general operations?

24   Q.  (Indicating.)

25   A.  All right.  So general operations.

1          Summer camps were always a big draw.  We'd have,

2     you know, a couple hundred kids every summer.  Not a

3     couple hundred.  More than a couple hundred.  Hundreds of

4     kids every summer.

5          School groups.  So, again, fall tended to be less

6     busy than the spring.  Spring was fairly busy.  But, again,

7     we'd get 200 school kids a day in the spring field trip

8     season.

9          We used to do a large program around

10    Christmastime.  It was called Folkways of the Holidays, and

11    we would -- every one of those houses was associated with a

12    particular immigration group, like a particular group of

13    people that came to Minnesota.  And the idea was to use the

14    Christmas holiday as a connection point for talking about

15    immigration and where people came from that settled in the

16    Minnesota River Valley.  That was a cool program.

17         We'd get -- again, a good Saturday there could be

18    400 people, and so that's probably our biggest in terms of

19    one-day programs.  I say "one-day."  One day Saturday, one

20    day Sunday for a couple of weekends over December.  But

21    400 people in a day, that's a big program for The Landing.

22    That's a lot of folks in the park.

23    Q.  That's a lot of folks in the park.  Was there a lot of

24    operational planning that would go into events like that?

25    A.  Yes.

1    Q.  Tell us about that.

2    A.  So, again, in order to make sure -- especially the

3    Christmas program in particular was thorny because none

4    of -- very few of the buildings are wired for electricity,

5    so the heat is a potbelly stove with firewood and that's the

6    heat and that's how we are cooking.  My staff were living as

7    much as they could in the 19th century.

8         So there's just a lot of preparation around that,

9    making sure we've got all the supplies that we need, making

10   sure that buildings are warmed up and ready for people, and

11   making sure the roads and paths are plowed to get folks

12   around the park.  So that takes a lot of preparation.

13        Same as the summer camp, right?  If you've got two

14   groups of 20 kids apiece coming to the park, you've got to

15   make sure you've got all the supplies, you've got to make

16   sure you've got enough people to cover the camp, enough

17   people to cover not just the functional part of the camp,

18   but to make sure that there's somebody to ferry kids back

19   and forth to the restrooms, things like that.  So quite a

20   bit of planning for an event that big.

21   Q.  You mentioned earlier, I think, that the public parking

22   lot, that sometimes it would be used for overflow for large

23   events.

24   A.  Mm-hmm.

25   Q.  Do you remember that?

1          So was that -- some part of it is that the parking

2     situation, that you would have to consider that when large

3     number of folks were coming to The Landing?

4     A.  Yeah, for sure, especially if you remember the picture

5     of that parking lot.  So there's no -- it's a big gravel

6     lot.  There's no painted lines.  So any time we would have a

7     large event, we usually had maintenance staff or our public

8     safety staff -- Three Rivers is big enough, it's got its own

9     police department.  So we would have those staff come in and

10    kind of help people park appropriately.

11         If you have ever worked in any situation where

12    there's just a big open lot and people can park, you will

13    see some really amazing interpretive parking, just cars

14    everywhere.

15         So, yeah, to accommodate 400 people on a Saturday

16    for our Christmas program, for example, we would have staff

17    out in the lot.  We would have to have the lot cleared.

18    There would usually be rope stanchions that we would put up

19    to try to, again, finagle people to park correctly and you

20    would still end up with someone parked diagonally, sideways

21    across an entrance.

22    Q.  All right.  Mr. Walker, I now want to turn your

23    attention to the time period during the pandemic.

24         THE COURT:  Actually, what I'm going to do is I'm

25    going to stop you at this point.

WILLIAM WALKER - DIRECT (WALCKER)

```
 1              MS. WALCKER:  Yes, Your Honor.

 2              THE COURT:  We will pick up there after lunch, and

 3    we'll return at 1:30.  Thank you, everyone.

 4              MS. WALCKER:  Thank you, Your Honor.

 5              (Lunch recess taken from 12:22-1:32 p.m.)

 6                    *    *    *    *    *

 7                         IN OPEN COURT

 8                        (JURY PRESENT)

 9              THE COURT:  Ms. Walcker, you may continue.

10              MS. WALCKER:  Thank you, Your Honor.

11    BY MS. WALCKER:

12    Q.  Good afternoon, Mr. Walker.

13    A.  Good afternoon.

14    Q.  Before we broke for lunch, you described for the jury

15    The Landing, your role and responsibilities, and some of the

16    programming that happened at The Landing.  Do you remember

17    that?

18    A.  Yes.

19    Q.  I now want to turn your attention to the time period of

20    the pandemic, specifically of July 2020 through December of

21    2020.  Okay?

22    A.  Mm-hmm.

23    Q.  That six-month, or so, period during the pandemic.

24    A.  Sounds good.

25    Q.  Now, at that time were you still in your role as the
```

```
 1    program manager and site supervisor for The Landing?

 2    A.  I was.

 3    Q.  Were you on-site at The Landing during that period of

 4    time?

 5    A.  I was.

 6    Q.  You weren't teleworking during that time?

 7    A.  No.  We came back pretty early.  Parks are -- you have

 8    to physically be there to make them run, so --

 9    Q.  Fair enough.

10         Based on your knowledge and observations as the

11    site supervisor and manager, are you aware of any meals

12    being served at The Landing during that time period, July

13    through December of 2020?

14    A.  I am not.  To my knowledge, there were none.

15    Q.  Did you see any meals being served at The Landing during

16    that time period?

17    A.  I did not.

18    Q.  As the manager and the site supervisor, would you hear

19    what was happening at The Landing?

20    A.  I would have, yes.

21    Q.  Would you or your staff have noticed if meals were being

22    handed out at The Landing during that time period?

23    A.  Yes.  My people were trained to look for visitors and to

24    interact with visitors.  So any large group of people, my

25    staff would have interacted with them and actually probably
```

WILLIAM WALKER - DIRECT (WALCKER)

```
 1    would have been fairly excited to see that large number -- a

 2    large number of people in the park.

 3    Q.  You mentioned before the break that visitors were

 4    something -- the number of visitors at the park were

 5    something that you and your team track; is that right?

 6    A.  That's correct.

 7    Q.  So if someone on your team had seen that number -- a

 8    large group of people at the park, they would have told you

 9    about that?

10    A.  Yes.

11    Q.  Did you ever see lines of vehicles picking up meals at

12    The Landing?

13    A.  I did not.

14    Q.  Did you ever see delivery trucks loading meals at

15    The Landing?

16    A.  I did not.

17    Q.  Did you ever see lines of people picking up meals at

18    The Landing?

19    A.  I did not.

20    Q.  You never saw that?

21    A.  Never saw that.

22    Q.  Not once?

23    A.  Not once.

24    Q.  Just speaking geographically, now that we know the

25    layout of The Landing, if a truck was to come in and unload
```

1    large amounts of meals during that time period, based on

2    your knowledge of the park and experience, where would that

3    have taken place?

4    A.  The only logical place, the only place you really could

5    accommodate a large group of people at The Landing that

6    isn't the -- open, you know, under the trees is the picnic

7    shelter that we talked about on the west side of the park.

8    It's where we held functions.  It's where we would have

9    encouraged something like that to happen had the park

10   district been contacted; and that didn't happen.

11   Q.  I think you mentioned before the break that the park

12   itself was open during the pandemic; is that right?

13   A.  That's correct.

14   Q.  Were the buildings themselves open during the pandemic?

15   A.  The buildings were not.  So none of the historic

16   structures were open.  All of the buildings were closed.

17   All of our staff, for the most part, functioned outside.

18         So the small groups that we did bring, small

19   summer camps, things like that, most of that happened

20   outside.  We actually did use the picnic shelter to host

21   some of our summer campers, but, again, this would have been

22   small groups of ten people.  And so we would have had people

23   at that side of the park throughout the summer who would

24   have been able to see the parking lot.

25   Q.  You mentioned there were some summer campers [sic] that

1    happened that summer of 2020; is that right?

2    A.  Yeah, we were one of the only agencies that still ran

3    summer camp in 2020.  We just ran them in very scaled-back

4    numbers.

5    Q.  And I think you mentioned before the break that it was

6    upwards of 40 or more campers pre-pandemic times; is that

7    right?

8    A.  Yeah.  So normally pre-pandemic we would run two

9    concurrent camps of 20 students, 20 kids.  During the

10   pandemic, because of the state guidelines, we limited them

11   to 10.  So we could have no more than two pods, was the term

12   they used, no more than two pods of 10 people at a time at

13   the park.  And so one set of parents dropped their kids off

14   at the picnic shelter.  The other set would drop their kids

15   off at the main entrance.

16   Q.  Okay.  And do you know during that summer when kids were

17   coming -- a smaller amount of kids were coming for the

18   summer program at the camp at The Landing, would they pack

19   their lunches or would lunches be provided to them?

20   A.  They packed their lunches.

21   Q.  Do you know where they ate their lunches?

22   A.  Well, again, they usually separated into those two

23   drop-off areas.  So one group usually ate somewhere near the

24   railroad depot, which is closer to the -- the historic

25   railroad.  It's not a functional railroad depot, want to be

```
 1    clear about that.  The railroad depot is by the main visitor

 2    entrance.  The other half usually used the picnic shelter.

 3    And those were our two, sort of, pod headquarters for the

 4    concurrent camps.

 5    Q.  Apart from the camps going on that summer, were there

 6    any other events or programs that were approved during that

 7    time at The Landing?

 8    A.  Nothing major.  Small things.  I think we might have

 9    done a walking tour, but, again, it would have been

10    outdoors.  It would have been something where we could

11    socially distance, we could keep six feet apart from

12    everybody.

13         It was a very hard park to manage during a

14    pandemic because the whole premise of the park is going

15    inside old historic buildings, which you couldn't do during

16    the pandemic.

17    Q.  If someone wanted to rent that pavilion you were just

18    describing, that larger event space that was covered, would

19    that have been approved at that time during the pandemic?

20    A.  It would not have.  Actually, by policy, from March 2020

21    at the beginning of the pandemic through at least 2020 and I

22    think into early 2021, none of the public spaces that were

23    rentable throughout the district could be rented.

24         So if you had called the number that was on that

25    sign in the picnic pavilion, the park staff person who
```

WILLIAM WALKER - DIRECT (WALCKER)

 1   answered would have told you that all park district

 2   facilities were closed, they weren't rentable.

 3            Things that we had on the book, like weddings that

 4   had been planned a year in advance, those were all canceled.

 5   So there were no public rentable spaces by matter of policy.

 6   Q.  And we had talked a little bit about the public parking

 7   lot near the pavilion on the west side of the park --

 8   A.  Mm-hmm.

 9   Q.  -- and I think you had mentioned that was -- in fact, I

10   can pull up a photo of that as well, but you had mentioned

11   it was gravel; is that right?

12   A.  That's correct.

13   Q.  If there were large numbers of vehicles coming through

14   the park during that time period, is that something you

15   would have noticed?

16   A.  Yes.

17   Q.  And can you tell us why.

18   A.  Large gravel parking lots don't withstand a lot of use

19   without needing to be re-filled, re-covered.  So our

20   maintenance staff would have been on top of filling

21   potholes, filling gouges.  If it rains, this gets real

22   sloggy.  So it's -- there would have been some evidence of

23   larger-than-expected, larger-than-normal usage.

24   Q.  And even at a more basic level -- you can even see in

25   this photo -- would there have been tire marks at that

1    point?

2    A.  Certainly.

3    Q.  Turning to the east side of the park where your office

4    was based, in the time frame of July of 2020 through

5    December of 2020, was there generally a staff presence in

6    that building at that time?

7    A.  Yes, certainly Monday through Friday.

8    Q.  And if there were a large number of cars passing by the

9    staff entrance to go to the public entrance, is that

10   something that you or your staff would have noticed?

11   A.  Yes.  And I'm sure I would have heard of it because my

12   staff were very good at catching people who missed the other

13   signs.  If you work in parks, you are used to people not

14   necessarily reading the signs that you have put out.  And so

15   our front gate attendant in particular was very good at

16   catching cars that parked there and redirecting them.  I'm

17   sorry, folks.  This is the employee entrance.  Please use

18   the west entrance.  That's where we are directing visitors.

19   So, yes, we would have caught them.

20   Q.  And you mentioned that you would have heard it as well.

21   I think we saw in an earlier map that The Landing was

22   situated between a highway and the Minnesota River; is that

23   right?

24   A.  That's correct.

25   Q.  Can you describe for the jury if it was a loud park.  Is

WILLIAM WALKER - DIRECT (WALCKER)

```
 1    that something you would have heard, if a large number of
 2    visitors was entering the park?
 3    A.   That's a harder question to answer.  Is it a loud park?
 4    There was always highway noise, but it's not -- if a big
 5    group of people is in the park, it's unlikely that our staff
 6    wouldn't have been aware of it.  It was their job, it was my
 7    job to monitor who is in the park to get a feel for who is
 8    in the park.
 9            And, honestly, they did it proactively because,
10    again, we're all very mindful that of the Three Rivers
11    parks, The Landing is not a terribly well-visited park, so
12    we were always very anxious to account for new visitors, new
13    groups of people.
14            When we opened the park up for bicyclists -- it
15    had been previously closed to cyclists -- my staff got very
16    good and very excited about, like, waving at people and
17    chatting with folks that were on bikes.
18            So it would be difficult to imagine a situation
19    where we wouldn't have been aware that people were in the
20    park.
21    Q.   Did you ever see any signs at The Landing advertising
22    free meals for children being served at the park?
23    A.   No, there were none.
24    Q.   Did you see any signs, for example, at the public
25    entrance advertising this is where you should go if you
```

1    wanted to pick up free meals for children during that time?

2    A.  There were none.

3    Q.  You never saw anything like that at any point during the

4    pandemic?

5    A.  Never did, no.  We had plenty of our own signs about

6    social distancing and when the park was open and the

7    buildings were closed.  And, again, we were monitoring

8    those.  So we would have seen a sign in the park, especially

9    if it wasn't ours.

10   Q.  Let me ask you:  Did you see any evidence of meals being

11   served at the park, such as leftovers or food things, during

12   that time period?

13   A.  Nothing that would have remotely spoke to any kind of a

14   volume, right?  So normal amounts of garbage in the garbage

15   cans, normal amounts of wear and tear and that kind of

16   thing, but nothing out of the ordinary and nothing that

17   would show that a large group of people had showed up at the

18   park.

19   Q.  And you mentioned before the break that The Landing

20   would host some larger events before the pandemic, such as,

21   I think, you mentioned a holiday program --

22   A.  Yes.

23   Q.  -- is that right?

24   A.  Mm-hmm.

25   Q.  And you said there were up to 400 visitors for events

1    like that; is that right?

2    A.  Yeah.  So for The Landing, 400 people on a Saturday was

3    a good number and that's a large event and that was a large

4    pre-pandemic event.

5    Q.  And after events like that, would you see leftovers or

6    other remnants that an event of that size had taken place?

7    A.  Yes.  And we'd have extra staff on deck because the

8    garbage cans would fill quicker.  We'd have people

9    monitoring restrooms.  The restroom buildings during the

10   pandemic were closed and we had porta johns on site.

11          If there had been a large influx of people into

12   the park, our assumption would have been that the porta

13   johns would have had to be cleaned out more regularly, which

14   they weren't.

15          So nothing that would indicate that large unseen

16   groups had been using the park outside the hours that I was

17   present.

18   Q.  I think you mentioned before that if someone wanted to

19   request use of the pavilion, for example, during that time

20   period, that you would have known about that; is that right?

21   A.  Yes.

22   Q.  Do you recall anyone asking for permission to use

23   The Landing as a location to distribute meals for children

24   during that time period?

25   A.  Nothing that came to me.  And just to be clear, nothing

WILLIAM WALKER - DIRECT (WALCKER)

1    that came to me.  And if they had called the main park line,
2    all of our reservation staff would have given the same
3    standard line, which was we are not renting any of the
4    public facilities out, right now they are all closed
5    based on the -- because of the pandemic.
6    Q.  But if a request like that was made and approved, would
7    you have known about it as part of your job responsibilities
8    as a site supervisor at The Landing?
9    A.  Yes, and because I had very attentive staff.  I'm here
10   today because my staff called me even though I no longer
11   work for the park district.
12   Q.  Maybe you weren't too happy about that, but thank you
13   for being here.
14   A.  No worries.
15   Q.  Okay.  For all the different reasons that we just
16   discussed, would you have noticed meals being served at
17   The Landing between July of 2020 and December of 2020?
18   A.  I believe I would have.
19   Q.  Are you aware that The Landing was registered as a site
20   for meals being served to children in -- with the State of
21   Minnesota in 2020?
22   A.  I'm aware that it is now.  Like, I didn't know it then.
23   Q.  As part of your knowledge of this case, you're aware of
24   that?
25   A.  That's correct.

