UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-124(1) (NEB/DTS)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) **GOVERNMENT'S POSITION** |
| v. | ) **REGARDING SENTENCING** |
| ABDIAZIZ SHAFII FARAH, | ) |
| Defendant. | ) |

The United States of America, by and through its attorneys, Joseph H. Thompson, Acting United States Attorney for the District of Minnesota, and Matthew S. Ebert, Harry M. Jacobs, and Daniel W. Bobier, Assistant United States Attorneys, submits the following sentencing memorandum and respectfully requests that the Court impose a sentence of 30 years in prison.

I. **BACKGROUND**

Defendant Abdiaziz Farah was a leading and prominent player in the largest Covid-19 fraud scheme in the United States. His crimes have shaken Minnesota to its core through the brazen and staggering nature of his fraud. His crimes have changed the state forever, and not for the better. The Court must send a message in the strongest possible terms to Farah and anyone else who believes they can shamelessly take advantage of a state and federal social safety net and steal with impunity money intended for children.

A. **Farah's Fraud Scheme**

Defendant Abdiaziz Shafii Farah was convicted of participating in a massive fraudulent scheme to obtain federal child nutrition program funds intended to provide free meals to children in need. The defendant and his co-conspirators obtained, misappropriated, and laundered more than $40 million in program funds that were intended as reimbursements for the cost of serving meals to children. They did so by exploiting changes in the program intended to ensure underserved children received adequate nutrition during the Covid-19 pandemic. Farah and his co-conspirators took advantage of the Covid-19 pandemic—and the resulting program changes—to enrich themselves by fraudulently misappropriating millions of dollars in federal child nutrition program funds.

Farah, along with Mohamed Ismail, was a partner and co-owner of Empire Cuisine & Market, one of the entities that originated the fraud scheme. As the Court will recall, it was Empire Cuisine that enrolled in the Federal Child Nutrition Program in April 2020—during the early days of the Covid-19 pandemic and within weeks of registering the company with the Minnesota Secretary of State.



Farah immediately opened a number of federal child nutrition program sites and began claiming—*falsely*—to be serving meals to thousands of children per day. These claims were fraudulent. As the Court heard repeatedly at trial, no meals at all were served at many of the Empire Cuisine "sites." Many of their purported food "sites" were nothing more than parking lots or vacant commercial spaces. Indeed, at some of the sites, it was instead the Shakopee Public Schools who were actually serving meals to kids on a daily basis. At their fraudulent peak, Farah and his co-defendants claimed to serve *2.7 million meals* to children in the month of March 2021 alone.

Farah's company was one of the for-profit restaurants that Minnesota Department of Education employees flagged as submitting an alarming number of fraudulent claims in the summer and fall of 2020. This led MDE to change the rules to prohibit for-profit restaurants from operating federal child nutrition program sites. But Abdiaziz Farah was not deterred. Rather than stop submitting fraudulent meal claims, he began opening sites in the names of various non-profit entities and then passing the fraudulently obtained federal child nutrition program funds through to Empire Cuisine.

Farah was a full partner in Empire Cuisine and in the fraud scheme itself. For instance, Farah was involved in the creation and submission of fraudulent meal counts and invoices. *See, e.g.*, Gov't Ex. L-5, L-7.



Farah likewise was directly involved in the scheme's use of phony rosters with fake children's names. *See, e.g.*, Gov't Ex. E-55, H-53l, E-83.



Few of the names on the rosters actually matched the names of real students attending the local school districts, and many of the names used by Farah and his co-conspirators with absurd and obviously fake, like "Serious Problem," "John Doe," and "Britishy Melony." *See, e.g.*, Gov't Ex. E-3, E-47, E-53, E-86, and C-346.

In addition, Farah routinely directed the flow of fraudulent funds to include participants' respective "cuts" of the proceeds. *See, e.g.*, Gov't Ex. H-51g.



Throughout the scheme, Farah repeatedly doled out fraudulent child food money to his co-conspirators often disguised as supposed "consulting" payments. *See, e.g.*, Gov't Ex. O-29, O-53.



6



To keep the fraud going, Farah engaged in a corrupt "pay-to-play" system, where he paid thousands of dollars in bribes and kickbacks to personnel at Feeding Our Future and Partners in Nutrition. *See, e.g.*, Gov't Ex. M-43, L-14, L-17.

During a search of Farah's home in January 2022, agents found an array of documents related to all aspects of the fraud scheme, including fake meal count sheets. *See, e.g.*, Gov't Ex. H-10 and H-11. Agents also recovered fake invoices in which Farah fraudulently billed the Federal Child Nutrition Program for millions of dollars of food that Empire Cuisine claimed to provide to kids throughout Minnesota. *See, e.g.*, Gov't Ex. H-4 and H-5.



