UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MINNESOTA
Criminal No. 22-cr-00124 NEB-DTS

―――――――――――――――――――X
UNITED STATES OF AMERICA,            )
                                      )     HAYAT MOHAMED NUR
        Plaintiff,                    )     POSITION REGARDING
                                      )     SENTENCING
                                      )
                                      )
    -against-                         )
                                      )
HAYAT MOHAMED NUR                     )
                                      )
        Defendant.                    )
―――――――――――――――――――X

## Introduction

Defendant Hayat Mohamed Nur ("Hayat"), by and through her counsel, Barry S. Zone, Esq., respectfully moves the Court for a downward departure by way of downward adjustments in the United States Sentencing Guidelines (the "Guidelines"), and a downward variance from the applicable Guidelines.

We make these motions upon:

(1) all the files and proceedings in this case;

(2) Hayat's position regarding sentencing, which is a sentence of 18 months custody. followed by three years of supervised release, six months of home confinement, 300 hours of community service, mental health treatment, and orders of restitution in an amount to be determined by the Court and forfeiture in the amount of $30,000.00; and

(3) the further points and authorities that we will present to the Court, including the anticipated arguments of counsel and the personal statement of Hayat at her sentencing hearing on August 26, 2025.

As the Court knows, Hayat was one of the seven defendants at the first Feeding Our Future trial last year. She was convicted of three substantive and conspiratorial wire fraud counts of the indictment (counts one, 10 and 11) and acquitted of two counts (four and 34), one substantive wire fraud count and one money laundering count.

Hayat is deeply remorseful for her many significant errors in judgment. If she could take back time, she would change so many of the actions she took.

## United States Sentencing Guidelines Calculation

We begin with a suggestion that the Court calculate Hayat's Sentencing Guidelines as follows:

• **Base Offense Level: 7**

Because the statutory maximum term of incarceration is 20 years, the base offense level is 7. *See U.S.S.G. §2B1.1(a)(1).*

• **Loss Enhancement: +20**

We ask the Court to find that the loss that is reasonably foreseeable to Hayat as to the counts of conviction and the supporting evidence is more than $9,500,000.00 but not more than

$25,000,000.00. Therefore, a 20-level Guidelines enhancement should apply. *See U.S.S.G. §2B1.1(b)(1)(L)*.

Here is our rationale:

In one of the counts of conviction, Count 10, Hayat is charged with sending an invoice on January 5, 2022, which was at the very end of the conspiracy. With no connection to these entities, financial or otherwise, and in a purely clerical capacity, Hayat sent the invoice to Partners In Nutrition, and it reflected that ThinkTechAct was entitled to more than $2 million in Federal Child Nutrition Program ("FCNP") funds for meals purportedly served to children during the prior month of December 2021. *See PSR, par. 52.*

In addition, Hayat was convicted of Count 11. The jury received evidence that a week later, on January 12, 2022, at the direction of her brother and co-defendant Abdimajid Nur, Hayat sent to her brother and his boss and co-defendant Abdiaziz Farah an invoice purporting to show that ThinkTechAct owed more than $2 million to Mr. Farah's company, Empire Enterprises, for serving meals at ThinkTechAct sites in April 2021. *See PSR, par. 52.*

As to Count 10, even though Hayat had no involvement with any federal program or food distribution, the jury also received evidence demonstrating that Hayat sent, again in a purely clerical capacity, invoices purporting to document the purchase of more than $10 million in food and expenses related to the FCNP. *See PSR, par 56.*

Therefore, because according to the trial evidence it appears that a loss amount of $14 million was reasonably foreseeable to Hayat, we ask the Court to increase her Guidelines by 20 levels.

- **Role Adjustment:   -4**

The Court should find that Hayat is entitled to a four-level minimal role adjustment. Her involvement appears to have been largely limited to administrative tasks at the request of her brother at the very end of the conspiracy and just before the defendants were arrested. Hayat had absolutely no decision-making authority or financial control within the conspiracy; nor did she recruit or direct anyone else. The evidence presented at trial indicates that her activities were confined to submitting meal count forms, invoices, and rosters, often based on templates that were provided to her. Her lack of knowledge regarding the scope of the scheme supports the conclusion that she acted with limited awareness and without any significant role in its orchestration or execution.

While the Presentence Investigation Report ("PSR") includes Hayat in the overall loss assessment of $50 million; the evidence appears to show that she received $30,000.00, less than one tenth of one percent, which further underscores her lack of financial benefit and extremely limited involvement in the scheme.

