Doug Passon
Law Offices of Doug Passon, PC
10565 N. 114th St., Suite 101
Scottsdale, AZ 85259
Telephone: 480.448.0086
Email: doug@dougpassonlaw.com

Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>MAHAD IBRAHIM,<br>Defendant. | CASE NO. 0:22-CR-00124-003(NEB)<br>**MOTION TO WITHDRAW GUILTY PLEA**<br>COURT: Hon. Nancy E. Brasel |

Defendant MAHAD IBRAHIM, by and through undersigned counsel and pursuant to Fed. R. Crim. Proc. 11(d)(2)(B) hereby moves to withdraw from his guilty plea entered on July 24, 2025 (ECF Doc. 841). Dr. Ibrahim did not knowingly and voluntarily enter into his guilty plea. He was misadvised by prior counsel and is, in fact, innocent.

In support thereof, Dr. Ibrahim states as follows:

## INTRODUCTION

It is beyond dispute that several bad actors knowingly and intentionally perpetrated fraud by submitting inflated food counts to obtain compensation for goods and services never provided. Many of those who orchestrated and profited significantly from this fraud have been held to account for their conduct. Mahad Ibrahim, Ph.D., was not one of these bad actors. Dr. Ibrahim was as much a victim of the fraudsters as was the government. Dr. Ibrahim, his reputation, and the organization he poured his life into were unwittingly used by others to further the fraud. Because of this, along with the unfortunate and

significant errors and omissions of prior counsel, there are fair and just reasons for withdrawing his guilty plea.

***

Dr. Ibrahim was well known and trusted in the Somali community from his years of providing educational programming to the community through his companies Mind Foundry Learning, Inc. and ThinkTechAct Foundation, Inc. (d/b/a/ "Mind Foundry Learning Foundation") (hereinafter collectively "Mind Foundry" or "ThinkTechAct" or "TTA"). Mind Foundry was a STEM education organization founded in 2016. For six years, it built curriculum, hired educators, partnered with schools, and taught hundreds of children. The characterization of Mind Foundry by the government as a "shell company" — an organization that existed only on paper — is contradicted by a mountain of evidence. The work was real. The people were real. The students were real. Dr. Ibrahim poured years of hard work, his own money, and his heart into building an operation he knew would do much good in the world.[1]

Dr. Ibrahim is categorically different from other defendants. His life has been built on hard work, education, and family. He earned his undergraduate degree in applied economics and business management at Cornell. He then earned his master's degree at University of California, Berkeley followed by a Ph.D. in Information Science also from UC Berkeley. Dr. Ibrahim was the only person of color in his Ph.D. program.

Among his many other accomplishments, Dr. Ibrahim is a Fulbright Scholar, and received an honorable mention from the Ford Foundation. Over his career, he has worked with Microsoft, UNICEF, the World Bank, and the Clinton Health Access Initiative. His principal academic focus is the application of technology to development projects, and he

[1] The defense has created the following website as a central archive to show the full extent of Mind Foundry's operations over the course of approximately six years. It is replete with documentary evidence, photos, videos, correspondence, testimonials, and more: www.mindfoundryarchive.com. The password is: "mindfoundry2026".

directly applied his PhD work to a number of global development initiatives. At the time of the events in question, Dr. Ibrahim was not only engaged in Mind Foundry/TTA, he was the managing partner for the Gobee Group, an international consulting firm, and overseeing the construction of the Afrique community center. He has never taken a dollar in his life that he has not earned with hard work and hard-won expertise. Nor would he ever put his reputation, his family, or his freedom at risk by committing fraud.

## OVERVIEW OF THE FRAUD ALLEGATIONS

Minnesota's Department of Education (MDE) outsources the operation of various meal programs for school-aged children to private organizations, primarily non-profits. Logistically, there are three primary entities involved in the distribution of these meals: a sponsor, a vendor, and a site. The sponsor manages the overall operation and funding, which it receives from the MDE by invoicing MDE for every meal provided. The sponsor is the liaison or primary contact between the MDE and the particular meal programs it oversees. Moreover, the sponsor is responsible for selecting vendors and site-providers. In contrast, the vendor supplies the actual food, which is purchased by the sponsor using MDE funds. Finally, the site is the physical location where the meals are served, and site staff provide the manual labor for packaging and distributing the meals. Any reimbursable expenses the site-provider may incur are also paid by the sponsor using MDE funds. Dr. Ibrahim was neither a sponsor, a vendor, nor a site. There were two main sponsors implicated in this fraud: Partners in Nutrition ("PIN") and Feeding Our Future ("FOF"). Inexplicably, nobody at PIN was criminally charged.[2]

There is a fourth category, that typically has no involvement in food distribution: the enrichment provider. This is where Dr. Ibrahim and Mind Foundry/TTA enter the picture. With the onset of the pandemic, the demand for meals sky-rocketed. But MDE

---

[2] *FBI Records Raise New Questions About Uncharged Player in Multimillion-Dollar Food Fraud*, Minnesota Star Tribune, June 18, 2026. https://www.startribune.com/fbi-records-raise-new-questions-about-uncharged-player-in-multimillion-dollar-food-fraud/601853141

placed a cap on how many meals any particular sponsor could provide via the Summer Food Service Program (SFSP), and many sponsors soon hit their cap. There was, however, a supplemental program that was not subject to this cap – Child and Adult Care Food Program At-risk Afterschool program. That program targeted at-risk youth. Under this program, in addition to providing meals, MDE required educational programming to also be offered.

Dr. Ibrahim's involvement in the present case comes largely from his interest in childhood education in the Minneapolis and St. Paul community. Dr. Ibrahim founded Mind Foundry shortly upon arriving to the Twin Cities in early 2016. By the time the global Covid-19 pandemic started, Mind Foundry was serving and delivering education and enrichment programming to hundreds of children at over 8 sites in the Twin Cities metro. One of these locations was Gateway STEM Academy, founded by Abdiaziz Farah in 2018. In this role, he was aware of both educational services in the Twin Cities and Farah's for-profit businesses, especially Empire. As the pandemic worsened in early 2020, Ibrahim used his understanding of data tools and logistics to assist both educators and vendors in establishing sites for the provision of food, he also built supply chains which delivered food to those sites in compliance with his understanding of CACFP regulations.

It is true that Dr. Ibrahim was involved in helping establish Farah's logistics and supply chain for acquiring and distributing food to the sites in question. But Dr. Ibrahim had no knowledge Farah and others committed fraud when they submitted claims for

reimbursement to MDE that included inflated food counts, fabricated food production records, and fake invoices.