WILLIAM WALKER - DIRECT (WALCKER)

1  Q.  Before you received a subpoena to testify, were you

2  aware of that?

3  A.  No.  We did receive at one point in time, which I

4  believe would have been in 2001 [sic], but sometime after

5  the main part of the pandemic, we received a call or a

6  letter or something -- I don't really recall which --

7  requesting information about the site being used as a food

8  distribution spot.  That did get to me.

9        And when I did see that, I thought, oh, this is

10  either a mistake or they've got the wrong landing.

11  "The Landing" is a super generic name and they probably

12  should have just kept it as Historic Murphy's Landing.

13  There's an old folks home across the river in Chaska that's

14  The Landing and we used to get their mail.  So I assumed it

15  was a mistake.  I think I bumped it up the chain and that

16  was that.

17  Q.  Do you remember who made that call or who made that

18  outreach?

19  A.  I couldn't -- I don't remember specifically.  I want

20  to -- I believe it was Department of Education or something

21  like that.

22  Q.  Okay.  I'm going to show you now what's been admitted as

23  Government Exhibit C-84, and I just want to look at the top

24  section here where it says, "Site Information."

25  A.  Mm-hmm.

WILLIAM WALKER - DIRECT (WALCKER)

1    Q.  Do you see that?

2             And it says here --

3    A.  I do.

4    Q.  -- a bunch of numbers and then, "Mind Foundry -

5    The Landing:  Minnesota River Heritage Park."  Do you see

6    that?

7    A.  I do.

8    Q.  Does that mean anything to you, "Mind Foundry -

9    The Landing"?

10   A.  The Mind Foundry part does not.  So the park's official

11   name is The Landing - Minnesota River Heritage Park, but

12   Mind Foundry I'm unfamiliar with.

13   Q.  Turning to the third page of that application, here it

14   says -- the section here under "Vendor Name," do you

15   recognize the name Empire Cuisine & Market?

16   A.  I do recognize the name.

17   Q.  How do you recognize that name?

18   A.  I just -- they're a place in Shakopee.  So we worked

19   with the Chamber of Commerce and any number of other

20   visitors bureaus.  If there's a restaurant in town or a shop

21   in town, you'd hear the name.  So I'm familiar with the

22   name.

23   Q.  Did you ever hear from anyone at Empire Cuisine & Market

24   about providing meals at The Landing?

25   A.  I did not.

WILLIAM WALKER - DIRECT (WALCKER)

```
1    Q.  Are you aware of anyone on your team receiving an
2    outreach from Empire Cuisine & Market about providing meals
3    at The Landing during the pandemic?
4    A.  No.
5    Q.  And here it looks like the meal type information, the
6    meals would be served between 11:00 and 12:00, breakfast,
7    and 11:00 and 12:00, lunch.  Do you see that?
8    A.  I do.
9    Q.  Did you ever see breakfasts or lunches being served at
10   The Landing between 11:00 and 12:00?
11   A.  I did not.  And my staff had not reported anything like
12   that either.
13   Q.  Now I want to talk to you about some of the claims that
14   are at issue in this case involving alleged meals that were
15   being served to children at The Landing.  Okay?
16          I'm going to show you what's been admitted as
17   Government Exhibit C-84, starting on page 5 here.  So the
18   first month here, it says, "July 2020" for month and
19   calendar year.  Do you see that?
20   A.  I do.
21   Q.  And then it says here, "Meal Information," the number of
22   days served and the total reimbursable meals that were
23   served.  Do you see that?
24   A.  I do.
25   Q.  Did you see 3,000 breakfasts for children being served
```

```
 1   at The Landing over 15 days in July of 2020?

 2   A.  I did not.

 3            MR. COTTER:  Your Honor, objection.  Lack of

 4   foundation, relevance.  He has already testified --

 5            THE COURT:  Overruled.  You may answer.

 6            THE WITNESS:  I did not.

 7   BY MS. WALCKER:

 8   Q.  What about, did you see 3,000 lunches being provided for

 9   children over 15 days in July of 2020 at The Landing?

10   A.  I did not.  And I would have been on-site, I assume, for

11   some of those 15 days.

12   Q.  Is there any way that that many meals would have been

13   served without you knowing it?

14   A.  I think it's extraordinarily unlikely.

15   Q.  Did it happen?

16   A.  I don't believe so.

17   Q.  Let's look at the next month, August of 2020.

18   Mr. Walker, did you see 5,450 breakfasts being served for

19   30 days in August of 2020 at The Landing?

20   A.  I did not.

21   Q.  Did you see 5,450 lunches being served at The Landing

22   over 30 days in August of 2020?

23   A.  I did not.  And, again, that's one day short of every

24   day of the month; and I would have been on-site for many of

25   those days and my staff would have been on-site.
```

1   Q.  Is there any way that many meals would have been served

2   without you knowing it?

3   A.  I don't believe so.

4   Q.  Did it happen?

5   A.  I don't think so, no.

6   Q.  Let's look at the next month here, September of 2020.

7   Mr. Walker, did you see 6,050 breakfasts being served over

8   30 days in September of 2020?

9   A.  I did not.

10  Q.  Did you see 6,050 lunches being served over 30 days in

11  September of 2020 at The Landing?

12  A.  I did not.  And, again, that's nearly every day in

13  September.

14  Q.  Is there any way that that many meals were being served

15  to children at The Landing without you knowing it?

16          MR. COTTER:  Objection.  701, 702.

17          THE COURT:  Overruled.

18          THE WITNESS:  Does that mean I can answer?

19          THE COURT:  You may answer.

20          THE WITNESS:  Trying to think about my *Law and*

21  *Order*.

22          No, I do not believe that that many meals were

23  served at The Landing, and I certainly would have known

24  about it if they were.

25  BY MS. WALCKER:

1    Q.  Did it happen?

2    A.  No.

3    Q.  Let's look at the next month, October of 2020.

4    Mr. Walker, did you see 1,850 breakfasts being served over

5    only six days in October of 2020?

6    A.  I did not.

7    Q.  What about that same number of lunches?

8    A.  No.

9    Q.  And for this month there was actually something

10   submitted called an adjustment, increasing the numbers of

11   meals served in October of 2020.

12           Let me ask you:  Did you see 9,800 breakfasts

13   being served over 28 days in October of 2020?

14   A.  I did not.

15   Q.  That's more than 3,000 meals that we saw from September

16   to October, an increase in that; is that right?

17   A.  That's correct.

18   Q.  Did you see 9,800 lunches being served over 28 days in

19   October of 2020 at The Landing?

20   A.  I did not.

21   Q.  Is there any way that many meals could have been served

22   at The Landing without you knowing it?

23   A.  I don't believe so.

24   Q.  Did it happen?

25   A.  No.

WILLIAM WALKER - DIRECT (WALCKER)

1    Q.  Turn to page 11 of Government Exhibit 84, C-84,

2    turning to the next month, November of 2020.  In November of

3    2020 did you see 10,212 breakfasts served over 30 days at

4    The Landing?

5    A.  I did not.

6    Q.  Did you see 10,212 lunches served over 30 days at

7    The Landing?

8    A.  I did not.

9    Q.  Is there any way that that many meals would have been

10   served at The Landing without you knowing it?

11   A.  No.

12   Q.  Did it happen?

13   A.  No.

14   Q.  All right.  Finally, let's look at December of 2020.  In

15   December of 2020 did you see 14,260 breakfasts served over

16   31 days in December of 2020 at The Landing?

17   A.  I did not.

18   Q.  Did you see 14,260 lunches being served over 31 days in

19   December of 2020 at The Landing?

20   A.  I did not.

21   Q.  Mr. Walker, do you know, in December of 2020 in

22   Minnesota, would there have been snow on the ground?

23   A.  I suspect parts of it, yeah.

24   Q.  Do you know if the public parking lot at The Landing, is

25   it always plowed in the winter?

WILLIAM WALKER - DIRECT (WALCKER)

1    A.  It's generally plowed.  Because we're a low visitation

2    park, we're a low priority park.  We share our maintenance

3    with a number of other parks that get higher visitation than

4    we do.  So we're usually the last place that gets plowed,

5    but we do get plowed.

6    Q.  Did you see any parents or children trudging through the

7    snow in December of 2020 to pick up 14,260 breakfasts and

8    14,260 lunches in December of 2020?

9    A.  I did not.

10    Q.  Did you see any parents or children picking up meals on

11    Christmas Eve or Christmas of December of 2020?

12    A.  I wouldn't have been there on Christmas Eve.  I was off

13    that day.  But, no, generally I did not see that many people

14    in the park.

15           As a point of reference, before the pandemic we

16    ran the -- again, this holiday program in December, which

17    is -- of the few things that we did that had a big

18    following, it was one of the things that had a following.

19           And so to compensate for that program not

20    happening, we had actually put out a self-guided walking

21    trail.  So imagine a 24 X 24 wayside sign that was placed at

22    the different houses that we would normally have had open

23    highlighting the particular traditions of different

24    immigrant groups that came to Minnesota.

25           So, again, throughout December my staff was

1    monitoring how closely -- we were hoping people were coming

2    to see the signs and read about the trail.  And, again, I've

3    got to think that that number of people coming every day in

4    the month of December would have left some sort of mark.

5    So, no, I don't think that that many people came to the

6    park.  We were looking for people coming to the park in

7    December.

8    Q.  And just to be clear, these are the number of meals that

9    were claiming to be served.  Did you see 14,260 meals being

10   served?

11   A.  I saw no meals whatsoever.

12   Q.  No meals at all, okay.

13          Is there any way that many meals would have

14   happened without you knowing it?

15   A.  I don't believe so.

16   Q.  Did it happen?

17   A.  No.

18   Q.  Now I'm finally going to show you what's been admitted

19   as Government Exhibit N-22.  So this is a summary chart of

20   all the meal claims from July of 2020 through December of

21   2020 for The Landing.

22          There were almost 100,000 meals that were claimed

23   to be served between July of 2020 and December of 2020, in

24   that six-month period.  Do you see that?

25   A.  I do.

WILLIAM WALKER - CROSS (IAN BIRRELL)

1    Q.  Did you see that many meals being served at The Landing?

2    A.  I didn't see any meals being served at The Landing.

3    Q.  If that type of volume was going on at The Landing,

4    would you have heard about it?

5    A.  Yes.

6            MS. WALCKER:  No further questions.  Thank you.

7            THE COURT:  Mr. Birrell.

8                      **CROSS-EXAMINATION**

9    BY MR. IAN BIRRELL:

10   Q.  Good afternoon, Mr. Walker.

11   A.  Good afternoon.

12   Q.  You worked on-site at The Landing Monday through Friday

13   generally 9:00 to 5:00, right?

14   A.  That's correct.

15   Q.  And you were well aware of what happened inside the park

16   perimeter; is that fair to say?

17   A.  I think that's fair to say.

18   Q.  Because you were on-site, right?

19   A.  I was on-site and I was purposefully aware of the number

20   of people passing through the park because it was part of my

21   job.

22   Q.  And you don't know one way or the other whether food was

23   distributed from another nearby location outside of the

24   perimeter; is that fair to say?

25   A.  Can you say that again?

WILLIAM WALKER - CROSS (IAN BIRRELL)

1    Q.  You don't know one way or the other whether food was

2    distributed from another nearby location outside of the

3    park's perimeter; is that fair to say?

4    A.  You're asking do I know if they gave food out somewhere

5    else?

6    Q.  Correct.

7    A.  I do not.

8    Q.  Okay.  And you don't know whether food was distributed

9    on the weekends on the corner of CR 101 outside of the

10   park's perimeter, true?

11   A.  Again, let me be clear.  You're asking if I physically

12   saw something happening outside the park on a Saturday when

13   I wasn't working; is that correct?

14   Q.  Correct.

15   A.  So I did not.

16   Q.  Okay.  You don't know what happened on Saturdays outside

17   of the park perimeter, that wasn't part of your job, right?

18   A.  Yes and no.  If there's a car accident on 101 in front

19   of the park, it's likely that I'm aware of it.  If there's a

20   hundred people milling about the entrance to my park and

21   blocking the entrance, there's a good chance I'm going to be

22   aware of that.

23   Q.  And you didn't see that, right?

24   A.  I did not see that.

25   Q.  Thank you.

1              MR. IAN BIRRELL:  I have nothing further.

2              THE COURT:  Mr. Sapone.

3              MR. SAPONE:  Thank you, Your Honor.

4                         **CROSS-EXAMINATION**

5    BY MR. SAPONE:

6    Q.  Good afternoon, sir.  How are you?

7    A.  Good afternoon.  How are you doing?

8    Q.  Good.  Thanks for asking.

9              Sir, federal agents did not contact you in August

10   of 2021, did they?

11   A.  They did not.

12   Q.  And at no time in 2022 or 2023 did any federal agents

13   contact you, right?

14   A.  That is correct.

15   Q.  Please tell the members of the jury, when was the first

16   time federal agents contacted you in connection with this

17   case?

18   A.  It would have been a couple of months ago I got a call

19   from the person who was my assistant.  The main desk person

20   contacted me.  She now works at Hyland Park Reserve.  She's

21   been transferred over to Hyland Park Reserve in Bloomington.

22   She was contacted by federal agents and wasn't sure what to

23   do, and so she called me because I was her supervisor at the

24   time.

25   Q.  And so the first time was a couple of months ago, yes?

WILLIAM WALKER - CROSS (SAPONE)

```
 1    A.  That's correct.

 2               MR. SAPONE:  Nothing further.

 3               THE COURT:  Ms. Walcker.

 4               MS. WALCKER:  Nothing further, Your Honor.  Thank

 5    you.

 6               THE COURT:  All right.  Thank you.  You may step

 7    down, sir.  Thank you.

 8               THE WITNESS:  Thanks.

 9               THE COURT:  The government may call its next

10    witness.

11               MS. WALCKER:  Thank you, Your Honor.  The

12    government calls John Ruhland.

13               THE COURT:  Good afternoon, sir.  You may come

14    forward past the jury, up to the witness stand.  And I will

15    have you stand to take the oath.

16                         (Witness sworn)

17               THE COURT:  Thank you.  You may be seated.

18               Could you state and spell both your first and last

19    name for the record.

20               THE WITNESS:  John Ruhland, J-o-h-n,

21    R-u-h-l-a-n-d.

22               THE COURT:  Ms. Walcker, you may inquire.

23               MS. WALCKER:  Thank you, Your Honor.

24

25
```

```
 1                      (John Ruhland)

 2                    DIRECT EXAMINATION

 3     BY MS. WALCKER:

 4     Q.  Good afternoon, Mr. Ruhland.

 5     A.  Good afternoon.

 6     Q.  Why don't you start by telling the jury, where are you

 7     from?

 8     A.  Grew up in Montgomery, Minnesota.

 9     Q.  Do you still live in Montgomery, Minnesota?

10     A.  No.  I now reside in Jordan.

11     Q.  Where is Jordan and Montgomery, Minnesota?

12     A.  It's about 30 minutes southwest of here right down 169.

13     Q.  And what about Montgomery?

14     A.  Montgomery is about 20 minutes straight south of Jordan.

15     Q.  Do you work?

16     A.  I do.  I work for Three Rivers Park District right now.

17     I'm a park maintenance supervisor.

18     Q.  What is the Three Rivers Park District?

19     A.  Three Rivers Park District is a park district that kind

20     of took the job of taking undeveloped land and kind of

21     keeping it undeveloped for the public and the future to have

22     undeveloped space to enjoy.

23     Q.  How long have you held your position as park maintenance

24     supervisor?

25     A.  Since July of 2023.
```

JOHN RUHLAND - DIRECT (WALCKER)

1    Q.  What did you do before that?

2    A.  Before that I was a crew chief at The Landing in

3    Shakopee, the same Hyland cluster that I am in now, from

4    2012 until July of 2023.

5    Q.  So that was about 11 or so years at The Landing before

6    your current role?

7    A.  Yes.

8    Q.  And you mentioned The Landing is a park within the Three

9    Rivers Park District?

10   A.  Yes.  It's a park, smaller park, located in Shakopee.

11   Yeah.

12   Q.  Can you describe the park a little bit for the jurors.

13   A.  The park is a park centered around a cluster of old

14   buildings to describe the late 1800s, early 1900s of how

15   Minnesota was.  It's on the banks of the Minnesota River.

16   They offered lots of different programs for people to come

17   and tour the houses, kind of see how things were; and we had

18   some farm animals that the kids could come enjoy, see; just

19   kind of take a walk-through with your dog, just enjoy the

20   scenery.