In addition, agents found checks and international wire transfer documents in Farah's home depicting the transfer of hundreds of thousands of dollars in fraudulent proceeds to his co-conspirators as well as his maneuvers to hide large sums of fraud money overseas in Kenya and China. *See, e.g.*, Gov't Ex. H-8, H-15 to H-20.

8



### B. Farah's Spending of Fraud Money

As a result of the fraud, Farah's Empire Cuisine & Market received more than $30 million in Federal Child Nutrition Program funds. In April 2021, Farah created another entity—a shell called Empire Enterprises—which he used to receive and launder proceeds of the scheme. As established at trial, Farah spent lavishly on himself using taxpayer money meant to feed kids. Farah put more than $700,000 in Federal Child Nutrition Program funds in Capital View Properties, a Kenyan real estate partnership, toward the purchase of a high-rise apartment building in Nairobi. He and Mohamed Ismail also laundered millions of dollars in fraud proceeds to China, much of which was purportedly used to purchase goods for shipment to Kenya.

Using taxpayer money meant for needy kids, Farah purchased five luxury vehicles for himself in about six months, including over $300,000 for a Porsche, a GMC truck, and a Tesla.




On top of his vehicles, Farah pilfered approximately $4.2 million in fraudulently obtained Federal Child Nutrition Program funds to purchase multiple pieces of real estate throughout the Twin Cities and Kentucky, which included buying two lakefront lots with the aim of building his own multi-million-dollar home:




Farah used Empire Enterprises to receive and launder more than $7 million in fraud proceeds. Farah directly pocketed more than $8 million.

In all, Farah and his co-conspirators fraudulently claimed to have served more than 18 million meals children in Minnesota during an 18-month period from summer 2020 through January 2022, for which they collectively received more than $47 million. Farah treated the taxpayer funded Federal Child Nutrition Program like his own slush fund. *See, e.g.,* Gov't Ex. H-54b, H-54j.





### C. Farah's Passport Fraud and Attempted Flight to Kenya

On January 20, 2022, federal agents seized Farah's U.S. passport during the execution of a federal search warrant at his house (which was part of a broader set of searches at more than two dozen locations around Minnesota). In the wake of the search, Ismail and Farah retained attorneys and were informed they were targets of the Feeding Our Future investigation.

Two months later, on March 22, 2022, Ismail and Farah went to the Minneapolis Passport Agency in downtown Minneapolis to apply for new U.S. passports. Each of them lied on their passport applications. Ismail and Farah each claimed falsely that their passports had been lost. They signed their applications after attesting that they had "not knowingly and willfully made false statements or included false documents in support of this application." They did so even though the Form DS-64 included in their application paperwork expressly warned that "false statements made knowingly and willfully on this form, in U.S. passport applications, or in affidavits or other supporting documents submitted therewith are punishable by fine or imprisonment under U.S. law, including 18 U.S.C. 1001 and/or 18 U.S.C. 1542."

> **WARNING**
> False statements made knowingly and willfully on this form, in U.S. passport applications, or in affidavits or other supporting documents submitted therewith are punishable by fine and/or imprisonment under U.S. law, including the provisions of 18 U.S.C. 1001 and/or 18 U.S.C. 1542. Alteration or mutilation of a U.S. passport is punishable by fine and/or imprisonment under the provisions of 18 U.S.C. 1543. The use of a U.S. passport in violation of the restrictions contained therein or of the passport regulations is punishable by fine and/or imprisonment under 18 U.S.C. 1544. All statements and documents submitted are subject to verification.

Based on these false representations, the U.S. Department of State issued Ismail and Farah new U.S. passports the same day they applied.

Perhaps unsurprisingly, less than two weeks after fraudulently obtaining a new passport, Farah attempted to use it to leave the country and go to Kenya—a country where he owned considerable property and to which he had laundered substantial amounts of money. On March 16, 2022, Farah booked a one-way flight for Nairobi, which was scheduled to depart on March 24, 2022. Local police subsequently apprehended Farah based on a federal arrest warrant concerning his fraudulent passport application. There is every indication that Farah intended to flee beyond the reach of law enforcement to live out his days on the millions he stole from the American taxpayers.

## II. THE GUIDELINES RANGE

### A. Count Group A: Conspiracy to Commit Wire Fraud, Wire Fraud, Conspiracy to Commit Federal Programs Bribery, and Federal Programs Bribery.