While the government introduced meal rosters, invoices, and other documents used to advance fraud, Hayat had no connection to the broader scope of the claimed loss. Her actions

appear to have been limited to clerical duties and did not involve financial transactions, management, or direct control over funds.

    **• Zero Point Offender:**        -2

Hayat is a zero-point offender as she meets the criteria of U.S.S.G. §§4C1.1(a)(1)-(10). Therefore, she asks the Court to find that she is entitled to a two-level Guidelines reduction pursuant to U.S.S.G. §4C1.1(a) and (b). *See PSR, par. 110.*

    **• No Sophisticated Means:**  0

The Court should not find the two-level enhancement for sophisticated means under U.S.S.G. §2B1.1(b)(10). While the government's case portrays as complex the overall scheme, the role apparently attributable to Hayat did not involve any sophistication. While the conspiracy involved a network of co-defendants, shell entities, and fraudulent documents, which may collectively reflect sophistication, none of this was reasonably foreseeable to Hayat, and her apparent minimal role looks as if it was limited to administrative tasks, and she lacked both the authority and ability to influence the scheme's complexity. Her contributions appear to have consisted largely of completing templates and forms provided by others, and did not require any specialized knowledge, decision-making, or the strategic creation of shell companies. She apparently followed instructions to input information into documents without involvement in any intricate or deceptive planning that would characterize sophisticated means.

• **Emergency Benefits:** +2

Because the offense involved fraud in connection with emergency benefits, which is conduct described in 18 U.S.C. §1040, a two-level Guidelines increase should apply. *See U.S.S.G. §2B1.1(b)(12); see also PSR, par. 105.*

**Adjusted Offense Level: 23 (Criminal History Category I)**

**= Advisory Range of 46 - 57 Months of Incarceration**

**<u>Argument</u>**

I did not have the honor of being Hayat's lawyer at that time of her trial, but I carefully read the trial transcripts, and I conferred extensively with Edward Sapone, trial counsel to Hayat's brother, Abdimajid Nur. What is obvious to me is the stark difference between Hayat and her co-defendants. Whether Your Honor finds that Hayat is a minimal participant, as I ask you to find, or a minor participant, as the PSR at paragraph 97 suggests, mindful of the need to avoid unwarranted sentence disparities among similar defendants, I respectfully urge the Court to find that the evidence against Hayat was, by far, the least of all of the trial defendants.

As mentioned above, I submit this sentencing memorandum with the hope that I will succeed in convincing the Court to find that a sentence of 18 month's custody with regular conditions and special conditions of supervised release including home confinement, community service and mental health treatment is sufficient but not greater than necessary to achieve the goals of sentencing under 18 U.S.C. §3553(a)(2).

As we consider the nature and circumstances of the offense, I am confident that Your Honor discerned during the trial that Hayat's involvement was at the request of her brother, was *11th hour*, and was extremely limited. In no way is this offered as an excuse, as we are all responsible for our actions. Hayat, nonetheless, is different from the lion's share of fraud defendants who end up in a prison jump suit because they are greedy. While it is impossible to totally divorce greed from a fraud case, Hayat's actions were not fueled by greed. In a male-dominated environment, Hayat's brother approached her with desperation. Of course, she should have exercised the wisdom and courage to decline his desperate plea; that she didn't, underscores the reality that Hayat needs additional mental health treatment to further strengthen her resolve.[1] She misunderstood how love acts, especially during times of adversity. And, at age 25, she made the worst mistake of her young life.

But, thankfully, we sentence the whole person. And while Hayat's actions in failing to turn her brother away deserve condemnation, she deserves praise for having taken positive steps to self-rehabilitate and for having lived her life consistently extending a helping hand to others.

## **Positive Steps Towards Self-Rehabilitation**

Since Hayat's detention at the Sherburne County Jail 16 months ago, once of the positive steps she has taken to change her life has been to participate consistently in group mental health therapy. She completed a lengthy voluntary program, which contained multiple consecutive

---

[1] As will be explained later in the memorandum, Hayat has engaged in voluntary mental health treatment while detained.

group sessions from which participants can withdraw at any time. *See Exhibit A* . The sessions that Hayat completed include:

• Grief and Loss Group (Nine Weeks);

• Trauma-Informed (TI) Group (Eight Weeks);

• Life Skills Group (Six Weeks);

• CBT Group (Eight Weeks); and

• Mini DBT Group (10 Weeks).

Each of the groups met once weekly for one to one-and-a-half hours. The purpose of the groups is to increase awareness of stressors, triggers and emotions, and to teach coping skills for clients to utilize when faced with difficult situations.