The following summary of facts, which are undisputed, detail the procedure for submitting the fraudulent invoices.

- Abdiaziz Farah, Abdimajid Nur, and Hayat Nur submitted false food production records, menus, and invoices directly to Partners in Nutrition (PIN) via PIN's My-FoodProgram computer system.
- PIN would not submit a reimbursement claim until a site delivered a signed Claims Checklist – PIN's own written policy: "Partners in Quality Care will not submit a claim for reimbursement until a program submits a signed Claims Checklist by email, postal mail or fax verifying that they have submitted all records to support their claim and certify that the data submitted is true and correct to the best of their knowledge." (Ex. 1, PIN Meal Claims Policy (A17) § 1.6, produced by PIN in the grand-jury production at GJS-00160957.) PIN's production contains seventy-four signed Claims Checklists; not one bears Dr. Ibrahim's signature. (Ex. 2, Claims Checklist Census; Ex. 3.)
- Claims submission itself belonged ***to the sponsor alone***: every reimbursement claim in the discovery record – 487 of 487 – was submitted to MDE under PIN's sponsor account, and none under any account of Dr. Ibrahim or his organizations. (Ex. 4, inventory of the 487 CLiCS claim records in the Government's production, with per-claim Bates citations; *see* Ex. 5, one claim for each of the 61 sites, each bearing the sponsor's certification.)
- Determining whether claimed meal counts were accurate required comparing what was reported to have been produced, with what was claimed and what monitors observed, i.e., the Food Production Records, the site meal counts with attendance, and PIN's monitoring reports. Each was held by PIN. Food Production Records were entered on the vendor side of PIN's My Food Program system and reviewed by PIN's Nutrition Specialist (GJS-00160957 § 1.3; EML-00022969; EML-00023117; EML-00023121; Ex. 6 at 6–11); meal counts were recorded at the sites under PIN's rules and entered into PIN's systems (EML-00892794); and monitoring reports were prepared by PIN's own staff (e.g., GJS-00501122–27). **Dr. Ibrahim was not stationed at the meal sites, because he was not a site operator. He never received the Food Production Records, and had no role in PIN's comparison of these records, so he was not in a position to make that comparison.**

Moreover, once this distribution network was established, Dr. Ibrahim's involvement in Farah's operations decreased considerably. For a significant portion of Farah's fraud scheme, Dr. Ibrahim was not even living in Minnesota: he moved to Ohio in 2021. Lastly, Dr. Ibrahim understood that there was a system of verification in place to oversee the legitimacy of the counts. This is a two-tiered system of checks and balances – starting

with the sponsor (Kara Lomen) and ending with the MDE. Each entity had the responsibility to verify every claim for reimbursement. And neither could delegate that duty: federal regulation forbids a sponsor from contracting out management of the program, 7 C.F.R. §§ 226.15(c), 225.15(a)(3), and MDE's own guidance lists the sponsor's management functions as non-delegable. (Ex. 7, MDE035377.) Thus, Dr. Ibrahim was never in a position to independently detect any fraud, and it was eminently reasonable for him to presume there was not any given the system of checks in balances in place.

Farah and others used Dr. Ibrahim and his organization to commit fraud. Having Mind Foundry/TTA provide educational programming to the sponsor's at-risk meal program allowed the fraudsters to "level-up" their fraud and exceed the funding caps for regular food programs (i.e. ones without an educational component). The educational programming itself was real. PIN's own monitors, using MDE's monitoring form, marked the enrichment requirement "Met" at Success Academy (Dec. 16, 2020; GJS-00501187, -93), Woodbridge (Oct. 2021; GJS-00501112), and Scott Park (Oct. 23, 2021; GJS-00501122), where the monitor attached Mind Foundry's program sign-up flyer to the form (GJS-00501127). The Government's production also includes a printout of Mind Foundry's live online program catalog (GJS-00469967–78). (Ex. 8.)

As the educational aspect of this program was required in order for it to be funded by MDE, Dr. Ibrahim had no reason to question when the sponsor asked him to be the "pass-through" for funding. Under this arrangement, the sponsor directed the programming funds from MDE into Mind Foundry's account. In turn, Mind Foundry used those funds to reimburse vendors and site-providers. Per the FBI's own accounting of the ThinkTechAct account, 88.9% of the $21.9 million in outflows went to the program's food vendors and delivery providers, 8.4% sat unspent until the Government seized it — and $5,885.82, less than three-hundredths of one percent, reached the FBI's "Defendants' Personal Accounts" category.[3] (Ex. 9, ThinkTechAct Scheduled Account.) At all times,

[3] In that regard, the sole item in the FBI's "Defendants' Personal Accounts" category —

Mind Foundry did in fact provide and/or make available the required educational programming for the meal programs.

Importantly for present purposes, the co-defendants, at all times, intentionally kept Dr. Ibrahim in the dark about the illegal activities occurring behind the scenes and "up the chain". Specifically, Dr. Ibrahim had no idea that Aimee Bock, Abdiaziz and others were fraudulently billing MDE, *nor could he have even discovered such fraud had he investigated*. Thus, he was *not* willfully blind. By the time any funds reached Mind Foundry, the fraud had already occurred. The false claims were submitted by others, certified by the sponsor, and approved and funded by MDE. Because Dr. Ibrahim was wholly unaware that Mind Foundry was being used to launder fraudulent funds, he did not possess the requisite *mens rea* to be guilty of money laundering, let alone fraud.

Separate and apart from Dr. Ibrahim's role as an educational provider and incidental to Mind Foundry serving as a payment conduit for the at-risk lunch programs, Dr. Ibrahim was paid by vendors as a consultant to assist them in negotiating contracts with wholesale food suppliers like Sysco, Starkist, General Mills, etc. This was the totality of Dr. Ibrahim's involvement. While he did receive significant compensation, Dr. Ibrahim had legitimately earned it. His incredible educational platform, his countless hours of work negotiating food contracts and other logistics, and his Ph.D.-level expertise in consulting and systems management, means he had every expectation to be compensated at fair market value for services actually and competently rendered.

**PERTINENT PROCEDURAL HISTORY**

On September 13, 2022, the Grand Jury issued a superseding indictment charging Dr. Ibrahim with various counts of fraud related to a federal child nutrition program. ECF Doc. 57.