21   Q.  I want to focus on your previous role when you were crew

22   chief at The Landing from, I think you said, 2012 until

23   2023; is that right?

24   A.  Yes.

25   Q.  What were your responsibilities as crew chief at

JOHN RUHLAND - DIRECT (WALCKER)

1    The Landing during this --

2    A.  My responsibilities?  Mainly I oversaw -- I had one

3    other full-time employee and during the summer months, which

4    were basically April through September, I had four seasonals

5    that would work under me.

6         I oversaw the maintenance of the park, which was

7    the mowing, weed-whipping, any kind of building maintenance.

8    We did painting, bathroom cleaning.  Any kind of

9    reservation -- we had a pavilion there that was mainly

10   rented for weddings.  We would do the setup, teardown before

11   the weekend and after the weekend.

12        We also did some upkeep of the buildings,

13   landscaping projects.  Most recently we've done some paver

14   walkways to all the buildings to kind of make them look old

15   but new, as well as any other programming needs that they

16   had we would do.

17        If they -- for some of their lumberjack camps they

18   needed bigger logs, so we would bring them to them and

19   station them where they needed; and when they didn't, we

20   would take them away.

21   Q.  Sounds like you were a jack-of-all-trades.  Fair to say?

22   A.  Most definitely.

23   Q.  There's a couple terms you used there that I wasn't

24   familiar with.  I think you said "bear logs"?

25   A.  Yeah, just any kind of logs, bigger logs.

JOHN RUHLAND - DIRECT (WALCKER)

```
1    Q.  Oh, bigger logs.  I'm sorry.

2    A.  Yes.

3    Q.  Okay, bigger logs.

4            And then I think you said "paper trails"?

5    A.  Paver trails.

6    Q.  Paver trails, okay.

7    A.  Yes.  Sorry.

8    Q.  Oh, no, no.  Thank you for correcting me.

9            So were you in charge at that time of all

10   maintenance, groundskeeping and then, in addition,

11   supporting events at that time?

12   A.  Yes.

13   Q.  When something needed to be done for park maintenance or

14   programs, would you be involved with that?

15   A.  Yes, I would -- if there was something specifically that

16   was needed, I would get a work request that was sent to me

17   giving me the details, when the event was happening, what

18   was needed, and if there's any special requests.

19   Q.  That's something you would have received in advance?

20   A.  Yes, usually a week.  Sometimes for bigger events it

21   would be a month.

22   Q.  What were your hours at The Landing?

23   A.  Our normal typical workday was 6:00 a.m. to 2:30 p.m.

24   Q.  And was that Monday through --

25   A.  Monday through Friday -- I'm sorry.  So our typical
```

1    workday is 6:00 to 2:30.  During the summer months of April

2    through mid-October, we would have -- seven days a week we

3    would have at least one person on, and then after that it

4    was five days a week 6:00 a.m. to 2:30.

5    Q.   Okay.  And you mentioned someone would be on.  Would you

6    have those hours, 6:00 to 2:00 or 2:30, Monday through

7    Friday throughout the year?

8    A.   Monday through Friday, yes, throughout the year would be

9    6:00 to 2:30 someone would be on-site.

10   Q.   Somebody would be on-site, but were you personally on

11   The Landing site during that time throughout the year?

12   A.   Not throughout the year.  Normally around Thanksgiving I

13   would go to Hyland to help out with the snowmaking that was

14   happening up there, but when we did leave to do that, we

15   would have somebody that would be going down to The Landing

16   daily to check the site.

17   Q.   Would you also -- well, first, what is the Hyland?

18   A.   Hyland is a park in Bloomington.  It's a little bit

19   bigger park and they offer more amenities than The Landing

20   does, and during the winter months they need all full-time

21   staff to come there to help make snow for the cross-country

22   ski trails.

23   Q.   So when you would go to Hyland to help with some of the

24   snowmaking for the trails, would you also go back to

25   The Landing throughout the week to check on the grounds?

1     A.  Yes.  Whenever we weren't making snow or grooming, there

2     would be -- we had a winter checklist every day that would

3     be done to ensure that water wasn't freezing, buildings

4     weren't getting broken into, any other, you know -- if it

5     snowed, we would be down there to plow or to shovel the

6     walkways, put salt or grit down on the walkways to make it

7     safe for the public.

8     Q.  How often would you go to The Landing during those

9     winter months when you were also at Hyland?

10    A.  That would be every day.  We had at least one -- not

11    myself, but as -- I would oversee at least one person every

12    day would go down there to check the buildings and check the

13    site.

14    Q.  Okay.  And would you also personally go to The Landing

15    during that time to check on the grounds?

16    A.  Yes.

17    Q.  Was it part of your responsibilities to know what was

18    going on at The Landing on any given day?

19    A.  Yes.  As the crew chief at The Landing, I was kind of

20    the main person that made things go from a maintenance

21    perspective, so I was often included in everything that was

22    going on.

23    Q.  Given your responsibilities, are you familiar with

24    The Landing, the layout?

25    A.  Very familiar.

JOHN RUHLAND - DIRECT (WALCKER)

1    Q.  Is there a part of the park where you would keep your

2    supplies or tools that you need throughout the day?

3    A.  Yes.  On the east end of the park we have what we call a

4    Quonset, which is a big metal shed, and that's where all of

5    our equipment and everything that we need on a day-to-day

6    basis is stored.

7    Q.  As the crew chief, were you responsible for maintaining

8    only one section of the park or the entire park?

9    A.  We maintained the entire park.

10   Q.  Did your work as crew chief take you throughout the park

11   on any given day?

12   A.  Yes.  Almost every day you would be on either end of the

13   park.  The park is not a very big park.  So we would have to

14   check every building, and we had buildings, you know, that

15   stretched from our far east boundary to our far west

16   boundary.  So we would need to check buildings every day to

17   make sure that they weren't broken into or vandalized.

18   Q.  Was that something that happened when you were a crew

19   chief at The Landing, the vandalism?

20   A.  Yes.  Very often during the summer months we would get

21   vandalism, people breaking in, breaking windows, basically

22   going after anything breakable.

23   Q.  Was it your job to try to fix it up --

24   A.  Yep.

25   Q.  -- make it look nice?

JOHN RUHLAND - DIRECT (WALCKER)

1    A.  We had to clean up and board up windows and fix the

2    glass and everything, get it back to looking old but new.

3    Q.  Are you familiar with the public parking lot on the west

4    side of the park?

5    A.  Yes.

6    Q.  I'm going to show you what's been admitted as Government

7    Exhibit C-92.  Do you see that?

8    A.  Yes.

9    Q.  What -- do you recognize this?

10   A.  Yes, I do recognize the -- to the far left of the

11   picture is the rental pavilion that I talked about where

12   weddings occur.  The yellow taller building to the right of

13   that is the church.  And then if you go to the -- kind of

14   the far right where the vehicle is parked, that's the main

15   entrance on the west end.

16   Q.  Did some of your responsibilities as crew chief involve

17   groundskeeping or maintenance of this public parking lot?

18   A.  Yes.  Most times during the summer we would have to

19   regrade the parking lot once to two times -- I'm sorry, once

20   a week or once every other week, because we do have -- since

21   it's such a large open area, we have a lot of people that

22   enjoy using it as a drift track and they like to make lots

23   of ruts.  And if we don't keep on top of it, the ruts will

24   just get bigger, it will be tough for the public to kind of

25   drive over, and it's just not a smooth experience for them.

JOHN RUHLAND - DIRECT (WALCKER)

1    Q.  Can you explain what regrading means.

2    A.  Yeah.  We would -- normally we have a tractor, a John

3    Deere 1010, that we would have a -- what we call a box

4    scraper.  There's a big box blade on the back of it that you

5    put down, and it would basically collect the highest points

6    and bring the gravel into the low points; and then we would

7    go over that with a broom attachment on the back of the

8    tractor that would basically take care of any other high

9    spots and make it a nice clean surface.

10   Q.  What about the winter months?  In Minnesota there's snow

11   on the ground.  Was part of your responsibility trying to

12   clear off the snow from this parking lot?

13   A.  Yes.  Unfortunately, with The Landing being a less

14   priority park in the Hyland cluster, it would be left until

15   the end.  That would be our lowest priority of plowing.  So

16   most of the time it would happen towards the end of the day,

17   sometimes next day.

18           But we would go down and plow.  And in this

19   particular west parking lot, we would plow roughly one car

20   length to the left of the light pole that's in the center of

21   the parking lot.  Everything else would be left unplowed.

22   Q.  Okay.  So in the winter months the parking lot would be

23   even smaller --

24   A.  Yes.

25   Q.  -- for visitors?

JOHN RUHLAND - DIRECT (WALCKER)

1    A.  It's roughly about half the size.

2    Q.  Okay.  You also mentioned that part of your role as crew

3    chief was assisting with park events at The Landing; is that

4    right?

5    A.  Yes.

6    Q.  Can you tell us more about some of the larger events

7    The Landing hosts.

8    A.  Yes.  So part -- events that I've been a part of,

9    recently we had a food truck festival that we hosted.  It

10   was a Friday evening, Saturday.  There was roughly 3,000

11   people that attended that event.

12            And, you know, weddings, sometimes we can get, you

13   know, one to two hundred guests that arrive for that.  So

14   that's a pretty big event, which would fill up that west

15   parking lot pretty good.

16            And then we have had a Savage arts fair a while

17   ago, and that was one to two thousand people over the course

18   of two days.

19   Q.  Can you tell us a little bit about what the parking

20   arrangements would look like at The Landing when you had

21   that number of visitors for those events.

22   A.  Yes.  With that large number of vehicles coming in and

23   going, usually we have the parking lot set up with parking

24   lot stanchions and ropes that run through them to keep

25   people from driving and parking everywhere to maximize the

 1    parking space.

 2              Usually we also -- because of the bottleneck that

 3    is where you enter and exit that parking lot, we usually

 4    have at least one public service assistant directing traffic

 5    as well as one or two employees that would be directing

 6    vehicles to park.  And, you know, normally -- we do have an

 7    overflow grass lot, but it's not the best for parking, so we

 8    try not to put people there.

 9    Q.  You mentioned a "public service assistant."  What is

10    that?

11    A.  Basically it is a -- somebody that goes around and

12    assists the park, kind of like a park ranger almost.

13    Somebody that goes around.  They check for passes.  They

14    help out if anybody is locked out of a vehicle, per se.

15    They'll help get the right people around or if -- you know,

16    they're just out kind of being the public face of Three

17    Rivers, where if somebody sees a tree down on a trail or

18    something, they can notify who needs to be notified.

19    Q.  When The Landing would host those type of larger events,

20    would it draw attention?

21    A.  Yes.

22    Q.  From a cleanup perspective and maintenance, can you

23    describe what The Landing looked like after those larger

24    events.

25    A.  After those events, it would normally be a full day of

JOHN RUHLAND - DIRECT (WALCKER)

1   cleaning up with just the trash and everything that was left

2   behind or put in the trash cans.

3        Normally after that big of an event, because of

4   the amount of traffic on the gravel, we would have to

5   regrade just to keep the quality of the parking lot up.  If

6   we let it get beat down, it kind of turns into almost like a

7   concrete.

8        So it would be a lot of cleanup as far as the

9   trash, the parking lot maintenance, and then cleaning of the

10  buildings and such.

11  Q.  All right.  Now I want to switch gears and I want to

12  focus with you on the time period of the COVID-19 pandemic.

13  Can you tell the jurors about what impact the COVID-19

14  pandemic had, if any, on The Landing.

15  A.  So in the beginning of the pandemic, when everybody was

16  kind of sent home, shelter in place, the park became very

17  quiet.

18       And then once things started to get opened up and

19  the outdoor activities kind of were geared as being safe,

20  The Landing kind of got a lot busier.  There was a lot more

21  people just walking through.  It's right next to the city of

22  Shakopee, so you weren't in town, but you were close enough

23  and out in the open.  So it was -- it got fairly busy right

24  after COVID kind of -- or right after the quarantine lifted.

25       Yeah, I would say just -- you know, the main thing

1    was the uptick in people there meant uptick in trash, uptick

2    in bathrooms needing to be cleaned, trashes needed to be

3    changed and, you know, just overall litter picking was one

4    of our main jobs just with the increase in visitorship.

5    Q.  Approximately how many visitors came to The Landing in

6    2020, if you know?

7    A.  We averaged 20 to 25 visitors per day, would be

8    recurring.

9    Q.  20 to 25 --

10    A.  Yes.

11    Q.  -- people a day, you said?

12    A.  Yes.

13    Q.  Approximately how many vehicles were at The Landing per

14    day in 2020, if you know?

15    A.  10 to 15, roughly.

16    Q.  Now, was the park -- the park was open during the

17    pandemic?

18    A.  Yes, the park is open from 5:00 a.m. to 10:00 p.m. every

19    day.

20    Q.  Were the buildings closed during the pandemic to the

21    public?

22    A.  Yes, the buildings were closed.

23    Q.  Did you remain on-site at The Landing during the

24    pandemic?

25    A.  Yes.  The only time that I was home was during that

1    two-week stretch when we were to quarantine in place.  Aside

2    from that, I was part of the first group that was allowed

3    back.  So we were back on-site as soon as we could be.

4    Q.  Do you remember when you were back on-site?

5    A.  It's hard for me to remember the time frame.  I guess I

6    would -- I'm trying to think when it would -- it was -- I

7    know it was before the summer months started.  My kids were

8    still in school.

9    Q.  Is when you would have returned to The Landing?

10   A.  Yes.  It would have been maybe May, middle of May.

11   Q.  Middle of May of 2020 you were back --

12   A.  Yes.

13   Q.  -- at The Landing on-site?

14   A.  Yes.

15   Q.  Are you aware of any summer camps happening at

16   The Landing that summer in 2020?

17   A.  Yes.  That summer we had -- it was a little bit

18   different because we had to keep our social distance.  So we

19   did have programs that were going on.  They were -- usually

20   had a max of 12 kids, and we had a few different locations

21   where drop-off occurred just to keep the safe distance.

22   Q.  Do you remember whether those campers packed their

23   lunches?

24   A.  Yes, they did.

25   Q.  There were not lunches provided to the children during

1    that time --

2    A.  No.

3    Q.  -- by The Landing?

4         Okay.  Now I want to talk to you about meals that

5    were claimed to be served to children at The Landing during

6    the pandemic.  I want to focus your attention on the time

7    period of July of 2020 through December of 2020, that

8    six-month period.  Okay?

9         Were you at The Landing during that time?

10   A.  Yes.

11   Q.  Okay.  And I think you had mentioned November you

12   started splitting your time with Hyland Park; is that right?

13   A.  Yes, usually -- I think it was roughly around

14   Thanksgiving.

15   Q.  Okay.  So starting in Thanksgiving, late November of

16   2020, you would split your time at the Hyland?

17   A.  Yes.

18   Q.  Would you also come to The Landing in December of 2020

19   as part of your responsibilities?

20   A.  Yes.

21   Q.  How often would you come to The Landing in December of

22   2020?

23   A.  I would say about three days a week.

24   Q.  And I think you mentioned before that you also had

25   facilities and maintenance staff there as well the rest of

JOHN RUHLAND - DIRECT (WALCKER)

1   the days?

2   A.  Yes, they would be -- there would be at least one person

3   that would come on-site every day.

4   Q.  And would you talk to your colleagues and the folks on

5   your team about what was happening in the park on those days

6   when you weren't physically present?

7   A.  Yes.

8   Q.  Is it important for you to know in your job, to know

9   what --

10  A.  Yes.  Usually every morning before we send people out,

11  we'll have a meeting where we'll -- we'll discuss what needs

12  to get done during the day, if anything, you know, major has

13  come up.

14         Also, I have a cell phone, a park district

15  provided cell phone.  They all have that number.  So if

16  anything out of the ordinary is coming up, usually I'll get

17  a text or a phone call.

18  Q.  Based on your observations, are you aware of any meals

19  being served at The Landing during that time period?

20  A.  No.

21  Q.  You never saw any meals being served at The Landing

22  between July of 2021 -- sorry, July of 2020 and December of

23  2020?

24  A.  No.

25  Q.  As the crew chief, would you or your staff have noticed

1    meals being served at the park?