The base offense level is 7 pursuant to Guidelines § 2B1.1(a)(1). PSR ¶113. The base offense level is increased 22 levels pursuant to Guidelines § 2B1.1(1)(L) because the loss was more than $25 million but less than $65 million. PSR ¶114. The offense level is increased an additional 2 levels pursuant to Guidelines § 2B1.1(b)(9)(A) because the offense involved a misrepresentation that Farah was acting on behalf of a charitable or educational organization. PSR ¶115. The offense level is increased 2 levels pursuant to Guidelines § 2B1.1(b)(10) because the offense involved sophisticated means. PSR ¶116. The offense level is increased 2 levels pursuant to Guidelines § 2B1.1(b)(12) because the offense involved conduct described in 18 U.S.C. § 1040 (Fraud in Connection with a Major Disaster or Emergency Benefits). PSR ¶117.

The offense level is increased by 4 levels because Farah was an organizer or leader of the criminal activity involving five or more participants under Guidelines § 3B1.1(a). The offense level is increased by 2 levels pursuant Guidelines § 3C1.1 because Farah willfully attempted to obstruct or impede the administration of justice with respect to the investigation of the instant offenses because he made false statements in a passport application to obtain a new passport and then booked a one-way flight to Kenya in March 2022 after search warrants were executed by the government. PSR ¶¶109, 120.

As a result, the adjusted offense level for Count Group A is 41. PSR ¶121.

### B.   Count Group B:  Conspiracy to Commit Money Laundering and Money Laundering

The base offense level for violations of money laundering is 35 pursuant to Guidelines §§ 2S1.1(a)(1), 1B1.5(b)(1). PSR ¶122. The offense level is increased by 2 levels pursuant to Guidelines § 2S1.1(b)(2)(B) because Farah was convicted under 18 U.S.C. § 1956. PSR ¶123. The offense is increased by two levels because the money laundering offense involved sophisticated laundering pursuant to Guidelines §§ 2S1.1(b)(2)(B) and (b)(3).

The offense level is increased by 2 levels pursuant Guidelines § 3C1.1 because Farah willfully attempted to obstruct or impede the administration of justice with respect to the investigation of the instant offenses because he made false statements in a passport application to obtain a new passport and then booked a one-way flight to Kenya in March 2022 after search warrants were executed by the government. PSR ¶¶109, 120.

As a result, the adjusted offense level for Count Group B is 41.  PSR ¶128.

### C.    Count 43:  False Statement in a Passport Application

The base offense level for a violation of 18 U.S.C. § 1542 is 11, pursuant to Guidelines §§ 2L2.1(a). PSR ¶129.  The offense is decreased by three levels because the offense was committed other than for profit, pursuant to Guidelines § 2L2.1(b)(1). A four-level increase applies because Farah fraudulently obtained a new passport, pursuant to Guidelines § 2L2.1(b)(5)(A).

The offense level is increased by 2 levels pursuant Guidelines § 3C1.1 because Farah willfully attempted to obstruct or impede the administration of justice with respect to the investigation of the instant offenses because he made false statements in a passport application to obtain a new passport and then booked a one-way flight to Kenya in March 2022 after search warrants were executed by the government. PSR ¶¶109, 134.

As a result, the adjusted offense level for Count 43 is 14.  PSR ¶128.

### D.    Grouping and the Total Offense Level

Farah is ineligible for acceptance of responsibility credit and for a 2-level decrease under the Zero-Point Offender provision. PSR ¶¶137-38. Farah's total offense level is 41.  PSR ¶¶111-12, 139.

### E.    Criminal History

Farah falls in criminal history category I. PSR ¶144.

### F.    Advisory Guidelines Range

An offense level of 41 and criminal history level I results in an advisory Guidelines range of 324 to 405 months in prison.  PSR ¶187.

### III.  GOVERNMENT'S SENTENCING RECOMMENDATION

Based on a review of the § 3553(a) factors, the government recommends that the Court impose a sentence of 30 years in prison.

#### A.  Nature and Circumstances of the Offense

Farah participated in one of the largest fraud schemes in the history of the District of Minnesota, and the single largest Covid-19 fraud scheme in the country. He took advantage of a once-in-a-century global pandemic to enrich himself. He abused the generosity of Minnesotans' and the state's substantial social safety net—a system designed to ensure that no child goes without food.

Notably, Farah's company was one of the first to get involved in the massive scheme to fraudulently obtain Federal Child Nutrition Program funds. Farah's was one of the companies that forced MDE to change the rules to prohibit for-profit restaurants from operating federal child nutrition program sites. But, of course, he and his co-conspirators were not deterred. They simply carried on by opening sites through a variety of non-profits and then passing the fraudulently obtained funds to their company, Empire Cuisine.