And Hayat continues to do all she can do to self-rehabilitate. To that end she has participated in all available additional groups that are offered at the jail. For example, she currently participates in the Psychoeducation Group, which is the final open therapeutic group. As of August 8th, she has completed three weeks of the six-week program.

Based on her excellent behavior Hayat was also selected as an inmate worker, and in connection with this designation she works extensively in the commissary sorting packages and inmate orders, as a podworker in the housing unit, where she cleans and organizes and with meal service 3 times daily. Captain J.D. Coolidge describes Hayat as an asset to the facility. *See Exhibit B*

The extraordinary effort that Hayat has made since her detention 16 months ago is consistent with her effort throughout her life to support her friends, neighbors, and family.

Fowziya Ahmed, a friend of Hayat's who almost died in a car accident, shares:

> Hayat's role in my recovery was beyond that of a neighbor; she was my caregiver, translator, and advocate. My mother reached out to Hayat for help, and she immediately responded, coming to the hospital every single day—after work and classes, despite the demands of her own life as a graduate student. For the entire four months I was hospitalized, Hayat was there by my side, ensuring that I received the proper care and helping to communicate with medical staff. Even after my discharge, Hayat continued to assist me, driving me to every physical therapy session and making sure my family had the support they needed.

*See Exhibit C.*

Amino Nur, Hayat's mother, writes:

> Hayat has always been mature beyond her years. While other teenagers were focused on having fun, she was helping me care for her younger siblings. At just 14 years old, she started working to help support our family while still excelling in school. Despite her busy schedule, she managed to be at the top of her class. She would stay up late into the night studying to achieve her goals, which led her to graduate high school with honors, followed by completing both her undergraduate and master's degrees with the same distinction.

*See Exhibit D.*

Imam Q. Mursal, the Imam of the Dar-Us-Salam Mosque, explains:

> Hayat is a dynamic and driven individual who has consistently demonstrated her potential as a leader and a role model. Despite her young age, she has made significant contributions to our mosque, particularly within the women's section, where she has taken on responsibilities that foster growth, connection, and support among members. Her efforts, especially during the holy month of Ramadan, have been instrumental in creating meaningful programs and fostering a welcoming and nurturing environment.

*See Exhibit E.*

Hayat's husband, Hussein Abdulaziz, tells us:

> Throughout her life, Hayat has consistently placed others' needs before her own. In addition to her support for her brother, she has also demonstrated an unwavering passion for working with children with special needs. Her empathy and ability to connect with these children are truly extraordinary, and she has made a lasting difference in their lives. Her dedication to serving others, whether it's through her family or her work with special-needs children, has been an integral part of who she is.

*See Exhibit F.*

Idil Hassan, a family friend, adds:

> In her personal and professional life, Hayat is known for her integrity and work ethic. Her honesty and dedication are evident in how she fulfills her obligations, no matter the circumstance. Hayat is respected for her ability to handle challenges with calmness, insight, and resilience, often guiding others through difficult situations with grace and understanding.

*See Exhibit G.*

Hayat's best friend, Marian Mohamed, writes:

> As the eldest daughter in an immigrant household, she understood the weight of setting a positive example for her younger siblings. I vividly remember late-night study sessions, where Hayat, despite being a full-time student, also worked two jobs. She juggled so much with such determination and strength, and I often found myself thinking, 'She's a Superwoman'.

*See Exhibit H.*

Mohamed Nur, Hayat's father, talks about Hayat's selflessness when she was barely 20 years of age:

> When I finally joined my family in the United States, Hayat's support continued to be invaluable. She helped me navigate the

> difficult transition of settling into a new country. Hayat assisted me in applying for jobs, understanding the systems in place, and adjusting to a completely new life. Her resilience, intelligence, and determination to help others have always been part of her character.

*See Exhibit I.*

Hayat's friend, Nasib Jama, adds:

> Hayat is a remarkable individual, known to all who have had the privilege of knowing her for her intelligence, diligence, and unwavering commitment to personal growth. She earned her master's degree, a testament to her dedication and perseverance in the pursuit of knowledge and career. Throughout our friendship, I have observed her deep compassion for others and her constant efforts to make a positive impact in her Community.

*See Exhibit J.*

Sadia Mohamed, Hayat's sister-in-law, explains:

> When I became pregnant and faced severe sickness throughout all my pregnancies, Hayat went out of her way to help me, often visiting and making sure I had what I needed. She truly cared for my well-being, and her support made such a difficult time much easier to endure.