On September 29, 2022, Dr. Ibrahim was arrested on a federal bench warrant and

$5,885.82 — was for payment of the organization's corporate credit card, personally guaranteed by Dr. Ibrahim.

released on bond with pretrial supervision. He remains on bond and has been fully compliant with all conditions of his release.

On July 24, 2025, Dr. Ibrahim entered into a plea agreement with the Government whereby he agreed to plead guilty to Count 5 of the Superseding Indictment charging him with wire fraud in violation of 18 U.S.C. § 1343, and to plead guilty to Count 36 of the Superseding Indictment charging him with money laundering in violation of 18 U.S.C. § 1957. ECF Docs. 841 (minute entry of change of plea) and 842 (plea agreement).

Among the stipulations Dr. Ibrahim agreed to in the plea agreement is that the loss amount attributable to him for purposes of sentencing is between $3.5 million and $9.5 million, but that the Government may argue it is between $9.5 million and $25 million. ECF Doc. 842 at 8. Dr. Ibrahim also agreed that the Government may argue for application of a sophisticated means enhancement. *Id.* As a result of the stipulations, Dr. Ibrahim is subject to an advisory sentencing range of at least 57 to 71 months, but the Government may argue that it should be 87 to 108 months. *Id.* at 10.

Dr. Ibrahim also agreed to an order of restitution of at least $1.5 million to $7.3 million. *Id.* at 11. Additionally, he agreed to the forfeiture of his family home with whom he shares with his wife and children unless he is able to come up with $620,000 in cash not traceable to fraud proceeds no later than 60 days prior to the sentencing hearing. *Id.* at 13.

On January 27, 2026, the Probation Office issued its preliminary Presentence Investigation Report (PSR).

On April 9, 2026, undersigned counsel was admitted *pro hac vice* as lead counsel, substituting in for prior counsel.

On July 10, 2026, Dr. Ibrahim timely submitted his objections to the PSR, which were subsequently filed under seal on July 20, 2026.

The final PSR has not yet been issued, nor has sentencing been scheduled.

**MOTIONS TO WITHDRAW GUILTY PLEAS ARE TO BE LIBERALLY GRANTED**

"To be valid, a guilty plea must represent 'a voluntary and intelligent choice among the alternative courses of action open to the defendant,' and the defendant must 'possess[] an understanding of the law in relation to the facts.'" *Wilkins v. Bowersox*, 145 F.3d 1006, 1015 (8th Cir. 1998) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970) and *McCarthy v. United States*, 394 U.S. 459, 466 (1969)). Likewise, "[a] defendant must enter into a plea agreement and waiver knowingly and voluntarily for these agreements to be valid." *United States v. Andis*, 333 F.3d 886, 890 (8th Cir. 2003). "There are many ways in which a . . . [plea] agreement, or aspects of an agreement, could be entered into without the requisite knowledge or voluntariness. Examples include an agreement entered into upon ineffective assistance of counsel, or undue coercion." *Id.* (citation omitted).

Federal Rule of Criminal Procedure 11(d)(2)(B) provides that "[a] defendant may withdraw a plea of guilty . . . after the court accepts the plea, but before it imposes sentence if . . . the defendant can show a fair and just reason for requesting the withdrawal." "The fair and just standard is a liberal standard." *United States v. Sims*, 171 F.4th 1044, 1047 (8th Cir. 2026) (internal quotation marks and citation omitted). Accordingly, "motions to withdraw prior to sentence should be liberally granted." *United States v. Gonzalez*, 970 F.2d 1095, 1100 (2d Cir. 1992) (citing *United States v. Russell,* 686 F.2d 35, 38 (D.C. Cir. 1982)); *United States v. Colbert*, No. 4:19-CR-0166, 2022 U.S. Dist. LEXIS 21139, *8, 2022 WL 358254 (W.D. Mo. Feb. 7, 2022) (holding that the "'fair and just' standard is construed liberally"). Moreover, "a defendant seeking to withdraw a plea before sentencing is given a more liberal consideration than someone seeking to withdraw a plea after sentencing . . . ." *United States v. Prior*, 107 F.3d 654, 657 (8th Cir. 1997).

Factors a district court should consider when presented with such a request include "whether the defendant asserts his innocence of the charge, the length of time between the guilty plea and the motion to withdraw it, and whether the government will be

prejudiced if the court grants the motion." *United States v. Ramirez-Hernandez*, 449 F.3d 824, 826 (8th Cir. 2006) (internal quotation omitted). Additionally, "ineffective assistance of counsel during the plea process can serve as the requisite fair and just reason for withdrawal but only if defendant demonstrates both that his attorney's performance was deficient and that he was prejudiced by it." *United States v. Trevino*, 829 F.3d 668, 673 (8th Cir. 2016) (citation modified). "To show prejudice, [Dr. Ibrahim] must prove there was a reasonable probability that, but for his counsel's errors, 'he would not have pleaded guilty and would have insisted on going to trial.'" *United States v. Khalaf*, No. 23-2159, 2024 U.S. App. LEXIS 4297, *2, 2024 WL 765039 (8th Cir. Feb. 26, 2024) (quoting *United States v. Lawhorn*, 735 F.3d 817, 820 (8th Cir. 2013)). To be sure, Dr. Ibrahim expressly reserved the right to collaterally attack his conviction based upon ineffective assistance of counsel. ECF Doc. 842 at 14 (Plea Agreement).

**FAIR AND JUST REASONS FOR WITHDRAWAL**

*I. INEFFECTIVE ASSISTANCE OF COUNSEL*

For four years, Dr. Ibrahim did everything a client can do: he sent his lawyers the documents, wrote them the analyses, identified the records that would prove his account, and objected in writing to the terms he was ultimately advised to accept. Prior Counsels' files contain all of this, and yet there is no indication they ever used any of it.

*A. Dr. Ibrahim was Ready for Trial*

This case was going to trial. The Government served its witness list on March 22, 2024, for an eight-defendant trial beginning April 22; Dr. Ibrahim was in the caption and filed his own witness list. ECF Doc. 400. He stood three days from jury selection when the Court severed his case — not for any weakness in the defense, but because his lead counsel had become "indisputably and absolutely unavailable." ECF Doc. 475 at 1.

Then, on June 12, 2025, came a letter recommending a plea. The file contains no risk memorandum, no evidentiary assessment, and no analysis of any alternative. When Dr. Ibrahim asked about the possibility of pleading open to the indictment in order to

preserve his right to appeal and to litigate sentencing factors, the response was profane and the alternative went unexamined.