2    A.  Yes.

3    Q.  Did you ever see lines of vehicles picking up meals at

4    The Landing?

5    A.  No.

6    Q.  I think you said at that time you'd see about 10 to 15

7    vehicles at the park on a daily average; is that right?

8    A.  Yes.

9    Q.  And about 20 to 25 visitors?

10   A.  Yes.

11   Q.  We'll talk about specific numbers shortly, but did you

12   see lines of people at The Landing picking up meals?

13   A.  No.

14   Q.  Did you ever see trucks unloading large amounts of meals

15   at The Landing during that time?

16   A.  No.

17   Q.  Did you ever see signs or flyers advertising free meals

18   for children to be served at The Landing?

19   A.  No.

20   Q.  Is that something you would have noticed?

21   A.  Yes.  If there's signs or anything that would be on our

22   property, as a park district protocol we're not allowed to

23   leave them up.  So we would be instructed to take them down

24   or I would instruct my staff to take them down.

25   Q.  Did any of your staff ever tell you that they saw signs

1    advertising free meals at The Landing?

2    A.  No.

3    Q.  Did anyone ever approach you at The Landing about using

4    The Landing as a location for giving free meals for children

5    during the pandemic?

6    A.  No.

7    Q.  Does the name Mind Foundry mean anything to you?

8    A.  No.

9    Q.  Did you hear from anyone at Empire Cuisine & Market

10   about providing meals at The Landing?

11   A.  No.

12   Q.  Have you ever heard the name Empire Cuisine & Market?

13   A.  Not before this case.

14   Q.  Before you received a subpoena?

15   A.  Correct.

16   Q.  Did someone named Abdiaziz Farah ever contact you about

17   providing meals at The Landing?

18   A.  No.

19   Q.  What about someone named Mohamed Ismail, did someone by

20   that name ever contact you about providing meals at

21   The Landing?

22   A.  No.

23   Q.  Would visitors at the park ever approach you with

24   questions or ask you about permission for holding events or

25   programs at the park?

1    A.  Yes.  Often we would get approached about what venues we

2    have available or what they could and couldn't do.  I

3    would -- because I am the crew chief on point, I would most

4    of the times talk to them, tell them what we offer, but also

5    direct them to our reservation line that they can then get

6    exact details and dates that are open and that type of

7    stuff.

8    Q.  Did you ever see any meals served at The Landing?

9    A.  No.

10   Q.  So did you ever see anyone with a clicker or a clipboard

11   taking down counts of meals being served?

12   A.  No.

13   Q.  You mentioned that one of your responsibilities at

14   The Landing was waste management.  Did you ever see any

15   evidence of meal distribution, any leftover food, anything

16   like that at The Landing during that time period?

17   A.  No.

18   Q.  You didn't see, for example, discarded milk cartons,

19   anything like that?

20   A.  No.

21   Q.  Based on your experience, if thousands of meals were

22   being distributed at The Landing during that time period,

23   what would the aftermath look like?

24   A.  I feel like even if people didn't mean to litter or

25   anything, people -- just that amount of traffic, there would

1    be evidence in the parking lot of trash and, you know -- and

2    the tire marks in the gravel after we would grade the gravel

3    parking lot.

4             Also, the other thing that -- you know, at

5    The Landing, with that many vehicles, I think there would be

6    some noise that would come from that.  Just in my prior

7    experience having those events, cars coming and going, doors

8    opening, shutting, people talking, you know, kind of drums

9    up a lot of noise that we can notice and hear if it's more

10   than we're used to.

11   Q.  Mr. Ruhland, I'm going to show you another photo of the

12   west side public parking lot.  Based on your knowledge of

13   the park, if a large number of meals were being served at

14   The Landing between July and December of 2020, would that

15   have been possible here?

16   A.  No.

17   Q.  Why do you say that?

18   A.  I feel like the parking lot and the way that everything

19   is set up, it's not conducive to that.  You know, just the

20   bottleneck that I talked about coming in and out of that

21   place with County Road 101 that runs parallel to the park

22   being, you know, a main highway, getting in and out without

23   having incident would not work without having, you know,

24   somebody there to park cars or direct traffic.

25   Q.  And let me ask you:  You mentioned the regrading of the

1    parking lot here, the gravel.  If a large uptick in vehicles

2    were coming through the park during that time period, would

3    you have noticed that?

4    A.  Yes.

5    Q.  And would you have needed to regrade the gravel parking

6    lot here?

7    A.  Yes.

8    Q.  All right.  Now, we've talked a lot about the west side

9    of the park, the public entrance.  Are you familiar with the

10   administrative office building on the east side of the park?

11   A.  Yes.

12   Q.  And I think the supply warehouse that you mentioned

13   where you keep some of your supplies?

14   A.  Yep.

15   Q.  In the time frame of July of 2020 through December of

16   2020, was there generally park staff in that office?

17   A.  Yes, normally Monday through Friday.

18   Q.  In addition, was there facilities and maintenance staff

19   at the park on the weekends?

20   A.  Yes.

21   Q.  So if there was a large number of cars coming by the

22   administrative office building to go to the public entrance,

23   is that something that someone in that office would have

24   seen?

25   A.  Yes.

JOHN RUHLAND - DIRECT (WALCKER)

1    Q.  For all the reasons that we just discussed, would you

2    have noticed meals being served at The Landing between July

3    of 2020 and December 2020?

4    A.  Yes.

5    Q.  All right.  Finally, I want to show you what's been

6    admitted as Government Exhibit N-22, and I want to talk

7    about the claims -- meal counts that were claimed in this

8    case.

9            All right.  This is the number of meals that were

10   claimed to be served between July of 2020 and December of

11   2020 at The Landing.  Do you see this?

12   A.  Yes.

13   Q.  Did you see in July of 2020 3,000 breakfast meals for

14   children and 3,000 lunch meals for children served at

15   The Landing?

16           MR. COTTER:  Your Honor, I just want to object as

17   cumulative, 403.  Multiple times this witness has testified

18   he didn't see any meals served.

19           THE COURT:  Overruled.  You may answer the

20   question.

21           THE WITNESS:  No.

22   BY MS. WALCKER:

23   Q.  Is that something that you would have noticed?

24   A.  Yes.

25   Q.  Turning to August of 2020, did you see 5,450 breakfast

1    meals and 5,450 lunch meals for children served at

2    The Landing in August of 2020?

3    A.  No.

4    Q.  If that many meals were being served at The Landing, is

5    that something you would have been aware of?

6    A.  Yes.

7    Q.  Did it happen?

8    A.  No.

9    Q.  Turning to September of 2020, did you see 6,050

10   breakfast meals for children and 6,050 lunch meals for

11   children served at The Landing in September of 2020?

12   A.  No.

13   Q.  In October of 2020 did you see 9,800 breakfast meals

14   for children and 9,800 lunch meals for children served at

15   The Landing?

16   A.  No.

17   Q.  If that many meals were being served at The Landing in

18   October of 2020, would you have noticed?

19   A.  Yes.

20   Q.  Turning to November of 2020, the next month, did you see

21   10,212 breakfast meals for children and 10,212 lunch meals

22   for children served at The Landing in November of 2020?

23   A.  No.

24   Q.  Finally, turning to December of 2020, did you see 14,260

25   breakfast meals for children and 14,260 lunch meals for

1    children served at The Landing in December of 2020?

2    A.  No.

3    Q.  Is there any way that many meals, almost 100,000 meals,

4    between July of 2020 and December of 2020 could have been

5    served without you knowing?

6    A.  No.

7    Q.  Did it happen?

8    A.  No.

9    Q.  Mr. Ruhland, do you have children?

10   A.  Yes.  I have three daughters.

11   Q.  How old are they?

12   A.  Twelve, nine, and two.

13   Q.  Would you have liked to have brought home free meals for

14   your children if they were provided at The Landing, where

15   you worked during that time?

16   A.  Yes.

17              MS. WALCKER:  No further questions.  Thank you.

18              THE COURT:  Mr. Birrell?

19              MR. IAN BIRRELL:  Nothing on behalf of Abdiaziz

20   Farah, Your Honor.

21              THE COURT:  Thank you.  Anyone else?

22              Mr. Cotter.

23                        **CROSS-EXAMINATION**

24   BY MR. COTTER:

25   Q.  Just real quick, everything you're talking about was

```
 1    within the confines of the park, correct?

 2    A.  Yes.

 3              MR. COTTER:  Nothing further.  Thank you.

 4              THE COURT:  Mr. Sapone.

 5              MR. SAPONE:  Thank you, Your Honor.

 6                        CROSS-EXAMINATION

 7    BY MR. SAPONE:

 8    Q.  Good afternoon, sir.

 9    A.  Good afternoon.

10    Q.  How are you?

11    A.  Good.

12    Q.  Sir, were you contacted by federal agents in August of

13    2021?

14    A.  No.

15    Q.  Please tell the members of the jury when the first time

16    you were contacted about this case by federal agents was.

17    A.  I don't know the exact date, but it would have been

18    roughly a month and a half ago.

19              MR. SAPONE:  Nothing further.

20              THE COURT:  Anyone else?

21              Ms. Walcker?

22              MS. WALCKER:  Nothing further.  Thank you.

23              THE COURT:  You may step down, sir.

24              The government may call its next witness.

25              MS. WALCKER:  Your Honor, the government calls
```

```
1    Damaris Graffunder.

2              THE COURT:  Hi.  You may come forward past the

3    jury, and you are coming up to this witness chair.  I will

4    have you stand to take the oath.

5                        (Witness sworn)

6              THE COURT:  Thank you.  You may have a seat in the

7    witness chair.  And when you're settled, I will have you

8    state and spell both your first and last name for the

9    record.

10             THE WITNESS:  Damaris Graffunder.

11             THE COURT:  Can you spell it for me.

12             THE WITNESS:  D-a-m-a-r-i-s, G-r-a-f-f-u-n-d-e-r.

13             THE COURT:  Thank you.

14             Ms. Walcker, you may inquire.

15             MS. WALCKER:  Thank you, Your Honor.

16                       (Damaris Graffunder)

17                       DIRECT EXAMINATION

18   BY MS. WALCKER:

19   Q.  Good afternoon, Ms. Graffunder.

20   A.  Good evening.

21   Q.  Am I saying that correctly?

22   A.  It's fine, yes.

23   Q.  Not exactly.  I'm trying.

24   A.  It's okay.

25   Q.  Why don't you start by telling the jury, where are you
```

1   from?

2   A.  I am from Panama, and I have been living here for a

3   while.

4   Q.  You've been in Minnesota for a while?

5   A.  Yes.

6   Q.  Where do you live now?

7   A.  In New Prague.

8   Q.  In New Prague?

9   A.  Yes.

10  Q.  Are you a U.S. citizen?

11  A.  I am.

12  Q.  Do you work?

13  A.  I do.

14  Q.  Where do you work?

15  A.  I work in a Holiday store in Apple Valley.  I am the

16  store manager.  I'm also the owner.

17  Q.  You said you're both the store manager and the owner?

18  A.  Yes, I am.

19  Q.  Okay.  How long have you been doing that?

20  A.  For a while.  Since we became Holiday.  Yes, it's a

21  while.

22  Q.  Okay.  Tell us about -- can you say more about that for

23  the jury?

24  A.  About how many years?

25  Q.  Yes.  How many years?

1    A.  About ten years.

2    Q.  Ten years?

3    A.  Yes.

4    Q.  You said you've been doing that for a while.  At some

5    point were you doing something else?

6    A.  We used to have -- my husband and I, we used to have a

7    shop in Apple Valley on 147.  So he decided to retire and

8    sell that one.  And we used to have a Holiday store -- it

9    used to be called Andy's Market, but then we came to be a

10   Holiday store because it was easier for us, for me because

11   he is retired.  So who does the job and who runs the store

12   is myself.

13   Q.  Okay.  So your husband is retired, but you own the

14   Holiday Stationstore in Apple Valley together?

15   A.  Yep.  Yes.

16   Q.  And you're the manager?

17   A.  Yes, I am.

18   Q.  All right.  And you said you have owned that for about

19   ten years?

20   A.  Yes.  Well, it's -- it became Holiday ten years ago, but

21   we used to be Andy's Market, so it's been more than that.

22   Q.  Okay.  You've owned the property for longer than that?

23   A.  Yes.

24   Q.  But you have owned the Holiday at that spot for about

25   ten years?

1    A.  Yes, ma'am.

2    Q.  Okay.  Do you know the address of that Holiday station

3    in Apple Valley?

4    A.  14113 Galaxie in Apple Valley.

5    Q.  I want to make sure.  It's 14113 Galaxie Avenue in Apple

6    Valley?

7    A.  Yes.

8    Q.  I want to make sure I get that correctly for our

9    wonderful court reporter here.

10            I want to talk to you about that building and some

11   of the surrounding area today.  Okay?

12   A.  Okay.

13   Q.  First, can you describe that property that you own for

14   the jury.

15   A.  Well, it's kind of big, and then also we have a park

16   next to and a lot of -- it is very busy.  But yeah.  And the

17   park has people.  They go play tennis court, and also there

18   is a place that they go and shoot.  In wintertime it's kind

19   of busy for me because there's a hill there and a lot of

20   kids go on the hill and slide on the hill.  So yeah.

21   Q.  So you said there's a park near the building that you

22   own, the Holiday station?

23   A.  Yes, it is a park.

24   Q.  Do you know the name of that park?

25   A.  Scott Park.

DAMARIS GRAFFUNDER - DIRECT (WALCKER)

```
 1   Q.  Scott Park?

 2   A.  Yes.

 3   Q.  And I think you mentioned there is a tennis court?

 4   A.  Yes, there is.

 5   Q.  And then there's a hill where you'll see people

 6   sledding?

 7   A.  Yes, it is there.

 8   Q.  There's a hill?

 9   A.  Yep.

10   Q.  And then I think you said in the park there's also a

11   place where people shoot?

12   A.  Yes.

13   Q.  Do you know, is it shooting guns or shooting bow and

14   arrow?

15   A.  Arrow, yes.

16   Q.  Archery?

17   A.  Yep.

18   Q.  Okay.  I want to talk about the park in just a moment,

19   but focusing on the building itself, are there any other

20   commercial spaces in that property you own apart from the

21   Holiday?

22   A.  It is fire department there.

23   Q.  There's a fire department?

24   A.  Yeah, on the other side.

25   Q.  On the other side of the building?
```

DAMARIS GRAFFUNDER - DIRECT (WALCKER)

```
 1    A.  Yes, it is.

 2    Q.  Where is the fire department in relation to the Holiday?

 3    A.  Well, if I'm standing right here, my store is right here

 4    (indicating), so there's a street and then to my left is the

 5    fire department.

 6    Q.  So if you're standing outside the Holiday, to your left

 7    there's a street there?

 8    A.  Yes.

 9    Q.  Is the Holiday on a corner?

10    A.  In a corner, yep.

11    Q.  And then across the street there's a fire station?

12    A.  Yes, it is.

13    Q.  Okay.  So the building itself, is there any other spaces

14    next to the Holiday station that --

15    A.  Houses.  Houses.

16    Q.  Houses.  Where are the houses?

17    A.  Behind, around.  The tennis court is right there

18    (indicating) in that right side.  So in the aisle there.  So

19    there is houses and trees too.

20    Q.  Is that part of Scott Park?

21    A.  Well, I don't know, but it's very close to the park.

22    Q.  There's trees in the park.  And then you said there's

23    houses --

24    A.  Houses.

25    Q.  -- around there?
```

1    A.   Yep.

2    Q.   Sort of a residential neighborhood around the park?

3    A.   Yes.

4    Q.   Okay.  Besides the Holiday station, is there anything

5    else in the building that you and your husband own?

6    A.   A daycare that they rent from us.

7    Q.   A daycare that they rent from you and your husband?

8    A.   Yes.

9    Q.   Okay.  Do you know the name of that daycare?

10   A.   I believe it's a Monseretti [phonetic].  I don't know

11   what it's called, but it is a little school there, a

12   daycare.