As noted above, Farah profited handsomely from his role in the scheme—taking home more than $8 million in Federal Child Nutrition Program funds in about 18 months. Farah sent much of this money abroad to China and Kenya, and he owns real estate in Kenya. To be clear, this money is beyond the reach of American law enforcement. Neither these funds nor Farah's international real estate holdings have been, or can be, seized or forfeited.

Despite the egregiousness of his fraud scheme, Farah has never taken any responsibility nor expressed any remorse for his crime. Like his co-defendants, he has no contrition for defrauding the very country that took him in.

### B.     History and Characteristics of the Defendant

Nothing in Farah's background explains or excuses his crime. He came to the United States at the age of 18 after he and his family arrived as refugees. PSR ¶¶151-54. He enrolled in high school and graduated in 2007 and received a generous grant from a corporate foundation that covered all of his college tuition. PSR ¶154. Farah obtained a bachelor's degree in business administration in 2011 from Metropolitan State University in St. Paul. PSR ¶172. Farah also reports that he earned another bachelor's degree in financial management from the University of Minnesota in 2010. *Id.*

After finishing his studies, Farah worked in a series of entry-level positions with Minnesota Department of Transportation from 2011 to 2013. PSR ¶179. Farah then worked for the Metropolitan Council as a project manager but was fired due to attendance issues. PSR ¶178. Farah also told pretrial services that he worked as a consultant for the Super Bowl host committee, helping "mak[e] connections with local minority-owned and women-owned businesses for inclusion in event-related contracts and community initiatives." PSR ¶178.

In 2016, Farah acquired a gas station in Shakopee together with his friend and co-defendant, Mohamed Ismail, which became Empire Gas and Grocery. PSR ¶¶156, 175. In 2017, Farah founded Gateway STEM Academy, a Burnsville non-profit charter school. PSR ¶177. Farah was employed as Gateway STEM Academy's

director when it opened in 2018 until he took a leave of absence in January 2022, when he was publicly identified as a target of the fraud investigation involving the Federal Child Nutrition Program. PSR ¶177.

At the onset of the pandemic in April 2020, Farah registered "Empire Cuisine and Market LLC." PSR ¶175. By all measures, Farah was living the American dream. But it wasn't enough. Far from a legitimate business venture, Empire Cuisine soon became Farah's vehicle for committing fraud on an egregious scale, as discussed above. And then Farah began egregiously exploiting the pandemic and defrauding the state and country that took him in and afforded him so many opportunities.

### C. The Need for Deterrence

Farah participated in one of the largest fraud schemes in the history of the District of Minnesota, and the single largest Covid-19 fraud scheme in the country. But Farah didn't just take advantage of the Covid-19 pandemic to enrich himself and his co-conspirators. He took advantage of our state's compassion and its efforts to ensure no child went hungry.

Make no mistake, Farah's fraud has done great damage to the state. It has eroded trust in the government and raised questions about the sustainability of the state's system of social services. His crime undermined and endangered legitimate nonprofit organizations that rely on donations to carry out necessary and important charitable work.[1]

---

[1] *See, e.g.*, Kelly Smith, *Feeding Our Future fraud investigation casts scrutiny on Minnesota nonprofits*, Minneapolis Star Tribune (Dec. 22, 2022), available at https://www.startribune.com/feeding-our-future-fraud-investigation-casts-scrutiny-on-minnesota-nonprofits/600238797.

Despite this, to this day, Farah has denied any and all responsibility for his crime. He has not expressed an ounce of remorse for his actions. He appears to have felt no shame.

Cases like this are difficult to investigate and prosecute, which results in the widely held belief that perpetrators routinely get away with these crimes. The Court must send a message that fraud schemes like this are not worth it and will be met with a severe sanction.

Taking into consideration the Sentencing Guidelines, as well as all of the other factors required to be considered under § 3553(a), the government respectfully suggests that a sentence of 30 years in prison appropriately reflects the seriousness of Farah's crimes, promotes respect for the law, provides a just punishment, and creates adequate deterrence not only to Farah, but to all other individuals who take advantage of the state and believe that they are above the law.

## IV. CONCLUSION

For the reasons stated above, the government respectfully requests that the Court impose a sentence of 30 years in prison.

Dated: July 7, 2025

Respectfully Submitted,

JOSEPH H. THOMPSON
Acting United States Attorney

BY:  /s/ *Matthew S. Ebert*
MATTHEW S. EBERT
HARRY M. JACOBS
DANIEL W. BOBIER
Assistant U.S. Attorneys