*See Exhibit K.*

Hayat's friend, Sagal Mohamud, writes of Hayat's responsibility, helpfulness, support, and work ethic:

> Hayat always had a sense of responsibility towards her family and anything she was assigned to do. I have witnessed her dedication to support her family and the community at large. For example, during the holy month of Ramadan, I would often see her at the mosque providing for and helping others in breaking their fasts. I would frequently see her support for her younger sister by taking part in her high-school events and meetings. Most importantly, Hayat had the most admirable work ethic.

*See Exhibit L.*

Sheymaa Nur, Hayat's younger sister, gives us a window into Hayat's character since Hayat was a young girl:

> Hayat was always by my side growing up, particularly during my school years. Her support has been a guiding force, especially when I felt uncertain about myself or my future. I can't count the number of times she would sit down with me before an important test, presentation, or school event, offering words of encouragement that helped me stay calm and confident.

*See Exhibit M.*

Notwithstanding Hayat's errors in judgement, Yasmin Jama, a mental health professional, notes:

> Hayat is deeply committed to her family, always prioritizing their needs and providing emotional support during times of hardship. She is known to be the one family members turn to for guidance, and her ability to nurture and care for those around her speaks volumes about her character. Her honesty, dependability, and strong sense of duty have earned her the respect and admiration of all who know her.

*See Exhibit N.*

**Hayat's Career Demonstrates That She Is Driven To Help Those In Need**

All of the good works that Hayat has done for countless neighbors and members of our community is consistent with the kind of person she has always been. She is a very smart woman who could have chosen just about any career. Hayat chose to work in human services to serve the most vulnerable members of the community. She has served those most in need of help, the neglected members of society, those abused and traumatized, and those who suffer with disabilities.

In a letter to the Court, Hayat explains:

> I really do want the Court to understand that the conduct that I was convicted of doesn't define who I am, and what I have been through in my life up to my involvement in this case. I spent years working in the human services field serving my community, particularly those most vulnerable: the disabled, the abused, the neglected, and the traumatized. Since my graduation from high school in 2015, throughout my college years and post-graduation, I have always held jobs and roles that involved assisting and providing support, advocacy, treatment, and resources for those who need it most in our community, so that they can live a life with dignity and joy, regardless of their disability or deficits.

*See Exhibit O.*

### **Hayat Nur's History and Characteristics**

It doesn't take much to figure out why Hayat has been attracted to a life of helping those most in need. Her birthday illuminates the darkness of her history. Hayat, now age 28, was born in Somalia during a murderous civil war. I am confident that the Court recalls the testimony of the defense expert during the first FOF trial who described in interesting yet tragic detail the history of so many folks from Somalia. Millions of people were killed, maimed, kidnapped, and driven from their homes. Everyone was harmed in one way or another. Children were separated from their parents. There is no Somali national from that time period who doesn't know someone who was displaced. This is why Hayat's birthday and the birthday of just about everyone else is January 1st.

The PSR at paragraphs 124-127 explains with some specificity Hayat's history while living in Somalia and once she relocated to Minnesota:

"[Hayat] has few memories of Somalia, but she recalled a lack of housing stability as they moved to different areas to escape the impact of the civil war. She has no memories of her father during this time, hearing from her mother that he had to flee the country. Her mother did not work outside the home, given her seven young children, and they relied on other family members for financial support. [Hayat] was age 8 when her family immigrated to Egypt in 2005. They received some support from a government refugee program. Although they did not live in a refugee camp, they were often in small apartments and had to move at times to save money. [Hayat] attended school, but it took some time for her to learn Arabic, and she did not always eat three meals a day due to their limited financial means. As she and her siblings aged, it became clear that they would not be able to pursue higher education in Egypt, where they were not citizens. Her mother hoped that moving to the United States would allow more opportunities for her children.

Immigration records confirm [Hayat] entered the United States on September 8, 2010. After briefly residing in the Twin Cities area, the family relocated to Marshall, Minnesota. While the community had few Somali or Muslim people, the smaller population made it less intimidating to seek social support services. [Hayat] recalls that her father was located in Saudi Arabia and moved to join the family in approximately 2014. She does not know all the details about why his whereabouts remained unknown for so long, believing her mother wanted to shield her children from that knowledge. [Hayat] stated she was excited to have her father present again, but it was not an easy transition for their family. She also held some resentment that her father, although fleeing the country himself, did not show greater

concern for her mother, who raised seven young children alone for several years. [Hayat] indicated that she and her siblings experienced racism and bullying in the community, and there was little awareness of Somali culture and Islamic beliefs. She attended English as a second language (ESL) classes throughout high school, although most of the other students in the classes spoke Spanish or Hmong. She also was relied on heavily by her parents to navigate paperwork and other administrative functions, as they have never achieved the same degree of proficiency in the English language. Following her graduation, she moved away from the family home to live with a roommate and attend college in St. Cloud, Minnesota. [Hayat] advised that this is highly unusual in Somali culture and caused some friction with her parents, although they eventually agreed to her plan. While she was residing in St. Cloud, her family moved back to the Twin Cities area to provide a wider variety of college choices to her younger siblings."