Sixteen days before the plea, Dr. Ibrahim wrote to his prior counsel that he was "not signing what was presented," i.e., the draft plea agreement. (Ex. 10 (client email, July 8, 2025).) While lawyers may change a recommendation, the Sixth Amendment does not permit a change with no reasoning behind it, nor may counsel summarily ignore a client's written objections to a draft plea agreement.

*B. What Prior Counsel Held and Never Used*

Prior counsel's file contained Dr. Ibrahim's defense. It held the Count 5 email — sent by the client twice in 2022, the second time labeled "Reference: Wire Fraud Count 5," with his written account of his place in the transmission chain. (Ex. 11.) The file held Dr. Ibrahim's May 2025 request made two months prior to the plea to "Subpoena PIQC. You will not see a single Claims Checklist signed by me." (Ex. 12.) No subpoena issued, and when the records surfaced, Dr. Ibrahim's prediction proved correct. *See supra* at 4. Counsel "has a duty to make reasonable investigations," *Strickland v. Washington*, 466 U.S. 668, 691 (1984), which prior counsel manifestly failed to do here. In fact, the file held the sworn testimony of the Government's own cooperating witness, and one which the Government referred to as a "vital witness": "I don't think he [Dr. Ibrahim] knew about the food program, sir." *United States v. Farah*, No. 22-CR-124, Trial Tr. Vol. XIII at 3134 (Ex. 13).

As a result of prior counsels' failure to undertake a competent investigation of the discovery or to actually address Dr. Ibrahim's objections and explanations, counsel switched course shortly prior to trial—possibly due to health reasons—and began pushing Dr. Ibrahim to accept a guilty plea. In that regard, it does not appear that prior counsel engaged in any meaningful negotiations regarding key provisions of the plea agreement and it shows. Prior counsel agreed to a loss range of $3.5 to $9.5 million but allowing the Government to argue that loss was up to $25 million, and did so without any

analysis of the scope of Dr. Ibrahim's own undertaking under USSG §1B1.3 despite the Government itself limiting Dr. Ibrahim's role "to June of 2021." ECF Doc. 957 at 31:6–13 (Change of plea hearing transcript). What is more, both counts of conviction ***post-date*** June 2021.

Quite tellingly, of 51 plea agreements of co-defendants reviewed, 49 fixed their loss amounts by agreement. The only other agreement to leave the loss bracket open, Anab Artan Awad's, combined the losses of two separate federal fraud cases and contains no Chapter 3 stipulation at all. Twenty-one obtained or expressly reserved a mitigating-role reduction, and the Government agreed to recommend a non-custodial or probationary sentence for five. These plea agreements are summarized in the table attached as Exhibit 14.

Most recently, the Government agreed to recommend a non-custodial sentence for Abdirahman Mohamud Ahmed, whose agreement states: "Because Mr. Ahmed was living in Ohio at the time, he did not directly or personally participate in preparing or submitting fraudulent meal reimbursement claims." Mr. Ahmed admitted only that he "deliberately was blind," and that he "simply kept his share of the profits, which totaled over $2.4 million," and he received a four-level minimal-participant reduction. *See* Plea Agreement, *United States v. Ahmed*, No. 22-cr-223 (14), ECF Doc. 882 at 3, 6, 8. There is no evidence that prior counsel researched the myriad of other favorable pleas or attempted in any way to use them as leverage in negotiating Dr. Ibrahim's plea agreement. Nor did counsel present any mitigation, particularly existing crucial mitigation deeply relevant to the issue of incarceration.[4]

The financial provisions tell the same story. Throughout the representation, Dr.

---

[4] Since the undersigned took over representation, he retained an expert to review Dr. Ibrahim's medical issues. (Ex. 19, Rich Decl.; Ex. 20, Rich C.V.). According to the expert, incarceration would pose a life-threatening risk to Dr. Ibrahim given his documented respiratory disease. Prior counsel never presented Dr. Ibrahim's documented medical conditions during plea negotiations.

Ibrahim explained to prior counsel — in writing repeatedly — that his work was real and that its value had to be accounted for in any resolution: the food he purchased and moved, the education his organization delivered, the consulting he performed. For fifteen months counsel held both the client's line-item accounting of the money and the Government's own forensic tracing of the same accounts but never even attempted to reconcile the two. (Ex. 15.) Eight days before the plea Dr. Ibrahim made the request explicit, tracing the equity in his family's home and asking counsel to "argue for offsets, as the value I provided." (Ex. 16 (client emails, July 16, 2025).)

Dr. Ibrahim then objected to the forfeiture terms—most especially the forfeiture of his family home—twice in writing, the second time the day before the plea. (Ex. 17.) No response resolved either objection — only counsel's report that the prosecutor seemed "unconcerned with how the government ultimately gets the money," with a stipulation to be pursued that never was. (Ex. 18 (Dooling email, July 20, 2025).) The plea went forward the next morning: a judgment of up to $7,324,412, against a Probation finding of approximately $2,000,000 "directly received" — already recovered through the seizures — and with the value of the client's work never once placed on the table.

*C. The Plea Was Not Knowing and Intelligent*

The factual basis recites the vocabulary of willful blindness — "deliberate steps to avoid learning," "closed his eyes to what should have been obvious," "no corrective action" — without any context. Indeed, it fails to set forth any actual facts underlying these assertions and so did not provide "sufficient evidence at the time of the plea upon which a court may reasonably determine that the defendant likely committed the offense." *United States v. Nelson*, 109 F.3d 1323, 1325 (8th Cir. 1997) (internal quotation marks and citation omitted). The factual basis does not identify any act of avoidance, blends in the language of negligence, and presumes a corrective power the regulations place in the sponsor and the State, not an enrichment provider. 7 C.F.R. §§ 226.16(d), 226.6. None of this was explained to Dr. Ibrahim, and a plea is intelligent only where the defendant

"possess[es] an understanding of the law in relation to the facts." *Wilkins*, 145 F.3d at 1015.