13   Q.   Amonseretti?

14   A.   Something like that.

15   Q.   Something like that, but it starts with an "A"?

16   A.   "M."

17   Q.   "M," okay.

18        Do you know the address of that daycare?

19   A.   I believe it's 14119.

20   Q.   14119?

21   A.   Yes.

22   Q.   Is that also on Galaxie Avenue?

23   A.   Yes.

24   Q.   How big is the daycare compared to the Holiday station?

25   A.   The daycare is 1,900 square feet.

```
 1    Q.  Sorry.  What was it?  1,000?

 2    A.  900 square feet.

 3    Q.  Okay.  So is it bigger or smaller than the Holiday

 4    station?

 5    A.  It's smaller than my store.

 6    Q.  It's smaller than your store.

 7            Can you -- you mentioned that Scott Park is next

 8    to the Holiday station that you own?

 9    A.  Yes.

10    Q.  I want to show you maybe some photos to help paint a

11    picture.  I'm going to show you what's been marked for

12    identification as Government Exhibit C-247.  There we go.

13            Do you recognize these images?

14    A.  This is the park next to my store.

15    Q.  This is the Scott Park next to your store?

16    A.  Yes.

17    Q.  You're familiar with that area?

18    A.  Very well.

19    Q.  And are these -- I'm going to flip through.  Are these

20    true and accurate depictions of the area where you work?

21    A.  Yes.  Right there is the tennis and then the place where

22    they rent from me, as well as the playroom they have too,

23    yeah, it's right there, and my fuel area.

24            MS. WALCKER:  I offer Government Exhibit C-247

25    into evidence.
```

1      MR. IAN BIRRELL:  Without objection.

2      THE COURT:  Exhibit C-247 is admitted and may be

3  published.

4  BY MS. WALCKER:

5  Q.  Now that the jury can see what we're looking at here,

6  can you explain to the jury what we're seeing in this first

7  picture here.

8  A.  It says, "Scott Park," and then I see the park and the

9  tennis.

10  Q.  This is the tennis park you were just talking about here

11  (indicating)?

12  A.  Yes, ma'am.

13  Q.  And then it looks like on the left side of the park, is

14  there a walking path and maybe a road here?

15  A.  Yes, it is.  Usually I walk around, and my husband too.

16  When we have to go to the bank, I walk around with my dog.

17  Q.  You walk your dog --

18  A.  Yes.

19  Q.  -- to the bank?

20      And you and your husband walk around, you said, as

21  well?

22  A.  Sometime he does.  Sometime I do.

23  Q.  Sometimes it's just you and sometimes he goes with you?

24  A.  Yes.

25  Q.  Okay.  Turning to the next page, it looks like this

DAMARIS GRAFFUNDER - DIRECT (WALCKER)

1   might be a similar perspective but just a little bit wider

2   to the left of that same sign we're looking at; is that

3   right?

4   A.  Yes, it is.

5   Q.  And I think you said earlier there was a bunch of trees,

6   maybe.  Is this what you are talking about here?

7   A.  Yes, it is trees.  Those trees, yes.

8   Q.  Okay.  So there's -- in the park you've got the tennis

9   courts, and I think you mentioned maybe a hill for sledding?

10  A.  Yes, it's all the way in the back over there.  That's

11  the hill.

12  Q.  This (indicating) is the hill you're talking about?

13  A.  Yes.

14  Q.  And then on the other side of these trees, what's on the

15  other side?

16  A.  On that side that it's showing there is the houses.

17  Q.  These are the houses that --

18  A.  Yes.

19  Q.  We can't see very clearly here, but on the other side of

20  some of these trees, there's the houses.

21         Okay.  Let's take a look at the next picture.

22  What are we seeing here on the third page of Government

23  Exhibit C-247?

24  A.  This is where the people will -- some of my clients go

25  over there and they practice shooting there, and then I see

DAMARIS GRAFFUNDER - DIRECT (WALCKER)

1    the playroom for the daycare area.

2    Q.  Okay.  So let's take those one at a time.  I think you

3    mentioned some of your clients.  Are those customers of the

4    Holiday station?

5    A.  Yes.

6    Q.  And you said some of them will do shooting here?

7    A.  Yes, they do.  Every morning they are there.

8    Q.  Okay.  You mentioned shooting.  This an archery area?

9    A.  Yes.

10   Q.  Okay.  So some of your clients will come into the

11   Holiday station and then go do archery?

12   A.  Yes, they buy the coffee and then go over there.

13   Q.  And then you mentioned the daycare.  You said a play

14   area?

15   A.  Yeah, that little area down there.

16   Q.  Is that the area in the red fence here?

17   A.  Yeah, there's a playroom.

18   Q.  Okay.  Let me ask you:  The park itself, does the park

19   have a separate parking area?

20   A.  Up front of where the park is the parking.  People when

21   they go over there, they park in that area or on my side or

22   in front where the daycare is.  So we share.

23   Q.  So the park visitors -- this is the shared parking lot

24   for the park and for the Holiday station and the daycare?

25   A.  Yes.

1    Q.  One shared parking lot?

2    A.  Yes.

3    Q.  So if visitors were to drive to the park, they would

4    park here in this parking lot?

5    A.  Yes.

6    Q.  And then you mentioned there's sort of a path here in

7    the front and then also on the --

8    A.  In the back.

9    Q.  -- other side of the daycare?

10   A.  Yes, in the back too.

11   Q.  Okay.  So parking in the front and the back.

12             And then you mentioned this was the play area for

13   the daycare as well?

14   A.  Yes, it is.

15   Q.  Okay.  Let's turn to the next page here.  Page 4 of

16   Government Exhibit C-247, is this showing more -- a

17   different angle that we just looked at of the property?

18   A.  Yes.

19   Q.  So is this the daycare?

20   A.  Yes.

21   Q.  Do you recognize the name here?

22   A.  Acacia, yes.

23   Q.  Is that the name of the daycare you were talking about?

24   A.  Yes.

25   Q.  Acacia Montessori?

1   A.  Yes.

2   Q.  Okay.  And then it looks like there's some gas pumps

3   here.  Can you tell us where the gas station is, the Holiday

4   station is next to the daycare.

5   A.  It's next to.  If I am seeing right now, it is to my

6   right.

7   Q.  So you see on one side of the building is the daycare.

8   On the other side is the Holiday station?

9   A.  Yes.

10  Q.  So if this camera were to sort of pan to the right, we

11  would see the Holiday station?

12  A.  Yes, ma'am.

13  Q.  Okay.  And then I think you mentioned earlier that on

14  the other side, if you were to pan to the right, there would

15  be an intersection there or a road?

16  A.  Yes.

17  Q.  And then did you say there's a fire department across

18  the street?

19  A.  Yes, it is a fire department.

20  Q.  Okay.  Does -- so does the gas station space take up the

21  rest of that building?

22  A.  Yes.

23  Q.  Okay.  Does it have a car wash?

24  A.  It does.  Yes, we do.

25  Q.  All right.  Now that we have an idea of the Scott Park

1   and this property here that you own and then the Holiday

2   station, I want to take you back to the time period of the

3   pandemic and talk about that time period with you.  Okay?

4   A.  Okay.

5   Q.  So the year -- let's focus on the year 2021, if you

6   remember that and have that in mind.  Okay?

7   A.  Okay.

8   Q.  During the pandemic were you working at the Holiday

9   station?

10  A.  I was.

11  Q.  Did you work at the Holiday station throughout the

12  pandemic?

13  A.  I had to work every single day because I didn't have no

14  employees, and sometimes I have to sleep at my store.

15  Q.  You were short-staffed at the Holiday station?

16  A.  Yes, I was.

17  Q.  Sometimes you had to sleep there overnight you were so

18  short-staffed?

19  A.  Yes.

20  Q.  What were the Holiday station hours?

21  A.  We used to be 18 hours, but because of that time, we

22  became 17 hours.  So we used to close at 11:00, but now we

23  are 10:00.

24  Q.  Now 10:00.  What time did the Holiday station open?

25  A.  5:00 in the morning.  But if I have to do my management

1    and also cashier, I have to be earlier so to prepare myself.

2    Q.  So it would open at 5:00 a.m., but because you were

3    short-staffed, you would have to get there earlier to set

4    up, get ready for the day?

5    A.  Yes.

6    Q.  So the first customers could come in at 5:00 a.m.?

7    A.  Yes.

8    Q.  And because of those long hours, sometimes you were

9    working -- even staying overnight?

10   A.  Yes.  It was long, long, long, long work.

11   Q.  Long days?

12   A.  Yes, long days.

13   Q.  Did a lot of employees call out -- couldn't appear in

14   person during that time?

15   A.  Well, they quit because they say it was better for them

16   to be at home than working there if the government was

17   helping them.

18   Q.  If the government was helping them, it would be better

19   for them to be at home instead of --

20   A.  Yes.  So I have to work because I own the store and

21   then -- I have to be open.

22   Q.  And you owned the store?

23   A.  Yes.

24   Q.  You want to keep the lights on?

25   A.  Yes.

1    Q.  Okay.  All right.  Were you working almost -- how many

2    days a week were you working during that time?

3    A.  Seven days a week.

4    Q.  Almost every day of the pandemic?

5    A.  Yes, every day.

6    Q.  Do you work every day now?

7    A.  Sometimes I have to.  When some people quit, I have to

8    be there.  Sometimes they send me a text message at

9    10:00 p.m. they no be there, so I have to be there.

10   Q.  Sometimes someone will send you a text at 10:00 p.m.

11   saying --

12   A.  I won't there be at 4:00 in the morning.  So I have to

13   be there.

14   Q.  You have to be there at 4:00 in the morning?

15   A.  Yes.

16   Q.  Are your hours a little less than they were during the

17   early pandemic?

18   A.  Yes.

19   Q.  Good.

20          Okay.  Does the Holiday station have any video

21   surveillance?

22   A.  We do have cameras, yes, 31 cameras in my building.

23   Q.  You said 31 surveillance cameras in your building?

24   A.  Yes, ma'am.

25   Q.  Were those cameras in place in 2021 during the pandemic

1    as well?

2    A.  Yes.

3    Q.  Can you describe for the jurors what those 31 cameras

4    captured, what they showed.

5    A.  Well, cameras inside the building and out.  All the

6    outside, the area where the tennis is, the park, I can see

7    all of that; and also the playroom for the daycare, the

8    garbage, the other side where the car wash is, the parking

9    area.  So all around my building we have a camera.

10   Q.  And why is that important, that you have surveillance

11   cameras of the building and the neighboring areas?

12   A.  It's important because we never know what's going to

13   happen, so --

14   Q.  What do you mean by that?  Can you say more about that?

15   A.  Well, when that case, it was -- something was going on

16   over here in Minneapolis, it was very bad.  So people were

17   going and paint our store and they did some damage to us.

18   Also, if someone want to steal something, we have to prove,

19   you know.

20   Q.  You would do it for proof if someone were to try to

21   steal at the Holiday Stationstore?

22   A.  Yes.  Usually many police officers from Apple Valley,

23   they go and ask me if they can see my cameras, and I give

24   them the permission to see them, so --

25   Q.  And so you mentioned that it captured the park, the

DAMARIS GRAFFUNDER - DIRECT (WALCKER)

```
 1    Scott Park area?
 2    A.  Yes, the whole park.
 3    Q.  Okay.  And then it captured the daycare as well?
 4    A.  It does.
 5    Q.  And then it captured outside of the -- the whole parking
 6    area?
 7    A.  Yes.
 8    Q.  Okay.  And did you have access to that surveillance
 9    camera, the footage, the video feed?
10    A.  Yes, I do, on my cell phone and my iPad, everywhere.
11    Q.  So you could -- and was that true in 2021 as well?
12    A.  Yes.
13    Q.  So if you weren't working all the time at the Holiday
14    Stationstore, if you were at home, could you pull up and see
15    the videos on your phone or your iPad?
16    A.  Yes.
17    Q.  So -- and even if you were at the Holiday Stationstore,
18    if you were helping a customer, could you look on your phone
19    and see what was happening outside in the area?
20    A.  In my store I have a camera right there like this
21    (indicating) and I see the playroom, I see the garbage and
22    outside and also the car wash.  And also I can see on my
23    iPad too.
24    Q.  Okay.  So you've got a screen right at your work --
25    A.  Yes.
```

DAMARIS GRAFFUNDER - DIRECT (WALCKER)

```
1    Q.   -- where you can see all that's happening?

2    A.   Yes.

3    Q.   And I think you said you had the garbage as well?

4    A.   Yes.

5    Q.   Does the property, the building, does it have a garbage

6    area that's shared?

7    A.   I share the garbage with the daycare people.

8    Q.   Okay.  All right.  So let's keep talking about that time

9    period of 2021 during the pandemic.

10              During that time, about how many customers or

11   clients would you get a day?

12   A.   Well, it went down because pretty much people were not

13   going outside.  So it was not busy-busy, but it was

14   people -- it was customers there.

15   Q.   What does "busy-busy" mean for you?

16   A.   Busy-busy for me is more than 500 customers.  But it

17   went down.

18   Q.   It went down at the time during the pandemic?

19   A.   Yes.

20   Q.   And when you say "customers," could that include people

21   just filling up their gas tank or going to the drive-thru,

22   as well as people coming in to buy food at the Holiday

23   station?

24   A.   They didn't went -- like, they just went for a coffee or

25   a pop or, you know, $20 of fuel or just -- they didn't even
```

1    be washing the cars too.

2    Q.  Okay.  So coming in for coffee or pop, that kind of

3    thing.

4            How many cars/vehicles would you typically see

5    parked in the parking lot during that time, 2021 in the

6    pandemic?

7    A.  Parked-parked?  No.  Maybe I can see a few clients.

8    Because there wasn't too much people going in there.

9    Q.  You're talking about the Scott Park, that there weren't

10   too many people going in there?

11   A.  In the Scott Park, I didn't see many cars parked there.

12   Q.  And this is for the parking area that's shared for both

13   the Scott Park and your building?

14   A.  Yes.

15   Q.  Not many vehicles?

16   A.  Not many.

17   Q.  Okay.  Not close to when you were busy-busy?

18   A.  No.

19   Q.  The daycare that we saw, Acacia Montessori, that photo,

20   was that daycare open during 2021 in the pandemic?

21   A.  No.

22   Q.  It was closed?

23   A.  It was closed.

24   Q.  Were there any kids -- so there were no kids there

25   during the pandemic?

 1    A.  No.

 2    Q.  2021 at least?

 3    A.  No.

 4    Q.  How do you know that?

 5    A.  Because it's my store and I see what is going on outside

 6    of my store when I'm inside.

 7    Q.  And you said that they lease that property from you and

 8    your husband?

 9    A.  Yes, they do.

10    Q.  Do you also know the owners?

11    A.  Yes, I see the wife and the husband.

12    Q.  The owners of the daycare, I should say.  You're the

13    owner of the building.

14    A.  The daycare, yes, I see them.  More I see is the wife

15    now.

16    Q.  The wife of the daycare?

17    A.  Yes.

18    Q.  Okay.  Did you also know folks/people that worked at the

19    daycare?

20    A.  No -- yes.  Yes, Melissa.

21    Q.  Melissa?

22    A.  Melissa.

23    Q.  Is that daycare now open?

24    A.  It is open right now, yes.

25    Q.  So -- but during 2021 it was closed, but now the daycare

1    is open?

2    A.  Yes, it is open.

3    Q.  Do you know about how many kids go to that daycare?

4    A.  I see in the cameras around seven, ten kids.

5    Q.  Seven or ten kids?

6    A.  Yes.

7    Q.  All right.  Switching gears here, are you aware that

8    Scott Park was registered as a location for serving meals

9    for children with the State of Minnesota in 2021?

10   A.  No, I was not aware.

11   Q.  I want to show you a couple documents that were

12   submitted for Scott Park as a location to serve meals for

13   children in that time period.

14          I'm going to show you first what's been admitted

15   as Government Exhibit C-245.  And first looking at the site

16   information here, it says, "Mind Foundry:  Scott Park."  Do

17   you see that?

18   A.  Yes.  Yes, I do.

19   Q.  Does the name Mind Foundry mean anything to you?

20   A.  No.  I never hear about it.

21   Q.  So did anyone that identified as being with Mind Foundry

22   ever contact you or your employees?

23   A.  No.

24   Q.  Are you familiar with this site address here,

25   14125 Galaxie Avenue in Apple Valley?

1    A.  No.

2    Q.  Are you familiar with Scott Park here?

3    A.  Yes.

4    Q.  Okay.  And that's the park next to the Holiday station?

5    A.  Yes.

6    Q.  Turning to page 2 here, on the application for this

7    Scott Park location it says, "Estimated Daily Enrollment,

8    1,500."  Do you see that?

9    A.  Yes, I do.

10   Q.  Did you ever see that many kids in Scott Park during

11   that time period?

12   A.  No.

13   Q.  Turning to paragraph 9 here, it says, "Method of Meal

14   Preparation:  Meals Prepared On Site."  Do you see that?

15   A.  Yes, I do.

16   Q.  Do you know if Scott Park had a meal preparation area?

17   A.  No, I didn't know.

18   Q.  Do you know -- you are familiar with the park.  Do you

19   know if it has a kitchen area?