So when the Court considers the factors of §3553(a), I hope that you will consider that a person such as Hayat Nur does not need to remain incarcerated any longer for the goals of sentencing and the parsimony clause to be met.

### No Need To Deter Hayat From Committing Future Offenses

There is no need to impose upon Hayat a further custodial sentence to deter her from engaging in future offenses. Hayat was arrested in this case in September 2022. She was immediately released on a PRB, and remained at liberty for almost 21 months. During that

almost-two-year time period, Hayat adhered to all conditions of pretrial release as ordered by the Court. Then during the multi-week trial, Hayat arrived to your courtroom early every morning and was as respectful as a person could be during the duration of the trial. During the almost three years since her arrest, throughout the 21 months while at pretrial liberty, and during the last 16 months while detained, Hyatt has proven to the Court that she will follow all rules and not commit future offenses.

## The Remaining §3553(a) Factors

As the Court reflects upon the whole person being sentenced, I urge Your Honor to consider that the requested sentence will reflect the seriousness of the offense, promote respect for the law and provide just punishment. Hayat deeply regrets what she did. Her mistakes, as terrible as they were, however, do not define the person being sentenced. The above letters demonstrate that she is a hard-working, kind and caring person, and a family woman.

For its part, the U.S. Sentencing Commission has noted that "dwindling prison space should be reserved for the most serious and dangerous offenders, necessitating a reconsideration of alternative sanctions for first-time and nonviolent offenders." Alternative Sentencing in the Federal Criminal Justice System, United States Sentencing Commission, January 2009, pg. 1. Hayat is such a first-time, nonviolent offender. She has lived almost her entire life as a positive and productive member of society who does not need to be imprisoned to be punished. The requested sentence will mean that Hayat, at the end of the day, will have spent years reporting to

either a pretrial services officer or a probation officer, being subjected to strict supervision. *See United States v. Gall*, 552 U.S. 38, 48-9 (2007) (describing probation as a punishment that "severely restricts an individual's liberty"); quoting *United States v. Knights*, 534 U.S. 112, 119 (2001). Lastly, as a first time felony offender, Hayat will continue to face myriad collateral consequences well into the future.

According to Professor Michelle Alexander, "[m]yriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of 'civi[l] death' and send the unequivocal message that 'they' are no longer part of 'us.'" Michelle Alexander, The New Jim Crow 142 (2010).

The requested sentence can provide adequate general and specific deterrence. The available empirical evidence does not support a finding that a prison sentence necessarily leads to increased deterrent effects, regardless of the type of crime. *See* Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999) (concluding that "correlations between sentence severity and crime rates … were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research 28-29 (2006)("[I]ncreases in severity of punishments do not yield significant (if any)

marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence.").

Studies have also demonstrated that, except for the incapacitation effect of incarceration, there is little apparent correlation between recidivism and imprisonment. *See* David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The Commission has similarly found that "[t]here is no correlation between recidivism and guidelines' offense level. … While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 15 (2004).

A more relevant predictor of recidivism is a defendant's criminal history, of which Hayat has none. Social science research indicates low recidivism rates for offenders with no prior criminal history. The Commission found that offenders with zero criminal history points have a recidivism rate of only 11.7% (compared with a recidivism rate of 22.6% for offenders with one criminal history point, and 36.5% for offenders with two or more criminal history points). *See id.*, p. 13-14, 26.

Therefore, while every case presents different facts and circumstances, given Hayat's unique history and characteristics, and the likely collateral consequences of her conviction, the requested sentence will provide just punishment for the offense and promote respect for the law.

## Conclusion

For all of the above reasons, and mindful of the kinds of sentences available, I most respectfully suggest that a sentence of time-served; three years of supervised release; six months of home confinement; 300 hours of community service, mental health treatment, and orders of restitution and forfeiture is sufficient but not greater than necessary to achieve the objectives of sentencing.

On behalf of Hayat Nur and her family, I thank Your Honor for considering this memorandum.

Dated: August 12, 2025                                        Respectfully submitted,

By:_____
Barry S. Zone, Esq
Attorney for Defendant
40 Fulton Street / 17th Fl.
New York, NY 10038

cc: All Government counsel (By ECF)