## *II. UNDISCLOSED EXCULPATORY EVIDENCE*

On the evening of April 20, 2021 — in the middle of the charged period — Hadith Ahmed sent Aimee Bock a private text message. Minutes earlier, Mr. Ahmed had written, "Dr Mahad sites. They think we submitted to MDE. How do we give them a transfer. ?" and Ms. Bock had answered, "Tell them I'll withdraw their application from MDE," "So they can just submit," and "Pin terminated so it will be all good." Mr. Ahmed then wrote: "Abdiaziz understands the situation and asked me to reschedule Saturday but I insisted to do it earlier. They when u asked to reschedule, I told Abdiaziz but Mahad doesn't know what we are up to. Mahad is eager for Ohio since he is moving there and getting married there." (Ex. 22 at 196–97.) Ms. Bock and Mr. Ahmed are defendants in related Feeding Our Future prosecutions — and Mr. Ahmed became the Government's cooperating witness at the first FOF trial.

The message is exculpatory on its face. Written in real time, in private, with no one to perform for, it distinguishes the informed circle — "I told Abdiaziz" — from the man kept outside it. It confirms what the surrounding record shows: the people running the scheme were using Dr. Ibrahim and his organization as an unwitting instrument, and they had every motive to keep him in the dark because his value to them was a real program run by a man who did not know what they were doing with it. At any trial, this message — from the Government's own cooperator, agreeing with his own later sworn testimony that "I don't think he knew about the food program, sir" (Farah Trial Tr. Vol. XIII at 3134 (Ex. 13)) — would have been powerful evidence on the only contested element of both counts: Dr. Ibrahim's knowledge.

There is no question the message is authentic, because the Government itself used this same thread at Ms. Bock's trial:

| **The Government's own use of this thread** | **Citation** | **The defense copy (Ex. 21)** |
|---|---|---|
| Exhibit BB-40a — an eight-page excerpt of this thread — admitted without objection | *Bock* Trial Tr. Vol. XIII at 2849 (Ex. 22) | Same conversation, Ex. 21 at 85–93 |
| Ms. Bock authenticated it under oath: "text messages between myself and Hadith Ahmed" — and read from it | *Bock* Trial Tr. Vol. XVIII at 3973 (Ex. 22) | The message she read appears in Ex. 21 at 93 |
| Government's sentencing memorandum displays "We may have become the mob" at 10:20:13 p.m. | *Bock*, Doc. 875 at 13 | Identical message, device time 4:20:13 AM UTC — the same instant, to the second |
| Case agent, on cross, places a second message at "a little after 8:00 p.m." | *Bock* Trial Tr. Vol. XIII at 3010 (Ex. 22) | Identical message, 8:22:48 p.m. Central — again to the second |
| Fifty messages read into the trial record | *Bock* Trial Tr. Vol. XIII at 2889–95, 2924–27, 3004–10 (Ex. 22) | All fifty appear verbatim, in the same order |

The defense obtained its copy independently of any Government production — a fact the Government can confirm in minutes against the original extraction it holds — and the complete copy is tendered for exactly that comparison. To dispute it, the Government would have to dispute its own exhibit, its own witness, and its own filings. ***Yet the Government never produced this thread to Dr. Ibrahim.*** Not when Mr. Ahmed was named witness No. 71 for the April 2024 trial at which Dr. Ibrahim stood three days from a jury, *see supra* Part I.A — the point at which a trial defendant's entitlement to exculpatory material about the Government's witnesses is bedrock — and, as far as counsel can tell, not at any time since, in any discovery production. If the Government believes otherwise, it need only identify the Bates range, and this section is withdrawn. What the Government did produce was the other half of the same man's record: his 2022 interview reports, containing the adverse speculation he offered while negotiating his own plea.

Thus, a defendant deciding whether to plead guilty to a knowledge offense was given only the adverse half of his accuser's record.

Had Dr. Ibrahim gone to trial, this evidence could not have stayed hidden — once Mr. Ahmed was listed as a witness, *Giglio* would have compelled its production, and his cross-examination would have run through it. The guilty plea was the only proceeding in which it could remain concealed. Dr. Ibrahim answered every question at that plea truthfully, on what he then knew; the Court's finding that his plea was knowing was correct on the record before it. The record was incomplete — and the party that made it incomplete is the party now holding him to it. That is a fair and just reason for withdrawal, whatever the outer bounds of *Ruiz*.

*III. INTERVENING CHANGES IN SENTENCING LAW*

*A. Hunter v. United States*

Dr. Ibrahim's plea agreement contains an appellate waiver. ECF Doc. 842 at 13-14. The waiver encompasses Dr. Ibrahim's "right to appeal [his] guilt or innocence, any issues relating to the negotiation, taking or acceptance of the guilty plea, the sentence imposed or any issues that relate to the calculation of the Guidelines range, the supervised-release term and conditions imposed, any restitution obligations, and the constitutionality of the statutes to which the defendant is pleading guilty." *Id.* at 14. The only exceptions to the appellate waiver are "an appeal by defendant of the substantive reasonableness of a term of imprisonment above the top of the Guidelines range, and an appeal by the government of the substantive reasonableness of a term of imprisonment below the bottom of the Guidelines range." *Id.* Thus, while the Government has reserved the right to appeal the imposition of any downward variance—something which occurs in the majority of sentencings under USSG §2B1.1, Dr. Ibrahim may only appeal an upward variance—an exceedingly rare occurrence.[5] So rare that this reservation of appellate rights is

[5] According to U.S. Sentencing Commission statistics, in fiscal year 2025, there were 4,803 individuals sentenced under USSG §2B1.1. Excluding the 677 individuals receiving a downward departure pursuant to USSG §5K1.1, over half (51.7% or 2,133 individuals) received

effectively a nullity.

This appellate waiver is facially unenforceable as it violates due process. Recently, the Supreme Court reviewed the enforceability of appellate waivers. In *Hunter v. United States*, __ U.S. __, 146 S. Ct. 1702 (2026) (8-1), the Court held that appellate waivers are unenforceable when doing so would result in a miscarriage of justice. *Id.* at 285. In acknowledging that "[t]he nature of the miscarriage-of-justice limit precludes any attempt to list all the situations in which it will overcome an appeal waiver," the Court helpfully provided some non-exclusive examples of types of errors that "would bring the judiciary into disrepute" should review of them be precluded by an appellate waiver. *Id.*

First, the Court noted that an "appeal [of] a sentence exceeding what the relevant statute allows" will categorically meet the miscarriage-of-justice standard. *Id.* Thus, as the appellate waiver does not expressly exempt such a sentence from the waiver, any sentence imposed in excess of the relevant statutory maximum renders the waiver unenforceable.