20   A.  No.

21   Q.  Nothing like that?

22   A.  No.

23   Q.  Does it have any refrigeration options at the park?

24   A.  No.

25   Q.  Are there -- do you know if there's any picnic tables at

DAMARIS GRAFFUNDER - DIRECT (WALCKER)

1    the park?

2    A.  In the park outside?

3    Q.  Mm-hmm.

4    A.  In the grass, yes, two chairs.

5    Q.  There's two chairs/picnic table areas.

6            Are there any covered areas of the park?

7    A.  No.

8    Q.  Nothing like that.

9            And paragraph 10 talks about here an after-school

10   program here at the location, at Scott Park in this case.

11   Did you see any after-school programs at Scott Park in 2021

12   during the pandemic?

13   A.  No.

14   Q.  Then it says here, "Months in Which Meals are Served:"

15   It says -- February through June was checked to be claimed,

16   as well as September.  Do you see that?

17   A.  Yes, I do.

18   Q.  And then it says here the meals claimed would be

19   after-school snacks and suppers.  Do you see that?

20   A.  Yes.

21   Q.  Did you see any evidence of that at Scott Park?

22   A.  No.

23   Q.  All right.  Now I want to talk about what you did see

24   during that time period.

25            THE COURT:  Ms. Walcker, would you mind if I

```
 1    stopped you there?  I have a hard stop at 3:00.  We will
 2    come back at 3:15.
 3              MS. WALCKER:  Yes, Your Honor.
 4              THE COURT:  Thank you.
 5                  (Recess taken from 2:59-3:22 p.m.)
 6                    *    *    *    *    *
 7                         IN OPEN COURT
 8                         (JURY PRESENT)
 9              THE COURT:  Ms. Walcker, you may continue.
10              MS. WALCKER:  Thank you, Your Honor.
11    BY MS. WALCKER:
12    Q.  Ms. Graffunder, during the pandemic did you see any food
13    being distributed while you were working at the Holiday
14    station?
15    A.  Like people going and pick up food?
16    Q.  Yes.  Did you see anything like that while you were
17    working at the Holiday station during the pandemic?
18    A.  I saw a few, like, but not too many.
19    Q.  Tell us, what did you see?
20    A.  Like Fridays I can see a truck, small truck, bringing
21    some food and then Saturday mornings people were there
22    looking for food.
23    Q.  On Fridays you --
24    A.  Saturdays.
25    Q.  On Saturday mornings people would come for the food?
```

DAMARIS GRAFFUNDER - DIRECT (WALCKER)

1    A.  Yes.

2    Q.  And then you said on Fridays a small truck would come

3    with the food?

4    A.  Yes.

5    Q.  Where did you see that happening?

6    A.  In front of the daycare.

7    Q.  In front of the daycare.

8         Let me show you again Government Exhibit C-247.

9    Oops.  I'll make this bigger for us.  You should be able to

10   circle on the screen in front of you.

11        MS. WALCKER:  Oops.  It looks like the jurors

12   cannot see.

13        THE COURT:  You can't see that one?

14        A JUROR:  Ours is down.

15        THE COURT:  Just yours?  All of yours?

16        MS. WALCKER:  Can we make do with flipping one of

17   our screens around?  Mr. Bobier, do you mind?  So the

18   jurors --

19        A JUROR:  We can see.

20        MS. WALCKER:  Oh, you can see on that side.

21            (Discussion off the record)

22        THE WITNESS:  It's gone.

23        THE COURT:  It's gone now.

24        MS. WALCKER:  Well, why don't we go ahead without

25   for now, maybe, and we can see if we can get this working

1    while we go here.

2    BY MS. WALCKER:

3    Q.  During the pandemic --

4            MS. WALCKER:  You can see -- the jurors can see

5    now?

6            THE JURY:  (Indicating.)

7            MS. WALCKER:  They're nodding.  Okay.  Great?

8    BY MS. WALCKER:

9    Q.  Can you -- if you are able, can you circle on the map

10    the area where you would see the truck pull up on Fridays

11    with the food and where the people came on Saturday

12    mornings.

13    A.  Where the truck is is where they bring my product to my

14    store.  There is where the truck park and bring the food to

15    the daycare.  And then when I see the people going to the

16    daycare is where usually -- where the truck is, it's not too

17    far from there.

18    Q.  Okay.

19    A.  Right here (indicating).

20    Q.  So this area -- oh, thank you.  So this area

21    (indicating) is sort of where the truck would pull up and

22    then there would be folks gathered here (indicating), kind

23    of up until where this red car is?

24    A.  Yes.  I make a little line there.

25    Q.  I see that.  That's great.

DAMARIS GRAFFUNDER - DIRECT (WALCKER)

```
 1            What do you remember about the time of day that
 2    the truck pulled up with the food?
 3    A.  They came in like evening, maybe 5:00.
 4    Q.  5:00?
 5    A.  They bring that.  And then in the morning there was a
 6    couple of people coming to get some food there.
 7    Q.  Okay.  Do you remember about how many times you saw
 8    this?
 9    A.  Not too many.
10    Q.  Not too many?
11    A.  No.
12    Q.  More than five?  Less than five?  How many, if you were
13    to estimate?
14    A.  I can say four or five.
15    Q.  Four or five times --
16    A.  Yes.
17    Q.  -- that you would see the truck pull up here and then
18    the next morning --
19    A.  Yes, but not every Friday.
20    Q.  Okay.
21    A.  Some Fridays.
22    Q.  About four or five Fridays you would see this?
23    A.  Yes.  Yes.
24    Q.  And then would you see the people come out the very next
25    day, on Saturday, those same weekends?
```

1    A.  Yes.

2    Q.  Okay.

3    A.  Usually it was Saturdays they go in and get the food.

4    Q.  What do you remember about the -- what you saw in terms

5    of the number of people and what you saw with the food?

6    A.  What do you mean?

7    Q.  Can you describe -- say more about what you saw with the

8    food being handed out.

9    A.  Well, there was a line of people going inside and get

10   the food and get out of there.

11   Q.  Okay.

12   A.  But it wasn't like a big thing of food.  It was just

13   like a little basket.

14   Q.  And how could you -- could you see what was being handed

15   out?

16   A.  Well, one of the person who was inside there, went

17   inside, and I was nosy and I asked, What is that?  And then

18   they say, Next door is giving some food away.

19   Q.  If I'm hearing you correctly -- correct me if I'm

20   wrong -- but that a customer came into the Holiday station

21   after getting the food?

22   A.  Yes.

23   Q.  And you were -- you said you were nosy and would ask

24   what that is they're holding?

25   A.  Yes.  Yeah, what was happening outside.  And they say it

1    was food, and it was like vegetables and tomatoes, onions

2    and stuff like that.

3    Q.   Vegetables, onions, tomatoes?

4    A.   Yeah, that's what I saw in the box, little box.

5    Q.   It was in a little box?

6    A.   Yeah.

7    Q.   Did it appear to be a ready-to-eat meal?

8    A.   No.

9    Q.   Did you see any children lined up to get food --

10   A.   No.

11   Q.   -- on those mornings?

12   A.   No.

13   Q.   Can you tell us, were they adults?

14   A.   Adult people.

15   Q.   Adults, okay.

16           Did you ever see someone taking notes or counting

17   the number of food bags/boxes being handed out?

18   A.   No.

19   Q.   All right.  Now, setting aside what you saw about the

20   people or the truck, did you see a lot of increased car

21   traffic in that parking lot during those times?

22   A.   If it was a lot of traffic, I would have noticed, but it

23   was not.

24   Q.   It was not a lot of traffic?

25   A.   No.

1    Q.  Okay.  Now, other than those four or five times you saw

2    people being handed out vegetables, things like that in a

3    box, did you see any other food being distributed during the

4    pandemic at any time?

5    A.  No.

6    Q.  I now want to go through with you some of the meal

7    claims at issue in this case.  I'm going to show you what's

8    been admitted as Government Exhibit N-68.  Do you see this?

9    A.  Yes.

10   Q.  You see this before you, okay.

11            Did you see in February of 2021 56,000 snacks and

12   suppers being served to children in that time period?

13   A.  That's a lot.

14   Q.  That's a lot, you said?

15   A.  Yeah.

16   Q.  Did you see that?

17   A.  No.

18   Q.  Is there any way that many meals would have been served

19   without you knowing it?

20   A.  I don't think so.

21   Q.  You don't think so?

22   A.  No.

23   Q.  Did it happen?

24   A.  It didn't happen.

25            MR. COTTER:  Objection.  704.

```
 1              THE COURT:  Overruled.  You may answer.

 2              THE WITNESS:  It didn't happen.

 3     BY MS. WALCKER:

 4     Q.  Based on what you know of the daycare space, the size of

 5     it, could that many meals fit in that space?

 6     A.  No.

 7     Q.  And, Ms. Graffunder, you're in the business of selling

 8     food and snacks at the Holiday Stationstore; is that right?

 9     A.  Yes.

10     Q.  Could the Holiday Stationstore fit 56,000 meals in that

11     store?

12     A.  No.

13     Q.  Would you have space for that many meals in your store?

14     A.  I could because my cooler is very big, but no --

15     Q.  Okay.

16     A.  -- I don't carry that much.

17     Q.  All right.  Now, turning to the next month, March of

18     2020 [sic], did you see 62,000 snacks and suppers being

19     served at any point?

20     A.  No.

21     Q.  Did you see any of that at Scott Park that was

22     neighboring you?

23     A.  No.

24     Q.  Never saw that?

25     A.  Never.
```

1    Q.  And skipping ahead to May of 2021, did you see 62,000

2    snacks and suppers for children being served?

3    A.  No.

4    Q.  Is there any way that many meals would have been served

5    without you knowing it?

6    A.  As I say before, if there were a lot of people there, I

7    would have known.

8    Q.  You would have known.  Did it happen?

9    A.  No, it didn't happen.

10   Q.  Turning to the next month, June of 2021, did you see

11   22,000 snacks and suppers being served in that month alone

12   at Scott Park?

13   A.  No.

14   Q.  Is there any way that you would have seen that -- that

15   that would have happened without you knowing it?

16   A.  Yes, I have a camera inside the store and I see around

17   my store when I am not outside.

18   Q.  Did it happen?

19   A.  It didn't happen.

20   Q.  What about 17,486 snacks and suppers in September of

21   2021, did you see that?

22   A.  No.

23   Q.  And that was just over 13 days under two weeks in that

24   month alone.  Did you see that?

25   A.  Yes, but -- I see the numbers here, but it didn't

1    happen.

2    Q.  It didn't happen, all right.

3              October 2021, the next month, did you see 81,162

4    snacks and suppers served at Scott Park in that month alone?

5    A.  No.

6    Q.  Your eyebrows are raised.  Can you tell us what your

7    reaction is to seeing this.

8    A.  That's a lot.  My store doesn't do that.

9    Q.  You don't even see that at your store?

10   A.  No.

11   Q.  In November of 2021, did you see 69,392 snacks and

12   suppers being served at Scott Park during that time period?

13   A.  No.

14   Q.  Did it happen?

15   A.  No.

16   Q.  December of 2021, did you see 74,980 snacks and suppers

17   being served at Scott Park or in the surrounding area in

18   December of 2021?

19   A.  No.

20   Q.  So, in total, over those eight or so months, did you see

21   almost half a million meals being distributed during this

22   time period in 2021?

23   A.  No.

24   Q.  You didn't see that many meals being distributed right

25   outside your work?

```
 1    A.  No.

 2              MR. COTTER:  Objection.  Asked and answered.

 3              THE COURT:  Sustained.

 4    BY MS. WALCKER:

 5    Q.  Is that something you would have noticed?

 6    A.  I would have noticed right away.

 7              MR. COTTER:  Objection.  Asked and answered.

 8              THE COURT:  Overruled.  The answer will stand.

 9    BY MS. WALCKER:

10    Q.  Based on your observations and experience, is it likely

11    that people were getting meals in the numbers that were

12    claimed during that time period?

13              MR. COTTER:  Objection.  Asked and answered.

14              THE WITNESS:  Can you repeat that again?

15              THE COURT:  Overrule the objection.  Ask it again.

16    BY MS. WALCKER:

17    Q.  Did you see that many meals during that time period

18    being served?

19    A.  No.

20              MS. WALCKER:  No further questions.  Thank you.

21              THE COURT:  Mr. Cotter.

22                       **CROSS-EXAMINATION**

23    BY MR. COTTER:

24    Q.  Good afternoon.

25    A.  Good afternoon.
```

DAMRIS GRAFFUNDER - CROSS (COTTER)

1    Q.  My name is Patrick Cotter.  I represent Mohamed Ismail.

2    A.  Nice to meet you.

3    Q.  Am I correct that the first time someone from the FBI or

4    the police came to talk to you was on or around March of

5    this year, 2024?

6    A.  Yes.

7    Q.  Okay.  And how many times have you had a chance to meet

8    with anybody here from the prosecution before you came to

9    testify today?

10   A.  He went to my store one time and then he talk to my

11   husband.

12   Q.  Got it.  And he talked to you?

13   A.  Yep.

14   Q.  And when you say "he," is that a particular FBI agent?

15   A.  Yes.

16   Q.  What's his name?

17   A.  Travis.

18   Q.  Travis Wilmer?

19   A.  I don't know any last name, but I know his name is

20   Travis.

21   Q.  And so the first time Travis or anybody from the FBI

22   came to your store was in March of 2024; is that correct?

23   A.  Yes.

24   Q.  All right.  And when he was talking to you, I'm assuming

25   he -- did he let you know that he was going to write some

1   things down about what the two of you talked about?

2   A.  Yes.

3   Q.  Okay.  And have you had a chance to look at what he

4   wrote down about what you told him?

5   A.  No.

6   Q.  No, okay.

7          Has anyone -- before you came in to testify, did

8   you have a chance to meet with these fine folks here, the

9   prosecutors?

10  A.  I speak with Ms. Chelsea.

11  Q.  Ms. Chelsea.  When did you speak to Ms. Chelsea?

12  A.  Today.

13  Q.  Today?

14  A.  And also Friday.

15  Q.  So you met with her two times, Friday and today --

16  A.  Yes.

17  Q.  -- before you came in here to court?

18  A.  Yes.

19  Q.  Any chance -- did she show you any paperwork before you

20  came in to testify?

21  A.  No.

22  Q.  Okay.  So I just want to talk a little bit -- you have

23  told us a lot about the store and the layout.

24          Did I get that right, that there are 31

25  surveillance cameras total?

```
 1    A.  Yes, sir.

 2    Q.  And it pretty much surrounds your entire --

 3    A.  The whole entire building.

 4    Q.  So in order for her to take this down, I have to finish

 5    and then you have to --

 6    A.  I am sorry.

 7    Q.  It's hard.  I understand.  It's kind of weird.

 8         And you said that you have all those cameras

 9    because if someone is stealing or something, you'll have

10    evidence; is that right?

11    A.  Yes.

12    Q.  Got it.

13         And is it true that no one from the FBI ever came

14    to look at those surveillance cameras back in 2021?

15    A.  I cannot say if it was for the FBI or whatever, because

16    if they ask me for permission, I let them do it.

17    Q.  So sometimes the police come and if they -- from the

18    Apple Valley Police Department, they might come and ask to

19    look at your cameras; is that right?

20    A.  Yes, they do.

21    Q.  And they want to see what's all around there and --

22    A.  They told me -- sorry.

23    Q.  That's okay.

24    A.  They ask me if they can see my camera because of

25    something illegal, because I believe I can be nice with
```

1    them.

2    Q.  That's great.

3         This Travis Wilmer, he never came and asked for

4    all of your surveillance cameras for back in June and the

5    fall of '21, did he?

6    A.  Not that I remember.

7    Q.  All right.  Thank you.

8         As it pertains to the people that you saw at the

9    daycare, you said that a truck would show up on Friday

10   nights in the evening and park right in front of the Acacia

11   Montessori; is that correct?

12   A.  Yes, sir.

13   Q.  All right.  And then the following Saturday morning

14   people would line up kind of around the building to come to

15   the Montessori to pick up food; is that correct?

16   A.  You say around or front?  Because I see people in front.

17   Here (indicating) is the Acacia and here (indicating) is --

18   the park is next, and then it's like a line right there

19   (indicating).

20   Q.  Sure.

21   A.  It was not around.

22   Q.  Sure.  When you talked to Mr. Wilmer -- I'll back up.

23   Strike that.

24        You were just shown some big numbers, like 22,000

25   and those kinds of numbers.  And obviously you didn't see

1    that many people there, right?