"Second, a defendant may appeal a sentence that is infected with a blatant constitutional error, such as when a judge takes account of a constitutionally impermissible factor (like race) or imposes a constitutionally infirm condition of supervised release (like barring a defendant from becoming pregnant)." *Id.* As discussed in Part IV below, there is more than a theoretical risk of such constitutional error infecting these proceedings. The President and senior officials in the Department of Justice have regularly impugned the Somali community of this District—including its U.S. Representative—as if merely being Somali constitutes a crime. At the risk of stating the obvious, Dr. Ibrahim is an American-born Somali.[6] While that fact should be irrelevant to these proceedings, it is

---

a downward variance or departure whereas just 13 (0.3%) received an upward departure. U.S. Sentencing Comm'n, *2025 Sourcebook of Federal Sentencing Statistics* tbl. 32, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2025/Table32.pdf.

[6] Although it is now questionable whether this Administration will continue to acknowledge his citizenship based upon its assault on birth-right citizenship inasmuch as Dr.

not. Indeed, as also discussed in Part IV below, it could result in Dr. Ibrahim serving a custodial sentence under far more onerous conditions than non-Somali defendants. As the waiver ostensibly covers such situations, it is unenforceable for this reason as well.

"[T]hird, a defendant may appeal if his sentence was imposed without some minimum of civilized procedure." *Id.* (internal quotation marks and citation omitted). Again, the appellate waiver's broad swath would preclude an appeal on grounds stated above. All this is to say, as the waiver is manifestly unenforceable, Dr. Ibrahim should be permitted to withdraw his guilty plea pursuant to the plea agreement.

### B. *Ellingburg v. United States*

The plea agreement provides that "[t]he parties agree that the defendant owes restitution in an amount that does not exceed $7,324,412 and that is not less than $1,500,000." ECF Doc. 842 at 11. That provision violates due process as the amount of restitution was not alleged in the indictment.

On January 20, 2026, the Supreme Court issued a unanimous opinion in *Ellingburg v. United States*, 607 U.S. 163 (2026), holding that "[r]estitution under the MVRA is plainly criminal punishment for purposes of the Ex Post Facto Clause." *Id.* at 166. The Court reversed the Eighth Circuit's prior holding that restitution was merely civil in nature.

Notably, the Government agreed with the petitioner that restitution was not a civil penalty but was, in fact, a criminal punishment. As a result, the Supreme Court appointed amicus to argue that restitution was civil in nature.[7] Amicus argued in its brief that if restitution is a criminal penalty, then the Sixth Amendment applies to it such that the amount of restitution is an element of the offense and therefore would have to be charged in the indictment and either admitted by the defendant or found by a jury. According to amicus

Ibrahim's parents are Somali emigrees and United States Naturalized Citizens.

[7] *See Ellingburg v. United States*, 24-842, dkt. entry of May 15, 2025, https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/24-482.html.

in *Ellingburg*,

> the "Sixth Amendment reserves to juries the determination of any fact, other than the fact of a prior conviction, that increases a criminal defendant's maximum potential sentence." *S. Union Co. v. United States*, 567 U.S. 343, 346 (2012). The Court has applied that rule "to criminal fines," and thus juries must "find beyond a reasonable doubt facts that determine [a] fine's maximum amount." *Id.* at 346, 350. If MVRA restitution were also deemed criminal punishment, the same rule would presumably apply. And because the MVRA requires judges to find by a preponderance of the evidence facts that increase the maximum amount of restitution, 18 U.S.C. § 3664(e), MVRA restitution would violate the Sixth Amendment were it criminal punishment. . . .

Brief of *Amicus Curiae* ISO Judgment Below, *Ellingburg v. United States*, No. 24-482, Aug. 22, 2025, at 30-31 (emphasis added).[8]

Indeed, as Justice Thomas observed in his concurrence in the seminal sentencing case of *Apprendi v. New Jersey*, "[c]ases from the founding to roughly the end of the Civil War establish . . . the common-law understanding that a fact that is by law the basis for imposing or increasing punishment is an element [of an offense]." *Apprendi v. New Jersey*, 530 U.S. 466, 501-502 (2000) (Thomas, J., concurring). Accordingly, "***[v]alue was an element because punishment varied with value***." *Id.* at 503 (emphasis added).

Moreover, Justice Gorsuch more recently argued directly in favor of applying the Sixth Amendment to determinations of restitution. As he explained,

> as long ago as the time of Henry VIII, an English statute entitling victims to the restitution of stolen goods allowed courts to order the return only of those goods mentioned in the indictment and found stolen by a jury. In America, too, courts held that in prosecutions for larceny, ***the jury usually had to find the value of the stolen property before restitution to the victim could be ordered.*** And it's hard to see why the right to a jury trial should mean less to the people today than it did to those at the time of the Sixth and Seventh Amendments' adoption.

*Hester v. United States*, 586 U.S. 1104, 1107 (2019) (Gorsuch, J., joined by Sotomayor,

---

[8] Available at , https://www.supremecourt.gov/DocketPDF/24/24-482/370519/20250822142119142_Brief%20of%20court-appointed%20amicus%20ISO%20of%20judgment%20below.pdf.

J., dissenting from denial of *certiorari*) (emphasis added; citations omitted).

Thus, "[o]nce we recognize restitution as being a 'criminal penalty' the proverbial *Apprendi* dominoes begin to fall. . . . [I]t dictates a conclusion that the district court's order imposing a restitution amount violates the Sixth Amendment's jury guarantee because . . . [the] amount was based upon facts not admitted to by [Dr. Ibrhaim] or found by a jury beyond a reasonable doubt." *United States v. Carruth*, 418 F.3d 900, 906 (8th Cir. 2005) (Bye, J., dissenting).

In light of *Ellingburg*, therefore, the current manner in which restitution is imposed is almost certainly unconstitutional. Since restitution is a criminal penalty for purposes of the Ex Post Facto clause, it must be for all purposes and so Sixth Amendment protections apply. This then requires that the amount of restitution should have been alleged in the indictment as it is an element of the offense.

One rather obvious objection, though, is that *Apprendi* held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." As there is no statutory maximum to restitution, then *Apprendi* and the Sixth Amendment cannot apply, or so the objection goes. But as Justice Gorsuch, joined by Justice Sotomayor, has pointed out in rebuttal to precisely that argument, "the statutory maximum for restitution is usually zero, because a court can't award any restitution without finding additional facts about the victim's loss. And just as a jury must find any facts necessary to authorize a steeper prison sentence or fine, it would seem to follow that a jury must find any facts necessary to support a (nonzero) restitution order." *Hester v. United States*, 586 U.S. 1104, 1106 (2019) (Gorsuch, J., dissenting from denial of certiorari; Sotomayor, J., joining).