2    A.  He never talked to me about what he was going to look in

3    the cameras.

4    Q.  I'll restate the question.  When you were talking to

5    him, do you recall telling him that there was a lot of

6    people that came for food distribution?

7    A.  It was not a lot of people.

8    Q.  Okay.  You don't recall telling Mr. Wilmer --

9    A.  No, I didn't tell him that.

10   Q.  All right.  And do you recall telling him that it

11   actually caused some disruption or interference with the

12   traffic at your business?

13   A.  No.

14   Q.  You don't recall telling him that either?

15   A.  No.

16   Q.  Okay.

17           MR. COTTER:  Can we pull up D2-32, please, just

18   for the witness.

19   BY MR. COTTER:

20   Q.  Before we play it, ma'am, I'm just showing you this.

21   Take a look at it.  We'll start it from the beginning.

22                (Video recording played)

23           MS. WALCKER:  Your Honor, objection.  This is not

24   in evidence.

25           MR. COTTER:  I just was showing it to the witness.

 1          THE COURT:  It's just for the witness.

 2                  (Video recording played)

 3   BY MR. COTTER:

 4   Q.  Did you have a good chance to look at this?

 5   A.  Yes.

 6   Q.  Does this look like the Acacia Montessori or in the area

 7   of your parking lot?

 8   A.  Yes, that's the parking.

 9   Q.  And did that look similar to what you observed when you

10   saw people lined up in front of the Montessori to go pick up

11   food?

12   A.  Yeah, but it wasn't a lot of people.

13   Q.  Okay.  I'm just asking:  Does this look like it fairly

14   represents --

15   A.  Yes.

16   Q.  -- what you saw when you would see people lined up to

17   pick up food?

18   A.  Yep.

19   Q.  And do you need to see it again to verify that?

20   A.  No.

21          MR. COTTER:  Your Honor, I would move to admit

22   D2-32.

23          MS. WALCKER:  Your Honor, the government objects

24   based on foundation.  It's not clear who took the video,

25   when the video was taken.  These numbers she just said

1    weren't consistent with what her observation were at the

2    time.

3              THE COURT:  Could you lay additional foundation?

4              MR. COTTER:  Certainly.

5    BY MR. COTTER:

6    Q.  So when you would make these observations, you would be

7    able to see on your own surveillance video what was going on

8    outside of the --

9    A.  Yes.

10   Q.  -- Montessori; is that true?

11   A.  Yes.

12   Q.  Okay.  And you already testified you had cameras in

13   multiple locations.  So you had multiple views of your

14   parking lot as it wrapped around and was in front of the

15   Montessori; is that true?

16   A.  Yes.

17   Q.  And you were able to observe this on more than one

18   occasion happening; is that true?

19   A.  Yes.

20   Q.  All right.  And would you like to see this again to see

21   if it will help you, assist you in observing --

22   A.  No, I don't need to see.  If it happens, it was not

23   every single day.

24   Q.  I'm not asking you how many days it happened.  I'm just

25   asking:  Does this fairly look similar to what you observed

1    on your surveillance cameras when you observed people coming

2    to pick up food at the Montessori?

3    A.  As I answered before, yes.

4            MR. COTTER:  I would again move to admit D2-32,

5    Your Honor.

6            MS. WALCKER:  The government objects.  This

7    witness does not know who took this video or when it was

8    taken.  She doesn't know what the inside of the daycare

9    looked like at this time.

10           MR. GOETZ:  Your Honor, could we have sidebars

11   rather than speaking objections?

12           THE COURT:  You may have a sidebar.

13                   (At sidebar)

14           THE COURT:  I take it this -- I am waiting for

15   Mr. Cotter.  Just a minute.

16                   (Pause)

17           THE COURT:  This video does not come from the

18   security cameras, I take it?

19           MR. COTTER:  No, Your Honor, it doesn't.  However,

20   under 901 she can still personally observe it and say it's a

21   fair and accurate representation of what she -- just like a

22   photograph of the park, we didn't know who took those

23   photos, when they were taken, under what circumstances they

24   were taken.  Under 901 she has personal knowledge of

25   observing from surveillance this same area under these same

1    circumstances.  We don't have to prove who actually took the

2    video.

3              THE COURT:  Ms. Walcker.

4              MS. WALCKER:  Your Honor, this witness can't lay

5    foundation for a video that she knows nothing about.

6    There's nothing in the record to show that she knows when

7    this was taken, who took the video.  Mr. Cotter just said

8    this wasn't from her surveillance camera.  This is not

9    properly -- there's no proper foundation here for this to be

10   admitted, Your Honor.

11             THE COURT:  So are you objecting to foundation or

12   authentication?

13             MS. WALCKER:  I think just foundation, Your Honor.

14   I mean, she testified that it was not in the same condition

15   as when she observed it.  She just testified about that.

16             THE COURT:  What do you mean by that?

17             MS. WALCKER:  I mean she just said this isn't how

18   it looked when she saw the people gathered outside the

19   daycare.  She said it didn't look like this, it didn't wrap

20   around the building.  Her testimony is contrary to what this

21   shows.  She doesn't know anything about when this video was

22   taken, who took it, when it was taken.  There's no proper

23   foundation here to get this in through this witness,

24   Your Honor.

25             MR. COTTER:  Your Honor, may I?

DAMRIS GRAFFUNDER - CROSS (COTTER)

2494

```
 1                    THE COURT:  Yes.
 2                    MR. COTTER:  Actually, she just said that it
 3        fairly and accurately represents what she saw.  Again, we
 4        don't have to establish that she took the video or that it
 5        came off of her actual surveillance camera so long as it is
 6        a fair and accurate depiction of what she would have
 7        observed on Saturday mornings for purposes of foundation.
 8        They can cross-examine her to beat the band about it.
 9                    THE COURT:  Okay.  Just a minute.  Do you have
10        anything else, Ms. Walcker?
11                    MS. WALCKER:  I mean, how could she have possibly
12        seen inside the storefront here?  I mean, this is not -- the
13        government maintains there's no foundation for this exhibit
14        to get in through this particular witness, Your Honor.
15                    THE COURT:  I agree, there's no foundation.  The
16        objection is sustained.
17                              (In open court)
18        BY MR. COTTER:
19        Q.  On your surveillance cameras, did you ever see people
20        kind of wrapped around the side of the building as they
21        would approach the front door to pick up food?
22        A.   Like I said before, what I see was up front.
23        Q.   Okay.  You didn't see the rest of the parking lot --
24        A.   No.
25        Q.   -- on your surveillance cameras?
```

DAMRIS GRAFFUNDER - CROSS (COTTER)

1    A.  No.

2    Q.  Did you happen to see all the cars that would be parked

3    there?

4    A.  If it was a lot of cars, I would see.

5    Q.  Okay.  And, again, you don't recall telling Mr. Wilmer

6    or Agent Wilmer that there was, in fact, parking that

7    interfered with your business?

8    A.  No, I didn't.

9    Q.  All right.  And a customer actually advised you that

10   they had picked up food from that -- by walking into the

11   daycare and coming out with food from there, correct?

12   A.  He didn't advise me.  I just ask, What is that?

13   Q.  So he told you?

14   A.  And he said, Somebody is giving food there.

15   Q.  Got it.  They were giving out food there, right?

16   A.  Yes.

17   Q.  Got it.  Thank you.

18           Of course, during this time, all this time, you

19   kind of said you were primarily running the store yourself

20   there, there wasn't -- you had not a lot of employees?

21   A.  I didn't have enough employees and I was there by

22   myself.  Sometime my husband go and help me out.  But yes.

23   Q.  So you had a lot to do.  You were dealing with

24   customers.  You were dealing with managing your store.  You

25   weren't spending a hundred percent of your time watching

1   what was happening over at the daycare, fair?

2   A.  As I mentioned before, I have a camera in my store -- in

3   my store inside and I can see around my building.

4   Q.  I thought you just said you couldn't -- could you see

5   around?

6   A.  Well, I have a camera that goes on the garbage, the

7   playroom, and also the car wash.

8   Q.  So when I asked you whether you could see people wrapped

9   around the side of the building on your camera, you said you

10  could only see them in front.  Are you saying you just

11  couldn't see people or you couldn't see around the side of

12  your building?

13          MS. WALCKER:  Your Honor, objection.  Misstates

14  the testimony.  I believe the witness said she didn't see

15  people wrapped --

16          THE COURT:  Overruled.  You may answer.

17          THE WITNESS:  Well, I see -- what I said, I see

18  the people.  The camera is over there in front of the

19  building.  I got the camera there, but I didn't see that

20  kind of people there I just saw.

21  BY MR. COTTER:

22  Q.  Okay.  You would see the people as they were coming in

23  front of the building?

24  A.  Yeah.

25  Q.  Got it.

```
 1                    Did you sit and watch to see if they would go back
 2       to their car --
 3       A.  No.
 4       Q.  -- with a bag of --
 5       A.  No, I didn't.
 6       Q.  -- meals?
 7                    You didn't watch that?
 8       A.  No.
 9       Q.  You didn't count how many people were there, correct?
10       A.  It was not my job to count people.
11       Q.  No, I'm just simply asking you.  That's all, ma'am.
12       A.  It's okay.
13       Q.  I'm not trying to be --
14       A.  It's okay.
15       Q.  -- mean.
16       A.  It's just I don't have time to go count how many people
17       go to that store.
18       Q.  Totally fair.
19                    So when you said not a lot of people, you mean
20       there wasn't thousands of people, right?
21       A.  No, no thousands of people.
22       Q.  All right.  But you didn't count the exact number of
23       people, correct?
24       A.  I would know if it was a lot of people there.
25       Q.  "A lot of people" meaning more than a hundred?
```

1    A.  Yes.  I would know if it was a lot of people.

2    Q.  More than 50?

3    A.  Few.  Few people.

4    Q.  All right.

5          MR. COTTER:  I don't have any further questions.

6    Thank you.

7          THE COURT:  Thank you.  Mr. Sapone?

8                    **CROSS-EXAMINATION**

9    BY MR. SAPONE:

10   Q.  Good afternoon, ma'am.  How are you?

11   A.  Good.  How are you?

12   Q.  Good.  Thanks for asking.

13         Ma'am, you testified today about events from 2021,

14   right?

15   A.  Yes.

16   Q.  When was the first time agents asked you to try to

17   remember events from 2021?

18   A.  When he went to my store --

19   Q.  When was that?

20   A.  -- in March.

21         In March.  I don't know the day.

22   Q.  March of what year?

23   A.  This year.

24         MR. SAPONE:  Thank you.  No further questions.

25         THE COURT:  Anyone else?

DARIS GRAFFUNDER - CROSS (IAN BIRRELL)

1    Mr. Birrell.

2                    **CROSS-EXAMINATION**

3    BY MR. IAN BIRRELL:

4    Q.  Good afternoon.

5    A.  Good afternoon.

6    Q.  I just wanted to follow up on these cameras a little bit

7    because I was a little unsure of some of the details there.

8        So when the agent, Travis Wilmer, came to your

9    store and talked to you, did he ask to look at the camera

10   footage?

11   A.  I don't -- no.  I think -- I don't remember.

12   Q.  You don't remember one way or --

13   A.  It's March.  I don't remember.

14   Q.  It was a couple months ago and it's hard to remember?

15   A.  Yes.

16   Q.  That's fair.

17   A.  I am not saying that -- I talked to him, but I don't

18   think he asked me for the cameras.

19   Q.  Okay.  Do you still have the camera footage?

20   A.  I do have the cameras at work, yes.

21   Q.  Do the -- the cameras record what happens, right?

22   A.  Yes.  If I want to see -- if he saw the cameras, I can

23   see because in my office I have a camera too.

24   Q.  And how long do the cameras -- after the cameras record

25   what happens, how long is the footage stored for?

DARIS GRAFFUNDER - CROSS (IAN BIRRELL)

1    A.  I cannot answer that because I am no security guy, but I

2    can ask the people who does that for me.

3    Q.  Do you know about how long it's stored for?

4    A.  I cannot tell you because I don't know.

5    Q.  So it might or might not still be stored?

6    A.  I can ask the person who does the camera security.

7    Q.  So just to be clear, you don't know if this footage from

8    2021 is still on the cameras or not at this point?

9    A.  I can no answer because I don't know.

10   Q.  Right, okay.

11            And you don't remember if the agents asked to look

12   at the camera footage from that time, you don't remember; is

13   that fair?

14   A.  If he asked me to see camera from 2021?

15   Q.  Correct.

16   A.  He haven't.

17   Q.  He has not asked that?

18   A.  To me, no.

19            MR. IAN BIRRELL:  Thank you, Your Honor.  Nothing

20   further.

21            THE COURT:  Anyone else?

22            Ms. Walcker?

23            MS. WALCKER:  Nothing further, Your Honor.  Thank

24   you.

25            THE COURT:  Thank you.  You may step down.

```
 1                THE WITNESS:  Thank you.

 2                THE COURT:  The government may call its next

 3    witness.

 4                MR. JACOBS:  United States calls Oldemar Lopez.

 5                THE COURT:  Good afternoon, sir.  You may come

 6    forward and I'll have you go by the jury box, and you're

 7    aiming for this witness chair up here.  Could you please

 8    stand while you take the oath.

 9                     (Witness sworn)

10                THE COURT:  Thank you.  You may have a seat there.

11    And when you're settled, I'll have you state and spell your

12    first and last name for the record.

13                THE WITNESS:  My name is Oldemar, O-l-d-e-m-a-r,

14    Lopez, L-o-p-e-z.

15                THE COURT:  You may inquire, Mr. Jacobs.

16                MR. JACOBS:  Thank you, Your Honor.

17                        (Oldemar Lopez)

18                      DIRECT EXAMINATION

19    BY MR. JACOBS:

20    Q.  Good afternoon, Mr. Lopez.

21    A.  Hi.

22    Q.  Could you please introduce yourself to the jury.

23    A.  My name is Oldemar.  I ran the office at [indiscernible]

24    Minnehaha.

25                COURT REPORTER:  I'm sorry.  I --
```

OLDEMAR LOPEZ - DIRECT (JACOBS)

```
 1              THE COURT:  I am going to have you put -- this
 2    microphone moves up and down, all the way.  Yep, right in
 3    there.  Thank you.
 4    BY MR. JACOBS:
 5    Q.  Let's try that again with the microphone.  Okay?
 6    A.  Okay.
 7    Q.  Mr. Lopez, where are you from?
 8    A.  I'm from Costa Rica.
 9    Q.  And where do you live now?
10    A.  West Bloomington.
11    Q.  What do you do for a living?
12    A.  Financial office manager.
13    Q.  A financial office manager?
14    A.  Yep.
15    Q.  At what company?
16    A.  Labor [indiscernible].
17    Q.  Can you explain --
18              COURT REPORTER:  Labor personnel?
19              THE WITNESS:  Laborforce Now.
20    BY MR. JACOBS:
21    Q.  Is that Laborforce Now?
22    A.  Mm-hmm.
23    Q.  And can you explain what you do for Laborforce Now.
24    A.  I do all the finances and payroll and -- many stuff.
25    Q.  And what kind of company --
```

OLDEMAR LOPEZ - DIRECT (JACOBS)

1    A.  It's a --

2    Q.  -- is Laborforce Now?

3    A.  -- temp agency.

4    Q.  A temp agency?

5    A.  Yes.

6    Q.  And in what kind of industries do you work?

7    A.  Landscaping.

8    Q.  How long have you worked for Laborforce Now?

9    A.  About [indiscernible] years.

10             COURT REPORTER:  Did you say 13 years or 30 years?

11             THE WITNESS:  30.

12   BY MR. JACOBS:

13   Q.  Are you familiar with a building at 4020 Minnehaha

14   Avenue in Minneapolis?

15   A.  Yes.

16   Q.  How are you familiar with that building?

17   A.  I rent an office there for the past nine years.

18   Q.  And can you describe that building to the jury, please.

19   A.  Describe the building?

20   Q.  Tell the jury what the building looks like.

21   A.  Well, it's a two-level building, some offices inside,

22   with pretty much a small parking lot, a warehouse in the

23   back.