As Justice Gorsuch reiterated just last year:

> Consistent with the Sixth Amendment's promise of a trial by jury, this Court has held that "[o]nly a jury may find 'facts that increase the prescribed range of penalties to which a criminal defendant is exposed.'" That means a jury must find both those facts that increase a criminal defendant's exposure to

> imprisonment and any facts that increase his exposure to monetary fines. If all that is true, it is difficult to see how a judge's factual findings might suffice to increase a criminal defendant's exposure to a restitution award.

*Rimlawi v. United States*, _ U.S. _, 145 S. Ct. 518, 518 (2025) (Gorsuch, J., dissenting from denial of certiorari) (citations omitted); *see also United States v. Leahy*, 438 F.3d 328, 339 (3d Cir. 2006) (en banc) (McKee, J., concurring in part and dissenting in part; Rendell, Ambro, Smith and Becker, JJ., joining) ("I do not agree that a judge can determine the amount of restitution under either the Mandatory Victims Restitution Act ('MVRA'), 18 U.S.C. § 3663A, or the Victim Witness Protection Act ('VWPA'), 18 U.S.C. § 3663, without violating the Sixth Amendment.").

As the restitution provision of Dr. Ibrahim's plea agreement is likely unconstitutional, this Court should allow him to withdraw his guilty plea.

*C. The Forfeiture Provision is Likely Unconstitutional*

The plea agreement requires Dr. Ibrahim to forfeit nearly $2.75 million in cash and his home, which is currently valued at $1.1 million. ECF Doc. 842 at 12. Thus, Dr. Ibrahim is required to forfeit over $3.8 million in total assets. However, the plea agreement also requires the entry of a money judgment against Dr. Ibrahim of up to $7,324,412. *Id.* at 13. While he will receive credit for the value of the forfeited assets—all of which have already been ordered forfeited, ECF Doc. 971—if a money judgment is issued for the full amount permitted, Dr. Ibrahim will still owe over $3.5 million.

The $7,324,412 amount allegedly "represents the amount of proceeds [Dr. Ibrahim] obtained from the wire fraud schemed alleged in [the] Superseding Indictment." *Id.* There is, in fact, zero evidence to support such an amount, and it was therefore manifest ineffective assistance of counsel for his prior counsel to negotiate such a financially devastating resolution. Indeed, the draft PSR states only that Dr. Ibrahim "directly received approximately $2,000,000 of fraudulently-obtained federal funds." PSR at 28, ¶. Thus, those proceeds already have been disgorged by the seizure of Dr. Ibrahim's bank accounts alone.

In all events, notwithstanding the lack of factual basis and facial contradiction contained in the plea agreement's forfeiture provision, it also is likely unconstitutional. As the Eighth Circuit has long held, "[t]he Eighth Amendment prohibits the government from imposing excessive fines. The Supreme Court has plainly announced that criminal forfeiture . . . is clearly a form of monetary punishment no different, for Eighth Amendment purposes, from a traditional fine. Thus, courts must engage in a fact-intensive analysis under the Eighth Amendment Excessive Fines Clause to ensure that the forfeiture is not an excessive penalty." *United States v. Bieri*, 68 F.3d 232, 236 (8th Cir. 1995) (internal quotation marks and citation omitted).

At the time of *Bieri*, the Eighth Circuit observed that "the Supreme Court has declined to establish a multifactor test for determining when a fine is unconstitutionally excessive." *Id.* That is about to change. On July 20, 2026, the Supreme Court granted *certiorari* to *Jouppi v. Alaska*, 25-246. The petitioner frames the issue as follows:

> This case presents a threshold question concerning the standard for whether a fine or forfeiture contravenes the Eighth Amendment's Excessive Fines Clause. For over a decade, the State of Alaska has been trying to forfeit bush pilot Ken Jouppi's 1969 Cessna airplane. The basis: One of Jouppi's passengers had beer in her luggage, and the State maintained that one six-pack, at least, would have been visible to Jouppi. For certain Alaskan villages, it's a crime to bring in alcohol. And when the means of importation is an airplane, the plane is subject to forfeiture. No matter that the offense is a misdemeanor. As here. No matter that the pilot is a first-time offender. As here. No matter that the alcohol is a six-pack of Budweiser. As here. No matter that it belonged to a customer. As here. The result: an airplane forfeited for a six-pack.
>
> The Excessive Fines Clause was built for cases like this.
>
> In holding otherwise "as a matter of law," the Alaska Supreme Court broke with this Court's precedent and with that of many lower courts. "[A] punitive forfeiture," this Court has held, "violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).

Pet. for a Writ of Certiorari, *Jouppi v. Alaska* 1 (Aug. 29, 2025).[9]

The Excessive Fines Clause was built for cases like Dr. Ibrahim's as well. The facially excessive forfeiture provision of the plea agreement is the functional equivalent of "an airplane forfeited for a six-pack." This Court should therefore grant the instant motion and permit him to withdraw his guilty plea.

[INTENTIONALLY LEFT BLANK]

[9] Available at https://www.supremecourt.gov/DocketPDF/25/25-246/373224/20250829124919814_Jouppi%20v.%20State%20-%20Petition.pdf.

## *IV. THE PRESIDENT'S ASSAULT ON SOMALIS AND THE ATTORNEY GENERAL'S WEAPONIZATION OF PRISON PLACEMENT*

**Donald J. Trump**
@realDonaldTrump · December 31, 2025, 10:55 AM
Original Post

Much of the Minnesota Fraud, up to 90%, is caused by people that came into our Country, illegally, from Somalia. "Congresswoman" Omar, an ungrateful loser who only complains and never contributes, is one of the many scammers. Did she really marry her brother? Lowlifes like this can only be a liability to our Country's greatness. Send them back from where they came, Somalia, perhaps the worst, and most corrupt, country on earth. MAKE AMERICA GREAT AGAIN!!!