24   Q.  I'm going to show you what has been marked for

25   identification as Government's Exhibit C-205.  Mr. Lopez, do

OLDEMAR LOPEZ - DIRECT (JACOBS)

```
1    you recognize what's on the screen in front of you?

2    A.  Yeah.  It's the -- where our office is located.

3             MR. JACOBS:  Your Honor, I would offer Government

4    C-205.

5             MR. IAN BIRRELL:  No objection.

6             THE COURT:  C-205 is admitted.

7    BY MR. JACOBS:

8    Q.  Mr. Lopez, this is now up in front of the jury.  Can you

9    explain to them what we're looking at here in this picture.

10   A.  I'm sorry.  Can you repeat the question?

11   Q.  Can you explain to the jury what we're seeing in this

12   picture in front of you.

13   A.  Well, the building where I work.  I work -- I go there

14   every day, Monday through Friday.  Insurance company in the

15   front.  My office is inside.

16   Q.  So I'm going to zoom in on part of this building here.

17   What are we looking at there?

18   A.  The main entrance.

19   Q.  That's where you go in to work and leave from work every

20   day?

21   A.  Every day.

22   Q.  And can you explain to the jury where your office is in

23   this building.

24   A.  It's located about -- this side (indicating), the third

25   window in the back.
```

OLDEMAR LOPEZ - DIRECT (JACOBS)

```
1    Q.  So if I zoom in on the left part of the building over
2    here --
3    A.  Right.
4    Q.  -- is that where you are talking about?
5    A.  Yes.
6    Q.  Now I'm going to go down to the fifth page here.  What
7    are we looking at in this picture?
8    A.  The warehouse and I see the window of my office.
9    Q.  Okay.  Can you actually point on the screen and you can
10   touch the window of your office.
11   A.  Somewhere here (indicating).
12   Q.  Okay.  So that is the window of your office?
13   A.  Yeah.
14   Q.  And you mentioned a warehouse.  Can you explain to the
15   jury what you are talking about with the warehouse.
16   A.  Over here (indicating).  The owner of the building rent
17   this warehouse for different businesses.
18   Q.  I want to focus your attention on 2020 and 2021 during
19   the pandemic.  Okay?
20   A.  Okay.
21   Q.  During that time period, how often did you go into the
22   office?
23   A.  Every day, Monday through Friday.
24   Q.  What were your normal working hours in the office?
25   A.  My regular schedule is Monday through Friday, 8:00 to
```

OLDEMAR LOPEZ - DIRECT (JACOBS)

1    4:00.

2    Q.  Did you work on the weekends?

3    A.  No, I don't.

4    Q.  On the weekdays, were you there pretty much every day

5    during that time period?

6    A.  Every day.

7    Q.  Was the building busy during the pandemic?

8    A.  No.  Most of the business shut down.  They were closed.

9    But I do go to work.  I did work.

10   Q.  You didn't work?

11   A.  I did work.  Most of the business in the building were

12   closed.

13   Q.  It wasn't crowded?

14   A.  No.

15   Q.  I'm going to bring back up what's in evidence as

16   Government's C-205.  Are you familiar with this directory

17   that I'm showing you here?

18   A.  Yes.

19   Q.  And I'm going to pull up one of the names.  Can you read

20   what's in Suite 2070.

21   A.  Yeah, Somali Community Resettlement.

22   Q.  Somali Community Resettlement?

23   A.  Yeah.

24   Q.  Apart from seeing that name on the directory, are you

25   familiar with the organization Somali Community

OLDEMAR LOPEZ - DIRECT (JACOBS)

1    Resettlement?

2    A.  No, I don't.

3    Q.  I want to focus your attention now on 2021.  Okay?

4    A.  Okay.

5    Q.  In 2021 did you see food distribution happen at the

6    building that you worked at?

7    A.  Yeah, a couple times.

8    Q.  Can you explain to the jury what you saw.

9    A.  I saw a few family -- Latino families picking up bags.

10   Assuming food.  I don't know.  I wasn't sure what was

11   inside.

12   Q.  About how many times did you see people picking up food?

13   A.  Just a couple times a week, just a few families.

14   Q.  And how many people on a given day did you see picking

15   up food?

16   A.  Maybe five, six.

17   Q.  I'm showing you again C-205, and I'm going down to that

18   last page.  Can you explain to the jury where you saw people

19   picking up food.

20   A.  Back door of that warehouse, over here (indicating).

21   Q.  And can you see the warehouse from your office?

22   A.  Yes.  I have a view from my office, very close.  That's

23   my window (indicating).  I --

24   Q.  So -- excuse me.  So we're looking at C-205, the fourth

25   page.  Can you tell the jury what we're seeing in this

OLDEMAR LOPEZ - DIRECT (JACOBS)

1    picture.

2    A.   I see the two doors from my office.

3    Q.   This is a view out of your office window?

4    A.   Yep.

5    Q.   And when you're in the office, how often are you looking

6    out this window?

7    A.   All the time because I park my car there.

8    Q.   And why are you looking out the window?

9    A.   Some break-ins happen in this neighborhood.  All the

10   time I check my car, many times a day.

11   Q.   You mentioned that the people picking up food were

12   Latino.

13   A.   Yes.

14   Q.   How do you know that?

15   A.   Because I know my people.

16   Q.   Did you ever see large groups of people in the parking

17   lot?

18   A.   No.

19   Q.   Did you ever see large groups picking up food?

20   A.   No, I didn't.

21   Q.   Would you have noticed if there were large people

22   gathering in the parking lot?

23   A.   No, I didn't notice anything.

24   Q.   Would you have noticed it?

25   A.   Yeah, I could because my window is close to the parking

```
 1    lot.
 2    Q.  Did you ever see advertisements or flyers offering food
 3    pickup?
 4    A.  No, I didn't.
 5    Q.  Did you ever talk to people or hear people in the
 6    building talk about food pickup?
 7    A.  I didn't.
 8    Q.  Did you ever see big groups of people picking up food
 9    within the building?
10    A.  No, I didn't.
11    Q.  Where did you see people picking up food?
12    A.  Where?
13    Q.  Where.
14    A.  The parking lot.
15    Q.  Right outside --
16    A.  Back door.
17    Q.  Right outside your office window?
18    A.  Somewhere over here (indicating).
19    Q.  I'm showing you what's already in evidence as Government
20    Exhibit N-50.  Mr. Lopez, I want to focus now on the months
21    that you see up here on the screen -- okay? -- February 2021
22    to December 2021.
23           During that time period were you in the office
24    every weekday?
25    A.  Yes, I did.
```

1    Q.  And during that time period did you see people handing

2    out food?

3    A.  How I tell you, just a few families.

4    Q.  Did you ever see in March of 2021 2,000 meals a day

5    being handed out?

6    A.  No, I didn't.

7    Q.  For example, in May of 2021 did you ever see in total

8    124,000 meals being handed out?

9    A.  No, I didn't.

10   Q.  Over the time period of February 2021 to December 2021,

11   is there any way that 637,000 meals were handed out from

12   that warehouse outside your office?

13   A.  No.  I could notice, but I didn't see so many people

14   there.

15              MR. JACOBS:  Your Honor, no further questions.

16              THE COURT:  Mr. Cotter.

17                    **CROSS-EXAMINATION**

18   BY MR. COTTER:

19   Q.  Good afternoon.

20   A.  Hello.

21   Q.  Just a couple questions.

22   A.  Sure.

23   Q.  So the view that we saw from your office, that's what

24   you would be able to see if you were sitting in your office;

25   is that correct?

1    A.  Correct.

2    Q.  You didn't work on the weekends, correct?

3    A.  No.

4    Q.  And you were done at 4:00, correct?

5    A.  Mm-hmm, correct.

6           MR. COTTER:  Nothing further.  Thank you.

7           THE COURT:  Anyone else?

8           MR. CARLSON:  Yes, Your Honor.

9           THE COURT:  Mr. Carlson.

10                    **CROSS-EXAMINATION**

11   BY MR. CARLSON:

12   Q.  Good afternoon, Mr. Lopez.

13   A.  Good afternoon.

14   Q.  My name is Clayton Carlson.  I represent Defendant Said

15   Farah.

16           I just wanted to ask you:  So you've been with

17   Laborforce Now -- you're an office manager; is that right?

18   A.  Right.

19   Q.  And your offices, they're in the same building as the

20   offices of another organization called Somali Community

21   Resettlement Services; is that right?

22   A.  Right.

23   Q.  Is that right?

24   A.  Right.

25   Q.  And you testified you continued working in-person during

OLDEMAR LOPEZ - CROSS (CARLSON)

```
 1    the pandemic; is that right?
 2    A.  Correct.
 3    Q.  And you were coming in five days a week, Monday through
 4    Friday, right?
 5    A.  Right.
 6    Q.  You didn't come into the office Saturday, Sunday; is
 7    that right?
 8    A.  Right.
 9    Q.  So if meal distribution happened on Saturday or Sunday,
10    you wouldn't know anything about that; is that fair to say?
11    A.  Correct.
12    Q.  And the government interviewed you for the first time,
13    was that last month or was that this month?
14    A.  Can you repeat the question?
15    Q.  So when was the first time the FBI came and asked to
16    talk to you?
17    A.  Last month.
18    Q.  Last month?
19    A.  Yeah.
20    Q.  And when they came to you last month, they were asking
21    you about things that you remembered from 2020 and 2021; is
22    that right?
23    A.  Right.
24    Q.  And that's three to four years ago; is that accurate?
25    A.  Yes.
```

OLDEMAR LOPEZ - CROSS (CARLSON)

1    Q.  And do you recall telling the FBI that you remember

2    seeing people picking up bags of food; is that right?

3    A.  Right.

4    Q.  And you recall telling them that the warehouse, you

5    remember, was being leased by you believed a gentleman from

6    maybe Nigeria; is that right?

7    A.  Before the pandemic.

8    Q.  Before the pandemic?

9    A.  Yeah.

10   Q.  Do you remember who leased the warehouse during the

11   pandemic?

12   A.  No, I don't remember.

13   Q.  Do you recall telling the FBI that at one point people

14   from Somali Community Resettlement actually approached you

15   and asked if they could hire some temporary workers from you

16   to help package food?

17   A.  Yeah, I recall that.

18   Q.  And I believe you told them you didn't have anybody that

19   they could hire at that time; is that right?

20   A.  Right.

21   Q.  And do you recall also -- there's a dumpster in the

22   alley by there; is that right?

23   A.  Yes.

24   Q.  Do you recall remembering that there was -- you would

25   notice significant amounts of food that would end up being

1    thrown away in that dumpster?

2    A.  Yeah, I remember basketfulls.

3    Q.  Do you know -- do you remember how much food that was?

4    A.  No, I don't.

5    Q.  That's fair.  It was a long time ago.

6            Do you know -- do you remember how many people

7    would come during each weekday on average to pick up food?

8    A.  How I told before, just a couple families.

9    Q.  Do you remember telling the FBI you saw like five to ten

10   people each weekday picking up food; is that accurate?

11   A.  Yeah, five to ten maybe.  Just a few.  No hundreds.

12   Q.  And I want to take you back through some numbers that

13   the government looked at.

14           MR. CARLSON:  And, actually, could you -- I think

15   it's N-50, not 52.

16   BY MR. CARLSON:

17   Q.  I'm showing you what's been marked as Government

18   Exhibit N-50.  I believe we just looked at these numbers; is

19   that right?

20   A.  Mm-hmm.

21   Q.  And the government was asking you if you ever saw, you

22   know, say, 2,000 people on average show up; is that right?

23   A.  Yeah, right.

24   Q.  And you never saw 2,000 people a day showing up to pick

25   up meals, did you?

1    A.  No, I didn't.

2    Q.  So -- but you know that people were picking up bags of

3    meals, right?

4    A.  Correct.

5    Q.  Do you know how many meals were bundled in each bag of

6    meals that was picked up?

7    A.  No, I don't.

8    Q.  It looks like on this chart it shows after-school snack

9    and supper.  So it looks like that's two separate meals.

10   Does that seem right to you?

11   A.  I just saw some grocery bags.  That's all.

12   Q.  So you don't know if there were like, say, seven days'

13   worth of meals in each bag?

14   A.  No, I didn't know.  No.

15   Q.  So I guess just doing some quick math -- I know that you

16   have a finance and accounting background -- if we look at,

17   you know -- if we take seven meals and we divide that 2,000

18   average attendance by that, that becomes more like 280.

19   Does that sound right?

20   A.  Maybe.

21   Q.  And if you look at maybe some of the lower numbers, like

22   there's that 927 in October, that's more like 130; is that

23   right?

24   A.  Right.

25   Q.  Do you know, the people who would come, would they

OLDEMAR LOPEZ - CROSS (CARLSON)

1    always bring their kids?

2    A.  I don't remember seeing kids.

3    Q.  You don't remember seeing kids?

4    A.  (Shaking head.)

5    Q.  So you saw mostly adults picking up meals --

6    A.  Yep.

7    Q.  -- is that right?

8    A.  Yep.

9    Q.  Do you have any idea how many kids each of those adults

10   might have been picking up meals for?

11   A.  No, I have no idea.

12   Q.  If I'm -- like let's just take a random -- let's say

13   five -- if an adult is picking up meals for five kids and

14   those bundles of meals have seven days' worth of meals,

15   those multiple meals in it, if we divide that again, it

16   looks like that's more like 26 to 50 people-ish on average?

17   Does that sound right?  Does that math sound right?

18   A.  How I repeat?  I just see a few families.  I don't know

19   how many meals in the bag.  I didn't know what food in the

20   bag.

21   Q.  And you saw five to ten families per day on the

22   weekdays --

23   A.  Not per day.

24   Q.  -- or five to ten adults?

25   A.  Per week.

OLDEMAR LOPEZ - CROSS (IAN BIRRELL)

```
1    Q.  Per week on the weekdays?

2    A.  They come twice a week to pick up.

3    Q.  Do you remember what day the food truck would come?

4    A.  No, I don't remember the days.

5    Q.  You don't remember if maybe the food truck showed up on

6    Friday each --

7    A.  No.

8    Q.  -- each week?

9    A.  No, I don't remember that.

10   Q.  And you don't know how many people ended up showing up

11   on the weekends, on Saturdays and Sundays, right?

12   A.  No, because I wasn't there.

13            MR. CARLSON:  Thank you.  No further questions.

14            THE COURT:  Anyone else?

15            Mr. Birrell.

16            MR. IAN BIRRELL:  Just very briefly.

17                        CROSS-EXAMINATION

18   BY MR. IAN BIRRELL:

19   Q.  Was there a security camera or security camera footage

20   at the location where you worked?

21   A.  I don't know.  I don't manage the building.

22            MR. IAN BIRRELL:  That's all I had, Your Honor.

23            THE COURT:  Anyone else?

24            Mr. Jacobs?

25            MR. JACOBS:  No redirect, Your Honor.  Thank you.
```

1           THE COURT:  Thank you.  Sir, you may step down.

2    Thank you.

3           THE WITNESS:  Thank you.

4           THE COURT:  We will break here for the day.

5    Members of the Jury, you are coming back at 10:30 tomorrow

6    morning and that's when we'll pick up the trial.

7           All rise.

8                   (Jury excused)

9                  **IN OPEN COURT**

10                **(JURY NOT PRESENT)**

11          THE COURT:  We are off the record.

12                (Discussion off the record)

13          MR. GOETZ:  Could I put just one thing on the

14   record?

15          THE COURT:  On the record, sure.

16          MR. GOETZ:  I know we're -- everyone is

17   experienced litigators.  We know not to do speaking

18   objections --

19          THE COURT:  Agree.

20          MR. GOETZ:  -- before the court.

21          I know that we have different vantage points in

22   the courtroom.  I'd ask that just counsel that are right

23   next to the jury be mindful of their tone or level of volume

24   when we're having these sidebars, because I think the jury

25   probably heard a lot of what Ms. Walcker had to say even

1    though we were on a sidebar.

2              THE COURT:  Interesting.  Would you -- I am always

3    cognizant of that.  Would you mind if we inquired to the

4    jury to see whether they could?

5              MR. GOETZ:  That's fine, Your Honor.  And I only

6    say that because my partner, Andrew Mohring, could hear

7    Ms. Walcker --

8              THE COURT:  And he didn't have a headset on.  I

9    will have Ms. Wegner inquire, if that's all right with you.

10   Because I agree, we ought to all be cognizant of that.

11             And, also, I absolutely agree that we ought to be

12   cognizant of speaking objections.  So no speaking

13   objections.

14             MR. GOETZ:  Thank you, Your Honor.

15             THE COURT:  Thank you.  All right.  We'll see you

16   all at 10:30 tomorrow morning.  Thanks.

17                  (Court adjourned at 4:13 p.m.)

18                        *      *      *

19

20             I, Lori A. Simpson, certify that the foregoing is a
     correct transcript from the record of proceedings in the
21   above-entitled matter.

22             Certified by:  _s/ Lori A. Simpson_

23                            Lori A. Simpson, RMR-CRR

24

25