**Donald J. Trump**
@realDonaldTrump · January 31, 2026, 8:21 AM
Original Post

The Theft and Fraud in Minnesota is far greater than the 19 Billion Dollars originally projected. The Biden Administration knew this FRAUD was happening, and did absolutely nothing about it. "Scammer" Illhan Omar and her absolutely terrible friends from Somalia should all be in jail right now or, far worse, send them back to Somalia. "Governor" Waltz is either the most CORRUPT government official in history, or the most INCOMPETENT. Even a very low IQ person, of which there are many, should have known what was going on in Minnesota!!! President DJT

**Aaron Rupar** @atrupar
Subscribe

Trump: "Somalia, it's a beautiful place. It's got no anything. It's got one thing that's really strong -- crime. All they do is run around shooting each other. It's filthy dirty, disgusting dirty. It's a horrible place. They come here, and Ilhan Omar, she heads it. She married her brother. I would imagine they're looking at her. Isn't she despicable? We ought to get those people the hell out of our country."




4:31 PM · May 1, 2026 · **3.7M** Views


Donald J. Trump
@realDonaldTrump · October 8, 2026, 4:30 PM

The once Great State of Minnesota is being taken over by Somali Immigrants. There is Violence, Murder, and Mayhem all over the State. The people of Minnesota must fight back. You have been robbed, and abandoned by your State Government. Your Governor is an incompetent thief who doesn't want to get involved. He just wants to get out of town with as much as he can steal, and then, lead a quiet life. The Somalians should not be allowed to get away with what they are doing. They view you as weak and stupid people. Fight back Minnesota, fight back! If you need, the Federal Government will come to your rescue.Governor Tim Walz, and Mayor of Minneapolis, Jacob Frey, must immediately ask for Federal help — and leave the rest to us! President DONALD J. TRUMP

The President's continuing, sustained indiscriminate attacks on Somalia and Somalis—whether citizens, immigrants or even a sitting member of Congress[10]—is outrageous and reprehensible. These attacks represent a significant threat to Dr. Ibrahim's due process. This is not speculative, as the recent raid on Rep. Ilhan Omar's home starkly illustrates.[11] The President utilized the vast resources of the federal government when, earlier this year, he sent ICE into this District to threaten, intimidate and deport Somalis, which resulted in the deaths of two U.S. citizens and bodily injury to many others as well as property damage.  So outrageous was this conduct that it resulted in the mass resignation of the bulk of line prosecutors in the U.S. Attorney's Office for this District including many assigned to this case and related cases.[12] The President's politicization of the

---

[10] *See* Alanna Dukin Richer and Eric Tucker, AP, "Agents search Rep. Omar's Washington home in criminal probe as she vows she won't 'be silenced'," Oct. 12, 2026, available at https://apnews.com/article/ilhan-omar-home-searched-8e18c2aea948bd90f4d7a4eb32b9ec3a. "Omar, an outspoken critic of President Donald Trump, said she was being targeted as one of the Republican's 'political enemies.'. . . 'For ten years, Trump has targeted me with baseless lies and smear campaigns. This is just the latest escalation in his campaign of political intimidation,' she said. 'I will not be silenced.'" *Id.*

[11] *See id.*

[12] Jeff Day, et al, The Minnesota Star Tribune, "Mass resignation at Minnesota U.S. Attorney's Office stems from Renee Good shooting, investigation," Jan. 13, 2026, available at https://www.startribune.com/joe-thompson-us-attorney-who-uncovered-massive-fraud-in-minnesota-resigns-from-office/601563206.

prosecutions of Somalis thus represents a real and imminent threat to Dr. Ibrahim's due process, most especially with respect to post-sentencing proceedings.

Indeed, quite recently, Attorney General Todd Blanche announced an unprecedented policy change to the long-standing procedure utilized by the Bureau of Prisons ("BOP") when designating defendants to institution for service of the custodial part of their sentences. According to this new policy, the Attorney General, at his whim, may override any designation decision of the BOP and place any defendant wherever he pleases. This too is not speculative.

Shortly before President Biden left office, he commuted the death sentences of nearly all individuals on federal death row. Shortly after taking office, in an overtly political move devoid of any penological purpose, President Trump announced that such prisoners should serve their sentences under the worst conditions possible.[13] Accordingly, the Attorney General at the President's behest redesignated all these inmates to USP Florence ADMAX, the highest security facility and most restrictive of any BOP institution in the nation.[14] In light of the President's sustained vitriol against those of Somali descent, it is eminently foreseeable that he will politicize Dr. Ibrahim's prison designation should he receive a custodial sentence. While normally Dr. Ibrahim could expect any custodial sentence to be served at a minimum security camp, the President could very well direct the Acting Attorney General to require Dr. Ibrahim and other co-defendants of Somali origin to serve their sentences in much higher security facilities where they would face much more onerous conditions of confinement.

The President's unremitting hatred toward the Somali defendants in this case and

---

[13] Executive Order 14164 of January 20, 2025, "Restoring the Death Penalty and Protecting Public Safety," 90 FR 8463, available at https://www.federalregister.gov/documents/2025/01/30/2025-02012/restoring-the-death-penalty-and-protecting-public-safety.

[14] Hayley Bedard, Death Penalty Information Center, "Federal Government Says It Will Transfer Former Federal Death-Sentenced Prisoners to Supermax Prison Within Weeks," Feb. 10, 2026, available at https://deathpenaltyinfo.org/federal-government-says-it-will-transfer-former-federal-death-sentenced-prisoners-to-supermax-prison-within-weeks

those of Somali descent generally, as well as his politicization of the prison designation process places Dr. Ibrahim's (ineffectively counseled) decision to plead guilty in a wholly different light, for the ramifications of his plea are far more onerous now than they were at the time he elected to plead guilty. Accordingly, this Court should grant the instant motion to give Dr. Ibrahim the opportunity to fully vindicate himself at trial.

**CONCLUSION**

Dr. Ibrahim's plea agreement is the result of ineffective assistance of counsel. It is rife with factually unsupportable concessions, provides an insufficient factual basis, and otherwise contains unconstitutional provisions. Dr. Ibrahim is, in fact, innocent of the conduct to which he pleaded guilty; a guilty plea that came at the behest of his prior counsel. As his guilty plea was based on this woefully unconstitutional plea agreement, for the reasons set forth above, this Court should grant the instant motion and permit Dr. Ibrahim to withdraw his guilty plea.

WHEREFORE, in light of the above, Dr. Ibrahim respectfully requests that this honorable Court grant the instant motion and permit him to withdraw his guilty plea.

RESPECTFULLY SUBMITTED,

Dated: October 15, 2026.

DOUG PASSON

/s/ DOUG PASSON

Attorney for Defendant
MAHAD IBRAHIM

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2026, the foregoing DEFENDANT'S MOTION TO WITHDRAW GUILTY PLEA was filed electronically and a copy was served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Doug Passon______________
DOUG PASSON